UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DUNKIN' DONUTS INCORPORATED and DUNKIN' DONUTS USA, INC., : Plaintiffs, : v. : 4 DONUTS, INC., GRANDO, INC., GLENN STETZER, KATHLEEN STETZER, GEORGE GERMANO, and JAMES MCMANAMA, : Defendants. | CIVIL ACTION NO. 3:02 CV 1920 (MRK) OCTOBER 28, 2003 |

## DEFENDANTS 4 DONUTS, INC., GRANDO, INC. AND GLENN STETZER'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INTERROGATORY ANSWERS

Defendants 4 Donuts, Inc. ("4 Donuts"), Grando, Inc. ("Grando"), and Glenn Stetzer (collectively, the "defendants") respectfully submit this memorandum in support of their motion to compel plaintiffs Dunkin' Donuts Incorporated and Dunkin' Donuts USA, Inc. to answer Interrogatory Nos. 1 and 3 and produce documents in response to Request No. 3 of defendants' Second Set of Interrogatories and Second Request for Production of Documents dated August 6, 2003.

### BACKGROUND

On August 6, 2003, defendants served on plaintiffs a Second Set of Interrogatories and a Second Request for Production of Documents. Plaintiff Dunkin' Donuts Incorporated responded on September 9, 2003 largely by objecting to defendants' interrogatories and document requests. A copy of each of these responses is attached as **Exhibits A** and **B**, respectively. By letter dated September 19, 2003, a copy of which is attached as **Exhibit C**, counsel for defendants wrote to

counsel for plaintiffs in an attempt to persuade plaintiffs to respond appropriately to the requests. On September 30, 2003, counsel for plaintiffs responded, settling some, but not all, of the issues raised. A copy of this letter is attached as **Exhibit D**. Defendants replied on October 6, 2003 and plaintiffs also supplemented their earlier reply on October 6, 2003. A copy of each of these letters has been attached hereto as **Exhibits E** and **F**, respectively.

Despite this exchange of correspondence, the parties were unable to reach agreement on certain issues, forcing defendants to file this motion to compel plaintiffs to respond to the interrogatories and document requests listed below. In general, defendants seek the following discovery: (i) identification of the names of persons plaintiffs contend were working illegally in defendants' shops; (ii) identification of other Dunkin' Donuts' franchisees who also conduct catering businesses, a description of such catering services, and a description of Dunkin' Donuts' reaction to their catering businesses; and (iii) production of Dunkin' Donuts' Loss Prevention Underreporting Manual that governed plaintiffs' surreptitious investigation of defendants' business operations.

## ARGUMENT

### POINT I

### THE COURT SHOULD ORDER PLAINTIFFS TO ANSWER INTERROGATORIES AND PRODUCE DOCUMENTS CONCERNING THEIR CLAIMS AGAINST DEFENDANTS

Plaintiffs' objections to defendants' discovery requests have hampered defendants' ability to prepare their defense of this action. For the following reasons, the Court should order plaintiffs to answer Interrogatory Nos. 1 and 3 and produce all documents responsive to Document Request No. 3.

**Interrogatory No. 1**: Identify each employee that plaintiffs contend was a foreigner working illegally in any of the franchises operated by the defendants.

**Plaintiffs' Answer**: Dunkin' objects to this Interrogatory on the grounds that it calls for information that is subject to the attorney-client privilege and the work product doctrine. Subject to and without waiving its objections, Dunkin' states that the answer to this Interrogatory may be derived or ascertained from Defendants' general ledgers and banking records, and the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served. Fed. R. Civ. P. 33(d). Further answering, Dunkin' states that its investigation of this issue is continuing and it will provide a supplemental answer if necessary.

Although there does not appear to be an express claim in the Complaint that defendants have breached their franchise agreements by hiring illegal foreigners, plaintiffs' counsel have asked a number of deponents questions about the nationality and work status of a number of people who have worked for defendants. As a result, defendants served this interrogatory to learn the identity of each person who plaintiffs contend was a foreigner working illegally.

Plaintiffs' objections to this interrogatory are inappropriate for a number of reasons. Plaintiffs' objection on the grounds of attorney-client privilege and work product doctrine is misplaced because this is a contention interrogatory under Rule 33(c) of the Federal Rules of Civil Procedure, which provides that an interrogatory is "not necessarily objectionable merely because an answer to the interrogatory involves an opinion or contention that relates to fact or the application of law to fact . . . ."

Because this is a contention interrogatory, defendants were not requesting any attorney-client privilege or work product doctrine information, but rather were asking whether the plaintiffs were claiming that the defendants have hired illegal aliens and, if so, to identify the employees who plaintiffs contend were illegal aliens working for the defendants.

Plaintiffs also improperly refer to defendants' own documents, stating: "the answer to this Interrogatory may be derived or ascertained from Defendants' general ledgers and banking

3

records . . . ." Federal Rule 33(d), however, requires that plaintiffs specify which documents plaintiffs are referring to "in sufficient detail to permit the interrogating party to locate and identify, as readily as the party served, the records from which the answer may be ascertained."

The interrogatory asked only for the names of foreigners that <u>plaintiffs contend</u> were working illegally. Consequently, an inspection by defendants of their own records might reveal foreigners but would not reveal which foreigners plaintiffs contend have worked illegally for defendants.

If, on the other hand, plaintiff had not found any evidence of foreigners working illegally from defendants' general ledgers and banking records, then plaintiffs should state this in their answer.

Plaintiffs also state that their investigation is continuing and that they will supplement their answer if necessary. Such a statement is also inappropriate because discovery is almost completed and plaintiffs should, therefore, be required to answer with respect to their contention. Once again, if plaintiffs are not aware of any foreigner working illegally in any of the franchises, they should state this in their answer.

**Interrogatory No. 3**: **Identify each franchisee (other than defendants) in the Dunkin' Donuts system that has provided "catering" as described in Paragraph 39 of the Complaint and, for each such franchisee, describe the catering services provided, the dates such services were provided, and the actions taken by plaintiffs or Allied Domecq with regard to such catering services.**

**Answer**: **Dunkin' objects to this Interrogatory on the grounds that it is vague, overly broad and unduly burdensome. Dunkin' also objects to this Interrogatory on the grounds that it calls for information that is subject to the attorney-client privilege and the work product doctrine. Dunkin' further objects to this Interrogatory on the grounds that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.**

Plaintiffs first object to this interrogatory on the grounds that it is vague. This interrogatory, however, simply seeks the identity of other franchisees who have provided

4

catering services and whether plaintiffs deemed such services in those cases to constitute breaches of the standard franchise agreement. The request is not vague because it defines "catering" by referring to the plaintiffs' own definition of "catering" in their Complaint. The interrogatory also asks for specific information regarding other franchisees who conducted catering services. It is hard to imagine how the interrogatory could have been made more clear.

Plaintiffs also object on the ground that the interrogatory is "overly broad and unduly burdensome." If the interrogatory is overly broad and unduly burdensome, it is only because the provision of catering services is widely prevalent in the Dunkin' Donuts' system and has continued without plaintiffs' reprimand of other franchisees or termination of their franchises, making such information highly relevant to defendants' defense that plaintiffs have terminated their franchises because of a vendetta stemming from a previous lawsuit and plaintiffs' stated reasons for termination, such as performance of catering services, are merely pretexts.

Plaintiffs' objection that this interrogatory seeks irrelevant information is off-base for another reason, as well. Plaintiffs claim that by providing catering services, defendants have breached Section 8.A.3 or 8.0.3. of the franchise agreements. Complaint ¶ 56. The issue, therefore, is whether this section, which does not use the word "catering," prohibits defendants from providing catering services.

If other franchisees provide catering services and plaintiffs have not objected, this would be strong evidence that plaintiffs have interpreted section 8.A.3. to allow catering. It also would support defendants' claim that plaintiffs brought this lawsuit as a vendetta against Glenn Stetzer, because plaintiffs would be bringing a claim that is inconsistent with their actions toward other franchisees.

Furthermore, despite plaintiffs' claims to the contrary, there is strong legal support for the relevance of this information. The Second Restatement of Contracts states that standardized agreements are "interpreted wherever reasonable as treating alike all those similarly situated." Restatement 2d of Contracts §211(2). The franchise agreements signed by defendants were standardized agreements. The language contained in sections 8.A.3 or 8.O.3. of defendants' franchise agreements must be the same or similar to language used in every Dunkin' Donuts franchise agreement. Dunkin' Donuts franchisees that conduct catering businesses are, therefore, "similarly situated" to defendants. Because the franchise agreements will be interpreted as treating all these franchisees alike, the information regarding Dunkin' Donut's interpretation of the same franchise agreement with respect to other franchisees becomes extremely relevant.

It is also black-letter law that the relevant inquiry when interpreting a contract is "the meanings attached by each party *at the time the contract was made*." E. Allen Farnsworth, Farnsworth on Contracts § 7.9 (2d Edition 2001) (emphasis added). The meaning attached by the plaintiffs to sections 8.A.3. and 8.O.3. at the time the franchise agreements were made can best be assessed by seeing how the plaintiffs interpreted the same or similar language with other franchisees.

Plaintiffs also object on the grounds that the names of franchisees performing catering services and the actions Dunkin' took in regard to those catering services are protected by the attorney-client privilege. The elements of the privilege are: "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the

Case 3:02-cv-01920-MRK   Document 116   Filed 10/29/2003   Page 7 of 14

protection be waived." <u>United States v. Int'l Brotherhood of Teamsters</u>, 119 F.3d 210, 214 (2d Cir. 1997).

The identity of franchisees performing catering services and plaintiffs' response to those services are facts, not communications between an attorney and client regarding legal advice. It is fundamental that the attorney-client privilege protects only legal advice, not facts. <u>In Re Six Grand Jury Witnesses</u>, 979 F.2d 939, 944-45 (2d Cir. 1992). Therefore, plaintiffs cannot shield these facts behind the attorney-client privilege.

Similarly, the work-product doctrine also does not protect these facts. The work-product doctrine "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial." <u>In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002</u>, 318 F.3d 379, 383 (2d Cir. 2003). None of the information requested could have been prepared in anticipation of litigation because the information is strictly factual, like the number of Dunkin' Donuts franchisees or the number of donuts sold by Dunkin' Donuts in a day, and such facts exist without preparation by counsel in anticipation of litigation.

Plaintiffs' claim of protection under the work-product doctrine also conflicts with their objection that this request was overly broad and unduly burdensome, since plaintiffs' claim of work-product protection assumes that they have already gathered the information.

Even assuming that plaintiffs have a viable claim of work-product protection, plaintiffs should still be required to respond to this interrogatory pursuant to Rule 26(b)(3). This information is crucial to defendants' defense of the catering charge. Without it, defendants will be forced into a debate over the meaning of the terms in section 8.A.3. This information is also non-public and in the sole control of plaintiffs, and is, therefore, undiscoverable by other means by the defendants. For these reasons, even if the court found the information protected by the

AVHCT:10120.2  10/28/03 2:19:14 PM

work-product doctrine, the court should order plaintiffs to respond to this interrogatory pursuant to Rule 26(b)(3).

In plaintiffs' letter of September 30, 2003 to defendants (Exhibit D), plaintiffs cited a number of cases for the proposition that "evidence concerning the relationship between franchisors and franchisees other than the ones that are at issue in a particular case" is "completely irrelevant to this action." Exhibit D at 2. These cases are not on point. In The Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd., 970 F.2d 273 (7th Cir. 1992), the defendants admitted they had breached the franchise agreement, but argued that the franchisor had not always terminated franchisees who breached the franchise agreement. The court stated that the franchisor's leniency to other franchisees was not relevant given that the defendants admitted to having repeatedly breached the contract. Id. at 279.

Here, by contrast, the issue is one of contractual interpretation to determine whether the franchise agreements have been breached at all. Defendants' interrogatory goes to the issue of how the plaintiffs have interpreted a clause in the franchise agreement with other franchisees, not whether plaintiffs have been lenient with other franchisees. Moreover, defendants deny they have breached the franchise agreements.

Smith v. Dowson, 158 F.R.D. 138 (D. Minn. 1994), was an action for false arrest under 42 U.S.C. § 1983. The court merely stated that "subsequent investigations" by the police officers were irrelevant to whether "a particular arrest and detainer was without probable cause." Id. at 141.

Hall v. Harleysville Ins. Co., 164 F.R.D. 172 (E.D. Pa. 1995), dealt with a document request by the plaintiffs for the names of people whose credit reports were pulled by defendants so that plaintiffs could learn about "other lawsuits, claims or notices lodged" against the

defendants. The court found that this document request was improper, but stated: "an interrogatory asking about other lawsuits, claims or notices will be more efficacious and less expensive." Id. at 173.

**Document Request No. 3:** **The Allied Domecq Loss Prevention Underreporting Manual in effect in 2001 and 2002.**

**Plaintiffs' Response: Dunkin' objects to this Request on the grounds that it calls for documents that are neither relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Moreover, Dunkin' objects to this Request insofar as it calls for information that is subject to the attorney-client privilege, the trade secret privilege, the work product doctrine and seeks confidential commercial information.**

This case is based on a notice of termination of defendants' franchises that resulted from an investigation started in November or December 2001 by Joseph McGowan, Dunkin' Donuts' Loss Prevention Consultant, who began investigating defendants' operations because he suspected they were underreporting their sales to Dunkin' Donuts and thereby not paying Dunkin' Donuts all its franchise and advertising fees which are calculated as a percentage of sales. McGowan Deposition at 88-89, cited pages of which are attached as **Exhibit G**. Initially, he started the investigation because he saw donuts that appeared to be Dunkin' Donuts products for sale at a delicatessen in Hamden, Connecticut. McGowan Depo. at 89. He then expanded the investigation based on a customer complaint that intimated that not all sales were rung in the register, id. at 92-93, and a phone call from a former manager of one of defendants' stores. Id. at 101-03. His investigation included hiring private investigators, id. at 104, to (a) follow defendants' delivery van in its pre-dawn deliveries to wholesale customers, id. at 123-24; (b) make various types of purchases at several of the defendants' stores and observe how the counterperson rang up the sale, made change, and issued receipts, id. at 122-23; and (c) set up phony meetings at hotels, ask defendants to cater the meetings with donuts, bagels, coffee, juices, paper goods, and other products, and videotape the delivery and pick up of the products

9

and utensils such as coffee urns. Id. at 148, 170-71. Mr. McGowan then conducted an audit of the defendants' financial operations by requiring them to produce three boxes of accounting and bookkeeping records and register tapes, which he submitted to Deloitte & Touche for assistance in the preparation of a Retail Sales Analysis. Id. at 284-87. He testified that he believed defendants were underreporting sales based on the results of the Retail Sales Analysis and his inability to find the sales that defendants did in fact report of the sting operations conducted at the hotels. Id. at 169, 177.

Plaintiffs first object to producing the Loss Prevention Underreporting Manual on the grounds of relevance. Mr. McGowan, however, testified that he followed the Loss Prevention Underreporting Manual as his guideline for his investigation. Id. at 30-32. Clearly, Mr. McGowan undertook a number of steps in conducting his investigation. In order for the defendants to assess whether the investigation was appropriate and was conducted in accordance with plaintiffs' own procedures and policies, it is necessary for the defendants to review the Loss Prevention Underreporting Manual.

One of defendants' primary defenses to this action is that plaintiffs have been pursuing a vendetta against Mr. Stetzer as revenge for a lawsuit he had brought against Dunkin' Donuts in 1997. Because of that lawsuit, defendants maintain that plaintiffs manufactured a charge of underreporting against Mr. Stetzer as a pretext to terminate him from the Dunkin' Donuts system. The Loss Prevention Underreporting Manual is extremely important to this defense because if Dunkin' Donuts did not follow the investigatory procedures outlined in the manual, it would be strong evidence that the "investigation" was a sham motivated by improper purposes and not a genuine attempt to discover if Mr. Stetzer was accurately reporting his sales.

10

For example, Mr. McGowan testified that he took the unusual step of hiring private investigators to investigate Mr. Stetzer's wholesale accounts even before he checked Dunkin' Donuts' own records on Mr. Stetzer's wholesale accounts. Id. at 270-74. This is evidence that plaintiffs were not interested in a legitimate investigation to determine *if* defendants were underreporting, but rather were conducting an investigation with the purpose of finding *any* violation they could use as justification for terminating Mr. Stetzer. Only by examining the Loss Prevention Underreporting Manual can defendants determine if Dunkin' Donuts followed or deviated from Dunkin' Donuts' own policies and procedures required by the manual.

To the extent plaintiffs contend the manual contains commercial information and trade secrets, defendants have agreed to sign a confidentiality agreement to allay their concerns. Because defendants are not competitors of the plaintiffs, the protection of a confidentiality agreement should be sufficient. Plaintiffs' arguments that a confidentiality agreement does not provide sufficient protection ignores the common practice of using such agreements in litigation even between competitors.

Plaintiffs also claim the manual is protected by the attorney-client privilege. The elements of the privilege are: "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived." Int'l Brotherhood of Teamsters, 119 F.3d at 214.

The Loss Prevention Underreporting Manual cannot meet this standard because it is a commercial and financial tool used by Dunkin' Donuts to detect cases of underreporting and is not a communication from a client to a lawyer regarding legal advice. In fact, plaintiffs' claim

that the manual is a trade secret conflicts with plaintiffs' attorney-client privilege claims, because a trade secret is "any formula, pattern, device or compilation of information which is used in one's business . . . . A trade secret is a process or device for continuous use in the operation of a business." Restatement of Torts § 757, comment b. This is vastly different from communications with an attorney regarding legal advice.

Plaintiffs also claim the work-product doctrine protects the manual. The work-product doctrine "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial." In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002, 318 F.3d at 383. If the manual is used continuously in the operation of plaintiffs' business, as plaintiffs claim, it could not have been prepared in anticipation of litigation.

In their letter dated September 30, 2003, plaintiffs cite three cases for the proposition that the Loss Prevention Underreporting Manual is a trade secret and confidential commercial information. Exhibit D at 3-4. The cases, however, deal with dramatically different factual circumstances. In Snelling, Inc. v. Armel, Inc., 179 U.S.P.Q. 699 (W.D. La. 1973), the agreement signed by the franchisees stated that certain manuals were confidential and not to be used by franchisees to compete with plaintiff. When the franchisees then used the manuals to set up businesses that competed with the plaintiff, the plaintiff sought an injunction. That is hardly the situation here. The Loss Prevention Underreporting Manuals are not mentioned in the franchise agreement, are not designated as confidential in any document signed by the defendants, and cannot be used to set up a competing business.

Similarly, <u>Pate v. Nat'l Fund Raising Consultants of Arkansas, Inc.</u>, 20 F.3d 341 (8th Cir. 1994), involved franchisees who used operation materials described as trade secrets in the franchise agreement to compete against the franchisor. Once again, that is not the case here.

Finally, in <u>Peat, Marwick, Mitchell & Co., v. Creditor's Committee of Northeast Dairy Coop. Fed'n, Inc.</u>, 65 B.R. 886 (N.D.N.Y. 1986), the plaintiff, an accounting firm, sought to protect the disclosure of its auditing methods to a creditor's committee whose accountant was plaintiff's chief competitor. This situation is analogous to Dunkin' Donuts revealing its donut recipe to Krispy Kreme, which is, again, not the case here.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court order plaintiffs to answer Interrogatory Nos. 1 and 3 and produce documents in response to Request No. 3 of defendants' Second Set of Interrogatories and Second Request for Production of Documents dated August 6, 2003.

>
> DEFENDANTS,
> 4 DONUTS, INC., GRANDO, INC., and
> GLENN STETZER
>
> By:   /s/ Richard S. Order
>       Richard S. Order (ct 02761)
>       Eric L. Palmquist (ct 24166)
>       AXINN, VELTROP & HARKRIDER LLP
>       90 State House Square
>       Hartford, CT 06103-3702
>       Telephone: 860-275-8100
>       Facsimile: 860-275-8101
>       Email:    rso@avhlaw.com

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a copy of the foregoing has been sent via first-class U.S. mail, postage prepaid, this 28th day of October, 2003 to:

Robert L. Zisk, Esq.
Jeffrey L. Karlin, Esq.
Christopher M. Loveland, Esq.
Schmeltzer, Aptaker & Shepard, P.C.
2600 Virginia Avenue, Northwest
Suite 1000
Washington, DC  20037-1922

Paul D. Sanson, Esq.
Alexandra M. McHugh, Esq.
Shipman & Goodwin LLP
One American Row
Hartford, CT  06103-2819

Robert K. Walsh, Esq.
Law Offices of Robert K. Walsh LLC
193 State Street
P.O. Box 777
North Haven, CT  06473-0777

Paul N. Gilmore, Esq.
Brad N. Mondschein, Esq.
Amy Leete Van Dyke, Esq.
Updike, Kelly & Spellacy, P.C.
One State Street
Hartford, CT  06123-1277

                                    By:  /s/ Eric L. Palmquist
                                         Eric L. Palmquist, Esq.
                                         Axinn, Veltrop & Harkrider LLP