# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

* * * * * * * * * * * * * * * *
                                *   CIVIL ACTION NO.
DUNKIN' DONUTS, INCORPORATED    *   3:02CV1920(JBA)
AND DUNKIN' DONUTS USA,         *
INC.,                           *
           PLAINTIFFS           *
                                *
VS.                             *   **COPY**
                                *
4 DONUTS, INC., GRANDO, INC.,   *
GLENN STETZER, KATHLEEN         *
STETZER, GEORGE GERMANO         *
AND JAMES MCNANAMA,             *
           DEFENDANTS           *
                                *
* * * * * * * * * * * * * * * *

---------------------------------------------------
           DEPOSITION OF:  JOSEPH MCGOWAN
---------------------------------------------------


     Taken before Kathleen S. Norton, Registered
Professional Reporter, Lic./Reg. No. 105, and Notary
Public in and for the State of Connecticut, pursuant
to the Federal Rules of Civil Procedure,
at the offices of Axinn, Veltrop & Harkrider, LLP,
Connecticut, on July 30, 2003, 90 State House Square,
Hartford, Connecticut, commencing at 9:20 a.m.


           BRANDON SMITH REPORTING SERVICE, LLC
                44 Capitol Avenue
                Hartford, CT  06106
                Tel:  (860) 549-1850
                Fax:  (860) 549-1537

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                              Joseph McGowan

Page 30

| | | |
|---|---|---|
| 1 | Q | What do you mean "enterprise"? |
| 2 | A | Well, Dunkin' Donuts. |
| 3 | Q | And how have you gone about investigating |
| 4 | | underreporting of sales? |
| 5 | A | By various methods to include retaining private |
| 6 | | investigators to provide a variety of services, |
| 7 | | surveillance, et cetera, to identify if all |
| 8 | | sales were being rung up. |
| 9 | Q | What kind of surveillance are you talking |
| 10 | | about? |
| 11 | A | Well, these are things that are in our -- we |
| 12 | | have a manual, an underreporting manual that is |
| 13 | | protected, it's a trade secret, and they are |
| 14 | | listed in there. |
| 15 | Q | What's the name of the manual? |
| 16 | A | The Loss Prevention Underreporting Manual.  I |
| 17 | | believe it's Allied Domecq's Loss Prevention |
| 18 | | Underreporting Manual. |
| 19 | Q | And do you know who prepares -- who has |
| 20 | | prepared that? |
| 21 | A | The person we spoke of earlier, John |
| 22 | | Capchionne, I know made it or updated the |
| 23 | | latest version on it. |
| 24 | Q | What's the latest version?  What year? |
| 25 | A | 2000. |

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                                                          Joseph McGowan

Page 31

| | | |
|---|---|---|
| 1 | Q | And is this in a loose-leaf binder? |
| 2 | A | Correct. |
| 3 | Q | How many pages is it? |
| 4 | A | I would say somewhere between 100 and 150 |
| 5 | | because there are some sections of it that were |
| 6 | | still being developed and I don't know -- |
| 7 | | because the way it was set up, I don't know how |
| 8 | | many pages were supposed to be in those |
| 9 | | sections but... |
| 10 | Q | Is the Allied Domecq Loss Prevention |
| 11 | | Underreporting Manual, that's in its present |
| 12 | | form, the same as it was in the year 2001? |
| 13 | A | Yes. |
| 14 | Q | And is it same as it was in the year 2002? |
| 15 | A | I believe so. |
| 16 | Q | And do you have a copy of this manual at home? |
| 17 | A | I do. |
| 18 | Q | And is it in -- you say it's in a loose-leaf |
| 19 | | binder.  What's the color of the binder? |
| 20 | A | Black. |
| 21 | Q | What size is the binder? |
| 22 | A | Four inches. |
| 23 | Q | Four inches? |
| 24 | A | Eight-and-a-half by 11. |
| 25 | Q | And what topics are covered by the |

Brandon Smith Reporting Service

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                    Joseph McGowan

Page 32

1        underreporting manual?

2              MR. KARLIN:  I will allow him to

3        answer that question, but in terms of the

4        specifics, as Mr. McGowan noted before,

5        it's a trade secret, confidential business

6        information.  We have actually litigated

7        this before and we'll do it again in this

8        case if you're going to ask the specifics

9        about what's in the manual with respect to

10       conducting underreporting investigations or

11       specifics with respect to what Dunkin'

12       Donuts looks for in terms of

13       underreporting, I will object and instruct

14       him not to answer.  I'll allow him to

15       answer questions about the topics that are

16       raised.

17              MR. ORDER:  Wait a minute.  This whole

18       case is about underreporting and you're

19       saying that the policies and procedures of

20       the company relating to an underreporting

21       investigation, we're not going to be

22       entitled to review?

23              MR. KARLIN:  Yes.

24              MR. ORDER:  Yeah, okay.  Well, I'm

25       going to request right now a copy of the

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                          Joseph McGowan

Page 88

1    Q    Andrew Sternberg?

2    A    I think it was.  And I don't know if that was

3         something that he sent or that he received, but

4         I was copied on it.  And I remember seeing

5         something about Sargent Drive and a lease

6         renewal or something.

7    Q    And did that have any impact in your

8         investigation?

9    A    No, sir.

10   Q    Are you aware of whether Mr. Stetzer submitted

11        architect's plans for the remodeling of the

12        Sargent Drive store --

13   A    No.

14   Q    -- in 2002?

15   A    No.

16   Q    Are you aware of whether Dunkin' Donuts

17        approved those plans?

18   A    No, sir.

19   Q    Now, we have referred to an underreporting

20        investigation of Mr. Stetzer's stores that you

21        conducted, but we haven't really talked about

22        the investigation itself.  What started that

23        investigation?

24   A    A couple of things actually.  The first being I

25        was in East Haven, Connecticut sometime in the

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                                    Joseph McGowan

Page 89

1       late summer, early fall of 2001, and I was in a

2       store, a delicatessen store that was selling

3       product that looked to be Dunkin' Donuts'

4       product.  And which isn't a problem if it's

5       done correctly and it's reported and it doesn't

6       have our trade dress and everything on it, but

7       I made a note, a mental note to myself to find

8       out where this product was coming from and to

9       ensure that those sales were being reported.

10      And approximately at the same time, I want to

11      say within two weeks, Joe Chaves called me and

12      made me aware of a customer complaint to do

13      with the York Street store and a customer

14      saying their sales weren't rung up correctly.

15      And, again, this was over the phone.

16  Q   Go ahead.

17  A   And Joe said something to me indicating that it

18      was a possible issue with either sales being

19      underreported or employee theft in that store.

20  Q   Do you recall anything else that Mr. Chaves

21      said?

22  A   No.

23  Q   Okay.  Let's go back a little bit.  You said

24      that you were in a delicatessen in East Haven.

25      When?

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                          Joseph McGowan

Page 92

| | | |
|---|---|---|
| 1 | | out, right? |
| 2 | A | (Witness nods.) |
| 3 | Q | We have to do something about the nodding. |
| 4 | A | After lunch.  Yes. |
| 5 | Q | And did you act -- did you check out your |
| 6 | | concern about the -- what you thought were |
| 7 | | Dunkin' Donuts' products in that delicatessen |
| 8 | | before or after Mr. Chaves said something to |
| 9 | | you about a customer complaint? |
| 10 | A | After. |
| 11 | Q | So a certain -- so you think that several weeks |
| 12 | | went by before Mr. Chaves informed you of the |
| 13 | | customer complaint? |
| 14 | A | Yes. |
| 15 | | MR. KARLIN:  Objection.  I'm sorry. |
| 16 | | Go ahead. |
| 17 | BY MR. ORDER: |
| 18 | Q | I guess you said within two weeks, right? |
| 19 | A | Yes, that's what I said. |
| 20 | Q | And he told you it was a customer complaint? |
| 21 | A | Correct. |
| 22 | Q | What did he say that the customer actually |
| 23 | | said? |
| 24 | A | Something to the effect that they were a |
| 25 | | regular customer and when they went in, their |

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                                          Joseph McGowan

Page 93

1       purchase either wasn't rung up or was rung up

2       as the wrong item.

3   Q   Okay.  Did he say anything more about that

4       customer's complaint?

5   A   I believe he was going to try and give me some

6       more information on it, but I don't believe he

7       had any more information on it.

8   Q   Was this complaint in writing?

9   A   I don't believe so.  I didn't have it in

10      writing.

11  Q   You never got it in writing, the complaint?

12  A   I don't believe so.

13  Q   Well, what was the customer actually

14      complaining about?

15  A   I believe it was that they were being

16      short-changed, but I don't know if they were

17      trying to provide some information to the

18      management or -- my recollection is that they

19      felt they had been somehow wronged.

20  Q   Well, did Mr. Chaves say whether the customer

21      had gone back to the store and asked for the

22      correct change?

23  A   That wasn't my sense.  I don't know.  But that

24      wasn't my sense that that had happened.

25  Q   Did he say by how much the customer thought he

Brandon Smith Reporting Service

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

| | | |
|---|---|---|
| 1 | A | Can I -- rather than my next step, there was |
| 2 | | something that happened in the interim. |
| 3 | Q | In the what? |
| 4 | A | In the interim. |
| 5 | Q | What happened? |
| 6 | A | I received a call from Mr. Czuprynski. |
| 7 | Q | You received a call from him? |
| 8 | A | No, from Joe Chaves who took a customer care |
| 9 | | line complaint. |
| 10 | Q | And that's before you retained any private |
| 11 | | investigators? |
| 12 | A | Correct. |
| 13 | Q | Okay. So before retaining the private |
| 14 | | investigators, Mr. Chaves called you and told |
| 15 | | you about Mr. Czuprynski calling the consumer |
| 16 | | care line? |
| 17 | A | Actually, he emailed me about it. |
| 18 | Q | Did he forward an email? |
| 19 | A | Yes. |
| 20 | Q | And what did the email say? |
| 21 | A | I can only give you the generalities of it.  I |
| 22 | | know you have seen the document.  It was that |
| 23 | | he was a terminated employee of Mr. Stetzer, |
| 24 | | that he felt somehow wronged by him, that all |
| 25 | | sales in Mr. Stetzer's stores weren't always |

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                                    Joseph McGowan

Page 102

1        reported, that some people were paid cash

2        payroll by Mr. Stetzer, and I believe there was

3        something about somebody being paid by a

4        Dunkin' Donuts payroll, by his franchise

5        payroll that didn't work at the store.

6    Q   So now we're sometime where?  Give me a time

7        frame.

8    A   I want to say the first week of December.  I

9        mean, that's verifiable, but I think it is.

10   Q   December of 2001, correct?

11   A   Correct.

12   Q   So in the first week of December of 2001, you

13       have three pieces of information.  You have one

14       confirmation from The Deli that they're

15       purchasing Dunkin' Donuts' products?

16   A   Correct.

17   Q   And re-selling them, right?

18   A   Correct.

19   Q   Which you didn't necessarily think was wrong in

20       and of itself, correct?

21   A   In and of itself, it's not wrong.  I just

22       wanted to be sure that the sales got reported.

23   Q   And the second item you were looking into at

24       that time was the customer complaint of the

25       York Street store, correct?

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                              Joseph McGowan

Page 103

1    A    Yes.

2    Q    And the third item was this information about

3         Richard Czuprynski calling in, correct?

4    A    Correct.

5    Q    You knew that item, the second item, the

6         customer complaint about the York Street store

7         related to Mr. Stetzer and you knew that the

8         third item, Mr. Czuprynski's complaint, related

9         to Mr. Stetzer's stores right?

10   A    Correct.

11   Q    You didn't know at that point that The Deli was

12        selling Dunkin' Donuts' products supplied by

13        Mr. Stetzer's stores, correct?

14   A    I didn't know for sure.  Again, somebody had

15        mentioned something to me.  I don't know if it

16        was Joe Chaves or something that somebody had a

17        wholesale account in East Haven, but that's

18        correct, I didn't know.

19   Q    Well, so did Mr. Chaves say that he knew that

20        Mr. Stetzer had wholesale accounts?

21   A    I know he knew that he had some wholesale

22        accounts.  I don't know if he said that that

23        was one of them or if he got that far down in

24        the business about it.  I don't know.

25   Q    So now, in the first week of December of 2001

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                                    Joseph McGowan

Page 104

| | | |
|---|---|---|
| 1 | | with the knowledge of these three different |
| 2 | | pieces of information, what did you do next? |
| 3 | A | I retained a private investigator to do some |
| 4 | | surveillance. |
| 5 | Q | And who was that private investigator? |
| 6 | A | Orion Investigations. |
| 7 | Q | And was there a particular person at Orion that |
| 8 | | you dealt with? |
| 9 | A | R, the letter R, Scott Turner. |
| 10 | Q | And had you worked with him before? |
| 11 | A | Yes. |
| 12 | Q | Under what circumstances? |
| 13 | A | I don't exactly. I mean, in the course of |
| 14 | | business, but I don't exactly recall which work |
| 15 | | he had done for me. |
| 16 | Q | Well, was it within -- when you say the course |
| 17 | | of business, you mean while you were working |
| 18 | | for Allied Domecq? |
| 19 | A | I'm sorry, yes. |
| 20 | Q | And was it to investigate franchisees? |
| 21 | A | I don't recall exactly. I would have to look |
| 22 | | to see what the circumstances were because |
| 23 | | there are different things that investigators |
| 24 | | might do for us. |
| 25 | Q | Well, how did you know of him? |

Brandon Smith Reporting Service

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Page 122

1              functions?

2    A    I don't know that.

3    Q    Are you aware that Dunkin' Donuts now asks on
4              its inspections about catering?

5    A    No.  What type of inspections?  I mean,
6              conducted by who?

7    Q    Conducted by Allied Domecq of franchisees
8              operations.

9    A    Operational people?  When I say business
10             consultants, people that do food service
11             inspection, that kind of thing?

12   Q    Right.

13   A    No, I'm not aware.

14   Q    So now getting back to the first week in
15             December, you hired a private investigator,
16             Mr. Turner, to identify the source on the
17             product, Dunkin' Donuts' product being sold to
18             The Deli and to make purchases to see whether
19             they were rung up correctly, correct?

20   A    To see how they were rung up, correct.

21   Q    And did you tell him to go to any particular
22             store to detect how the sales were rung up?

23   A    I believe I told him to go to -- I did direct
24             him to certain stores.  I don't recall which
25             order because he went to three or four

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                                    Joseph McGowan

Page 123

```
 1           different stores.  I don't know which one I
 2           told him to do first.
 3    Q      Well, the complaint was about the York Street
 4           store, correct?
 5    A      I believe so.
 6    Q      So why would you tell him to go to any store
 7           other than the York Street store?
 8    A      Because they are still part of the same network
 9           and I wanted to eliminate or identify that it
10           was either an isolated problem or a problem in
11           the network.
12    Q      And so did he perform those two tasks for you?
13    A      Yes, he did.
14    Q      And what was the result?
15    A      I believe he identified, and again I don't have
16           the report in front of me, I believe he
17           identified that the donuts, the stuff going to
18           The Deli was from Mr. Stetzer's store and he
19           observed no irregularities at the store or
20           stores that he shopped the first time.
21    Q      How did he learn that the deliveries were being
22           made from Mr. Stetzer's store?
23    A      Again, I believe it was by the vehicle -- I
24           really have to look, but I believe it was by
25           vehicle or plate number, but that's a matter of
```

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                                    Joseph McGowan

Page 124

| 1 | | record. |
|---|---|---|
| 2 | Q | And he said there was nothing wrong with the |
| 3 | | way sales were rung up at the stores? |
| 4 | A | That's correct. |
| 5 | Q | So did your investigation of the customer |
| 6 | | complaint about the York Street store end? |
| 7 | A | No.  I believe because -- I believe he went to |
| 8 | | one or two other stores on a subsequent day. |
| 9 | | Are you asking me did it end in York Street? |
| 10 | | No. |
| 11 | Q | Did it go anywhere? |
| 12 | A | No, it didn't go anywhere. |
| 13 | Q | So there were no adverse results that -- or |
| 14 | | conclusions that you drew stemming from the |
| 15 | | York -- the customer complaint about a sale of |
| 16 | | product in the York Street store? |
| 17 | A | There was one purchase that he made, a |
| 18 | | controlled purchase to see how it was handled |
| 19 | | that could or could not have been rung up.  It |
| 20 | | was tough to determine.  I believe it was an |
| 21 | | issue with the receipt or something, but that |
| 22 | | was the only one. |
| 23 | Q | And so, from your perspective, did you -- do |
| 24 | | you feel that that customer complaint has been |
| 25 | | addressed and resolved? |

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                                    Joseph McGowan

Page 148

1              answered.  Go ahead and answer.

2     A    That's correct.

3     BY MR. ORDER:

4     Q    With respect to the seven instances of -- with

5          respect to the seven instances of where the

6          investigator ordered product through Dunkin'

7          Donuts for a fake function or breakfast, is it

8          fair to call that whole procedure a sting

9          operation?

10    A    That would depend on your definition of sting

11         operation.

12    Q    Well, what do you think -- what's your

13         definition of sting operation?  What's your

14         definition?  Have you ever heard the phrase

15         sting operation before?

16    A    Yes.

17    Q    What do you understand that to mean?

18    A    I'm not sure.  There are plenty of different

19         components or variables, and I don't know if

20         there is a common.

21    Q    I'm just asking what you understand the phrase

22         to mean.

23    A    Some type of undercover operation.

24    Q    And usually it's -- by undercover operation,

25         you mean it's something in which someone is

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

1   Q   How did you decide what dates to select?

2   A   Random, for the most part, leaving enough time

3       in between, when possible, so after the fact we

4       could go back and verify whether or not those

5       sales were rung in.

6   Q   When is the first time you tried to verify

7       whether the sales were -- are you saying to

8       determine whether they were rung in or

9       reported?

10  A   Rung out.

11  Q   Or reported?

12  A   Okay, reported.

13  Q   How did you go about determining how the

14      sale -- whether the sales to your private

15      investigators on these catering jobs were rung

16      up?  I'm sorry, were reported?

17  A   Were reported.  The early ones that were done

18      in January where fee cards had already been

19      submitted to Allied and they were on

20      microfiche, I believe there were a couple of

21      them.  When I say early, I mean the turn-around

22      time to get them in, fiche them and get them

23      out, I looked at those.  And once we collected

24      the documents to do the RSA, Retail Sales

25      Analysis, I looked at those.

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                                    Joseph McGowan

Page 170

1   Q   You looked at what?

2   A   The fee cards that Mr. Stetzer provided.

3   Q   So when did you look at the microfiched fee

4       cards for the January jobs?

5   A   I believe the turn-around time was three weeks,

6       or something like that.  So I told her as soon

7       as they got them in, I wanted them back.

8   Q   So when did you look at them?

9   A   I can only estimate somewhere mid-February.

10  Q   And the February sales you looked at when Mr.--

11      you looked at the fee cards that Mr. Stetzer

12      produced in April, right?

13  A   Yes, sir.  Unless there was some overlap there.

14      Without looking at it, I can't tell you what it

15      is.

16  Q   The final paragraph on Exhibit 41, the first

17      page of Exhibit 41 near the bottom of that

18      paragraph, "The product was videotaped on each

19      occasion."

20              Do you see that?

21  A   No.  On the --

22  Q   The second to the last sentence.

23  A   Yes, I do.

24  Q   Have you reviewed each videotape?

25  A   Yes.

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                                    Joseph McGowan

Page 171

| 1 | Q | By the way, at these sales, were you present at |
| 2 | | any of these catering jobs? |
| 3 | A | No, sir. |
| 4 | Q | Where were you during those catering jobs? |
| 5 | A | I couldn't say.  I was not involved. |
| 6 | Q | Were you in touch with the investigator on that |
| 7 | | day? |
| 8 | A | On which day? |
| 9 | Q | On any day, any of these catering job days. |
| 10 | A | Yes.  I told them to call me and update me via |
| 11 | | phone. |
| 12 | Q | Did they do that? |
| 13 | A | I believe on all occasions. |
| 14 | Q | Now, it says on this videotape -- I'm sorry. |
| 15 | | Did you say that you reviewed each videotape? |
| 16 | A | I did. |
| 17 | Q | And was there any sound on the videotapes that |
| 18 | | you reviewed? |
| 19 | A | No, sir. |
| 20 | Q | And where are these videotapes located? |
| 21 | A | They are -- copies of them I have.  The |
| 22 | | originals are maintained by the investigators. |
| 23 | Q | By -- |
| 24 | A | Their investigative firms.  And I believe |
| 25 | | Mr. Karlin's firms has either a copy or -- one |

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

Dunkin' Donuts, Inc. vs 4 Donuts, Inc.

7/30/2003                                                           Joseph McGowan

Page 177

```
 1            was inquiring as to apparently there was some

 2            kind of newer start-up business and he asked

 3            what it was about and was told that things were

 4            starting to pick up.

 5     Q      And there were seven catering jobs ordered by

 6            your private investigators from January 17th

 7            through February 22nd, correct?

 8     A      Yes, sir.

 9     Q      Two bullet points below that it says, "There

10            are no entries on the available weekly fee

11            cards that account for the catering sales."

12                     Now, so at this point, February 26th,

13            you're only looking at fee cards that Allied

14            Domecq has sent to you on microfiche for

15            January, correct?

16     A      Correct.  And I'm not even sure it was all of

17            January.

18     Q      So you examined those and you didn't see any

19            entries.  What kind of entries were you looking

20            for?

21     A      I was looking in the wholesale sales box.

22     Q      Okay.  Then a little bit down, you talk about,

23            another bullet point, "Surveillance was

24            obtained of Stetzer delivering products to

25            another function at Yale University."
```

b9ded1cf-0784-4b84-8f49-3daeb6e468ce

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*    CIVIL ACTION NO.
                                        \*    3:02CV1920(JBA)
DUNKIN' DONUTS, INCORPORATED            \*
AND DUNKIN' DONUTS USA,                 \*
INC.,                                   \*
             PLAINTIFFS                 \*
                                        \*
VS.                                     \*
                                        \*    **COPY**
                                        \*
4 DONUTS, INC., GRANDO, INC.,           \*
GLENN STETZER, KATHLEEN                 \*
STETZER, GEORGE GERMANO                 \*
AND JAMES MCNANAMA,                     \*    VOLUME II
             DEFENDANTS                 \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


-------------------------------------------------
       CONTINUED DEPOSITION OF:  JOSEPH MCGOWAN
-------------------------------------------------


        Taken before Kathleen S. Norton, Registered
Professional Reporter, Lic./Reg. No. 105, and Notary
Public in and for the State of Connecticut, pursuant
to the Federal Rules of Civil Procedure,
at the offices of Axinn, Veltrop & Harkrider, LLP,
Connecticut, on August 1, 2003, 90 State House Square
commencing at 12:54 p.m.


        BRANDON SMITH REPORTING SERVICE, LLC
             44 Capitol Avenue
             Hartford, CT  06106
           Tel:  (860) 549-1850
           Fax:  (860) 549-1537

Dunkin' Donuts vs 4 Donuts, Inc.

8/1/2003                                    Joseph McGowan ( Volume II )

Page 270

1          complaint about a retail sale?

2                    MR. KARLIN:  Objection.  Asked and

3              answered.  Go ahead.

4     A    I don't know.

5     BY MR. ORDER:

6     Q    Okay.  And did you think in December of 2001

7          that information about wholesale accounts

8          reported by Glenn Stetzer's stores had anything

9          to do with any allegation made by Richard

10         Czuprynski?

11    A    I didn't know.

12    Q    But, in any event, you asked for the

13         information.  She said she doesn't see anything

14         recently submitted about wholesale accounts and

15         indicated to you that information that was more

16         than a year old had been sent to archives.  And

17         my question is:  If you were interested in

18         finding out information about Mr. Stetzer's

19         wholesale accounts, why didn't you ask her to

20         go to the archives and find anything on file

21         concerning his wholesale accounts that may have

22         been sent to archives?

23                   MR. KARLIN:  Objection to form.  It's

24             been asked and answered and misstates what

25             the Email says.  Go ahead and answer.

Brandon Smith Reporting Service

Page 271

1    A    Because I wasn't at that point in the

2         investigation.

3    BY MR. ORDER:

4    Q    At what point?

5    A    If I had found the wholesale sales were not

6         reported, I would have gone and looked to see

7         if those accounts were registered.

8    Q    But then you undertook the expense of having

9         private investigators look into wholesale

10        sales, correct?

11              MR. KARLIN:  Objection.  Asked and

12           answered.  Go ahead.

13   A    I had already taken that step at that point.

14   BY MR. ORDER:

15   Q    As I recall, you had -- you had Pinkerton trail

16        Mr. McNanama and Mr. Stetzer when they drove to

17        Yale University to make a delivery, correct?

18   A    Correct.

19   Q    And --

20   A    Three months later.

21   Q    Right.  So, you still, I mean, you were still

22        investigating wholesale sales, right?

23   A    I was investigating all the sales.

24   Q    Okay.  But, in any event, you decided on

25        December 13th, 2001 that you wanted to know

c424051b-1d9b-4bfd-b170-c75d3f5365b5

Dunkin' Donuts vs 4 Donuts, Inc.

8/1/2003                                      Joseph McGowan ( Volume II )

Page 272

1          about wholesale accounts even though -- well,

2          let's leave it at that.

3                    You decide on December 13, 2001, that

4          you wanted to know about Mr. Stetzer's

5          wholesale accounts and when the answer came

6          back that there was no current information

7          available in the office, that all other

8          information, prior information, was in

9          archives, you just decided, all of a sudden,

10         you didn't need that information?

11                    MR. KARLIN:  Objection.  Asked and

12              answered.  Go ahead and answer.

13    A    I didn't need it at that time.  I wasn't at

14         that point yet.

15    BY MR. ORDER:

16    Q    Well, if she had had the information available

17         on December 17, would you have asked her to

18         send it to you?

19                    MR. KARLIN:  Objection to form.  Go

20              ahead.

21    A    Most likely.

22    BY MR. ORDER:

23    Q    If she had it available, readily available, you

24         would have asked her for a copy of it, but

25         since she had to go to archives, you decided it

c424051b-1d9b-4bfd-b170-c75d3f5365b5

Page 273

1        wasn't worth it; is that correct?

2                MR. KARLIN:  Same objection.  Go

3            ahead.

4    A    That's not correct.

5  BY MR. ORDER:

6    Q    How is that incorrect?

7    A    Because she didn't have any current

8            information.  When I got to the document, the

9            document collection process, if I felt I needed

10           it, I would have got it then.

11   Q    I would like to show you what was previously

12           marked as Exhibit 51.  I would like to ask you

13           to review it.

14   A    Okay, sir.

15   Q    Have you seen any of these documents before?

16   A    I don't recall.

17   Q    Looking at the first page of Exhibit 51, this

18           is a Wholesale Survey dated February 12, 2002

19           that indicates a wholesale account at the

20           Atrium Cafe on behalf of the Ferry Street

21           store.  Do you see that?

22   A    Yes.

23   Q    February 12, 2002 was a date during which you

24           were investigating Mr. Stetzer's store, is that

25           correct?

Dunkin' Donuts vs 4 Donuts, Inc.

8/1/2003                                          Joseph McGowan ( Volume II )

Page 274

1    A    That's correct.

2    Q    Did you ask anyone at Dunkin' Donuts to obtain

3         information or to update wholesale information

4         concerning Mr. Stetzer's wholesale stores

5         during the course of your investigation?

6    A    I'm not following.

7    Q    During the course of your investigation, did

8         you ask either Mr. Stetzer or someone at

9         Dunkin' Donuts to obtain from Mr. Stetzer more

10        current information about his wholesale

11        accounts?

12   A    I don't believe so.

13   Q    Did anyone send you this wholesale survey dated

14        February 12, 2002?

15   A    I do not believe so.

16   Q    Do you see on the right side of -- actually,

17        since you're holding it in the landscape

18        position, it's at the bottom of the first page

19        of Exhibit 51, some handwriting that says,

20        "B.C.," and then, because there's periods after

21        it, probably stands for business consultant, a

22        dash, and "TBH," unsigned.  Caps, "TBH," then

23        says, "DD."  Do you know what that is?

24   A    I do not.

25   Q    Do you know anybody with the initials TBH?

Dunkin' Donuts vs 4 Donuts, Inc.

8/1/2003                                                    Joseph McGowan ( Volume II )

Page 284

```
 1        March 5, 2002 from Joe Chaves to Geraldine

 2        Cody.  I ask that you review it.  In

 3        particular, I would like to direct your

 4        attention to the second to the last sentence on

 5        the first page.

 6   A    Okay.

 7   Q    Here he says, "I understand from Joe we're

 8        sending to Glenn an RSA request for documents

 9        this week."

10             Do you recall sending an RSA request

11        to Glenn at the end of March, 2002?

12   A    It was somewhere in that time frame.

13             MR. ORDER:  And, again, Mr. Karlin we

14          discussed this off the record, that I don't

15          think I have seen that and you said you

16          would look for it.

17             MR. KARLIN:  Absolutely.  And I will

18          send it to you.

19             MR. ORDER:  Thank you.

20   BY MR. ORDER:

21   Q    Now, you have -- you have brought to this

22        deposition three boxes containing nine white

23        three-ring binders of documents that

24        Mr. Stetzer produced to you in response to a

25        request from you, right?
```

c424051b-1d9b-4bfd-b170-c75d3f5365b5

8/1/2003                                                    Joseph McGowan ( Volume II )

Page 285

1    A    Correct.

2    Q    Was that part of the RSA, the Retail Sales

3         Analysis, or was that -- or was that request

4         for his information -- for his documents

5         considered to be part of something else?

6    A    The documents were to complete the RSA, and to

7         verify information conducted during the

8         investigation.

9    Q    So who looked at the documents that Mr. Stetzer

10        provided?

11   A    Myself, the person that copied them, two of my

12        co-workers.  And this list isn't inclusive of

13        all of them, this is who looked at any piece or

14        part of them?

15   Q    By "looked at," I meant reviewed or saw them or

16        examined them, not mechanically in the course

17        of copying.

18   A    Myself, two co-workers, the folks at Deloitte &

19        Touche.

20   Q    Who are the two co-workers?

21   A    In that case, it was Tom Hess.

22   Q    H-E-S-S?

23   A    Correct.

24   Q    What position did he hold?

25   A    Loss prevention consultant.

c424051b-1d9b-4bfd-b170-c75d3f5365b5

Dunkin' Donuts vs 4 Donuts, Inc.

8/1/2003                                    Joseph McGowan ( Volume II )

Page 286

```
 1    Q    Was he, like, on your same level?

 2    A    Yes, sir.

 3    Q    And who else?

 4    A    John Hopbell.

 5    Q    Okay.  And then you said Deloitte & Touche?

 6    A    Correct.

 7    Q    Who at Deloitte and Touche?

 8    A    Kevin Huang and Natalie Ackerman, and I don't

 9         know if that's all.

10    Q    Anyone else?

11    A    Various individuals in Mr. Karlin's office.

12    Q    Were they attorneys or paralegals?

13    A    I don't know.

14    Q    Did you meet with them or did you just send

15         documents to them?

16    A    Sent them to them.

17    Q    Well, who did you send the documents to?

18    A    I believe I sent them to Mr. Zisk.  Mr. Zisk

19         and/or Mr. Karlin.

20    Q    Did you send all nine binders to them?

21    A    I'm not sure how many binders there were.

22    Q    There are nine binders in those three boxes and

23         I think you counted them, or you can if you

24         would like to.

25    A    There is nine here in the room.  I'm not sure
```

c424051b-1d9b-4bfd-b170-c75d3f5365b5

8/1/2003    Dunkin Donuts vs 4 Donuts, Inc.
Joseph McGowan ( Volume II )

Page 287

1        if Mr. Karlin brought them all back up with him

2        or not.  I don't know.

3    Q   Anyone else that you're aware of who reviewed

4        the documents produced to you by Mr. Stetzer in

5        response to your request?

6    A   I don't believe so.

7    Q   Is it appropriate to call this request for

8        documents an audit?

9    A   It is.

10   Q   Is that what you -- is that what you called it?

11   A   I don't call it that.

12   Q   What did you call it?

13   A   A sales analysis.

14   Q   And what was the purpose of this request for

15       documents?

16   A   To verify some of the information that was

17       found during the investigation as in wholesale

18       information, that kind of thing.

19   Q   And the sales to the private investigators?

20   A   Correct.

21   Q   Anything else?

22   A   And to actually complete the Retail Sales

23       Analysis.

24   Q   Well, what was the purpose of the Retail Sales

25       Analysis?

c424051b-1d9b-4bfd-b170-c75d3f5365b5