1

     1       IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF CONNECTICUT

     2

     3

                              No. 3:02CV1920

     4

     5

     6  DUNKIN' DONUTS INCORPORATED AND

         DUNKIN' DONUTS USA, INC.

     7

         VS

     8

         4 DONUTS, INC., GRANDO, INC., GLENN STETZER, KATHLEEN

     9  STETZER, GEORGE GERMANO AND JAMES MCMANAMA

    10

    11

    12

    13

    14       Deposition of:  JAMES MCMANAMA, taken before

    15  Barbara L. Murphy, Licensed Shorthand Reporter,

    16  License No. 305 and Notary Public within and for the

    17  State of Connecticut, held at the offices of Shipman

    18  and Goodwin, One American Row, Hartford, Connecticut

    19  on October 15, 2003 commencing at 9:08 a.m.

    20

    21

    22

    23

    24

    25

1    A.    I don't know if I did that.

2    Q.    Why not?

3    A.    I don't know.

4    Q.    Do you know which -- do you know which --
5    what Mr. Citerella did with respect to the -- paying
6    the American Express card in terms of what process he
7    went through?

8    A.    Would issue a check.

9    Q.    Would he issue a check with respect to what
10   you identified as the business expenses?

11   A.    I believe so.

12   Q.    And what about the expenses that were
13   personal? What would -- would he issue any checks
14   with respect to those?

15         MR. GILMORE: Objection as to form.

16         THE WITNESS: No.

17   Q.    (By Mr. Karlin) How were they paid for?

18   A.    They were paid personally.

19   Q.    And were there expenses that were your
20   personal expenses on those American Express
21   statements?

22   A.    Yes.

23   Q.    How did you pay for those?

24   A.    By check.

25   Q.    By check?

74

1  health insurance from any of the doughnut businesses?

2  A.  No, I do not.

3  Q.  Do you have health insurance?

4       MR. GILMORE:  Objection as to form.

5       THE WITNESS:  Do I have health

6  insurance?  I'm covered under a policy, yes.

7  Q.  (By Mr. Karlin) Are you covered under a

8  policy under the name of somebody else?

9  A.  That's correct.

10 Q.  Whose policy are you covered under?

11 A.  My wife's.

12 Q.  Who is she employed by?

13 A.  A division --

14      MR. ORDER:  What's the relevance?

15      THE WITNESS:  -- of Yale New Haven

16 Hospital.

17 Q.  (By Mr. Karlin)  And aside from -- I'm

18 sorry, aside from your salary have you received any

19 life insurance from the doughnut businesses?

20 A.  There is a life insurance policy on myself,

21 yes.

22 Q.  From 1998 to the present has the life

23 insurance policy -- have the doughnut businesses paid

24 for a life insurance policy for you?

25 A.  I believe so, yes.

```
 1      Q.    Do you know what the policy amount is?
 2      A.    That I do not.
 3      Q.    Do you know what the -- whether the premium
 4  is paid by the doughnut businesses?
 5      A.    I think I answered that.
 6      Q.    Do you know how much the premium is?
 7      A.    That I do not know.
 8      Q.    Did you have a discussion with Mr. Stetzer
 9  about that?
10      A.    About what?
11      Q.    About the life insurance policy?
12      A.    A discussion?
13      Q.    Yes.
14      A.    When it was initially consummated.
15      Q.    When was that?
16      A.    That I'm not sure of the year.
17      Q.    Do you know what company it's through?
18      A.    No, I don't.  Aetna maybe but that would be
19  a guess.
20      Q.    I'm not interested in guesses.
21      A.    All right.  That would be my guess.
22      Q.    Aside from salary and life insurance do you
23  receive any sort of car allowance?
24      A.    Yes, I do.
25      Q.    How much do you receive?
```

```
 1     A.   Approximately $600 a month.
 2     Q.   When did you start receiving that?
 3     A.   You wrote down six twenty.
 4     Q.   What my notes say are my business.
 5     A.   Okay.
 6     Q.   You said approximately six hundred?
 7     A.   Right.
 8     Q.   Do you know whether it's six twenty?
 9     A.   Obviously you do.
10     Q.   Don't make any assumptions.  I just want to
11  know.
12     A.   All right.  Approximately six hundred, yes.
13     Q.   So approximately six hundred.  Do you know
14  in particular whether it's six twenty or not?
15     A.   It must be six twenty.
16     Q.   Don't assume anything from what I wrote
17  down.
18     A.   Approximately six hundred.
19     Q.   And do you use the car allowance to either
20  lease or purchase a car?
21          MR. GILMORE:  Objection as to form.
22          THE WITNESS:  My car is -- my Tahoe is
23  paid for.
24     Q.   (By Mr. Karlin)  Okay.  In the last year
25  have you -- when was your -- when did you complete
```

1  Q. Do you know whether Mr. Stetzer put any
2  money into C and T Investments?
3  A. I'm not sure.
4  Q. Did you ever have any discussion with Mr.
5  Stetzer about C and T Investments?
6  A. There might have been.
7  Q. Do you have any recollection of any specific
8  things you talked about with Mr. Stetzer about C and T
9  Investments?
10             MR. GILMORE: Objection as to form.
11             THE WITNESS: No.
12  Q. (By Mr. Karlin) Do you know -- do you have
13  a recollection of when those conversations might have
14  taken place?
15  A. It would have been right in the beginning
16  when it was being formed.
17  Q. Do you know whether C and T borrowed any
18  money for the purpose of purchasing the doughnut
19  shops?
20  A. No, I don't.
21  Q. Do you know whether it raised any money for
22  the purpose of purchasing the doughnut shops?
23  A. No, I do not.
24  Q. Do you have knowledge of an LLC by the name
25  of Mustang Group?

152

```
 1        A.   Yes, I do.
 2        Q.   Did you have any -- do you know when Mustang
 3   Group was created?
 4        A.   Several years ago.
 5        Q.   Did you have any --
 6        A.   Approximately.  I'm not positive.
 7        Q.   Was it formed before 2000, do you know?
 8        A.   I don't believe so.
 9        Q.   Did you have any involvement in the creation
10   of Mustang Group?
11        A.   Yes, I did.
12        Q.   What involvement did you have?
13        A.   Just starting it.
14        Q.   What was involved in starting it?
15        A.   Just forming an -- I believe it's an LLC.
16   Forming the LLC, a member.
17        Q.   Who did you work with, if anybody, in terms
18   of forming the LLC?
19        A.   Professionally?
20        Q.   Yes.
21        A.   Mr. Citerella.
22        Q.   And did you work with Mr. Stetzer in terms
23   of forming Mustang Group, LLC?
24        A.   Yes, I did.
25        Q.   What was the purpose of -- what was the
```

```
 1   purpose of Mustang Group, LLC?
 2        A.   Future investments.
 3        Q.   Future investments in what?
 4        A.   Business opportunities.
 5        Q.   What sort of business opportunities?
 6        A.   None had been established at that point.
 7        Q.   Business opportunities involving retail
 8   establishments?
 9        A.   Nothing had been established at that time.
10        Q.   Was there any intent to invest in real
11   estate?
12        A.   If it had come along I'm sure.
13        Q.   Did you put any money into Mustang Group,
14   LLC?
15        A.   No.
16        Q.   Do you have any ownership -- going back to C
17   and T Investments.
18             Did you ever have any ownership interest
19   in C and T Investments?
20        A.   Originally, no.
21        Q.   And did there come a time when had you an
22   ownership interest in C and T Investments?
23        A.   Yes.
24        Q.   The answer to my question is yes?
25        A.   Yes.
```

154

```
 1      Q.   How is it that it came about that you gained
 2   an interest in C and T Investments?  How is it that it
 3   came about?
 4      A.   Christopher and Tony asked me.
 5      Q.   When did they ask you?
 6      A.   I'm not sure.
 7      Q.   Why did they ask you?
 8      A.   They wanted me to be part of it.
 9      Q.   For what purpose?
10      A.   Financial.
11      Q.   And what do you mean by financial?
12      A.   To have the ability to get a loan.
13      Q.   What specifically was the -- what specific
14   help was contemplated that you would give in terms of
15   getting a loan?
16      A.   Just that I was established.
17      Q.   Did Chris and Tony try to get a loan for the
18   business?
19      A.   No, they did not.
20      Q.   How much of an ownership interest
21   percentagewise did you have in C and T Investments?
22      A.   I'm not quite sure.
23      Q.   Was it more than 10 percent?
24           MR. GILMORE:  Objection as to form.
25           THE WITNESS:  I believe so, yes.
```

1    Q.   (By Mr. Karlin)  Was it 50 percent?

2    A.   I'm not sure.

3    Q.   Did you pay any money for that?

4    A.   No, I did not.

5    Q.   For Mustang Group, did you put any money

6  into Mustang Group?

7    A.   No, I did not.

8    Q.   Do you know whether Mr. Stetzer put any

9  money into Mustang Group?

10   A.   No, I do not.

11   Q.   Do you know whether Mustang Group received

12  any funds from 4 Donuts, Inc.?

13   A.   No, I do not.

14   Q.   Did you ever write a check on 4 Donuts, Inc.

15  account to Mustang Group?

16   A.   It's possible.

17   Q.   On how much occasions did you write a check

18  from 4 Donuts, Inc. to Mustang Group?

19            MR. GILMORE:  Objection as to form.

20            THE WITNESS:  I don't know.  I said

21  it's possible.

22   Q.   (By Mr. Karlin)  Do you have a memory of

23  doing that?

24   A.   I think it was done, yes.

25   Q.   I'm sorry?

```
1      A.   Yes.  I think it did happen.
2      Q.   And what was the circumstances behind
3  writing a check to Mustang Group?
4      A.   To put funds in the account.
5      Q.   And on how many occasions did you write a
6  check to Mustang Group from 4 Donuts, Inc.?
7      A.   I'm not sure.
8      Q.   Did you discuss that with Mr. Stetzer?
9      A.   I'm not sure.
10          MR. ORDER:  Objection.
11     Q.   (By Mr. Karlin)  Did you have authority from
12 Mr. Stetzer to write a check from 4 Donuts, Inc. to
13 Mustang Group?
14     A.   I believe so.
15     Q.   Why is it that you believe so?
16     A.   He gave me the authority.
17     Q.   Did Mr. Stetzer give you authority to invest
18 money from 4 Donuts, Inc. into other companies?
19     A.   I had authority.
20     Q.   And did you have to check with him before
21 you invested money from 4 Donuts, Inc. into other
22 companies?
23     A.   No, I did not.
24     Q.   And did you have a conversation about that?
25          MR. ORDER:  About what?
```

157

1  Q. (By Mr. Karlin) About your authority to
2  invest money in 4 Donuts, Inc. into other companies?
3       MR. GILMORE: Objection as to form.
4       THE WITNESS: He was sick and he asked
5  me to handle the businesses.
6  Q. (By Mr. Karlin) What was your understanding
7  about the length and breadth of your authority with
8  respect to that?
9  A. Just try to do the best.
10 Q. Did you have any limits with respect to your
11 authority?
12 A. Not specifically.
13 Q. Did Mr. Stetzer put any limits on your
14 authority?
15 A. Not specifically.
16 Q. What, if anything, did Mustang Group do with
17 any of the money that was -- that it received from 4
18 Donuts, Inc.?
19 A. I'm not quite sure.
20 Q. Did it purchase anything with any of the
21 money that was -- that it received from 4 Donuts,
22 Inc.?
23 A. Might have purchased a computer but I'm not
24 sure.
25 Q. Why is it that -- let me withdraw that

158

1   question.
2           Do you have a recollection of when that
3   computer might have been purchased?
4       A.  No, I do not.
5       Q.  Do you have a recollection about who may
6   have purchased that computer?
7       A.  Could have been me.
8       Q.  Do you have a recollection of what type of
9   computer may have been purchased?
10      A.  No, I do not.
11      Q.  Do you have a recollection about whether it
12  might have been a laptop or a desk PC?
13      A.  Could have been a laptop.
14      Q.  Do you have a recollection of where that
15  computer might have been used?
16      A.  It's not being used.
17      Q.  Was it used at any time?
18      A.  No.
19      Q.  What sort of laptop was purchased?
20      A.  I don't know. I don't recall.
21      Q.  Was it purchased from Dell?
22      A.  I don't know.
23      Q.  Do you know how much it cost?
24      A.  I'm not sure.
25      Q.  Did it cost over $1,000?

159

```
 1        A.   Could have.
 2        Q.   And was it used at any time?
 3        A.   No.
 4        Q.   Why not?
 5        A.   Nothing had -- the business hadn't gone
 6   anywhere yet.
 7        Q.   Why was the computer purchased to begin
 8   with?
 9        A.   For future use.
10        Q.   Was there anything in the offing that led to
11   -- in terms of business opportunities that led you to
12   purchase the laptop for Mustang Group?
13        A.   No.
14        Q.   Where is the laptop today?
15        A.   I believe it's at my house.
16        Q.   When was Cody Mac Motor Sports created?  Let
17   me withdraw the question.
18             Are you aware of a company called HMS
19   Racing?
20        A.   Yes, I am.
21        Q.   Has it gone through a couple name changes
22   from 1998 to the present?
23        A.   Yes, it has.
24        Q.   Was it at one time known as CMS Racing?
25        A.   Yes, it was.
```

Spherion Deposition Services
212 490 3430

```
 1      Q.   Is that something you did on your own?
 2      A.   Yes.
 3      Q.   Did you tell anybody else you threw away
 4  statements for CMS?
 5      A.   No.
 6      Q.   Does HMS or CMS, Cody Mac Motor Sports have
 7  insurance costs?
 8      A.   Yes, it does.
 9      Q.   How are those paid?
10      A.   By check.
11      Q.   And from what account are those expenses --
12  insurance expenses paid?
13      A.   Some are through Cody Mac Motor Sports.
14      Q.   And the others?
15      A.   4 Donuts.
16      Q.   For the ones that are paid through 4 Donuts,
17  who writes the checks for those?
18      A.   Either I would or Mr. Citerella.
19      Q.   When you wrote the checks, where would you
20  get the checks that you wrote?
21      A.   Out of a checkbook ledger.
22      Q.   Where is that ledger maintained?
23      A.   In the office.
24      Q.   And is it kept in a loose-leaf binder of
25  some kind?
```

1      Q.   Is it -- is that still at the office?  I'm
2  sorry, is that still at the doughnut -- to your
3  knowledge, is it still at the doughnut network's
4  office?
5           MR. GILMORE:  Objection to form.  How
6  would he know?
7      Q.   (By Mr. Karlin)  I said to your knowledge is
8  it still there, the One-Write system, the check, the
9  check register, was that at the office the last time
10 you were there when you were still employed?
11     A.   Yes.
12          MR. KARLIN:  I'm going to hand you
13 eighty-seven.  I have one for each of you if you can
14 mark that.
15          (Exhibit No. 87, offered and marked.)
16     Q.   (By Mr. Karlin)  I'll have you take a look
17 at that and I'm going to ask you about specific checks
18 but they're actually the specific checks that I
19 believe are handwritten and not computer generated and
20 they start about four pages in with No. 2205 at the
21 bottom.
22     A.   Um-hm.
23          MR. ORDER:  The Bates numbers on the
24 bottom of the exhibit are not in sequential order.
25          MR. KARLIN:  Yes, that's right.

```
 1        Q.    Do you recognize this as Christopher's
 2   writing?
 3        A.    It could be.  I'm not sure.
 4        Q.    Is that your signature at the bottom?
 5        A.    I believe so.
 6        Q.    What was this $556 for?
 7        A.    Production labor.
 8        Q.    For production labor?
 9        A.    That's correct.
10        Q.    The next check is for National City
11   $2,446.40.
12        A.    Um-hm.
13        Q.    Can you tell me what that is for?
14        A.    That's a trailer payment.
15        Q.    Trailer payment?
16        A.    Um-hm.
17        Q.    Is that -- what was that trailer for?
18        A.    CMS Motor Sports.
19        Q.    And the next page is a check for $3,393 No.
20   2194 at the bottom to Gulfway Insurers.
21              What was that for?
22        A.    That's for insurance.
23        Q.    Insurance for what?
24        A.    Car and trailer, motors.
25        Q.    I'm sorry?
```

316

1    Q.   (By Mr. Karlin)  The next check is No. 2333.
2 It's a check to E-trade Bank for $3,000.
3    A.   Um-hm.
4    Q.   There is a Social Security number I believe
5 below E-trade Bank and do you recognize that Social
6 Security number?
7    A.   Yes.
8    Q.   Whose Social Security number is that?
9    A.   That's mine.
10   Q.   And what was this transaction about?
11   A.   That was a CD.  Says CD on it.
12   Q.   What purpose were you -- what were you doing
13 in terms of purchasing a CD from E-trade Bank?
14   A.   That was -- just savings for myself and
15 Glenn.
16   Q.   Savings for yourself and Glenn?
17   A.   Yes.
18   Q.   Did you talk to Mr. Stetzer about this
19 transaction before you did it?
20   A.   Not this particular one.  I don't believe
21 so.
22   Q.   Were you authorized to do this transaction?
23   A.   Yes.
24   Q.   Without talking to Mr. Stetzer, correct?
25   A.   Correct.