COPY

1      IN THE UNITED STATES DISTRICT COURT

       FOR THE DISTRICT OF CONNECTICUT

2

3
                        No. 3:02CV1920

4

5

6   DUNKIN' DONUTS INCORPORATED AND

    DUNKIN' DONUTS USA, INC.

7

    VS

8

    4 DONUTS, INC., GRANDO, INC., GLENN STETZER, KATHLEEN

9   STETZER, GEORGE GERMANO AND JAMES MCMANAMA

10

11

12

13

14        Deposition of:  GLENN STETZER, taken before

15   Barbara L. Murphy, Licensed Shorthand Reporter,

16   License No. 305 and Notary Public within and for the

17   State of Connecticut, held at the offices of Shipman

18   and Goodwin, One American Row, Hartford, Connecticut

19   on October 13, 2003 commencing at 9:05 a.m.

20

21

22

23

24

25

94

```
 1   all done the end of the month.
 2        Q.   Is it still in operation?  Is the business
 3   still in operation?
 4             MR. ORDER:  Which business?
 5             MR. KARLIN:  3 Kings?
 6             THE WITNESS:  No.
 7        Q.   (By Mr. Karlin)  Is the gas station
 8   convenience store still in operation?
 9        A.   That is 3 Kings.  No.
10        Q.   So is the gas station convenience store shut
11   down?  I'm just making sure I understand that.
12        A.   Correct.
13        Q.   In terms of the severance pay that you're
14   paying Mr. McManama.
15             Who will make the decision as to the
16   length of the severance pay?
17        A.   Who made?
18        Q.   Who will make?
19        A.   I will.
20        Q.   What factors will go into whether the
21   severance pay continues?
22             MR. ORDER:  Objection.
23             THE WITNESS:  I'm undetermined at this
24   time how I'm going to put a number on it.
25        Q.   (By Mr. Karlin)  Is it tied into anything?
```

95

1    A.    It's just ultimately my decision.  I'd like
2    to see what happens in the future.
3    Q.    See what happens with what?
4          MR. GILMORE:  Objection as to form.
5          THE WITNESS:  See how my health is, see
6    how I feel.
7    Q.    (By Mr. Karlin)  Why is that connected to
8    his severance package?
9    A.    Just something I want to think about.
10   Q.    If your health got worse, how would that
11   affect your severance package?
12         MR. GILMORE:  Objection as to form.
13         MR. ORDER:  Objection.  Asks for
14   speculation.
15         THE WITNESS:  It's speculation.  I
16   don't know when I'm going to stop the severance pay.
17   Q.    (By Mr. Karlin)  Well, you tied the --
18   or you tied the continuation or the non-continuation
19   of the severance pay to your health.
20   A.    Not solely to my health, no.
21   Q.    Partly then; is that correct?
22   A.    A portion.
23   Q.    What connection is there?  Can you explain
24   that?
25   A.    How I make my mind up at the time.  There is

199

1   A.   I haven't been in that station in a couple
2   of years.
3   Q.   Have you -- do you know how close it is to
4   the nearest Dunkin' Donuts?
5   A.   A mile.
6   Q.   Do you know the franchisee of that Dunkin'
7   Donuts that's within a mile of the Aroma's?
8   A.   One is mine and the other mile, Branford
9   Hill could be a man by the name of Joe Calella.
10  Q.   Could you spell that, please?
11  A.   I don't have a clue.
12  Q.   Joe Calella?
13  A.   Calella.
14  Q.   Calella.  Thank you.  And which of your
15  stores is Aroma's a mile away from?
16  A.   Frontage Road.
17  Q.   When did you first become aware of Aroma's
18  Coffee?
19  A.   Just recently.
20  Q.   How did you find out about it?
21  A.   I heard about it I believe from my -- my
22  general manager picked up a wholesale account to a
23  Citgo gas station.
24  Q.   Your general manager is Chris Matusik; is
25  that correct?

1   A.   Yes.

2   Q.   Is that the person you were just referring

3   to?

4   A.   Yes.

5   Q.   Did he discuss with you the fact that he

6   picked up a wholesale account at the Citgo gas

7   station?

8   A.   Yes.

9   Q.   When did he discuss that with you?

10  A.   I think about a month ago.

11  Q.   What did he tell you about it?

12  A.   That somebody called up, wanted wholesale

13  doughnuts delivered.

14  Q.   And how frequently did they -- how

15  frequently did they want delivery?

16  A.   I don't know.

17  Q.   And in what quantity did they want delivery?

18  A.   I don't know.

19  Q.   In which shop -- I'm sorry, is your doughnut

20  business currently supplying Aroma's Coffee?

21  A.   I don't know.  Aroma's coffee?  No.  I

22  thought you meant doughnuts, I'm sorry.

23  Q.   I'm sorry, we were -- let me ask the

24  question again.

25       MR. ORDER:  You're using coffee as a

```
                                                              201
 1    pronoun, he's using it as --

 2              MR. KARLIN:  I'm sorry.

 3       Q.  (By Mr. Karlin)  Is your doughnut

 4    business currently supplying Aroma's?

 5              MR. ORDER:  Proper noun, not pronoun.

 6              THE WITNESS:  Aroma's?  No.  As far as

 7    I knew it was doughnuts to a Citgo gas station.

 8       Q.  And did you at any time become aware that

 9    the Citgo gas station -- let me take this back a

10    minute.

11              Did you ever become aware that the Citgo

12    gas station was the same place where Aroma's was

13    located?

14       A.  Just recently.

15       Q.  Okay.  How long ago in terms of just

16    recently?

17       A.  A couple days ago.

18       Q.  At any time between the conversation one

19    month ago with Chris Matusik and two days ago, has

20    your business been delivering doughnuts and other

21    goods to Aroma's?

22       A.  As far as I know Chris arranged to have

23    doughnuts delivered to the Citgo gas station.

24       Q.  Do you know who at the Citgo gas station was

25    his contact?
```

202

```
1      A.   I do not.

2      Q.   Other than Aroma's Coffee -- let me make

3  sure I understand this.

4           Aroma's Coffee is located in the Citgo

5  gas station; is that correct?

6           MR. GILMORE:  Objection as to form.

7           THE WITNESS:  I'm not sure but I think

8  so.

9      Q.   (By Mr. Karlin)  Did you have any reason to

10  believe that the doughnuts were staying at the Citgo

11  gas station rather than being delivered to Aroma's?

12          MR. ORDER:  Objection to form.

13          THE WITNESS:  I thought it was a Citgo

14  gas station until recently.

15     Q.   (By Mr. Karlin)  Now do you have a different

16  understanding?

17     A.   It looked like it was Aroma's, yeah.

18     Q.   When you say it looked like Aroma's --

19     A.   It looked like a bakery sign on the outside

20  of the building.

21     Q.   And are you -- is your doughnut business

22  currently supplying the Citgo gas station?

23     A.   No.

24     Q.   Why is that?

25     A.   When I found out about it, I stopped it.
```

1   Q.   What specifically did you find out?

2   A.   I just found out a couple days ago it looked
3   like Aroma's instead of a Citgo gas station and I
4   instructed Chris to stop it.

5   Q.   When you say it looked like, did you go by
6   the Aroma's store at that time?

7   A.   Drove by it, correct.

8   Q.   Was that the first time you had driven by
9   it?

10  A.   In a very long time.

11  Q.   Did you go into the store?

12  A.   No.

13  Q.   Why is it that you instructed Chris to stop
14  deliveries to Aroma's?

15  A.   I didn't want to put doughnuts so close to
16  my other store.

17  Q.   I'm sorry?

18  A.   I didn't want to put doughnuts so close to
19  my other store.

20  Q.   Did you have a conversation with Chris --
21  did you have an additional conversation with Chris
22  besides instructing him not to send doughnuts to
23  Aroma's?

24  A.   No.

25       MR. ORDER:   Objection.