## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DUNKIN' DONUTS INCORPORATED,<br>  a Delaware corporation, and<br>DUNKIN' DONUTS USA, INC.,<br>  a Michigan corporation,<br><br>            Plaintiffs,<br><br>v.<br><br>4 DONUTS, INC.,<br>  a Connecticut corporation,<br>GRANDO, INC.,<br>  a Connecticut corporation,<br>GLENN STETZER,<br>KATHLEEN STETZER,<br>GEORGE GERMANO, and<br>JAMES MCMANAMA<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   C.A. No. 302 CV 1920 (JBA)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   NOVEMBER 10, 2003 |

### PLAINTIFF DUNKIN' DONUTS INCORPORATED'S REPLY
### TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR
### LEAVE TO FILE AN AMENDED COMPLAINT

Paul D. Sanson ct 05477
Alexandra M. McHugh ct 22428
SHIPMAN & GOODWIN LLP
One American Row
Hartford, CT 06103-2819
(860) 251-5612

Robert L. Zisk ct 13503
Eric L. Yaffe, ct 24168
Jeffrey L. Karlin ct 14965
Christopher M. Loveland ct 24169
SCHMELTZER, APTAKER & SHEPARD, P.C.
2600 Virginia Avenue, N.W.
Suite 1000
Washington, D.C. 20037
(202) 333-8800

**ORAL ARGUMENT REQUESTED**

This case arose because a former manager of one of Defendants' franchises provided information to Dunkin' that Defendants had engaged in tax fraud by not reporting large cash sales and by paying workers off the books. Dunkin' inadvertently disclosed this information, including the identity of the former manager, to Defendants. That day, James McManama—Defendants' general manager—admittedly tracked down the former manager, pushed him down, jumped on top of him and demanded a letter retracting the allegations. According to the former manager, McManama—who was later arrested and prosecuted for this incident and entered into a plea bargain under which he was placed on probation—then slashed the tires on his car and left the scene. Dunkin' terminated Defendants' franchise agreements for, among other things, the assault and the violations of tax laws. Discovery has uncovered evidence of tax fraud beyond that identified in the initial report to Dunkin', including large amounts of personal items written off as business expenses on the books of the franchises. It has also revealed, only recently, that McManama and one of the corporate Defendants used funds and equipment from the franchises to open a competing coffee and donut shop. Although Dunkin' could raise claims based on these additional facts in another action, both sides in this action—and the Court itself—have an interest in deciding the future of this relationship in one proceeding, rather than through piecemeal litigation. There is no reason to hold that Dunkin' cannot bring all of its claims in this case, and every reason to hold that it can.

I. **DUNKIN'S NEW CLAIM FOR VIOLATION OF THE COVENANT NOT TO COMPETE IS BASED ON EVIDENCE THAT DEFENDANTS SUPPLIED AND ESTABLISHED A COMPETING BUSINESS, WHICH CANNOT BE CURED BY DISCONTINUING THEIR DELVERIES TO THE SHOP.**

Defendants argue that Dunkin' Donuts cannot state a claim based on their involvement with a competing business, Aromas Coffee and Bake Shop, because this was simply a permissible wholesale customer of whom they gave notice to Dunkin'. (Opp'n at 6.) The fallacy

in this argument is shown by the lengths to which Defendants go to misrepresent the facts. Defendants misleadingly state that they "notified Dunkin' in advance of servicing these accounts and Dunkin' did not object." *Id.* at 10. The Exhibit 10 that they reference, however, was a notice that product was being delivered to "East Haven Citgo," where the competing business is located, not to Aromas itself. The form they have cited to only proves that Stetzer and 4 Donuts, Inc., who submitted the form, took steps to conceal that Aromas was a competing business.

      Defendants' concealment of Aromas runs deeper than submitting a false form. First, it is undisputed that Aromas was easily identifiable as a competing business. Ex. 1 at 202-203. Nevertheless, Defendants made daily deliveries to Aromas *for over a month* before they received the Supplemental Notice of Termination. (Stetzer depo., Ex. 1 at 199-201; Letter of Oct. 17, 2003, Ex. 2.) Second, none of the Defendants stated in their interrogatory answers that they had an interest in Aromas, LLC. Records from the State of Connecticut, however, show that Aromas was created in early 2002 (more than a year and a half before it opened for business), Defendant McManama was listed as its sole owner, and Aromas' business address was that of Defendants' accountant. (Articles of Org., Ex. 3.) In addition, 4 Donuts checks paid for some of Aromas' start-up costs, including its registration fee to the Secretary of State, as well as a payment to the Commissioner of Revenue. (Gen. Ledger, Ex. 4.). Third, McManama testified that he did not obtain any equipment used to outfit Aromas from 4 Donuts or Stetzer, and instead bought it from brokers and an internet auction site, the names of which he cannot recall. (McManama depo., Ex. 5 at 95, 99-100, 104-05, 102-10, 114-15.) Dunkin' has recently obtained information, however, that equipment installed and used at Aromas (including cash registers, toasters and coffee brewers) was actually supplied by 4 Donuts. (Loveland Certification, Ex. 6 ¶ 4.)[1] All of

---

[1] Defendant McManama, who was delegated full authority by Defendant Stetzer to manage and act on behalf of the franchises, installed the equipment and signed the lease. Ex. 5 at 156-57.

this information—which was extracted from Defendants in discovery over their strenuous objections—shows that there is ample basis for bringing a claim based on this breach.

Defendants incorrectly contend that Dunkin's Supplemental Notice of Termination is not proper because "it relate[s] back to the date of the original Notice of Termination." (Opp'n at 8.) The Supplemental Notice of Termination states:

> As permitted by Paragraph 9 of the Franchise Agreements, and for the reasons stated in this Notice of Default and Termination, Dunkin' Donuts elects to and does hereby, without further notice, terminate your Franchise Agreements *effective sixty (60) days from your receipt of this Notice*.

Ex. 7 at 3 (emphasis added). The notice does not state that it is retroactive. It states the opposite: that it is *not* effective until sixty days *after* Defendants' receipt of it. *Id.*

Defendants' claim that they have cured the breach also is incorrect. Unless an agreement's default and cure provisions are by their own terms the *exclusive* means for terminating the contract, they are *cumulative* of other common law remedies. Thus, the wronged party has a right to terminate a contract for a material breach without affording the other party an opportunity to cure. 6 Williston, *Law of Contracts* §842 at 165 n.1 (3d ed. 1962); 6 *Corbin on Contracts* §1266 (Supp. 1997); *e.g., Olin Corp. v. Central Industries, Inc.*, 576 F.2d 642, 645 (5th Cir. 1978); *D.C. Films, Inc. v. Best Film & Video Corp., (In re Best Film & Video)*, 46 B.R. 861 (Bankr. E.D.N.Y. 1985). Accordingly, when a franchisee materially breaches the franchise agreement, the franchisor may terminate it without providing a cure period if the notice and cure

---

McManama claims he left the employ of the franchises approximately four or five months ago (*Id.* at 82), although he admits that even post-"termination" he continues to receive such benefits as a $2,000 per week salary, a $600 monthly car stipend, gas reimbursement, and a cell phone. *Id.* at 75-76, 85-86, 168-169. According to Stetzer, he is "undetermined at this time how I'm going to put a number on the [severance]. . . . I'd like to see what happens in the future." Ex. 1 at 94-95. McManama could not recall whether his purported separation from Defendants occurred before or after Aromas opened for business. Ex. 5 at 114. At best, McManama was used as a subterfuge to breach the noncompete covenants, for which the franchisee-Defendants

provisions, by their own terms, are not the exclusive means to terminate. *See, e.g., Southland Corp. v. Mir,* 748 F.Supp. 969, 982-84 (E.D.N.Y. 1990) (upholding immediate termination of franchise agreement, despite contractual right to cure material breaches, because underreporting sales went to the very "essence of the contract."). Massachusetts law, which governs these contracts, applies this principle. *Saxon Theatre Corp. v. Hayden*, 7 Mass. App. Ct. 695, 699, 389 N.E.2d 1020, 1022 (Mass. App. Ct. 1979).

The notice-and-cure provisions at issue here are *expressly* cumulative. For example, Paragraph 9.G of the State Street Franchise Agreement provides:

> No right or remedy herein conferred upon or reserved to DUNKIN' DONUTS is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but *each shall be cumulative* of every other right or remedy hereunder.

(State Street Franchise Agreement, Ex. 8.) (emphasis added). Nothing in this provision limits Dunkin's ability to terminate without cure only to those circumstances set forth in paragraphs 9.B.4. and 9.E. Given the general language of paragraph 9.G., Dunkin' has the right to terminate the Franchise Agreement without an opportunity to cure for all material breaches. *Murphy v. Noonan*, 30 Mass. App. Ct. 950, 951 (1991) (a contract must be read in its entirety when interpreting specific provisions).

Under Massachusetts law, a material breach occurs when there is a breach of "an essential and inducing feature of the contract." *Lease-It, Inc. v. Massachusetts Port Auth.*, 33 Mass. App. Ct. 391, 600 N.E.2d 599, 602 (Mass. App. Ct. 1992). The breaches at issue here – establishing and supplying a competing donut and coffee business – constitute material breaches of the Franchise Agreements, which is most readily seen in connection with the harm they did to

---

are fully liable. It is well held that one cannot use a third party to avoid a noncompete covenant. *E.g., Ingredient Tech. Corp. v. Nay*, 532 F. Supp. 627, 632 (E.D.N.Y. 1982).

Dunkin's goodwill. The most valuable asset any franchisor has is the goodwill associated with the trademark that its franchisees pay royalties to use. Twelve paragraphs or sub-paragraphs of the Agreement contain covenants regarding Dunkin' Donuts' trademarks, the System they represent, and the goodwill associated with them. Ex. 8. In each Agreement, Defendants acknowledged that the System, the marks, and the goodwill were developed "as the result of the expenditure of time, effort and money" and that their purpose for entering into the Agreement was "to make use of the trademark 'Dunkin' Donuts' and to enjoy the benefits of that mark, the other proprietary marks, and the Dunkin' Donuts System." *Id.* Defendants were granted "the right to use . . . the trademark 'Dunkin' Donuts', along with other Proprietary Marks . . . ." *Id.* at ¶ 1.A. There can be no question that breaching the covenant not to "do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Dunkin' Donuts' Proprietary Marks and the Dunkin' Donuts System" (*Id.* at ¶ 8.A.1.) is a material breach.

Courts have routinely interpreted the injury to goodwill clause (¶ 8.A.1) of the Dunkin' Franchise Agreement—the same paragraph at issue here—as permitting Dunkin' to terminate a franchisee for a material breach without an opportunity to cure. *See Dunkin' Donuts Incorporated v. Chieng-Eung Thiem*, CV 93-0419JSAl (TX), slip op. at 3 (C.D. Cal. filed March 9, 1993) (finding breach of paragraphs 5.Q. and 8.A.1. constitute "a noncurable breach of the Dunkin' Donuts Franchise Agreement, for which immediate termination is warranted") (Ex. 9); *Dunkin' Donuts Incorporated v. Panagakos*, Bus. Franchise Guide (CCH) ¶ 11,174 (D.Mass. May 13, 1997) (finding involvement in a tax fraud scheme by the franchisee is a material breach of the Franchise Agreement warranting termination) (Ex. 10). The establishment and operation of Aromas fits within these principles and Dunkin' is entitled to terminate Defendants' Franchise Agreements without an opportunity to cure.

Second, even assuming there could be a cure, ceasing deliveries while concealing the rest of their involvement in the business can hardly be a "cure." According to Defendants, after receiving the notice of termination, they simply stopped deliveries and had McManama reimburse the registration fee filed by 4 Donuts, Inc. Ex. 2. This hardly cures the default, since the opening of the business (which now is supposedly in the hands of a third party operator), the deliveries to Aromas, and the sale of those products cannot be undone; neither can the irreparable harm to goodwill that occurred through the operation of Aromas. *See* E. ALLAN FARNSWORTH, *Contracts,* §8.17, n.1 ("Cure is not always possible, as in the case of the singer who does not show up on the night of the opera"). The notion that "it is too late to undo the harm" has rendered incurable various acts of omission or commission by franchisees, including remaining closed for business for an impermissible period of time, *e.g., In re Deppe,* 110 B.R. 898 (D.Minn. 1990), and selling products outside a permitted territory, *McKeesport Beer Distrib., Inc. v. All Brand Importers, Inc.,* Bus. Franchise Guide (CCH) ¶10,005 (Pa. 1992) (Ex. 11).

Finally, Defendants contend that Dunkin' fails to allege enough facts in the Amended Complaint to support its non-compete claim. (Opp'n at 5-6.) Rule 8(a) of the Federal Rules of Civil Procedure states that a complaint must only include "a short and plain statement of the claim showing that the pleader is entitled to relief." The notice pleading Rule only requires that the Complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002); *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir. 2002).[2] In its Amended Complaint, Dunkin' sets forth the contractual provisions at issue, namely Paragraphs 8.A.1 or 8.0.1, Paragraphs 8.A.3 or 8.0.3 and Paragraph A-9.B.4. (Am. Compl. ¶ 94.) The Amended Complaint then alleges:

6

>Defendants are also in default of their Franchise Agreements by supplying doughnuts and other products to a competing doughnut and coffee business. Upon information and belief, Defendants have supplied doughnuts and other products to a business called Aromas Coffee and Bake Shop. Aromas Coffee and Bake Shop is a doughnut and coffee business located near Defendants' and other Dunkin' franchises.

(Am. Compl. ¶ 43.) When they received the termination notice and Amended Complaint, Defendants knew full well the range of their own activities on behalf of Aromas, and cannot claim that they were not apprised of Dunkin's claim. Dunkin', however, has fought for discovery that only recently disclosed the breadth of those activities. By identifying the business that was operated, the fact that it was supplied by 4 Donuts, and the contractual provisions that this conduct breached, Dunkin' has provided more than adequate notice to the Defendants under the liberal standards for notice pleading.

## II. DUNKIN'S CLAIMS WERE BROUGHT SHORTLY AFTER THEY WERE DISCOVERED OR MERELY CLARIFIED EXISTING CLAIMS.

Both with respect to claims of tax fraud and those involving Aromas, Dunkin' timely filed the Amended Complaint after it discovered the factual basis for these claims or the need to clarify its pleading. The tax fraud claims were included in its initial Complaint. Although Defendants contend that they "assumed for some time that tax charges were not part of this case," (Opp'n at 14), this cannot be true because the initial termination notice, which is referred to and relied upon in the Complaint, plainly stated that Defendants' Franchise Agreements were being terminated for violation of tax laws. (Ex. 2 to Mot. to Am. Compl. at 3.) Documents such as the Notice are incorporated by reference even if they are not attached to the complaint. *Lone Star Ind., Inc. v. Nelstad Material Corp.*, 811 F. Supp. 147, 148 (S.D.N.Y. 1993) ("[N]otice pleading under Fed. R. Civ. P. 8 permits allegations concerning governing documents even if not

---

[2] The Supplemental Notice of Termination also provided Defendants with notice of the grounds

attached to the complaint."); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (a document not attached to a complaint may be incorporated by reference if the plaintiff refers extensively to the document or it forms the basis of its claim). The Complaint, along with the original Notice, gave Defendants adequate notice that claims had been raised against them based on tax law violations.

Dunkin' also discussed this claim on several occasions in its filings with the Court. In its February 4, 2003 opposition to Defendants' motion to quash, Dunkin' stated that "Defendants' underreporting also had the effect of cheating the taxing authorities, another breach of the Franchise Agreements and an allegation in Dunkin's Complaint." (Opp'n to Mot. to Quash at 3.) A similar statement was made in support of Dunkin's motion to compel: "[o]ne of the allegations in this suit is that Defendants violated the 'obey all laws' clause by failing to pay taxes on their underreported sales." (Mot. to Compel at 27.) Defendants' "assumption" that tax fraud was not part of the case should thus be rejected.

Defendants' further contention that Dunkin' has not met the "good cause" standard to amend its Complaint after the deadline for doing so in the scheduling order ignores the fact that whether such an amendment is possible "depends on the diligence of the moving party." *Parker v. Columbia Pictures Industries*, 204 F.3d 326, 340 (2d Cir. 2000). Dunkin' has exercised more than sufficient diligence with respect to its tax fraud claims. It did not learn of Defendants' apparent "confusion" regarding its tax claims until they filed their surreply in further opposition to Dunkin's motion to compel on August 20, 2003. Defendants contended that "Plaintiff's search for underreporting is just a pretext to try to find some tax irregularity that can be used as a justification to terminate defendants under the so-called 'obey all laws' clause, even though no

---

for terminating the Franchise Agreements. Ex. 7.

tax violation is alleged in the Complaint." (Surreply at 3.) Although Dunkin' explained the basis for its tax law claims in its response to the surreply, it moved to clarify its initial Complaint. Dunkin' did not delay in doing so. Good cause thus exists to permit Dunkin' to clarify its initial Complaint regarding Defendants' violations of the tax laws. *Ladd v. Equicredit Corp. of Am.*, 2001 U.S. Dist. LEXIS 7895, *5 (E.D. La. June 1, 2001) (allowing amended complaint after expiration of deadline in scheduling order because "the amendment appears merely clarifying in nature and . . . [this] constitutes good cause.") (Ex. 12).

Defendants fought tooth and nail to keep their financial information from discovery, and denying the motion to amend would bring to fruition their obstructionist approach.[3] Only through numerous, lengthy discovery battles (which are ongoing) was Dunkin' able to discover—from Defendants' own records—that they had paid employees with a second set of checks without deducting applicable taxes, deducted as "office expenses" thousands of dollars in personal credit card expenses (the credit cards were withheld in discovery), and improperly funded a race car business with their Dunkin' businesses. Dunkin' alleged from the outset that the franchises were used to commit tax fraud, and it has fleshed out those claims in discovery.

Defendants contend they will be prejudiced by "plaintiffs' delay in asserting the tax claim," but fail to identify how. (Opp'n at 14.) They will need no additional discovery since the basis for the tax law claims is Defendants' own personal and corporate records that Defendants have fought so strenuously not to produce, and which have already been the focus of this case. Additionally, the scheduling order affords the parties until December 31, 2003 to conduct expert discovery, which will address these claims. Moreover, the Court scheduled a hearing on the

---

[3] Including bringing a halt to the deposition of Defendant James McManama, without proper justification, which is the subject of a recently filed Motion.

9

issue of whether the discovery deadlines should be extended and Defendants can address their need for more fact discovery then.

Dunkin' also acted diligently to amend its Complaint to include Aromas. It opened for business in August 2003 and Dunkin' confirmed that Defendants were supplying products on September 18, 2003. Ex. 6 ¶ 3. McManama concealed his interest in Aromas until October 27, 2003, three weeks *after* Dunkin' moved to amend its Complaint. Defendants did not produce any documents relating to Aromas until October 21, 2003, despite the Court's September 11, 2003 Order that such information be produced by September 29, 2003. *Id.*

On October 3, 2003, Dunkin' served Defendants with a Supplemental Notice of Termination for breaching their Franchise Agreements by establishing and supplying a competing business and then moved to amend its Complaint. Ex. 7. Had Defendants produced documents and information relating to their other business interests at the outset of this case, there would have been ample time for Dunkin' to amend its Complaint before the July 15, 2003 deadline. Good cause thus exists because of the expeditious manner in which Dunkin' moved to amend its Complaint to include this breach of the Franchise Agreements. *The Topps Co. v. Cadbury S.A.I.C.*, 2002 U.S. Dist LEXIS 16758, *5 (S.D.N.Y. Sept. 10, 2002) (finding good cause to amend when party moved to amend one month after becoming aware of claim) (Ex. 13).

It is in the best interests of all parties that the Complaint be amended to include all claims instead of requiring Dunkin' to file a separate action that would increase the costs for all. It is a more efficient use of the parties' and the Court's resources for Dunkin' to amend its Complaint. *The Topps Co.*, 2002 U.S. Dist. LEXIS 16758, *5 (prejudice to a defendant in a civil action must be balanced against the court's interest in litigating all potential claims in a single action.) (Ex. 13). Additionally, although Dunkin' would not oppose additional discovery related to Aromas,

10

little discovery would be needed because all of the facts are already known by Defendants and the evidence supporting this claim is in their own records.

Respectfully submitted,

*Alexandra M McHugh*
Robert L. Zisk ct 13503
Jeffrey L. Karlin ct 14965
Christopher M. Loveland ct 24169
SCHMELTZER, APTAKER & SHEPARD, P.C.
2600 Virginia Avenue, N.W.
Suite 1000
Washington, D.C. 20037
(202) 333-8800

Paul D. Sanson ct 05477
Alexandra M. McHugh ct 22428
SHIPMAN & GOODWIN LLP
One American Row
Hartford, CT 06103-2819
(860) 251-5612

Attorneys for Plaintiffs
Dunkin' Donuts Incorporated,
Dunkin' Donuts USA, Inc.

Dated: November 10, 2003

11

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff Dunkin' Donuts Incorporated's Reply to Defendants' Opposition to Plaintiff's Motion for Leave to File an Amended Complaint was served by hand delivery this 10th day of November, 2003, to:

Richard S. Order, Esq.
Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT  06103-3702

Amy Leete Van Dyke, Esq.
Updike, Kelly & Spellacy, P.C.
One State Street
Hartford, CT  06123-1277

Robert K. Walsh, Esq.
The Law Offices of Robert K. Walsh
193 State Street
P.O. Box 777
New Haven, CT  06473

/s/ Alexandra M. McHugh
Alexandra M. McHugh

297006 v.01