1       IN THE UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF CONNECTICUT

2

3                              No. 3:02CV1920

4

5                                                    COPY

6   DUNKIN' DONUTS INCORPORATED AND

    DUNKIN' DONUTS USA, INC.

7

    VS

8

    4 DONUTS, INC., GRANDO, INC., GLENN STETZER, KATHLEEN

9   STETZER, GEORGE GERMANO AND JAMES MCMANAMA

10

11

12

13

14       Deposition of:  JAMES MCMANAMA, taken before

15   Barbara L. Murphy, Licensed Shorthand Reporter,

16   License No. 305 and Notary Public within and for the

17   State of Connecticut, held at the offices of Shipman

18   and Goodwin, One American Row, Hartford, Connecticut

19   on October 15, 2003 commencing at 9:08 a.m.

20

21

22

23

24

25

95

1  Q. Did you have a phone conversation or did you

2 have -- did you talk to him in person?

3  A. I believe a phone conversation.

4  Q. Did you phone him or did he phone you?

5  A. I'm not sure.

6  Q. What did he say and what did you say?

7  A. He informed me that they were not delivering

8 to that location any longer.

9  Q. Prior to that time -- when you say they,

10 what do you mean?

11  A. 4 Donuts, Inc.

12  Q. And prior to that time was 4 Donuts, Inc.

13 delivering to the Aroma's Coffee and Bake Shop?

14  A. Yes.

15  Q. How frequently was it delivering there?

16  A. That I'm not sure.

17  Q. Was it done on a daily basis?

18    MR. GILMORE:  Objection as to form.

19    THE WITNESS:  I believe so.

20  Q. (By Mr. Karlin) Do you know when those

21 deliveries began?

22  A. No, I do not know.

23  Q. Do you know whether it began in September

24 2003?

25  A. I'm not sure.

99

1    Q.    Who is the owner of that Citgo gas station?

2    A.    I don't know.

3    Q.    Did you ever have any conversation with that

4    owner of that Citgo gas station?

5    A.    No, I have not.

6    Q.    Did Aroma's, LLC ever have any -- I'm sorry,

7    withdraw the question.

8         Did Aroma's lease the space from the

9    Citgo gas station?

10    A.    I'm not sure if it was the Citgo gas

11    station.

12    Q.    Was there a lease with anybody else?

13    A.    I believe so.

14    Q.    Who is the lease with?

15    A.    An oil company.

16    Q.    I'm sorry?

17    A.    Oil company.

18    Q.    Was the lease directly with the Citgo Oil

19    Company?

20    A.    I'm not sure.

21    Q.    Did you have any involvement in that lease?

22    A.    I helped set up the lease.

23         MR. ORDER:   Objection.

24    Q.    (By Mr. Karlin)   You helped set up the

25    lease.

1           When did you help set up the lease?

2       A.   I don't recall.

3       Q.   Was it this year?

4       A.   I don't recall.

5       Q.   Was it in 2002?

6       A.   I don't recall.

7       Q.   Is there a lease agreement in existence

8   between Aroma's and the oil company?

9       A.   Now?

10      Q.   Yes.

11      A.   No.

12      Q.   Was there in the -- was there at any time

13  prior to today's date a lease agreement between

14  Aroma's and the oil company?

15      A.   I believe so.

16      Q.   Why is it that there is no lease agreement

17  today?

18      A.   There is no more operation there.

19      Q.   And was the lease cancelled in any way?

20      A.   I believe so.

21      Q.   Were you involved in that occurrence?

22      A.   No.

23      Q.   Who was involved in that occurrence?

24      A.   It just cancelled.

25      Q.   How do you know that?

102

1    A.    At my house.

2    Q.    I'm sorry?

3    A.    Would be at my house if I had anything.

4    Q.    Who does the accounting work for Aroma's

5 Coffee, if anyone?

6    A.    My accountant.

7    Q.    And your accountant is who?

8    A.    Anthony Citerella.

9    Q.    And how long has Anthony Citerella done the

10 accounting for Aroma's?

11    A.    I'm not sure.

12    Q.    Is there anybody else who has done

13 accounting for Aroma's?

14    A.    No.

15    Q.    Did Aroma's take over an existing coffee

16 stand inside the gas station?

17    A.    Yes.

18    Q.    Did Aroma's have to do any work with respect

19 to installing any shelves or counters?

20    A.    Yes.

21    Q.    And were you involved in that?

22    A.    Yes, I was.

23    Q.    Where did the shelves and counters come from

24 that were installed at Aroma's?

25    A.    Where did they come from?

1    Q.    Right.

2    A.    They were old units.

3    Q.    Old units from what?

4    A.    From shops.

5    Q.    From shops owned by or owned by 4 Donuts and

6    Grando?

7    A.    No.

8    Q.    What shops were they from?

9    A.    Just bought them from a broker.

10    Q.    You bought them from a broker?

11    A.    (Witness nodding.)

12    Q.    When did you buy them from a broker?

13    A.    I'm not sure.

14    Q.    What broker did you buy them from?

15    A.    A broker in Wallingford.

16    Q.    I'm sorry?

17    A.    A broker in Wallingford.

18    Q.    Wallingford.  Did that broker -- was he

19    connected to a business, do you know.

20    A.    I'm not sure.

21    Q.    How is it that you came in contact with that

22    broker?

23    A.    Just saw the shop.

24    Q.    I'm sorry?

25    A.    I saw the shop.

104

1     Q.   You saw the shop?

2     A.   Yes.

3     Q.   Where was that shop located?

4     A.   In Wallingford.

5     Q.   Why is it that that -- the shelves and

6 counters were available to be sold?

7     A.   He buys and sells used equipment.

8     Q.   Was this a Dunkin' Donuts shop?

9     A.   No.

10    Q.   What sort of shop was it?

11    A.   Just a used restaurant supply.

12    Q.   Do you have any sort of bill of sale in

13 connection with that transaction?

14    A.   I don't believe so.

15    Q.   Did you buy any equipment from 4 Donuts or

16 Grando, Inc. or 2 Donuts, Inc. with respect to

17 Aroma's?

18    A.   No, I did not.

19    Q.   Did you take any equipment from 4 Donuts,

20 Grando or 2 Donuts, Inc. for use in Aroma's?

21    A.   No, I did not.

22    Q.   Are you aware of any equipment or fixtures

23 used in the Aroma's shop that were previously used in

24 any shops owned or operated by 4 Donuts, Grando or 2

25 Donuts, Inc.?

1      A.   No, I'm not.

2      Q.   Do you know whether any of the shelving or

3  equipment or counters were previously used in a

4  Dunkin' Donuts shop?

5      A.   That I do not know.

6      Q.   Did you keep a record of the transaction

7  which you purchased the used equipment and fixtures?

8      A.   I don't know.

9      Q.   How did you pay for them?

10     A.   Cash.

11     Q.   Cash.  Where did you get the cash?

12     A.   From my bank account.

13     Q.   Where is your bank account located?

14     A.   New Haven Savings Bank.

15     Q.   How much did you pay for them?

16     A.   I don't recall.

17          MR. ORDER:  Are you talking about the

18  shelves and counters still?

19          MR. KARLIN:  I'm sorry, shelves,

20  counters, other equipment.

21          THE WITNESS:  I don't recall.

22     Q.   (By Mr. Karlin)  Aside from shelves and

23  counters, what other equipment did you pay for from

24  the broker?

25     A.   That's all I can recall.

1    Q.    Do you have any coffee machines at all?

2    A.    Pardon me?

3    Q.    Do you have coffee machines?

4    A.    Yes.

5              MR. ORDER:    Objection to form.

6    Q.    (By Mr. Karlin)    You had coffee machines at

7    Aroma's?

8    A.    Yes.

9    Q.    Where did the coffee machines come from?

10    A.    A broker.

11    Q.    Same broker for the shelves and counters?

12    A.    A different one.

13    Q.    Where was that broker located?

14    A.    In New Haven.

15    Q.    Do you know the name of that broker?

16    A.    No, I do not.

17    Q.    Did you purchase or lease the coffee --

18    A.    It was all used.

19    Q.    So you purchased it?

20    A.    Yes, correct.

21    Q.    How many coffee machines did you purchase?

22    A.    Two.

23    Q.    How much did you pay?

24    A.    I don't recall.

25    Q.    I'm sorry?

1    A.    I don't recall.

2    Q.    Was it more than $1,000?

3    A.    I don't recall.

4    Q.    Was it more than $2,000?

5    A.    I don't recall.

6    Q.    In terms of the counters and the shelves.

7    How much did you pay for that?

8    A.    I don't recall.

9    Q.    Did you keep a record of how much you paid

10    for the two coffee machines?

11    A.    No.

12    Q.    Did you receive any sort of a receipt?

13    A.    I think so.

14    Q.    Do you know whether you kept the receipt?

15    A.    I don't believe so.

16    Q.    Why not?

17    A.    Wasn't necessary.

18    Q.    Why wasn't it necessary?

19    A.    Because it was used equipment.

20    Q.    Did you give the receipt to Mr. Citerella,

21    do you recall?

22    A.    I don't recall.

23    Q.    Do you recall whether you informed Mr.

24    Citerella of purchasing the coffee equipment?

25    A.    No, I do not.

108

1    Q.   Is that an expense -- was that an expense of

2    Aroma's, LLC?

3    A.   That was an expense of mine.

4    Q.   Of yours.  And did you pay cash or check for

5    the coffee machines?

6    A.   Cash.

7    Q.   Cash?

8    A.   Cash.

9    Q.   Where did you get the cash?

10   A.   From my bank.

11   Q.   From your bank account at New Haven Savings

12   Bank?

13   A.   That's correct.

14   Q.   Other than the coffee machines and the

15   shelves and the counters, were there any other

16   equipment or fixtures that Aroma's purchased or you

17   purchased on behalf of Aroma's?

18   A.   I don't believe so.

19   Q.   So just shelves, counters and coffee

20   machines?

21   A.   I believe so.

22   Q.   Did it have a register, cash register?

23   A.   Yes.

24   Q.   Where did you obtain that?

25   A.   I don't recall.

109

1      Q.  Did you purchase it?

2      A.  I believe so.

3      Q.  Where did you purchase it from?

4      A.  I don't recall.

5      Q.  Did you purchase it from a broker?

6      A.  I don't believe so.

7      Q.  Was it a used register or new one?

8      A.  It was -- I believe it was a used one.

9      Q.  Do you know -- did you purchase it from a

10  business or did you purchase it from an individual?

11     A.  Online.

12     Q.  Online.  Where online did you purchase it

13  from?

14     A.  I don't recall.

15     Q.  Was it -- did you purchase it from an online

16  website, I take it?

17     A.  Something like e-Bay.

18     Q.  Something like e-Bay.  Do you know whether

19  it was e-Bay or not?

20     A.  I'm not sure.

21     Q.  Do you remember whether it was an online

22  auction site?

23     A.  It could have been.

24     Q.  What sort of register was it?

25     A.  I don't know.

1       Q.   How much did you pay for it?

2       A.   I don't recall.

3       Q.   Do you recall how you paid for it?

4       A.   No, I do not.

5       Q.   Did 4 Donuts, 2 Donuts or Grando pay for any

6  expenses for Aroma's?

7       A.   No.

8       Q.   You believe no.  Were there any filing fees

9  -- I'm sorry, Aroma's, LLC, did it file any sort of

10  papers with the state of Connecticut?

11       A.   I believe so.

12       Q.   Did you have any involvement in that?

13       A.   Filing the papers?

14       Q.   Yes.

15       A.   No.

16       Q.   Did you have any involvement in having the

17  papers filed?

18       A.   I don't understand the question.

19       Q.   Did somebody else file the papers for you?

20       A.   That's correct.

21       Q.   Did Mr. Citerella file the papers?

22       A.   I believe so.

23       Q.   Did you have any involvement in that?  Did

24  you have any involvement in terms of -- did you have a

25  discussion -- let me withdraw the question.

1    A.    No, I wasn't.

2              MR. ORDER:  What's the antecedent

3    pronoun it.

4              MR. KARLIN:  I'm sorry, I'll withdraw

5    the question.

6    Q.    (By Mr. Karlin)  When work began on the

7    installation of fixtures and equipment at Aroma's,

8    were you still employed by 4 Donuts, Inc.?

9    A.    I do not believe so.

10    Q.    In relation to the conversation you had with

11    Mr. Stetzer about leaving the employment of the 4

12    Donuts, Inc., did the work on Aroma's, the

13    installation work of the equipment and fixtures at

14    Aroma's occur before or after that conversation?

15    A.    I don't recall.

16    Q.    Who did the work in terms of installing the

17    equipment and the fixtures at Aroma's?

18    A.    I did.

19    Q.    I'm sorry?

20    A.    I did.

21    Q.    Anybody else work with you?

22    A.    Most of it was done by myself.

23    Q.    I'm sorry?

24    A.    Most of it was done by myself.

25    Q.    Who else, if anyone, worked on it?

115

1    A.    Maybe Cody helped me.

2    Q.    Is that Cody McManama?

3    A.    That's right.

4    Q.    Aside from Cody McManama, did anybody else

5    help you?

6    A.    No.

7    Q.    Did there come a time when Aroma's opened

8    for business?

9    A.    Yes.

10    Q.    When did it open for business?

11    A.    I'm not exactly sure.

12    Q.    Did it open for business in July of 2003?

13    A.    I don't believe so.

14    Q.    Did it open for business in August 2003?

15    A.    It could have.

16    Q.    Did it open for business in September of

17    2003?

18    A.    It could have, yes.

19    Q.    Do you have any records that would show when

20    it opened for business?

21    A.    No, I do not.

22    Q.    The cash register that you purchased with --

23    did you use it in connection -- was it used in

24    connection with the Aroma's Coffee Shop?

25    A.    I believe so.

1    A.   Yes.  I think it did happen.

2    Q.   And what was the circumstances behind

3  writing a check to Mustang Group?

4    A.   To put funds in the account.

5    Q.   And on how many occasions did you write a

6  check to Mustang Group from 4 Donuts, Inc.?

7    A.   I'm not sure.

8    Q.   Did you discuss that with Mr. Stetzer?

9    A.   I'm not sure.

10          MR. ORDER:  Objection.

11    Q.   (By Mr. Karlin)  Did you have authority from

12  Mr. Stetzer to write a check from 4 Donuts, Inc. to

13  Mustang Group?

14    A.   I believe so.

15    Q.   Why is it that you believe so?

16    A.   He gave me the authority.

17    Q.   Did Mr. Stetzer give you authority to invest

18  money from 4 Donuts, Inc. into other companies?

19    A.   I had authority.

20    Q.   And did you have to check with him before

21  you invested money from 4 Donuts, Inc. into other

22  companies?

23    A.   No, I did not.

24    Q.   And did you have a conversation about that?

25          MR. ORDER:  About what?

1       Q.    (By Mr. Karlin)  About your authority to

2  invest money in 4 Donuts, Inc. into other companies?

3                 MR. GILMORE:  Objection as to form.

4                 THE WITNESS:  He was sick and he asked

5  me to handle the businesses.

6       Q.    (By Mr. Karlin)  What was your understanding

7  about the length and breadth of your authority with

8  respect to that?

9       A.    Just try to do the best.

10      Q.    Did you have any limits with respect to your

11  authority?

12      A.    Not specifically.

13      Q.    Did Mr. Stetzer put any limits on your

14  authority?

15      A.    Not specifically.

16      Q.    What, if anything, did Mustang Group do with

17  any of the money that was -- that it received from 4

18  Donuts, Inc.?

19      A.    I'm not quite sure.

20      Q.    Did it purchase anything with any of the

21  money that was -- that it received from 4 Donuts,

22  Inc.?

23      A.    Might have purchased a computer but I'm not

24  sure.

25      Q.    Why is it that -- let me withdraw that

1        A.    Personal trips?  What do you mean by

2    personal trips.

3        Q.    Do you use it for personal use as opposed to

4    business use?

5        A.    Yes.

6        Q.    Do you use it to drive back and fourth to

7    work, for example?

8        A.    Yes.

9        Q.    Are you still working for the doughnut

10   businesses?

11       A.    No.

12       Q.    When did you stop working for the doughnut

13   businesses?

14       A.    Four months ago, five months ago.

15       Q.    I'm sorry.

16       A.    I'm not sure.  Four or five months ago.

17       Q.    Why aren't you still working for the

18   doughnut businesses?

19       A.    Just a decision not to be in the doughnut

20   business.

21       Q.    Who made that decision?

22       A.    I believe it was mine.

23       Q.    Was anybody else involved in that decision?

24       A.    It was my act to not work for Dunkin' Donuts

25   any longer.

1    Q.   Do you know what the policy amount is?

2    A.   That I do not.

3    Q.   Do you know what the -- whether the premium

4    is paid by the doughnut businesses?

5    A.   I think I answered that.

6    Q.   Do you know how much the premium is?

7    A.   That I do not know.

8    Q.   Did you have a discussion with Mr. Stetzer

9    about that?

10   A.   About what?

11   Q.   About the life insurance policy?

12   A.   A discussion?

13   Q.   Yes.

14   A.   When it was initially consummated.

15   Q.   When was that?

16   A.   That I'm not sure of the year.

17   Q.   Do you know what company it's through?

18   A.   No, I don't.  Aetna maybe but that would be

19   a guess.

20   Q.   I'm not interested in guesses.

21   A.   All right.  That would be my guess.

22   Q.   Aside from salary and life insurance do you

23   receive any sort of car allowance?

24   A.   Yes, I do.

25   Q.   How much do you receive?

1    A.   Approximately $600 a month.

2    Q.   When did you start receiving that?

3    A.   You wrote down six twenty.

4    Q.   What my notes say are my business.

5    A.   Okay.

6    Q.   You said approximately six hundred?

7    A.   Right.

8    Q.   Do you know whether it's six twenty?

9    A.   Obviously you do.

10   Q.   Don't make any assumptions.  I just want to

11   know.

12   A.   All right.  Approximately six hundred, yes.

13   Q.   So approximately six hundred.  Do you know

14   in particular whether it's six twenty or not?

15   A.   It must be six twenty.

16   Q.   Don't assume anything from what I wrote

17   down.

18   A.   Approximately six hundred.

19   Q.   And do you use the car allowance to either

20   lease or purchase a car?

21          MR. GILMORE:  Objection as to form.

22          THE WITNESS:  My car is -- my Tahoe is

23   paid for.

24   Q.   (By Mr. Karlin)  Okay.  In the last year

25   have you -- when was your -- when did you complete

85

1    employment at the doughnut businesses?

2        A.   I have to devote more time to other things.

3        Q.   What other things do you have to devote more

4    time to?

5        A.   Family.

6        Q.   Was anything in -- did you and Mr. Stetzer

7    reach some sort of written agreement with respect to

8    the ending of your employment?

9        A.   No.

10       Q.   Did you reach any sort of verbal agreement

11   with Mr. Stetzer with respect to the ending of your

12   employment with him?

13       A.   As far as what?

14       Q.   Well, did you reach an agreement as to when

15   you would stop working?

16       A.   I don't know if there was a specific date.

17       Q.   When did you stop working after the

18   conversation?

19       A.   Very shortly after that.

20       Q.   Are you receiving any sort of severance pay?

21       A.   Yes.

22       Q.   How much severance pay are you receiving?

23       A.   I'm receiving my weekly pay that I was

24   receiving before.

25       Q.   So you're receiving the same $2,000?

1      A.    That's correct.

2      Q.    Are you still receiving payments from both 4

3 Donuts and 2 Donuts?

4      A.    No.

5      Q.    Are you receiving payments from just 4

6 Donuts?

7      A.    Yes.

8      Q.    Are you receiving -- are you still covered

9 under that life insurance policy that we spoke about

10 earlier?

11     A.    That I don't know.

12     Q.    Do you still receive a car allowance?

13     A.    Yes, I do.

14     Q.    Do you -- are you receiving money for gas?

15     A.    Occasionally.

16     Q.    When was the last time you got money for

17 gas?

18     A.    Maybe a month ago.

19     Q.    Was that cash -- in the form of cash?

20     A.    As the previous way I stated.

21     Q.    How much was it?  How much was the amount

22 that you received in cash at that time?

23     A.    $25.

24     Q.    Since that conversation four or five months

25 ago, have you done any work for the doughnut

168

1      Q.   You've had the same cell phone -- did you

2  have the same cell phone in September 2002 that you

3  have today?

4      A.   I'm not sure.  It was changed at some point

5  in time but I do not know.

6      Q.   Did your cell number -- cell phone number

7  change at any time between August 2002 and today?

8      A.   August 2002 -- I believe it could have.

9      Q.   Do you know when it might have been changed?

10     A.   I'm sorry, no.

11     Q.   Do you know whether you had the same cell

12  phone number in September 2002 that you have today?

13     A.   September 2002?

14     Q.   Yes.

15           MR. GILMORE:  Objection as to form.

16           THE WITNESS:  I don't think I did.

17     Q.   (By Mr. Karlin)  You had a different cell

18  phone number in September 2002 than you have today?

19     A.   September 2002?  It's a possibility, yes.

20     Q.   What's your current cell phone number?

21     A.   I know you're not going to believe this but

22  I don't know.

23     Q.   Do you get a cell phone statement or cell

24  phone bill every month?  Do you get them?

25     A.   Personally?

1   Q.  Yes.

2   A.  No, I don't.

3   Q.  Does the bill go to 4 Donuts, Inc. do you

4   know?

5   A.  My personal --

6   Q.  I'm sorry, you have a cell phone, correct?

7   A.  Yes.

8   Q.  Do you get a bill for that cell phone?

9   A.  Personally?

10  Q.  Yes.

11  A.  Not me personally.

12  Q.  Does a cell phone bill come to your

13  residence?

14  A.  No, it does not.

15  Q.  Do you know where the cell phone bill for

16  your cell phone that you're using now goes to?

17  A.  I believe it goes either to -- a doughnut

18  shop.

19  Q.  One of the doughnut shops?

20  A.  I believe so.

21  Q.  Do you know which doughnut shop it goes to?

22  A.  I think it would be the Hamden doughnut

23  shop.

24  Q.  Do you have your cell phone with you today?

25  A.  No, I don't.