UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DUNKIN' DONUTS INCORPORATED, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | C.A. No. 302 CV 1920 (MRK) |
| v. ) | |
| ) | |
| 4 DONUTS, INC., *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | NOVEMBER 10, 2003 |

### CERTIFICATION OF CHRISTOPHER M. LOVELAND

1. My name is Christopher M. Loveland. I am a citizen and resident of the Commonwealth of Virginia, and I make this Certification based on personal knowledge.

2. I am an associate at the law firm of Schmeltzer, Aptaker & Shepard, P.C. I represent Dunkin' Donuts Incorporated and Dunkin' Donuts USA, Inc. in the present case.

3. Dunkin' Donuts hired an investigator to conduct surveillance on Defendants' State Street shop to determine whether Defendants were delivering doughnuts to Aromas Coffee and Bake Shop. Surveillance was conducted at Defendants' shop on September 17, 2003. On September 18, 2003, the investigator provided Dunkin' Donuts with a report that stated that he observed doughnuts being delivered from Defendants' State Street shop to Aromas Coffee and Bake Shop.

4. Dunkin' has recently obtained information that the equipment installed and used at Aromas was supplied by 4 Donuts, Inc., including cash registers, toasters and coffee brewers.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 10th day of November, 2003.

_____
Christopher M. Loveland

**SCHMELTZER, APTAKER & SHEPARD, P.C.**
COUNSELORS AT LAW
THE WATERGATE
2600 VIRGINIA AVENUE, NORTHWEST, SUITE 1000
WASHINGTON, D.C. 20037-1922
WEB SITE http://www.saspc.com
E-MAIL sas@saslaw.com
FAX (202) 337-6065
(202) 333-8800

October 3, 2003

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Glenn Stetzer
4 Donuts, Inc.
Grando, Inc.
c/o Richard S. Order, Esq.
Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT 06103-3702

George Germano
c/o Amy Leete Van Dyke, Esq.
Updike, Kelly & Spellacy, P.C.
One State Street, PO Box 231277
Hartford, CT 06123-1277

Kathleen Stetzer
c/o Robert K. Walsh, Esq.
The Law Offices of Robert K. Walsh
193 State Street
P.O. Box 777
New Haven, CT 06473

    Re:    **Supplemental Notice of Default and Termination**
             New Haven, Connecticut (PC 304966)
             Hamden, Connecticut (PC 308629)
             East Haven, Connecticut (PC 302769)
             New Haven, Connecticut (PC 330525)
             New Haven, Connecticut (PC 302697)
             New Haven, Connecticut (PC 302069)

Dear Franchisees:

    We are sending you this Supplemental Notice of Default and Termination through your attorneys because you have informed us that you are presently represented by counsel with

## SCHMELTZER, APTAKER & SHEPARD, P.C.

4 Donuts, Inc.
Grando, Inc.
Glenn Stetzer
George Germano
Kathleen Stetzer
October 3, 2003
Page 2 of 5

respect to your violations of the Franchise Agreements. If it is your position that sending you this notice through your attorney is inadequate or improper in any way, we request that you or your attorney notify us immediately in writing. This Notice serves to supplement the Notice of Termination previously sent to you on October 24, 2002. This letter does not supersede the Notice of Termination, nor does it constitute a waiver of any rights Dunkin' Donuts Incorporated or Dunkin' Donuts USA, Inc. have pursuant to the Notice of Termination or the pending litigation.

You are hereby notified of certain defaults under the Franchise Agreements between Dunkin' Donuts Incorporated (hereinafter referred to as "Dunkin' Donuts") and the franchisees listed below, pursuant to which you operate Dunkin' Donuts franchises at the addresses listed:

| Dunkin' Franchisee | Date of Agreement | Location of Shop | PC# |
|---|---|---|---|
| Glenn Stetzer | February 25, 1985 | 291 Ferry Street New Haven, CT | 304966 |
| 4 Donuts, Inc. Glenn Stetzer George Germano | August 27, 1992 | 1950 State Street Hamden CT | 308629 |
| 4 Donuts, Inc. Glenn Stetzer George Germano | April 1, 1993 | 87 Frontage Road East Haven, CT | 302769 |
| Grando, Inc. Glenn Stetzer Kathleen Stetzer | November 12, 1996 | 475 Forbes Avenue New Haven, CT 06513 | 330525 |
| 4 Donuts, Inc. Glenn Stetzer George Germano | December 9, 1992 | 66 York Street New Haven, CT | 302697 |
| 4 Donuts, Inc. Glenn Stetzer George Germano | May 28, 1992 | 200 Sargent Drive New Haven, CT | 302069 |

**SCHMELTZER, APTAKER & SHEPARD, P.C.**

4 Donuts, Inc.
Grando, Inc.
Glenn Stetzer
George Germano
Kathleen Stetzer
October 3, 2003
Page 3 of 5

It is a violation and default of the Franchise Agreements to divert or attempt to divert any business or customer of the Dunkin' Donuts shops to any competitor. (Paragraph 8.A.1 or 8.0.1) It is also a violation and default of the Franchise Agreements to own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to those offered by Dunkin' Donuts. (Paragraph 8.A.3 or 8.0.3) Based on a variety of evidence, Dunkin' has concluded that you have breached your Franchise Agreements by supplying doughnuts from your Dunkin' Donuts shops to a competing doughnut business called Aromas Coffee and Bake Shop.

It is also a violation and default of the Franchise Agreements to perform, directly or indirectly, any act injurious or prejudicial to the goodwill associated with Dunkin' Donuts' proprietary marks and the Dunkin' Donuts system. (Paragraph 8.A.1 or 8.0.1) Your actions are in further breach of the Franchise Agreements in that they are injurious or prejudicial to the goodwill associated with Dunkin' Donuts' proprietary marks.

As a matter of law, your breached cannot be cured and constitute good cause for termination of the Franchise Agreement. As permitted by Paragraph 9 of the Franchise Agreements, and for the reasons stated in this Notice of Default and Termination, Dunkin' Donuts elects to and does hereby, without further notice, terminate your Franchise Agreements effective sixty (60) days from your receipt of this Notice.

Moreover, the termination of the Ferry Street Franchise Agreement also constitutes a default under the terms of the Forbes Avenue and Sargent Avenue Franchise Agreements, which cannot be cured as a matter of law and constitutes grounds for termination of the Forbes Avenue and Sargent Avenue Franchise Agreements. (Paragraph A-9.B.4.) The termination of the State Street Franchise Agreement also constitutes a default under the terms of the Frontage Road and York Street Franchise Agreements, which cannot be cured as a matter of law and constitutes grounds for termination of the Frontage Road and York Street Franchise Agreements. (Paragraph A-9.B.4.) Accordingly, as permitted by the Frontage Road Franchise Agreement, the Forbes Avenue Franchise Agreement, the York Street Franchise Agreement, and the Sargent Avenue Franchise Agreement, and for the reasons stated in this Notice of Termination, Dunkin' Donuts elects to and does hereby, terminate the Frontage Road, Forbes Avenue, York Street, and Sargent Avenue Franchise Agreements effective sixty (60) days from your receipt of this Notice.

Dunkin' Donuts further demands that you take such actions as are necessary to comply with your post-termination obligations as set forth in the Franchise Agreements, including but not limited to, ceasing to use any methods associated with Dunkin' Donuts, ceasing to use any or

## SCHMELTZER, APTAKER & SHEPARD, P.C.

4 Donuts, Inc.
Grando, Inc.
Glenn Stetzer
George Germano
Kathleen Stetzer
October 3, 2003
Page 4 of 5

all of the proprietary marks of Dunkin' Donuts, returning all manuals to Dunkin' Donuts, and complying with the post-termination obligations set forth in Paragraph 8 of the Franchise Agreements, effective sixty (60) days from your receipt of this Notice.

Alternatively, if it should be determined as a matter of law that your defaults are curable, then Dunkin' Donuts hereby gives you thirty (30) days from the receipt of this Notice in which to do those acts which you contend constitute a "cure" of the defaults under the Franchise Agreements. If, as a matter of law, a longer cure period is required, then that period is applicable to this Notice.

You are advised that if you contest the claimed defaults and contend that termination is not justified, Dunkin' Donuts will not enforce the termination by itself. Instead, it will submit the matter to a court to determine which party is right, and will seek judicial enforcement of the terminations and your post-termination obligations, as well as damages, attorneys' fees, costs and interest. If it should be determined that there is no good cause for termination of the Franchise Agreements, then Dunkin' Donuts will consider this Notice to be void. Any and all amounts paid and to be paid by you while in possession of the premises and operating under its trademarks may be accepted by Dunkin' Donuts without waiver of its rights and claims, including the right to terminate the Franchise Agreements, and the right to exercise its options under the Lease Option Agreements and lease rider. Nothing in this letter constitutes acquiescence by Dunkin' Donuts in your continued use of the Dunkin' Donuts proprietary marks.

Conversely, if at any time it is your position that the terminations are valid and enforceable, please advise me immediately, in writing, so that we can take the appropriate legal steps to completely end the relationship.

To the extent that Dunkin' has the option to assume any leases for the franchised businesses after termination of the Franchise Agreements, Dunkin' will elect whether to exercise such options upon the issuance of an Order enforcing this Notice. To the extent that any of the franchises have EBO or other required remodels or other planned capital expenditures, including but not limited to investment in new products or programs (other than those necessary to comply with repair and maintenance obligations under the Franchise Agreements) that would be effectuated in the coming weeks or months, you may hold the remodels or capital expenditures in abeyance until the court has ruled on the termination of the franchises. In the alternative, you may remodel or invest. However, please note that your decision to remodel or invest will not affect the termination of the franchises, is not a waiver of Dunkin's position that the terminations

SCHMELTZER, APTAKER & SHEPARD, P.C.

4 Donuts, Inc.
Grando, Inc.
Glenn Stetzer
George Germano
Kathleen Stetzer
October 3, 2003
Page 5 of 5

are valid and enforceable, and you would be acting at your own risk should the terminations be enforced by the court.

Sincerely,

Christopher M. Loveland

# DUNKIN' DONUTS INCORPORATED
# FRANCHISE AGREEMENT

's PC 8629
...elated PC's:
PROD. 4966
SAT. _____
EDA 5951
OTHER _____

This Agreement, dated __8/27__, 19_92_ is made by and between DUNKIN' DONUTS INCORPORATED, a Delaware corporation having its principal place of business in Randolph, Massachusetts (hereinafter referred to as "DUNKIN' DONUTS"), and the following individuals or entity (hereinafter referred to collectively as "FRANCHISEE"): 4 Donuts Inc., a Connecticut Corporation and Glenn Stetzer and George Germano, both residents of Connecticut.
Mail Address: c/o Dunkin' Donuts, 291 Ferry Street
New Haven, CT 06513

**Parties**

DUNKIN' DONUTS, as the result of the expenditure of time, effort and money, has acquired experience and skill in the development, opening and operating of shops and distribution outlets involving the production, merchandising and sale of donuts and other related products utilizing a specially designed building or facility with specially developed equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, distribution and delivery methods, specifications and proprietary marks and information, all of which are referred to in this Agreement as the "DUNKIN' DONUTS SYSTEM."

**Introduction**

DUNKIN' DONUTS has developed and used and continues to use and control the usage of, in connection with its business and the business of its DUNKIN' DONUTS franchisees, certain proprietary interests, trademarks, service marks and trade names, including "DUNKIN' DONUTS", which is registered as a trademark on the Principal Register of the United States Patent Office (the "PROPRIETARY MARKS"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark "DUNKIN' DONUTS", and to enjoy the benefits of that mark, the other PROPRIETARY MARKS and the DUNKIN' DONUTS SYSTEM.

FRANCHISEE understands the importance of DUNKIN' DONUTS' high and uniform standards of quality, cleanliness, appearance and service to the value of the DUNKIN' DONUTS SYSTEM and the necessity of opening and operating FRANCHISEE's DUNKIN' DONUTS SHOP in conformity with the DUNKIN' DONUTS SYSTEM and in accordance with DUNKIN' DONUTS' standards and specifications.

In recognition of all the above, the parties agree as follows:

1. A. DUNKIN' DONUTS hereby grants to FRANCHISEE during the term hereof and FRANCHISEE accepts a franchise to operate a donut shop utilizing the DUNKIN' DONUTS SYSTEM in accordance with the terms, covenants and conditions of this Agreement, at one location only, situated at

**Grant of the Franchise**

**SEE ADDENDUM**

| 1950 | State Street | Hamden, | Connecticut | 06514 |
|---|---|---|---|---|
| (No.) | (Street) | (City or Town) | (State) | (Zip Code) |

ten (10)
(the "DUNKIN' DONUTS SHOP" or the "SHOP"). The term of this Agreement shall extend ~~twenty (20)~~ years from the date the SHOP opens ~~(or, in the case of an existing shop, originally opened)~~ to serve the general public, ~~or until _____, whichever is sooner~~. This franchise includes the right to use, in connection therewith and at the agreed location, the trademark "DUNKIN' DONUTS", along with other PROPRIETARY MARKS owned and utilized by DUNKIN' DONUTS in connection with other DUNKIN' DONUTS shops, and the right to use the DUNKIN' DONUTS SYSTEM including confidential and valuable information which now exists or may be acquired hereafter and set forth in DUNKIN' DONUTS' operating manuals or otherwise disclosed to DUNKIN' DONUTS franchisees.


INITIALS

1. B. For a new DUNKIN' DONUTS SHOP where the location is to be developed by FRANCHISEE, this franchise is granted to FRANCHISEE subject to (and shall become effective only upon compliance with) the terms, covenants, and conditions of the DUNKIN' DONUTS FRANCHISE OWNER DEVELOPMENT AGREEMENT executed concurrently herewith by DUNKIN' DONUTS and FRANCHISEE.

1. C. This Agreement shall automatically expire upon the earlier expiration of any lease relating to the FRANCHISEE's occupancy of the DUNKIN' DONUTS SHOP.

1. D. FRANCHISEE and all partners and shareholders of FRANCHISEE represent and warrant to DUNKIN' DONUTS that each individual is a United States citizen or a lawful resident alien of the United States, that each corporation is and shall remain duly organized and in good standing during the term of this Agreement, and that all financial and other information which FRANCHISEE has provided to DUNKIN' DONUTS in connection with FRANCHISEE's application for this DUNKIN' DONUTS franchise is true and accurate.

2. DUNKIN' DONUTS agrees:

2. A. ~~For a new DUNKIN' DONUTS SHOP where the location is to be developed by DUNKIN' DONUTS, to use~~ reasonable efforts (i) to acquire control of the real estate for the term of this Agreement, and (ii) ~~to cause~~ the DUNKIN' DONUTS SHOP thereon to be constructed, subject to the regulations of all governmental authorities having jurisdiction, and to thereupon lease the DUNKIN' DONUTS SHOP ~~either directly~~ or through a subsidiary to FRANCHISEE. In the event DUNKIN' DONUTS is unable to lease the DUNKIN' DONUTS SHOP to FRANCHISEE, FRANCHISEE shall have the option to terminate this Agreement and obtain a refund of the INITIAL FRANCHISE FEE paid to DUNKIN' DONUTS ~~or to accept a substitute location should one be proposed to FRANCHISEE by DUNKIN' DONUTS~~;

**Initial Services Furnished by DUNKIN' DONUTS**



2. B. For a new DUNKIN' DONUTS SHOP where the location is to be developed by FRANCHISEE, to approve the location if it meets the standards employed by DUNKIN' DONUTS in selecting other locations at the time; and to provide FRANCHISEE with one copy of the standard plans and specifications for a DUNKIN' DONUTS shop;

2. C. To make available the specifications and/or requirements for the equipment to be utilized in the DUNKIN' DONUTS SHOP;

2. D. To make available to FRANCHISEE and FRANCHISEE's designated representative, prior to the opening of the DUNKIN' DONUTS SHOP, a training program at the DUNKIN' DONUTS University Corporate Training Center (DDU) with respect to the operation of the DUNKIN' DONUTS SYSTEM;

1

2. E. To provide operating procedures to assist FRANCHISEE in complying with DUNKIN' DONUTS' standard methods of record keeping, controls, staffing and training requirements, and production methods, and in developing approved sources of supply;

2. F. To make available to FRANCHISEE assistance, based on the experience and judgment of DUNKIN' DONUTS, in the preopening, opening and initial operation of the DUNKIN' DONUTS SHOP and in conforming to the requirements of the DUNKIN' DONUTS SYSTEM; and

2. G. To prepare and coordinate the Grand Opening Promotional Advertising Program (or such other advertising program as DUNKIN' DONUTS may specify) for the initial opening of the DUNKIN' DONUTS SHOP.

3. DUNKIN' DONUTS agrees:

3. A. To maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; **Continuing Services Furnished by DUNKIN' DONUTS**

3. B. To provide operating manuals to FRANCHISEE, which contain the standards, specifications, procedures and techniques of the DUNKIN' DONUTS SYSTEM, and to revise, from time to time, the content of the manuals to incorporate new developments regarding standards, specifications, procedures and techniques.

3. C. To continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all DUNKIN' DONUTS shops, thus protecting and enhancing the reputation of DUNKIN' DONUTS and the demand for the products of the DUNKIN' DONUTS SYSTEM and, to that end, to make reasonable efforts to disseminate its standards and specifications to potential suppliers of FRANCHISEE upon the written request of FRANCHISEE;

3. D. To review for approval all proposed advertising and promotional materials relating to FRANCHISEE's DUNKIN' DONUTS operations prepared by FRANCHISEE for use in local advertising; and

3. E. To administer The DUNKIN' DONUTS Franchise Owners Advertising and Sales Promotion Fund (the "Fund") and to direct the development of all advertising and promotional programs. One-fifth of FRANCHISEE's 5% advertising contribution (1% of the GROSS SALES of the SHOP) will be utilized, at the discretion of DUNKIN' DONUTS, to provide for the administrative expenses of the Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the DUNKIN' DONUTS SYSTEM. The balance, including any interest earned by the Fund, will be used for advertising and related expenses. Contributions to the Fund in excess of 5% of GROSS SALES shall be used in accordance with the programs to which they relate. The content of all advertising, as well as the media in which the advertising is to be placed and the advertising area, shall be at the discretion of DUNKIN' DONUTS. Upon request, DUNKIN' DONUTS will provide FRANCHISEE a statement of receipts and disbursements of the Fund, prepared by an independent certified public accountant, for each fiscal year of the Fund.

4. FRANCHISEE agrees: **PAYMENTS:**

4. A. ~~For a new DUNKIN' DONUTS SHOP where the location is developed by DUNKIN' DONUTS, FRANCHISEE~~ shall pay to DUNKIN' DONUTS _____ Dollars ($_____) representing the INITIAL FRANCHISE FEE, payable as follows: Five Thousand Dollars ($5,000.00) upon the execution of this Agreement; Ten Thousand Dollars ($10,000.00) upon execution of the LEASE OF DUNKIN' DONUTS SHOP and the remaining unpaid balance prior to attendance by FRANCHISEE or FRANCHISEE's designated representative at the DUNKIN' DONUTS training course or thirty (30) days prior to the scheduled opening of the DUNKIN' DONUTS SHOP, ~~whichever date is earlier.~~ **Initial Franchise Fee** 

—set forth in the Exclusive Development Agreement dated Sept. 21, 1992

4. B. For a new DUNKIN' DONUTS SHOP where the location is developed by FRANCHISEE, FRANCHISEE shall pay to DUNKIN' DONUTS ___Ten Thousand___ Dollars ($_10,000.00___) representing the INITIAL FRANCHISE FEE, payable as ~~follows: Four Thousand Dollars ($4,000.00) upon the execution of this Agreement; and the remaining unpaid balance upon written approval by DUNKIN' DONUTS of FRANCHISEE's location for the DUNKIN' DONUTS SHOP.~~ If the DUNKIN' DONUTS SHOP is not open to serve the general public within fifteen (15) months from the date of this Agreement, the INITIAL FRANCHISE FEE shall be increased to the then current INITIAL FRANCHISE FEE, which shall be payable to DUNKIN' DONUTS upon demand, unless DUNKIN' DONUTS elects to terminate this Agreement.

4. C. ~~At any time prior to the time that the second payment required under the terms of Paragraphs 4.A or 4.B~~ of this Agreement becomes due, FRANCHISEE may, by written notice, terminate this Agreement. In that event, DUNKIN' DONUTS will return the initial installment paid upon execution of this Agreement, less a charge of Two Thousand Dollars ($2,000.00) to compensate DUNKIN' DONUTS for assistance rendered to FRANCHISEE to the date of termination. ~~Franchise fees are not otherwise refundable.~~ **Refunds**

4. D. FRANCHISEE shall pay to the Fund Three Thousand Dollars ($3,000.00), which shall be nonrefundable after the DUNKIN' DONUTS SHOP commences operation, for a Grand Opening Promotional Advertising Program (or such other advertising program as DUNKIN' DONUTS may specify). Payment shall be made in full prior to attendance by FRANCHISEE or FRANCHISEE's designated representative at the DUNKIN' DONUTS training course or thirty (30) days prior to the scheduled opening of the DUNKIN' DONUTS SHOP, whichever date is earlier. **Grand Opening**

4. E. FRANCHISEE shall pay to DUNKIN' DONUTS at Post Office Box 294, Randolph, Massachusetts 02368 (or such other address as DUNKIN' DONUTS shall from time to time give to FRANCHISEE in writing), on or before Thursday of each week, a sum equal to four and nine tenths percent (4.9%) of the GROSS SALES of the DUNKIN' DONUTS SHOP for the seven (7) day period ending at the close of business on the preceding Saturday. The term "GROSS SALES" in this Agreement shall include all sales made by FRANCHISEE pursuant to this Agreement, but shall not include the sale of cigarettes, sales taxes or similar taxes. **Continuing Franchise Fees**

4. F. FRANCHISEE shall pay to the Fund at the same time, for the same seven (7) day period, in the same manner as, and in addition to, the payments provided for under Paragraph 4.E. of this Agreement, 5% of the GROSS SALES of the DUNKIN' DONUTS SHOP (excluding wholesale sales to accounts approved in writing, in advance, by DUNKIN' DONUTS) . In addition, FRANCHISEE shall participate in and make additional payments to the Fund with respect to all advertising, marketing and other DUNKIN' DONUTS programs which from time to time are supported by a majority of producing DUNKIN' DONUTS SHOPS in the market in which the DUNKIN' DONUTS SHOP is located with respect to local programs, and in the Continental United States, with respect to national programs. DUNKIN' DONUTS reserves the right in its sole and absolute discretion to designate or change the composition of shops included in the base for purposes of determining a majority. FRANCHISEE shall have complete discretion as to the prices he charges for product sold in the DUNKIN' DONUTS SHOP. Nothing herein shall be construed to require FRANCHISEE to establish prices in accordance with programs supported by the majority of shops. **Advertising**

**SEE ADDENDUM 4.F.**

**SEE ADDENDUM 4.G.**

5. FRANCHISEE understands and acknowledges that every detail of the DUNKIN' DONUTS SYSTEM is important to DUNKIN' DONUTS, to FRANCHISEE and to other DUNKIN' DONUTS franchisees in order to develop and maintain high and uniform standards of quality, cleanliness, appearance, service, facilities, products and techniques to increase the demand for DUNKIN' DONUTS products and to protect and enhance the reputation and goodwill of DUNKIN' DONUTS. Accordingly, FRANCHISEE agrees to: devote full time, energy and effort to the management and operation of the DUNKIN' DONUTS SHOP; obtain from DUNKIN' DONUTS prior written approval of all wholesale accounts; use best efforts to maximize sales of the DUNKIN' DONUTS SHOP; ensure accurate reporting of GROSS SALES to DUNKIN' DONUTS; and implement all procedures recommended by DUNKIN' DONUTS to minimize employee theft. FRANCHISEE further agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to DUNKIN' DONUTS based on GROSS SALES pursuant to Paragraph 4. of this Agreement and that accurate reporting of GROSS SALES includes ringing all sales in the cash register at the time the product is delivered to the purchaser including without limitation retail, wholesale, bulk discount sales and sales for which payment may be deferred.

**TENANTS / THE FRANCHISEE:**

**SEE ADDENDUM**

FRANCHISEE also agrees:

5. A. To use all materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product preparation and delivery prescribed by or which conform with DUNKIN' DONUTS' standards and specifications and to carry out the business covered by this Agreement in accordance with the operational standards and specifications established by DUNKIN' DONUTS and set forth in DUNKIN' DONUTS' operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to DUNKIN' DONUTS' franchisees from time to time.

5. B. To refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product preparation, merchandising, and delivery which do not meet DUNKIN' DONUTS' standards and specifications.

5. C. To offer for sale only such products as shall be expressly approved for sale at the DUNKIN DONUTS SHOP in writing in advance by DUNKIN' DONUTS and to offer for sale all products that have been designated as approved by DUNKIN' DONUTS.  **SEE ADDENDUM**

5. D. To maintain at all times a sufficient supply of approved products.

5. E. To purchase all food products, supplies, equipment and materials required for the operation of the DUNKIN' DONUTS SHOP from suppliers who demonstrate, to the reasonable satisfaction of DUNKIN' DONUTS, the ability to meet all of DUNKIN' DONUTS' standards and specifications for such items; who possess adequate capacity and facilities to supply FRANCHISEE'S needs in the quantities, at the times and with the reliability requisite to an efficient operation and who have been approved, in writing, by DUNKIN' DONUTS. Prior to purchasing any items from any supplier not previously approved by DUNKIN' DONUTS, FRANCHISEE shall submit to DUNKIN' DONUTS a written request for approval of the supplier. DUNKIN' DONUTS may require that samples from the supplier be delivered to DUNKIN' DONUTS or to a designated independent testing laboratory for testing prior to approval and use. A charge not to exceed the actual cost of the test shall be made by DUNKIN' DONUTS and shall be paid by FRANCHISEE; provided, however, the cost of the first test requested by FRANCHISEE in any calendar year shall be borne by DUNKIN' DONUTS.

5. F. To maintain, at FRANCHISEE's expense, at all times, the interior and exterior of the DUNKIN' DONUTS SHOP and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by DUNKIN' DONUTS, and to make no material alteration, addition, replacement or improvement in, or to, the interior or exterior (including the parking lot and landscaped areas) of the DUNKIN' DONUTS SHOP without the prior written consent of DUNKIN' DONUTS.   **Shop Maintenance**

5. G. To manage the DUNKIN' DONUTS SHOP at all times with at least two (2) individuals, one of whom must be the FRANCHISEE or partner or shareholder of FRANCHISEE. Both individuals must have successfully completed the DUNKIN' DONUTS training program at DDU. Both individuals must have literacy and fluency in the English language sufficient, in the good faith opinion of DUNKIN' DONUTS, to satisfactorily complete training at DDU and to communicate with employees, customers, and suppliers of DUNKIN' DONUTS. In the event FRANCHISEE applies for and receives approval to develop or purchase an additional DUNKIN' DONUTS shop, DUNKIN' DONUTS requires that the additional shop be managed by at least one DDU trained individual approved by DUNKIN' DONUTS.   **Staffing and Training**

5. G.1. To ensure that all employees are trained in accordance with DUNKIN' DONUTS in-shop training procedures. Also, FRANCHISEE shall ensure that the manager and all employees whose duties include customer service have sufficient fluency in the English language to adequately meet the public in the DUNKIN' DONUTS SHOP.

5. G.2. To attend and to require those employed in the DUNKIN' DONUTS SHOP to attend such further training as DUNKIN' DONUTS shall from time to time reasonably require.

5. G.3. To pay the cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the DUNKIN' DONUTS SHOP. FRANCHISEE will also bear the cost of in-shop training programs. The cost of presenting the DDU training program will be borne by DUNKIN' DONUTS.   **Training Costs**

5. H. To keep full, complete and accurate books and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed below or as may be further prescribed by DUNKIN' DONUTS from time to time.   **Books, Records and Reports**

5. H.1. To submit to DUNKIN' DONUTS, on or before Thursday of each week, on an approved form, a signed statement of GROSS SALES for the seven (7) day period ending at the close of business on the preceding Saturday along with all monies required to be paid under Paragraphs 4.E. and 4.F. of this Agreement.

5. H.2. To submit to DUNKIN' DONUTS, on or before the twentieth (20th) day of each month, on an approved form, a profit and loss statement of the DUNKIN' DONUTS SHOP for the preceding calendar or fiscal month prepared in accordance with generally accepted accounting principles.

5. H.3. To submit to DUNKIN' DONUTS, within thirty (30) days after the close of each six (6) month period, commencing with the opening of the DUNKIN' DONUTS SHOP, on an approved form, a profit and loss statement for the six (6) month period and a balance sheet (including a statement of retained earnings or partnership account) as of the end of the period. Annual financial statements must be certified by an independent certified public accountant or such other independent public accountant as may be acceptable to DUNKIN' DONUTS.

5. H.4. To submit to DUNKIN' DONUTS such other periodic forms and reports as may be prescribed and at the times prescribed by DUNKIN' DONUTS.

5. H.5. To preserve for a period of not less than three (3) years during the term of this Agreement and for not less than three (3) years following the term of this Agreement, in the English language, all accounting records and supporting documents relating to the FRANCHISEE's operations under this Agreement, or any lease with DUNKIN' DONUTS or its subsidiary, including but not limited to:

   a. daily cash reports;
   b. cash receipts journal and general ledger;
   c. cash disbursements journal and weekly payroll register;
   d. monthly bank statements, and daily deposit slips and canceled checks;
   e. all tax returns;
   f. supplier's invoices (paid and unpaid);
   g. dated cash register tapes (detailed and summary);
   h. semi-annual balance sheets and monthly profit and loss statements;
   i. daily production, throwaway and finishing records and weekly inventories;
   j. records of promotion and coupon redemptions;
   k. records of all wholesale accounts (prior written approval of wholesale accounts by DUNKIN' DONUTS is required); and
   l. such other records as DUNKIN' DONUTS may from time to time request.

5. I. FRANCHISEE shall record all sales on a cash register, the make, model and serial number of which has been individually approved in writing by DUNKIN' DONUTS; such cash register shall contain a device that will record accumulated sales and cannot be turned back or reset, and a back-up power system for memory storage in the event of power loss. **Registers**

5. J. FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting the FRANCHISEE and DUNKIN' DONUTS, and their directors and employees, against any loss, liability or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with the DUNKIN' DONUTS SHOP or by reason of FRANCHISEE's operation or occupancy of the DUNKIN' DONUTS SHOP. Such policy or policies shall include comprehensive general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with a single limit of one million dollars ($1,000,000) (or such higher limit as DUNKIN' DONUTS, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any lease for the DUNKIN' DONUTS SHOP) for bodily injury and property damage combined, "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the DUNKIN' DONUTS SHOP and the contents thereof, plate glass insurance and boiler insurance, if applicable, and such statutory insurance as may be required in the state in which the DUNKIN' DONUTS SHOP is located. All insurance afforded by the policies required under the terms of this Paragraph shall: **Insurance**

**SEE ADDENDUM**

   1. Be written in the names of FRANCHISEE, DUNKIN' DONUTS, and any other parties as directed by DUNKIN' DONUTS, as their respective interest may appear;
   2. Be written by insurance companies acceptable to DUNKIN' DONUTS;
   3. Contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named;
   4. Contain the provision that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and
   5. Not be limited in any way by reason of any insurance which may be maintained by DUNKIN' DONUTS or any party named.

During the term of this Agreement, FRANCHISEE shall promptly (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish DUNKIN' DONUTS with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that the premiums therefor have been paid. If at any time FRANCHISEE fails to comply with the provisions of this Paragraph 5.J., DUNKIN' DONUTS, in addition to all other remedies available, shall have the option (but shall not be required) to obtain such insurance with respect to the DUNKIN' DONUTS SHOP, and keep the same in effect. FRANCHISEE shall thereupon pay DUNKIN' DONUTS when and as billed for the costs of the premiums therefor. Maintenance of insurance and the performance by FRANCHISEE of the obligations under this Paragraph shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in this Agreement.

5. K. If all conditions precedent to the opening of the DUNKIN' DONUTS SHOP have been satisfied, FRANCHISEE shall promptly open the DUNKIN' DONUTS SHOP to the general public as soon as construction and equipping the DUNKIN' DONUTS SHOP are substantially complete. FRANCHISEE shall thereafter keep the DUNKIN' DONUTS SHOP open and in normal operation 24 hours a day on all days except Christmas and Thanksgiving unless prior written approval is obtained from DUNKIN' DONUTS or unless DUNKIN' DONUTS otherwise directs in writing. FRANCHISEE shall operate the DUNKIN' DONUTS SHOP so as to maximize GROSS SALES and maintain all standards of the DUNKIN' DONUTS SYSTEM. **Continuous Operation**

5. L. FRANCHISEE shall submit all advertising and promotional materials prepared for use in local areas to DUNKIN' DONUTS prior to use. In the event written disapproval of the advertising and promotional material is not received by FRANCHISEE from DUNKIN' DONUTS within fifteen (15) days from the date such material is received by DUNKIN' DONUTS, said materials shall be deemed approved unless and until subsequently disapproved. **Advertising Approval**

5. M. In the event DUNKIN' DONUTS develops a new shop and leases the DUNKIN' DONUTS SHOP to FRANCHISEE, FRANCHISEE agrees to enter into a LEASE OF DUNKIN' DONUTS SHOP with, at DUNKIN' DONUTS' option, DUNKIN' DONUTS or its rental subsidiary. FRANCHISEE recognizes that, in the event DUNKIN' DONUTS or its subsidiary leases the DUNKIN' DONUTS SHOP to FRANCHISEE, rent payable under the lease will include additional compensation to DUNKIN' DONUTS or its subsidiary for the acquisition, by purchase or lease, or otherwise, of the DUNKIN' DONUTS SHOP. In the event, during the term of this Agreement or any extension thereof, FRANCHISEE directly or indirectly acquires ownership or control of the property, FRANCHISEE also agrees to grant to DUNKIN' DONUTS, under its standard LEASE OPTION AGREEMENT, the option to acquire the location in the event of default by FRANCHISEE under this Agreement or in the event of FRANCHISEE'S default under any lease or mortgage relating to the premises. **Company-Developed Real Estate**

5. N. For a new DUNKIN' DONUTS SHOP where the location is to be developed by FRANCHISEE, FRANCHISEE agrees to develop the DUNKIN' DONUTS SHOP in accordance with plans, specifications, documentation and procedures approved in writing by DUNKIN' DONUTS; to purchase and install in the DUNKIN' DONUTS SHOP fixtures, furnishings, equipment, signs and materials from suppliers which have been approved by DUNKIN' DONUTS; to cause the DUNKIN' DONUTS SHOP to open to the public within fifteen (15) months from the date of this Agreement, and to grant to DUNKIN' DONUTS the option to acquire the location in the event of default by FRANCHISEE under this Agreement or in the event of FRANCHISEE'S default under any lease or mortgage relating to the premises. FRANCHISEE also agrees to execute, concurrently with the execution of this Agreement, but before permitting construction to begin on the DUNKIN' DONUTS SHOP, DUNKIN' DONUTS' FRANCHISE OWNER DEVELOPMENT AGREEMENT and DUNKIN' DONUTS' LEASE OPTION AGREEMENT (with attachments) duly executed in recordable form by FRANCHISEE and the landowner of the premises.
    *Franchisee-Developed Real Estate*

    *SEE ADDENDUM*

5. O. FRANCHISEE agrees to renovate and remodel the interior and exterior of the DUNKIN' DONUTS SHOP (including but not limited to fixtures, furnishings, signs and equipment) no later than the tenth (10th) anniversary of the original opening date of the DUNKIN' DONUTS SHOP to the then current design for shops of comparable age and condition. The nature and scope of renovation and remodeling shall be as then generally required by DUNKIN' DONUTS for shops of comparable age and condition.
    *Remodel*

5. P. In the event FRANCHISEE, or any partner or shareholder thereof, holds any interest in a DUNKIN' DONUTS franchise other than the DUNKIN' DONUTS SHOP, FRANCHISEE and the partners and shareholders of FRANCHISEE who own an interest in any other franchise(s) agree to execute concurrently with this Agreement DUNKIN' DONUTS' AGREEMENT OF CROSS-GUARANTEE to DUNKIN' DONUTS for the payment of fees, rents and other obligations for each franchise in which FRANCHISEE or any partner or shareholder thereof holds or acquires any interest.
    *Cross-Guarantee*

5. Q. FRANCHISEE agrees to comply promptly with all applicable laws, rules, regulations, ordinances and orders of public authorities including, but not limited to, Government Agencies, Board of Fire Underwriters and other similar organizations. The term "Government Agencies" shall include without limitation all governmental units, however designated, which address health, safety, sanitation, environmental or other issues affecting operations of the DUNKIN' DONUTS SHOP.
    *Compliance with Regulations*

5. R. FRANCHISEE agrees to submit to DUNKIN' DONUTS promptly upon receipt thereof, copies of all customer complaints and notices and communications from Government Agencies and hereby authorizes Government Agencies to provide directly to DUNKIN' DONUTS copies of all such notices and communications.

5. S. FRANCHISEE agrees to enter into this Agreement and the various other agreements with DUNKIN' DONUTS as an individual, individuals, general partnership or corporation provided that all individuals, general partners, officers, shareholders and directors (if a corporation) will be required to personally guarantee full payment and performance of FRANCHISEE'S money and other obligations under this Agreement and any lease for the premises with DUNKIN' DONUTS or its subsidiary.
    *Personal Guarantees*

5. S.1. If FRANCHISEE is a corporation, said corporation must be in compliance with the requirements applicable to corporations set forth in paragraph 10.C. hereof;

5. S.2. FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein.

6. A. In order to preserve the validity and integrity of the PROPRIETARY MARKS and to assure that the standards and specifications of the DUNKIN' DONUTS SYSTEM are properly employed in the operation of the DUNKIN' DONUTS SHOP, DUNKIN' DONUTS, or its agents, shall have the right, at all times, to enter and inspect the DUNKIN' DONUTS SHOP and the right to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the standards and specifications of the DUNKIN' DONUTS SYSTEM. DUNKIN' DONUTS may require FRANCHISEE to remove any item which does not conform with applicable standards and specifications. DUNKIN' DONUTS may remove or destroy at FRANCHISEE's expense any item which does not conform to applicable standards and specifications.
    *Certain Rights of DUNKIN' DONUTS*

6. B. If, within twenty-four (24) hours following written notice by DUNKIN' DONUTS requesting the correction of an unhealthy, unsanitary or unclean condition, or within thirty (30) days following written notice by DUNKIN' DONUTS requesting repairs, alterations or painting of the DUNKIN' DONUTS SHOP, FRANCHISEE has not corrected the condition or completed the repairs, alterations or painting, DUNKIN' DONUTS may, without being guilty of, or liable for, trespass or tort and without prejudice to any other rights or remedies, enter the DUNKIN' DONUTS SHOP and cause the repairs, alterations or painting to be completed, or the condition to be corrected, at the expense of FRANCHISEE.

6. C. DUNKIN' DONUTS' representatives shall have the right to examine FRANCHISEE's original books, records and supporting documents at reasonable times and to perform such tests and analyses as it deems appropriate to verify GROSS SALES. If an examination reveals that the GROSS SALES reported by FRANCHISEE to DUNKIN' DONUTS are less than the GROSS SALES ascertained by the examination, then FRANCHISEE shall immediately pay to DUNKIN' DONUTS any amounts owing to DUNKIN' DONUTS and the Fund and DUNKIN' DONUTS' rental subsidiary based upon the corrected GROSS SALES. All examinations shall be at the expense of DUNKIN' DONUTS; however, if an examination results from FRANCHISEE's failure to prepare, deliver or preserve statements or records required by Paragraph 5.H. of this Agreement, or results in the discovery of a discrepancy in the GROSS SALES reported by FRANCHISEE, FRANCHISEE shall pay, or reimburse DUNKIN' DONUTS for any and all expenses connected with the examination, including, but not limited to, reasonable accounting and legal fees, the unpaid amounts owed to DUNKIN' DONUTS, its rental subsidiary and the Fund, and interest thereon from the date payment was due at 18% per annum or the highest permissible rate. Such payments will be without prejudice to any other remedies DUNKIN' DONUTS may have under this Agreement, including the right to terminate, without opportunity to cure, in the case of intentional underreporting of GROSS SALES.

6. D. FRANCHISEE and all partners and shareholders of FRANCHISEE shall, upon the request of DUNKIN' DONUTS in connection with the examination of FRANCHISEE's books and records under Paragraph 6.C. of this Agreement, provide DUNKIN' DONUTS' representatives with personal federal and state tax returns, bank statements (including deposit slips and cancelled checks) and such other documents and information as DUNKIN' DONUTS may in its sole discretion request in connection with DUNKIN' DONUTS' efforts to verify GROSS SALES reported to DUNKIN' DONUTS under this Agreement or any LEASE OF DUNKIN' DONUTS SHOP. Personal tax returns and financial data unrelated to the franchise business need not be provided by any partner or shareholder of FRANCHISEE who has not been active in the business and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the franchise or any LEASE OF DUNKIN' DONUTS SHOP, alone or in conjunction with any other family member or related entity.

6. E. FRANCHISEE hereby grants DUNKIN' DONUTS the irrevocable right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby irrevocably authorizes such parties to release such records to DUNKIN' DONUTS.

7. A. FRANCHISEE acknowledges that "DUNKIN' DONUTS" is a registered trademark, that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees, that said mark, together with the other PROPRIETARY MARKS, presently owned by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the DUNKIN' DONUTS SYSTEM and that valuable goodwill is associated with and attached to said mark and the other PROPRIETARY MARKS. FRANCHISEE agrees to use said mark and the other PROPRIETARY MARKS only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE further agrees that any unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm subject to injunctive relief. **Proprietary Marks**

7. A.1. FRANCHISEE understands that FRANCHISEE's license to use any or all of the PROPRIETARY MARKS is non-exclusive and relates solely to the location set forth in Paragraph 1.A. of this Agreement. FRANCHISEE further acknowledges that DUNKIN' DONUTS, in its sole discretion, has the right to operate or franchise other DUNKIN' DONUTS SHOPS and sales outlets under, and to grant other licenses in, and to, any or all of the PROPRIETARY MARKS, in each case at such locations and on such terms and conditions as DUNKIN' DONUTS deems acceptable.

7. A.2. FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the PROPRIETARY MARKS.

7. A.3. FRANCHISEE agrees to notify DUNKIN' DONUTS promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the PROPRIETARY MARKS. In the event DUNKIN' DONUTS undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for DUNKIN' DONUTS, be necessary to carry out such defense or prosecution.

7. B. It is expressly recognized that any and all goodwill associated with the PROPRIETARY MARKS, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7. C. FRANCHISEE shall operate, advertise and promote the DUNKIN' DONUTS SHOP under the name "DUNKIN' DONUTS", with no accompanying words or symbols of any nature, except as may be otherwise required by law. FRANCHISEE shall not use, as part of its corporate or other business name, any PROPRIETARY MARKS used by DUNKIN' DONUTS, including, but not limited to, "DUNKIN DONUTS", "DUNKIN", "DUNK" or any form or variations thereof which, in the judgment of DUNKIN' DONUTS, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

8. A. During the term of this Agreement or any extension thereof, and for a period of two (2) years thereafter, regardless of the cause of termination, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any shareholder, if FRANCHISEE is a corporation, shall, except with respect to the ownership or operation by the FRANCHISEE of additional licensed DUNKIN' DONUTS shops: **Restrictions on the FRANCHISEE'S Activities**

8. A.1. Divert or attempt to divert any business or customer of the DUNKIN' DONUTS SHOP to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with DUNKIN' DONUTS' PROPRIETARY MARKS and the DUNKIN' DONUTS SYSTEM;

8. A.2. Employ or seek to employ any person who is at that time employed by DUNKIN' DONUTS or by any other DUNKIN' DONUTS franchisee, or otherwise directly or indirectly induce such person to leave such employment;

8. A.3. Own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell any product of a type offered by a DUNKIN' DONUTS shop; provided that, during the two (2) year period following expiration or termination of this Agreement only, the provisions of this subparagraph 3. shall not apply to another business located more than five (5) miles from the DUNKIN' DONUTS SHOP or from any other DUNKIN' DONUTS shop. Either party to this Agreement, upon notice in writing to the other, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities during said two (2) year period by requesting that the matter be submitted to arbitration in accordance with the rules of the American Arbitration Association then applicable for commercial disputes. In such event, each party shall select one arbitrator and the two shall select a third and the decision of the arbitrators shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute; or

8. A.4. Communicate or divulge to, or use for the benefit of, any other person, persons, partnership, association or corporation any information or knowledge concerning the methods of constructing, equipping or operating a DUNKIN' DONUTS shop and all other information or knowledge which DUNKIN' DONUTS deems confidential which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the licensed business. Any and all information, knowledge and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which DUNKIN' DONUTS designates as confidential shall be deemed confidential for purposes of this Agreement. DUNKIN' DONUTS shall have the non-exclusive right to use and incorporate in the DUNKIN' DONUTS SYSTEM, for the benefit of itself and other franchisees of the DUNKIN' DONUTS SYSTEM, any modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the licensed business, without any liability or obligation to the developer thereof.

8. B. The covenants contained in this Paragraph 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Paragraph 8 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in a decision to which DUNKIN' DONUTS is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Paragraph.

8. C. FRANCHISEE understands and acknowledges that DUNKIN' DONUTS shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Paragraph 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified, which shall be fully enforceable, the provisions of Paragraphs 14.A. and/or 15 of this Agreement notwithstanding.

8. D. FRANCHISEE agrees that the existence of any claims against DUNKIN' DONUTS, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by DUNKIN' DONUTS of the covenants in this Paragraph 8.

8. E. FRANCHISEE acknowledges that FRANCHISEE's violation of the terms of this Paragraph 8. would result in irreparable injury to DUNKIN' DONUTS for which no adequate remedy at law may be available, and FRANCHISEE accordingly consents to the issuance of an injunction prohibiting any conduct by FRANCHISEE in violation of the terms of this Paragraph 8.

9. A. FRANCHISEE shall be in default under this Agreement: **Default**

9. A.1. If FRANCHISEE shall become insolvent or an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or such a petition is filed against and consented to by FRANCHISEE, or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshal or constable.

9. A.2. If FRANCHISEE fails to comply with any law, regulation, order or DUNKIN' DONUTS standard relating to health, sanitation or safety; or if FRANCHISEE ceases to operate, but does not abandon, the DUNKIN' DONUTS SHOP for a period of forty eight (48) hours without the prior written consent of DUNKIN' DONUTS.

9. A.3. If FRANCHISEE fails, refuses, or neglects to pay when due to DUNKIN' DONUTS any monies owing to DUNKIN' DONUTS or to the Fund.

9. A.4. If FRANCHISEE fails to comply with any of FRANCHISEE's obligations under this Agreement not otherwise set forth in Paragraph 9 of this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any lease for the DUNKIN' DONUTS SHOP, or under any mortgage, equipment agreement, promissory note, conditional sales contract or other contract materially affecting the DUNKIN' DONUTS SHOP to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not DUNKIN' DONUTS is a party thereto.  **SEE ADDENDUM**

9. A.5. If FRANCHISEE abandons the DUNKIN' DONUTS SHOP; or if FRANCHISEE intentionally underreports GROSS SALES or falsifies financial data; or if FRANCHISEE's lease for the DUNKIN' DONUTS SHOP with DUNKIN' DONUTS or a subsidiary of DUNKIN' DONUTS is terminated or expires.  **SEE ADDENDUM**

9. B. Except as otherwise provided in Paragraph 9 of this Agreement, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within the applicable period set forth below, following written notice of default from DUNKIN' DONUTS. In the event that a statute in the state wherein the DUNKIN' DONUTS SHOP is located requires a cure period for the applicable default which is longer than the cure period specified below, the statutory cure period shall apply.  **Cure Period**

9. B.1. A twenty four (24) hour cure period shall apply to the violation of any law, regulation, order or DUNKIN' DONUTS standard relating to health, sanitation or safety; or if the FRANCHISEE ceases to operate, but does not abandon, the DUNKIN' DONUTS SHOP for a period of forty eight (48) hours without the prior written consent of DUNKIN' DONUTS.

9. B.2. A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to DUNKIN' DONUTS any monies owing to DUNKIN' DONUTS or to the Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in Paragraph 5.J. of this Agreement.

9. B.3. A thirty (30) day cure period shall apply if FRANCHISEE fails to comply with any of FRANCHISEE's obligations under this Agreement, unless otherwise specified in Paragraph 9 of this Agreement, or if FRANCHISEE fails to carry out in all respects its obligations under any lease for the DUNKIN' DONUTS SHOP, or under any mortgage, equipment agreement, promissory note, conditional sales contract or other contract materially affecting the DUNKIN' DONUTS SHOP to which FRANCHISEE is a party or by which the FRANCHISEE is bound, whether or not DUNKIN' DONUTS is a party thereto.  **SEE ADDENDUM**

9. B.4. No cure period shall be available if FRANCHISEE abandons the DUNKIN' DONUTS SHOP; or if FRANCHISEE intentionally underreports GROSS SALES or falsifies financial data; or if FRANCHISEE's lease for the DUNKIN' DONUTS SHOP with DUNKIN' DONUTS or a subsidiary of DUNKIN' DONUTS is terminated or expires.  **No Cure Period SEE ADDENDUM**

9. C.1 If FRANCHISEE fails to remit when due any payments required under this Agreement, FRANCHISEE agrees to pay all collection costs, reasonable attorney's fees and interest on the unpaid amounts at 18% per annum or the highest permissible rate, in addition to the unpaid amounts.  **Interest and Costs**

9. C.2 If FRANCHISEE fails to cure a default, following notice, within the applicable time period set forth in subparagraph 9.B., or if this Agreement is terminated, FRANCHISEE shall pay to DUNKIN' DONUTS all damages, costs and expenses, including without limitation interest at 18% per annum, or the highest permissable rate, and reasonable attorneys' fees, incurred by DUNKIN' DONUTS as a result of any such default or termination; and said interest and all damages, costs and expenses, including reasonable attorneys' fees, may be included in and form a part of the judgment awarded to DUNKIN' DONUTS in any proceedings brought by DUNKIN' DONUTS against FRANCHISEE. Continued use by FRANCHISEE of DUNKIN' DONUTS' trademarks, trade names, PROPRIETARY MARKS, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE. Nothing in this Agreement shall preclude DUNKIN' DONUTS from seeking any remedy under federal or state law for willful trademark infringement, including without limitation treble damages and injunctive relief.

9. D. Except as set forth in Paragraph 9.E., if FRANCHISEE fails to cure to DUNKIN' DONUTS satisfaction within the applicable period following notice from DUNKIN' DONUTS, DUNKIN' DONUTS may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement. Except as set forth in Paragraph 9.E., such termination shall be effective immediately upon receipt of a written notice of termination from DUNKIN' DONUTS.  **Termination**

9. E. This Agreement shall immediately terminate upon the occurrence of any event set forth in Paragraph 9.A.1., without opportunity to cure or notice of termination.

9. F. Upon any termination or expiration of this Agreement:

9. F.1. FRANCHISEE shall promptly pay to DUNKIN' DONUTS all sums owing or accrued prior to such termination or expiration from FRANCHISEE to DUNKIN' DONUTS, the Fund, and DUNKIN' DONUTS' rental subsidiary. Said sums shall also include interest of 18% per annum or the highest permissible rate and any damages, costs and expenses, including reasonable attorney's fees, incurred by DUNKIN' DONUTS by reason of default on the part of FRANCHISEE.

9. F.2. FRANCHISEE shall immediately cease to use, by advertising or in any other manner whatsoever, any methods associated with the name "DUNKIN' DONUTS", any or all of the PROPRIETARY MARKS and any other trade secrets, confidential information, operating manuals, slogans, signs, symbols or devices forming part of the DUNKIN' DONUTS SYSTEM or otherwise used in connection with the operation of the DUNKIN' DONUTS SHOP. FRANCHISEE agrees that any unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm subject to injunctive relief.

9. F.3. FRANCHISEE shall immediately return to DUNKIN' DONUTS all operating manuals, plans, specifications and other materials containing information prepared by DUNKIN' DONUTS and relative to the operation of a DUNKIN' DONUTS SHOP, and

9.F.4. FRANCHISEE shall continue to comply with, for the period specified therein, Paragraph 8. of this Agreement.

9. G. No right or remedy herein conferred upon or reserved to DUNKIN' DONUTS is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder.

10. A. This Agreement shall inure to the benefit of the successors and assigns of DUNKIN' DONUTS. DUNKIN' DONUTS shall have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by DUNKIN' DONUTS herein and FRANCHISEE receives a statement from both DUNKIN' DONUTS and its transferee to that effect. Upon such assignment and assumption, DUNKIN' DONUTS shall be under no further obligation hereunder, except for accrued liabilities, if any. **Transfer of Interest**

10. B. Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any shareholder, if FRANCHISEE is a corporation, without DUNKIN' DONUTS' prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of DUNKIN' DONUTS shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of DUNKIN' DONUTS including, but not limited to those set forth in Paragraph 10.C. and the following:

10. B.1. FRANCHISEE shall have operated the DUNKIN' DONUTS SHOP for a period of six (6) months prior to the proposed transfer.

10. B.2. The sales price of the interest to be conveyed shall not be so high, in the good faith judgment of DUNKIN' DONUTS, as to jeopardize the ability of the transferee to maintain, operate and promote the DUNKIN' DONUTS SHOP properly and meet his financial obligations to DUNKIN' DONUTS, third party suppliers and creditors. This provision shall not create any liability on the part of DUNKIN' DONUTS to the transferee in the event that DUNKIN' DONUTS approves the transfer and the transferee experiences financial difficulties.

10. B.3. The transferee may not be a limited partnership, trust or other entity not specifically authorized herein;

10. B.4. All accrued money obligations of FRANCHISEE to DUNKIN' DONUTS, the Fund, DUNKIN' DONUTS' rental subsidiary, and obligations of FRANCHISEE which DUNKIN' DONUTS has guaranteed, liens, deferred rent and all other obligations under the LEASE OF DUNKIN' DONUTS SHOP, if any, shall have been satisfied prior to assignment or transfer.

10. B.5. The DUNKIN' DONUTS SHOP, including equipment, signs, building, improvements, interior and exterior, shall be in good operating condition and repair and in compliance with DUNKIN' DONUTS then-current standards, including without limitation replacements and additions.

10. B.6. FRANCHISEE and any transferee hereby agree not to assert any security interest, lien, claim or right now or hereafter in this franchise, the franchise granted to the transferee, or lease for the DUNKIN' DONUTS SHOP and further agree that any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by DUNKIN' DONUTS, its successors or assigns.

10. B.7. In the event the transferee, or any partner or shareholder thereof, holds any interest in a DUNKIN' DONUTS franchise other than the DUNKIN' DONUTS SHOP, the transferee and the partners and shareholders thereof who own an interest in other DUNKIN' DONUTS franchise(s) shall execute DUNKIN' DONUTS' AGREEMENT OF CROSS-GUARANTEE to DUNKIN' DONUTS for the payment of fees, rents and other obligations for each DUNKIN' DONUTS franchise(s) in which the transferee or any partner or shareholder thereof holds or acquires any interest.

10. C. DUNKIN' DONUTS shall not unreasonably withhold its consent to any transfer referred to in Paragraph 10.B. of this Agreement when requested, provided, however:

10. C.1. If FRANCHISEE is an individual or partnership and desires to assign and transfer this Agreement to a corporation:

    a. Said transferee corporation shall be newly organized and its charter shall provide that its activities are confined exclusively to operating DUNKIN' DONUTS shops as licensed under this Agreement.

    b. FRANCHISEE or, if FRANCHISEE is a partnership, the partners licensed herein to operate the franchise shall be the owner or owners of the majority stock interest of the transferee corporation.

    c. FRANCHISEE or, if FRANCHISEE is a partnership, one of the partners licensed herein to operate the franchise shall be the principal executive officer of the corporation.

    d. The transferee corporation and all shareholders of transferee corporation shall enter into a written assignment, under seal, in a form satisfactory to DUNKIN' DONUTS, with the transferee corporation assuming all of the FRANCHISEE's obligations under this Agreement.

    e. All shareholders of the transferee corporation shall enter into a written agreement, in a form satisfactory to DUNKIN' DONUTS, jointly and severally guaranteeing the full payment and performance of the transferee corporation's obligations to DUNKIN' DONUTS.

    f. Each stock certificate of the transferee corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon transfers by this Agreement; and

    g. No new shares of common or preferred voting stock in the transferee corporation shall be issued to any person, persons, partnership, association or corporation without obtaining DUNKIN' DONUTS' prior written consent, which shall not unreasonably be withheld.

10. C.2. If a transfer, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in the franchise licensed herein, or the entity holding such franchise, to someone other than an original signatory of this Agreement: **Transfer of Control** **SEE ADDENDUM**

    a. The transferee and each partner and shareholder of transferee must be a United States citizen or lawful resident alien of the United States and shall be of good moral character and reputation and shall have a good credit rating and business qualifications reasonably acceptable to DUNKIN' DONUTS. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in the good faith opinion of DUNKIN' DONUTS, to communicate with employees, customers, and suppliers of DUNKIN' DONUTS and to satisfactorily complete training at DDU. FRANCHISEE shall provide DUNKIN' DONUTS with such information as DUNKIN' DONUTS may require to make such determination concerning each such proposed transferee;

    b. The transferee must designate two managers for the DUNKIN' DONUTS SHOP, one of whom must be a transferee or a partner or shareholder of the transferee. Prior to the transfer, both managers must successfully complete the DUNKIN' DONUTS training course then in effect for franchisees;

c. The transferee, including shareholders and partners of the transferee, shall jointly and severally execute, on DUNKIN' DONUTS' then current forms, a Franchise Agreement and any other standard ancillary agreement, including without limitation a priority payment agreement, if applicable, with DUNKIN' DONUTS. The priority in payment agreement will provide, among other things, that if the transferee is unable at any time to make payments to the transferor for the purchase of the DUNKIN' DONUTS SHOP and to DUNKIN' DONUTS and/or its rental subsidiary under the Franchise Agreement and Lease, that payments to DUNKIN' DONUTS, the Fund, and DUNKIN' DONUTS' rental subsidiary will have priority. With respect to the then current Franchisee Agreement, no greater percentages of the GROSS SALES than those required by Paragraphs 4.E. and 4.F. shall be required.

d. The transferor, and all individuals proposing to transfer an interest in the franchise, shall execute a general release under seal of all claims against DUNKIN' DONUTS and a priority in payment agreement, if applicable.

e. Unless a longer period is agreed upon by DUNKIN' DONUTS and the transferee, the term of the Franchise Agreement required pursuant this subparagraph shall be for the unexpired term of this Agreement. Except in the instance that a period longer than the unexpired term of this Agreement is agreed upon by DUNKIN' DONUTS, transferee shall pay no INITIAL FRANCHISE FEE as provided in Paragraph 4. of this Agreement.

f. If transferee is a corporation:

(1) Each stock certificate of the transferee corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon transfers by this Agreement;

(2) No new shares of common or preferred voting stock in the transferee corporation shall be issued to any person, persons, partnership, association or corporation without obtaining DUNKIN' DONUTS' prior written consent; and

(3) All shareholders of the transferee corporation shall enter into a written agreement, in a form satisfactory to DUNKIN' DONUTS, jointly and severally guaranteeing the full payment and performance of the transferee corporation's obligations to DUNKIN' DONUTS.

g. FRANCHISEE shall have fully paid and satisfied all of FRANCHISEE's obligations to DUNKIN' DONUTS, the Fund, and DUNKIN' DONUTS' rental subsidiary and DUNKIN' DONUTS shall have been paid a Transfer Fee equal to the greater of Four Thousand Dollars ($4,000.00), increased by 5% compounded annually during the term of this Agreement and any renewal period, or: **Transfer Fee**

(1) 5% of the Adjusted Sales Price of the DUNKIN' DONUTS SHOP if the sale takes place within three (3) years after the date on which FRANCHISEE opened the SHOP to the public (as a new shop), or the date on which FRANCHISEE acquired the SHOP (as a previously operated shop); or

(2) 3% of the Adjusted Sales Price of the DUNKIN' DONUTS SHOP if the sale takes place after three (3) years from the date on which FRANCHISEE opened the SHOP to the public (as a new shop), or the date on which FRANCHISEE acquired the SHOP (as a previously operated shop).

The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations, and deferred financing and amounts allocated to property of every kind, nature and description: furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building if owned by FRANCHISEE. It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the Contract of Sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

The Adjusted Sales Price shall be the Sales Price to be received by FRANCHISEE upon transfer of the DUNKIN' DONUTS SHOP less the amount paid by FRANCHISEE for the DUNKIN' DONUTS SHOP if purchased from another franchisee or from DUNKIN' DONUTS as a previously operated shop. No adjustment shall be made for amounts paid in connection with the development of a new DUNKIN' DONUTS shop.

DUNKIN' DONUTS will waive the five percent (5%) or three percent (3%) fee but not the fixed fee of $4,000 (subject to increase) in connection with transfer of the DUNKIN' DONUTS SHOP to FRANCHISEE'S spouse or one or more of FRANCHISEE'S children provided that, in DUNKIN' DONUTS' good faith opinion, FRANCHISEE has been in full compliance with the terms of all agreements with DUNKIN' DONUTS and its rental subsidiary. However, the Franchise Agreement issued to the spouse and/or children will be on the then current form in use at the time of transfer including the then current Transfer Fee provision.

For purposes of determining the correct Transfer Fee, DUNKIN' DONUTS reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise if, in the good faith opinion of DUNKIN' DONUTS, the allocation of the parties is unreasonable in relation to the value of the franchised business. If DUNKIN' DONUTS purchases the DUNKIN' DONUTS SHOP from FRANCHISEE by exercise of its right of first refusal under subparagraph 10.F. hereof, the Transfer Fee shall be payable by FRANCHISEE to DUNKIN' DONUTS as if FRANCHISEE had sold the franchised business to a third party.

h. Upon compliance with the aforesaid conditions and DUNKIN' DONUTS' approval of the transfer, FRANCHISEE and any shareholders or partners participating in said transfer shall, to the extent of the interest so transferred, thereupon be relieved of further obligations under the terms of this Agreement, except that FRANCHISEE and any former shareholders or partners of FRANCHISEE shall remain obligated for FRANCHISEE's money obligations under Paragraph 4., through the date of sale, and under the restrictive covenants contained in Paragraph 8., after the date of sale.

10. C.3. If a transfer would have the effect of transferring an interest of forty-nine percent (49%) or less in the franchise licensed herein, or the entity holding such franchise, to someone other than an original signatory of this Agreement: **Transfer of Less Than Control**

a. The transferee and each partner and shareholder of transferee must be a United States citizen or lawful resident alien of the United States and shall be of good moral character and reputation and shall have a good credit rating and business qualifications reasonably acceptable to DUNKIN' DONUTS. FRANCHISEE shall provide DUNKIN' DONUTS with such information as DUNKIN' DONUTS may require to make such determination concerning each such proposed transferee;

b. The transferee must designate two managers for the DUNKIN' DONUTS SHOP, one of whom must be a transferee or a partner or shareholder of the transferee. Prior to the transfer, both managers must successfully complete the DUNKIN' DONUTS training course then in effect for franchisees;

c. The transferee, including all shareholders and partners of the transferee, shall jointly and severally execute this Agreement and any other standard ancillary agreement, including without limitation a priority payment agreement, if applicable, with DUNKIN' DONUTS. The priority in payment agreement will provide, among other things, that if the transferee is unable at any time to make payments to the transferor for the purchase of the DUNKIN' DONUTS SHOP and to DUNKIN' DONUTS and/or its rental subsidiary under the Franchise Agreement and Lease, that payments to DUNKIN' DONUTS, the Fund, and DUNKIN' DONUTS' rental subsidiary will have priority.

d. The transferor and all individuals proposing to transfer an interest in the franchise, shall execute a general release under seal of all claims against DUNKIN' DONUTS and a priority in payment agreement, if applicable.

e. If transferee is a corporation:

9

(1) Each stock certificate of the transferee corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon transfers by this Agreement;

(2) No new shares of common or preferred voting stock in the transferee corporation shall be issued to any person, persons, partnership, association or corporation without obtaining DUNKIN' DONUTS' prior written consent; and

(3) All shareholders of the transferee corporation shall enter into a written agreement, in a form satisfactory to DUNKIN' DONUTS, jointly and severally guaranteeing the full payment and performance of the transferee corporation's obligations to DUNKIN' DONUTS.

f. Upon compliance with the aforesaid conditions and DUNKIN' DONUTS' approval of the transfer, FRANCHISEE and any shareholders or partners participating in said transfer shall, to the extent of the interest so transferred, thereupon be relieved of further obligations under the terms of this Agreement, except that FRANCHISEE and any former shareholders or partners of FRANCHISEE shall remain obligated for FRANCHISEE's money obligations under Paragraph 4., through the date of sale, and under the restrictive covenants contained in Paragraph 8., after the date of sale.

10. D. In the event of the death of FRANCHISEE, or any partner or shareholder thereof at any time during the term of this Agreement, the legal representative of FRANCHISEE, partner or shareholder, together with all surviving partners or shareholders, if any, jointly, shall, within three (3) months of such event apply, in writing, for the right to transfer the franchise, or the interest of the deceased partner or shareholder in such franchise, to such person or persons as the legal representative may specify. Such transfer shall be approved by DUNKIN' DONUTS upon the fulfillment of all of the conditions set forth in Paragraph 10.C.2. or 10.C.3. (as applicable) of this Agreement, except that no transfer fee shall be required if the transferee is a beneficiary or heir of FRANCHISEE. **Transfer on Death**

10. E. If the legal representative and all surviving partners or shareholders, if any, do not comply with the aforesaid provisions of Paragraph 10. or do not propose a transferee acceptable to DUNKIN' DONUTS under the standards set forth in Paragraph 10.C.2. and 10.C.3., all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to DUNKIN' DONUTS. DUNKIN' DONUTS shall have the right and option, exercisable upon such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld. DUNKIN' DONUTS shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10. F. If FRANCHISEE, or any shareholder or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's franchise or shareholder's or partner's interest in the franchise, FRANCHISEE or such shareholder or partner shall notify and provide DUNKIN' DONUTS with a copy of such offer, and DUNKIN' DONUTS shall have the right and option, exercisable within forty-five (45) days after its receipt of a copy of the offer to purchase FRANCHISEE'S franchise, or such shareholder's or partner's interest in the franchise, on the same terms and conditions as offered by said third party. DUNKIN' DONUTS' exercise of its right to purchase FRANCHISEE's franchise hereunder shall not relieve FRANCHISEE of its transfer fee obligation to DUNKIN' DONUTS under Paragraph 10.C.2.g. Should DUNKIN' DONUTS not exercise this option and the terms of the unaccepted offer be altered, DUNKIN' DONUTS shall, in each instance, be notified of the changed offer and shall again have forty-five (45) days to purchase on the altered terms. Should DUNKIN' DONUTS not exercise this option, the terms of Paragraph 10.C.2. and 10.C.3. (as applicable) shall apply to any transfer which may be contemplated. **Right of First Refusal**

11. A. This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of DUNKIN' DONUTS or its subsidiary for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of DUNKIN' DONUTS or its subsidiary or to create any obligation, express or implied, on behalf of DUNKIN' DONUTS or its subsidiary. The parties agree that this Agreement does not create a fiduciary relationship between DUNKIN' DONUTS or its subsidiary and FRANCHISEE. **Relationship of Parties**

11. B. Under no circumstances shall DUNKIN' DONUTS or FRANCHISEE be liable for any act, omission, debt or any other obligation of the other. Each party shall indemnify and save the other harmless against any such claim and the cost of defending against such claims arising directly or indirectly from, or as a result of, or in connection with, FRANCHISEE's operation of the DUNKIN' DONUTS SHOP.

12. No failure of DUNKIN' DONUTS to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any obligation or condition hereunder, and no custom or practice of the parties in variance with the terms hereof, shall constitute a waiver of DUNKIN' DONUTS' right to demand strict compliance with the terms hereof. Waiver by DUNKIN' DONUTS of any particular default by FRANCHISEE shall not affect or impair DUNKIN' DONUTS' right in respect to any subsequent default of the same or of a different nature; nor shall any delay, waiver, forbearance or omission of DUNKIN' DONUTS to exercise any power or rights arising out of any breach or default by FRANCHISEE of any of the terms, provisions or covenants hereof affect or impair DUNKIN' DONUTS' rights, nor shall such constitute a waiver by DUNKIN' DONUTS of any right hereunder or of the right to declare any subsequent breach or default. Subsequent acceptance by DUNKIN' DONUTS of the payments due to it hereunder shall not be deemed to be a waiver by DUNKIN' DONUTS of any preceding breach by FRANCHISEE of any terms, covenants or conditions of this Agreement. Acceptance by DUNKIN' DONUTS of payments due it hereunder from any person or entity other than FRANCHISEE shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee or successor to FRANCHISEE. **Non-Waiver**

13. All notices hereunder by DUNKIN' DONUTS to FRANCHISEE shall at DUNKIN' DONUTS' option be personally delivered or sent by telecopier, or prepaid private courier, or certified mail to the FRANCHISEE at the address set forth below or at such other address as FRANCHISEE may from time to time give notice of to DUNKIN' DONUTS. All notices hereunder by FRANCHISEE to DUNKIN' DONUTS shall be sent by certified mail to DUNKIN' DONUTS INCORPORATED, Post Office Box 317, Randolph, Massachusetts 02368, Attn: Senior Vice President and General Counsel or at such other address as DUNKIN' DONUTS may from time to time give notice of to FRANCHISEE. **Notices**

To FRANCHISEE: c/o Dunkin' Donuts, 291 Ferry Street, New Haven, CT 06513

14. A. This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between DUNKIN' DONUTS and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. **Entire Agreement**

14. B. The success of the business venture contemplated to be undertaken by FRANCHISEE by virtue of this Agreement is speculative and depends, to a large extent, upon the ability of FRANCHISEE as an independent businessman, as well as other factors. DUNKIN' DONUTS does not make any representations or warranty as to the potential success of the business venture contemplated hereby. FRANCHISEE acknowledges that it has entered into this Agreement after making an independent investigation of DUNKIN' DONUTS' operations, and not upon any representation as to profits which FRANCHISEE in particular might be expected to realize, nor has anyone made any other representation which is not expressly set forth herein, to induce FRANCHISEE to accept this franchise and execute this Agreement.

14. C. Captions, paragraph and subparagraph de...tions and section headings are included in this Agreement for convenience only, and in no way do they define, limit, construe or describe the scope or intent of the respective parts of this Agreement.

15. Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement. **Severability**

16. A. This Agreement shall be interpreted, construed and governed by the laws of the Commonwealth of Massachusetts. **Applicable Law**

16. B. Nothing herein contained shall bar the right of either party to obtain injunctive relief against threatened conduct that will cause loss or damages, under the usual equity rules, including the applicable rules for obtaining preliminary injunctions.

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this Agreement in triplicate the day and year first written above. FRANCHISEE acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) days prior to the date hereof.

ATTEST/WITNESS:

```
                                    4 Donuts Inc.                              FRANCHISEE
x [signature]                    By _____
  George Germano   -   Secretary    Glenn Stetzer   -   President
x [signature]                       _____
                                    George Germano  -  Vice President
x [signature]                       _____
                                    FRANCHISEE    Glenn Stetzer  - Individually
x [signature]                       _____
                                    FRANCHISEE    George Germano -  Individually
                                    FRANCHISEE
```

ATTEST:
[signature: Catherine W. Spalding]
Assistant Secretary

DUNKIN' DONUTS INCORPORATED                    FRANCHISOR
By [signature]
   WILLIAM P. DALY
   Director of Development & Operations

11

PERSONAL GUARANTEE OF OFFICERS, SHAREHOLDERS
AND DIRECTORS OF A CORPORATION

We, the undersigned officers, directors and/or shareholders of one hundred (100%) percent of the original issue of capital stock of _____4 Donuts Inc._____

a corporation organized under the laws of the state of ___Connecticut_____
waiving demand and notice, hereby, jointly and severally, personally guarantee the full payment of the corporation's money obligations under Paragraph 4, and performance of the corporation's other obligations under this Franchise Agreement, including Paragraph 8 in its entirety relative to the restrictions on the activities of FRANCHISEE and personally agree that said Paragraphs shall be binding on each of us personally, as if each of us were FRANCHISEE.

The undersigned, jointly and severally, agree that DUNKIN' DONUTS may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of the corporation's money obligations under Paragraph 4; (b) modify, with the consent of the corporation, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of DUNKIN' DONUTS against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned.

This Guarantee is intended to take effect as a sealed instrument.

Signed in the presence of:

| X _James McManam_____ Witness | _/s/ Glenn Stetzer_____ Individually |
| X _Barbara Ormino_____ Witness | _/s/ George Germano____ Individually |
| _____ Witness | _____ Individually |
| _____ Witness | _____ Individually |
| _____ Witness | _____ Individually |

12