

1  STEPHEN HORN
   ROBERT L. ZISK
2  LAURA O'LEARY
   SCHMELTZER, APTAKER & SHEPARD, P.C.
3  2600 Virginia Avenue, N.W.
   Washington, D.C. 20037
4  (202) 333-8800

5  MITCHELL S. SHAPIRO
   DOUGLAS L. CARDEN
6  SHAPIRO, POSELL, ROSENFELD & CLOSE
   2029 Century Park East
7  Los Angeles, CA 90067
   (310) 277-1818
8
   Attorneys for Plaintiff
9  Dunkin' Donuts Incorporated

                    ORIGINAL

                    FILED

                    MAR  9 1993

                    CLERK, U.S. DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA

10              UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12  _____
                                    )
13  DUNKIN' DONUTS INCORPORATED,    )    CV 93-0419JSL (Tx)
    a Delaware Corporation,         )
14                                  )
              Plaintiff,            )    OPINION AND ORDER
15                                  )
         v.                         )
16                                  )
    CHIENG-EUNG THIEM, et al.,      )
17                                  )
              Defendants,           )
18                                  )
    and All Related Cross-Claims    )
19  _____)

                    ENTERED
                    CLERK, U.S. DISTRICT COURT

                    MAR 12 1993

                    CENTRAL DISTRICT OF CALIFORNIA
                    DEPUTY

20       Plaintiff has moved this Court for partial summary

21  judgment on liability on Counts I and II of the Complaint.

22  Upon consideration of the motion and the opposition thereto,

23  the pleadings, including the admissions contained in the

24  counterclaims, and after hearing oral argument, the Court

25  makes the following findings of fact and conclusions of law.

26

27

28
                    MAR 12 1993

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

FINDINGS OF FACT

1.    Plaintiff and the Defendant-Counterclaimants were party to two Franchise Agreements, pursuant to which Defendants were licensed to operate Dunkin' Donuts franchises at 528 South Beach Boulevard, Anaheim, and 601 Broadway, Chula Vista.

2.    Under ¶ 8.A.1 of each Franchise Agreement, Defendants agreed not to do or perform, directly or indirectly, any act injurious or prejudicial to the goodwill associated with Dunkin' Donuts' proprietary marks and the Dunkin' Donuts system.  Additionally, under ¶ 5.Q of the Franchise Agreement for the Chula Vista franchise, Defendants agreed to comply with all laws, rules, regulations, ordinances, and orders of public authorities applicable to the operation of the franchises.

3.    The Defendants agreed under ¶¶ 4.E, 4.F, and 5.H of each Franchise Agreement to accurately report to Dunkin' Donuts each week the actual gross sales of the franchises and to pay franchise and advertising fees as percentages of those gross sales.

4.    The Defendants have admitted that they intentionally underreported the sales of their franchises to Dunkin' Donuts.

5.    The Defendants have reported the same sales to the taxing authorities as they reported to Dunkin' Donuts, and have intentionally understated their franchise sales to the taxing authorities as well.

1      6.   On October 6, 1992, Dunkin' Donuts terminated the

2   Defendants' franchises on the grounds, among others, that the

3   use of their franchises and their affiliation with the Dunkin'

4   Donuts System to commit tax fraud was conduct injurious and

5   prejudicial to the goodwill associated with Dunkin' Donuts'

6   marks and the Dunkin' Donuts system, and a failure to comply

7   with all applicable laws.  Dunkin' also terminated the Lease

8   from it to Defendants for the Anaheim premises, which was

9   subject to cancellation upon termination of the Franchise

10   Agreement.

11      7.   Under ¶ 17(c) of the Lease for the Anaheim

12   franchise, Dunkin' Donuts is entitled to enter and repossess

13   the premises upon termination of the Lease.

14

15               CONCLUSIONS OF LAW

16   1.   Defendants' intentional underreporting of sales to

17   the taxing authorities was injurious and prejudicial to the

18   goodwill associated with Dunkin' Donuts' proprietary marks and

19   the Dunkin' Donuts system, in breach of Paragraph 8.A.1 of

20   both Franchise Agreements.

21      2.   Defendants' acts were in violation of Paragraph 5.Q

22   of the Franchise Agreement for the Chula Vista franchise,

23   requiring them to obey all laws in connection with the opera-

24   tion of their franchise.

25      3.   Underreporting the sales of the franchises to the

26

27

28

1   taxing authorities is a noncurable breach of the Dunkin'

2   Donuts Franchise Agreement, for which immediate termination is

3   warranted.

4       4.   Plaintiff is entitled to summary judgment on the

5   issue of Defendants' liability for breach of contract under

6   Counts I and II of the Complaint.

7       5.   The Lease for the Anaheim franchise premises is

8   terminated concurrently with the termination of the Franchise

9   Agreement.

10

11      In accordance with the foregoing, it is hereby

12      ORDERED that Plaintiff's motion for partial summary

13   judgment is GRANTED, and

14      ORDERED that summary judgment on the issue of Defendants'

15   liability under Counts I and II of the Complaint is hereby

16   entered in favor of Plaintiff, and further

17      ORDERED that:

18          a.   each of the Franchise Agreements is hereby

19   terminated nunc pro tunc;

20          b.   the Lease for the premises of the Anaheim

21   franchise is hereby terminated nunc pro tunc;

22          c.   the Defendants shall immediately comply with

23   all of their obligations upon termination of each of the

24   Franchise Agreements, as set forth in ¶ 9.C therein; and

25          d.   the Defendants shall surrender possession of

26   the premises of the Anaheim franchise to Dunkin' Donuts in

27

28

- 4 -

1    accordance with the terms of the Lease on or before ____ days

2    from the date of this Order. To the extent that this Order

3    Conflicts with the Order of the court entered February 5, 1993,
     this Order controls.

4

5    _3/9/93_____                    _____Sunn Lett_____
     DATE                            UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶11,174, **Dunkin' Donuts Inc. v. Michael Panagakos, et al.** (Dated May 13, 1997)

**Dunkin' Donuts Inc. v. Michael Panagakos, et al.**

U.S. District Court, District of Massachusetts. Civil Action No. 96-11040-RGS. Dated May 13, 1997.

**Relationship/Termination —Cause for Termination —Criminal Conviction —Tax Evasion —Injury to Goodwill.** —A master franchisee's guilty plea and conviction on 77 counts of tax evasion constituted cause for termination under the terms of the master franchise agreement. The agreement permitted termination for any acts "injurious or prejudicial" to goodwill associated with the franchisor's marks and system. The franchisee's criminal conduct, which was intimately connected with the operation of his franchises, represented a material breach of this provision. Although sales volume at three of the franchisee's stores had actually increased in the year the franchisee was convicted, proof of a negative financial impact to the franchisor was not necessary to establish an injury to goodwill. Sales volume, while influenced by goodwill, was a function of a number of unrelated factors, including product quality, store location, pricing, and competition.

Back reference: ¶825.

**Relationship/Termination —Cause for Termination —Criminal Conviction —Tax Evasion —Waiver —Post-Indictment Assurances, Actions.** —A donut shop franchisor whose representatives had assured a franchisee that his indictment on tax evasion charges would not have an adverse impact on his franchisee status might not have waived its right to terminate the franchisee once he was convicted on the charges. Evidence indicated that the franchisor's representatives made the assurances based on the franchisee's assertions that he was innocent. Moreover, the franchisor maintained that it had granted the franchisee another franchise after his entry of a guilty plea only because it wanted to give him a fair opportunity to sell the shop as a going concern. Also, the franchisor alleged that it had delayed filing a lawsuit in the case based on representations by the franchisee that he needed a year to sell the franchises.

Back reference: ¶825.

### MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**[In full text]**

STEARNS, D.J.: On May 21, 1996, Dunkin' Donuts, Inc., brought this action to rescind five Dunkin' Donuts franchises owned by Michael Panagakos. [1] Dunkin' Donuts also seeks to enjoin Panagakos from using its trademarks and trade dress. Cross-motions for summary judgment are pending before the court. [2]

### *FACTS*

The undisputed facts relevant to Dunkin' Donuts' motion are these. In 1992, Panagakos owned three Dunkin' Donuts shops (M&K Corp., 807 Corp., and 1014 Corp.) in New Bedford and in Fairhaven, Massachusetts. Dunkin' Donuts' master franchise agreement provides that:

neither the FRANCHISEE ... nor any shareholder, if the FRANCHISEE is a corporation, shall ... do or perform, directly or indirectly, any ... act injurious or prejudicial to the goodwill associated with DUNKIN' DONUTS' PROPRIETARY MARKS and the DUNKIN' DONUTS SYSTEM.

Paragraph 8(A)(1). [3]

Panagakos did not file corporate excise and meals tax returns for two of his shops during seventy-three quarters. On December 8, 1992, he was indicted by a state grand jury for seventy-seven counts of tax

*Copyright © 2003, CCH INCORPORATED. All rights reserved.*

evasion. Panagakos informed Dunkin' Donuts of the indictment and protested his innocence to Robert Gabellieri, his "primary representative" at Dunkin' Donuts. [4] Gabellieri told Panagakos that his status with Dunkin' Donuts would remain unchanged while his case was being resolved.

On January 27, 1993, Panagakos submitted a Dunkin' Donuts Exclusive Development Plan (EDP) application to expand his territorial license and to build what would be the fifth shop in his chain. On September 10, 1993, Dunkin' Donuts approved the EDP and authorized a new Panagakos corporation, NB18 Corp., to begin construction. On September 20, 1993, Dunkin' Donuts and Panagakos executed the franchise agreement for the fourth shop (DD94 Corp.). In November of 1993, DD94 opened its doors. Construction of the NB18 shop began in December of 1993. [5]

On February 16, 1994, Panagakos pled guilty to all seventy-seven counts of the indictment. He was sentenced to two years in jail, three years' probation, and 1,000 hours of community service. The indictment and the fact that Panagakos was a Dunkin' Donuts franchisee were publicized by *The Boston Globe* ( *Restaurateur, Two Brockton Men —Are Indicted on Tax Evasion Charges,* December 10, 1992). *The Boston Globe* also reported Panagakos's eventual guilty plea, again highlighting his connection to Dunkin' Donuts ( *Man Pleads Guilty to Tax Evasion,* February 18, 1994). One of Panagakos's employees, Jane Magan, wrote a letter on Panagakos's behalf to the sentencing judge, expressing regret at the adverse impact of Panagakos's convictions on his franchises. Magan stated: "[i]t appears the resolution is not as important to the State as the negative publicity we have received... . We are eager to ... begin to rebuild our fine reputation again."

On March 10, 1994, after his guilty plea, Panagakos and Dunkin' Donuts signed the franchise agreement for the NB18 shop. In April of 1994, Panagakos began serving his state sentence. In October of 1994, he was paroled to a work release program. On October 26, 1994, Dunkin' Donuts gave Panagakos termination notices. In 1994, the M&K, 807, 1014, and DD94 shops had an increase in total sales over 1993.

## DISCUSSION

Dunkin' Donuts argues that under the terms of the master franchise agreement it has the right to terminate Panagakos because his convictions constitute "act[s] injurious or prejudicial to the goodwill associated with DUNKIN' DONUTS' PROPRIETARY MARKS and the DUNKIN' DONUTS SYSTEM." Dunkin' Donuts contends that the criminal conviction of a franchisee is injurious per se to a franchisor's goodwill. See *Serubo Cadillac Co., Inc. v. Cadillac Motor Car, Div. of General Motors Corp.,* 1986 WL 4524, at *9 (E.D. Pa., April 15, 1986), *aff'd without opinion* 808 F.2d 1518 (3rd Cir. 1986) ("GM can certainly claim that, in light of the adverse publicity surrounding [the franchisee's] original guilty plea, it had a justifiable concern of possible damage to its reputation"); *Tyler v. Bennett,* 449 S.E.2d 666, 667 (Ga. App. 1994) ("The evidence ... shows that soon after telling [plaintiff] he was not guilty of any criminal acts, [defendant] pled guilty to bank fraud, thereby destroying the good will he had purported to sell [to plaintiff]"); *AAMCO Indus., Inc. v. DeWolf,* 250 N.W.2d 835, 839-840 (Minn. 1977) (termination of franchisee for consumer fraud was proper under a regulation allowing termination for conduct "which materially impairs the good will associated with the franchisor's trademark").

A federal district court in California, addressing an almost identical fact situation, held that the indictment of two Dunkin' Donuts' franchisees for tax fraud was cause for termination under paragraph 8(A)(1) of the master agreement.

The Defendants' intentional underreporting of sales to the taxing authorities was injurious and prejudicial to the goodwill associated with Dunkin' Donuts' proprietary marks and the Dunkin' Donuts system, in breach of Paragraph 8.A.1 of both Franchise Agreements.

*Dunkin' Donuts Inc. v. Chieng-Eung Thiem,* CV 93-0419-JSL (Tx), slip op. at 3 (C.D. Cal., March 9, 1993). The only thing that distinguishes this case from *Thiem* is that Panagakos pled guilty while the franchisees in *Thiem* had merely been indicted. The distinction does not favor Panagakos.

Dunkin' Donuts argues that Panagakos's criminal conduct, which reflected directly on his operation of the

*Copyright © 2003, CCH INCORPORATED. All rights reserved.*

Dunkin' Donuts shops, was indistinguishable in the public mind from conduct by Dunkin' Donuts itself. As the court in *Palombi v. Getty Oil Co.*, 501 F. Supp. 158, 162 (E.D. Pa. 1980), observed in a case involving the fraud conviction of a franchisee,

[c]ertainly there can be few more compelling justifications for terminating a service station franchise than the indictment and conviction of the franchisee for price-gouging. Through trademarks and advertising, the consumer comes to link supplier and dealer. When the dealer is convicted of price-gouging, the suggestion of fraud necessarily taints the supplier's reputation. That such a charge and conviction would support a dealer's termination seems indisputable.

*Id.* at 162.

That the reputation of a principal can be damaged by being associated with the criminal acts of an agent is also recognized in the employment context. See *Kucera v. Ballard*, 485 So.2d 345, 347 (Ala. Civ. App. 1986) (discharge of public employee committed an assault and other offenses was proper because "such conduct by an employee ... would certainly have a negative effect on the [agency's] relations with the public"); *Horsefield v. Commonwealth*, 531 A.2d 829, 832 (Pa. Commw. Ct. 1987) ("While there is no doubt that conviction for drug violations may not prevent Claimant from performing the physical act of making and serving a drink, there is no denying that customers may choose to go elsewhere for potation rather than patronize a bar where the bartender is connected with drugs."); *Kinoshita v. Canadian Pacific Airlines, Ltd.*, 803 F.2d 471, 475 (9th Cir. 1986) (affirming district court's determination that an employee's "conduct involving drugs could harm the company's reputation"); *City of Colorado Springs v. Givan*, 897 P.2d 753, 757-760 (Colo. 1995) (upholding termination of an employee who pled guilty to incest because retention of the employee would have had an adverse effect on public perception of the City.)

Dunkin' Donuts also points to cases under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §2801, which hold that a conviction for tax evasion is ample grounds for termination of a franchisee. "The failure to pay sales tax is a breach of trust which reflects on the character of the business." *In re Matthew Enterprises, Inc.*, 51 B.R. 333, 336 (Bankr. S.D. Ind. 1985). See also *Shell Oil Co. v. Altina Assoc, Inc.*, 866 F. Supp. 536, 541-542 (M.D. Fla. 1994) (holding that damage to a franchisor's reputation and goodwill stemming from tax evasion by a franchisee is irreparable). [6]

Panagakos argues that there is a dispute of fact whether his convictions were "injurious and prejudicial" to Dunkin' Donuts because three of his stores increased their sales in 1994. Panagakos contends that proof of negative financial impact is necessary to establish an injury to goodwill. I disagree. In the law of defamation, which provides a useful analogy, a corporation is "not obligated to show out-of-pocket loss as a consequence of the libel." *Dexter's Hearthside Restaurant, Inc. v. Whitehall Co.*, 24 Mass. App. Ct. 217, 220-221 (1987). Cf. *Ross-Simons of Warwick, Inc. v. Baccarat*, 102 F.3d 12, 20 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. According, this kind of harm is held to be irreparable.") Panagakos's "financial impact" theory confuses the separate concepts of goodwill and sales volume. Goodwill measures a company's reputation in the community at large. Sales volume, while influenced by good will, is a function of a number of other unrelated factors, such as the uniqueness and quality of a company's product, the location of its sales outlets, the pricing of the product, and the presence or absence of competition.

Panagakos argues that even if the publicity surrounding his convictions is to be considered a per se injury to Dunkin' Donuts' goodwill, a question of fact remains whether the injury was significant enough to constitute a material breach of the franchise agreement. Materiality, while usually a jury question, is not always a jury question. "Though questions of materiality are usually to be determined by the trier of fact, ... the rule is not universal. As is true of virtually any factual question, if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law." *Gibson v. City of Cranston*, 37 F.3d 731, 736 (1st Cir. 1994). I conclude that on the undisputed evidence no reasonable jury could find that Panagakos's involvement in a tax evasion scheme intimately connected with the operation of his Dunkin' Donuts' franchises was not a material breach.

*Copyright © 2003, CCH INCORPORATED. All rights reserved.*

Finally, Panagakos argues that Dunkin' Donuts waived its right to terminate his franchises by delaying his termination for as long as it did. The argument misapprehends Dunkin' Donuts' present motion. Dunkin' Donuts is not asking that the court ratify Panagakos's termination. It only asks that the court declare that Panagakos's convictions for tax fraud are grounds for termination. [7] Whether Dunkin' Donuts' conduct effected a waiver of its right to terminate Panagakos is an issue to be decided at trial.

### PANAGAKOS' MOTION FOR SUMMARY JUDGMENT

In his motion for summary judgment Panagakos argues that even if Dunkin' Donuts had grounds to terminate his franchises, it waived its right to do so by assuring him that his indictment would have no adverse impact on his status as a franchisee. Panagakos claims as a result to have expended considerable funds building the two new shops. Panagakos notes that despite his indictment, Dunkin' Donuts permitted him to remain as a franchisee, awarded him a fourth franchise, and approved the construction of the fifth shop. Panagakos finally points out that Dunkin' Donuts entered into the NB18 franchise agreement after he pled guilty to the indictment.

In addition to the facts detailed earlier, the following facts are undisputed. After the termination notices were sent in October of 1994, officials from Dunkin' Donuts met with Panagakos and his lawyer. At the meeting, Panagakos stated that he was looking into the possibility of selling his franchises. [8] Dunkin' Donuts indicated that it would be interested in exercising its right of first refusal. Dunkin' Donuts filed this lawsuit on May 21, 1996.

Dunkin' Donuts disputes all of the facts underlying Panagakos's waiver argument. Dunkin' Donuts has submitted affidavits from its representatives stating that they told Panagakos that he would not be terminated because of the indictment in light of the fact that he maintained his innocence. They also state that Panagakos was given the franchise for the fifth shop after his guilty plea to give him a fair opportunity to sell the shop as a going concern. Finally, Dunkin' Donuts maintains that Panagakos told its representatives that he needed a year to sell the franchises and that because of this representation it delayed the filing of the lawsuit. The issues of waiver and detrimental reliance are clearly in dispute.

### ORDER

For the foregoing reasons, Dunkin' Donuts' motion for partial summary judgment is *ALLOWED*. The court *ADJUDGES* and *DECLARES* that Panagakos's convictions constitute a sufficient grounds for termination of his franchises. The court makes this declaration without prejudice to Panagakos's affirmative defenses. Panagakos's motion for summary judgment is *DENIED*.

SO ORDERED.

[1] Panagakos operates each of his five Dunkin' Donuts shops as a separate corporation. The corporations (M&K Corp., 807 Corp., DD94 Corp., 1014 Corp., and NB18 Corp.) are named as nominal defendants.

[2] On October 8, 1996, at a scheduling conference, the court invited Dunkin' Donuts to file by November 8, 1996, a memorandum of law on the issue whether Panagakos's criminal convictions constituted prima facie grounds for termination under his franchise agreements. The court ordered that all other dispositive motions be filed by July 23, 1997. Dunkin' Donuts responded with this motion. On November 22, 1996, Panagakos filed a premature motion for summary judgment together with an opposition to Dunkin' Donuts' motion for partial summary judgment. Because the parties have fully briefed Panagakos's untimely motion, the court will consider it on its merits without prejudice to Dunkin' Donuts' right to file its own motion for summary judgment at the close of discovery.

[3] All of franchise agreements at issue in this case, except for M&K Corp.'s, contain identical wording.

[4] At oral argument Panagakos's counsel claimed that a dispute of fact exists whether Panagakos told Gabellieri that he was innocent of the charges. The record before the court, however, does not reveal any dispute. Gabellieri states in his affidavit that "I spoke to Mr. Panagakos after the indictments and he told

Copyright © 2003, *CCH INCORPORATED. All rights reserved.*

me he was innocent. Based on Mr. Panagakos' assurances that he had not broken the law, I told him that his status as a franchisee would not change while his criminal case was pending.... . In February 1994, Mr. Panagakos contradicted his claims of innocence by pleading guilty to all charges brought against him." Gabellieri Affidavit, ¶¶4 and 6. Panagakos has submitted an affidavit in which he recounts his meeting with Gabellieri and his discussions with other Dunkin Donuts' employees about the indictment. Nowhere in Panagakos's affidavit does he squarely deny the statement that Gabellieri attributes to him. Instead he states that:

[i]mmediately after the return of the indictment against me, I spoke with Dunkin's employee, Bob Gabellieri ( "Gabellieri"), who was Dunkin's primary representative in dealing with my franchises, and who held the title of "Business Consultant". I described the charges against me, and Gabellieri told me that my relationship with Dunkin' would be "business as usual." Gabellieri made similar statements in subsequent conversations. Shortly after my first conversation with Gabellieri and prior to January 12, 1993, met with Gabellieri and Don Ciampittiello ( "Ciampittiello"), Dunkin's Man[a]ger of Real Estate and Franchise Development. We discussed my interest in further Dunkin' franchises. In that meeting Ciampittiello indicated that my indictment would not affect Dunkin's consideration of my interest in additional franchises.

Panagakos Affidavit, ¶4.

[5] At oral argument, Panagakos's counsel insisted that a dispute exists whether construction of the NB18 shop had begun before Panagakos entered his guilty plea. Again, the record does not reflect such a dispute. Gabellieri attests to the fact that construction began in December of 1993. Gabellieri Affidavit, ¶5. Panagakos in his affidavit says only that the NB18 shop opened its doors on May 29, 1994.

[6] While the reasoning of these cases is persuasive, they are not exactly on point because the otherwise dealer-friendly PMPA specifically authorizes termination of a franchisee convicted of a crime.

[7] Panagakos argues that Dunkin' Donuts has no grounds for terminating the M&K franchise because its agreement does not contain the goodwill provision of his other agreements. Evidence of Panagakos's convictions, however, is also sufficient grounds to state a "for cause" termination. *GTE Products Corporation v. Broadway Electrical Supply Co. Inc.*, 42 Mass. App. Ct. 293, 301 (1997).

[8] The parties dispute whether Panagakos promised to sell his franchises within a year. Panagakos states in his own affidavit that he "did not say nor did [he] agree that [he] would sell [his] franchises within one year." Panagakos Affidavit, ¶5. The affidavit Panagakos has submitted from his own lawyer, however, relates that "Panagakos stated [at the meeting] that he was looking into the possibility of selling the franchise." Mickelson Affidavit. ¶4.

*Copyright © 2003, CCH INCORPORATED. All rights reserved.*

STATE-DECISION, BUSINESS FRANCHISE GUIDE ¶10,005, **McKeesport Beer Distributors, Inc. v. All Brand Importers, Inc.** (Filed May 14, 1992)

**McKeesport Beer Distributors, Inc. v. All Brand Importers, Inc.**

Pennsylvania Supreme Court, Western District. No. J-97-1992. Filed May 14, 1992.

Appeal from Superior Court.

**Beer Distributor's Extra-Territorial Sales Constituted Cause for Termination**

### Pennsylvania Malt and Brewed Beverage Law

**Relationship/Termination —Cause for Termination —Extra-Territorial Sales —Violation of Distribution Agreement, Liquor Law —Subsequent Cure of Claimed Deficiency. —**A beer distributor's repeated sales outside of its exclusive geographical area, in violation of the distributorship agreement and the Pennsylvania Liquor Code, constituted good cause for termination, despite claims that the sales amounted to a deficiency that the distributor cured during the 90-day statutory period. The Pennsylvania malt and brewed beverage law states that a distributor "shall have ninety (90) days in which to rectify any claimed deficiency, or challenge the alleged cause." Contrary to the trial court decision, the legislature's use of the disjunctive "or" must be interpreted as permitting rectification of a claimed deficiency or challenge of the alleged cause, but not rectification of both. Under the law, a deficiency is conduct or a condition that can be rectified. Good cause is defined as an unrectified or unrectifiable deficiency involving an "essential, reasonable and commercially acceptable requirement ... under the terms of an agreement." In this case, the distributor's violation of the only requirement imposed by the importer under the distributorship agreement exposed the importer to confiscation of its products, fines of up to $10,000, and a prohibition of importation of its products into Pennsylvania for up to three years. Unlike rectifiable deficiencies such as inadequate warehousing, insufficient advertising and sales, or tardy deliveries, the Liquor Code violations could not be rectified by any subsequent action to prevent further sales outside the distributor's exclusive sales area.

### Opinion of the Court

#### [In full text]

LARSEN, J.: The issue raised in this appeal is whether the illegal sale of malt or brewed beverages outside the geographical area for which an importing distributor has been given exclusive distributing rights constitutes a rectifiable deficiency under the Liquor Code, 47 P.S. §§1-101-8-803, so that the importing distributor may avoid, by discontinuing such illegal sales, the termination for good cause of its distributing rights agreement with an out of state manufacturer.

Appellant, All Brand Importers, Inc. (hereinafter "All Brand"), a New York corporation, distributes certain brands of beverages, including Moosehead Beer, Foster's Lager, Dos Equis Beer, Superior Beer, Pilsner Urquell, Whitbread Ale and MacKesson Stout, to importing distributors in this Commonwealth. [1] Pursuant to an agreement memorialized in writing in a letter to the Liquor Control Board in 1982, appellee, McKeesport Beer Distributors, Inc. (hereinafter "McKeesport"), was given the exclusive right, as a licensed importing distributor, to distribute All Brand's products in Westmoreland, Greene, Washington and Fayette Counties in their entirety, and in a portion of Allegheny County. On sixteen different occasions in 1985, McKeesport sold All Brand's products outside the geographical area for which McKeesport had been given exclusive distributing rights. This conduct was a violation of the agreement between the parties and constituted illegal conduct under the Liquor Code, 47 P.S. §431(b), for which violation McKeesport was cited and fined. [2] Commonwealth, Pennsylvania Liquor Control Board v. McKeesport Beer Distributor, Inc., 120 Pa. Commw. 554, 549 A.2d 256 (1988).

*Copyright © 2003, CCH INCORPORATED. All rights reserved.*

By letters dated October 7, 1985, and November 6, 1985, All Brand informed McKeesport that it intended to terminate McKeesport's distribution rights for All Brand's products. The November 6 letter was sent by certified mail and notified McKeesport that its distributing rights agreement would be terminated for good cause within ninety days, on the basis of McKeesport's Liquor Code violations. On January 30, 1986, McKeesport filed an action in equity in the Court of Common Pleas of Allegheny County, seeking to enjoin the termination of its distributing rights under its agreement with All Brand. Following a hearing in the matter, McKeesport's request for injunctive relief was denied. McKeesport filed an appeal to the Superior Court which reversed and remanded for further proceedings. *McKeesport Beer Distributors, Inc. v. All Brand Importers, Inc.*, 390 Pa. Super. 627, 569 A.2d 951 (1990). We granted All Brand's petition for allowance of appeal to this Court, and we now reverse.

Superior Court determined that the violations of the Liquor Code committed by McKeesport constituted good cause for termination of its distributing rights agreement with All Brand. In spite of its finding of good cause to terminate, Superior Court further determined that All Brand was not entitled to terminate the distributing rights agreement with McKeesport in that McKeesport had, within ninety days of the notice it received by certified mail, rectified its office practices to preclude any further sales of All Brand's products outside the geographical area that was the subject of the distributing rights agreement between the parties.[3]

All Brand challenges this adverse determination which was based upon Superior Court's interpretation of section 4-492(19) of the Liquor Code. 47 P.S. §4-492(19). Section 4-492(19) provides, in relevant part:

### *Modifying or terminating distributing rights agreement*

[It shall be unlawful) ...

For any manufacturer ... to ... terminate, ... without good cause, any distributing rights agreement, and in no event shall any ... termination ... of any distributing rights agreement become effective for at least ninety (90) days after written notice of such ... termination ... has been served on the affected party and board by certified mail.... The notice shall state all the reasons for the intended ... termination .... *The distributor or importing distributor holding such agreement shall have ninety (90) days in which to rectify any claimed deficiency, or challenge the alleged cause.*

If the deficiency shall be rectified within ninety (90) days of notice, then the proposed ... termination ... shall be null and void and without legal effect.

47 P.S. §4-492(19) (emphasis added).

Superior Court opined that this section permits an importing distributor to rectify claimed deficiencies *and* the conduct that constitutes good cause for termination within ninety days to avoid termination of a distributing rights agreement. All Brand argues that the Legislature's use of the disjunctive "or" regarding an importing distributor's options when faced with a termination notice must be interpreted as permitting rectification of a claimed deficiency or challenge of the alleged cause, but not rectification of *both* a claimed deficiency and alleged cause. Thus, All Brand urges this Court to find that the only remedy McKeesport had when faced with a notice of termination for good cause was to "challenge the alleged cause" within ninety days. Because McKeesport admitted that it had sold All Brand's products outside its assigned geographical area and, thus, did not challenge the cause alleged by All Brand, All Brand argues that it is entitled to terminate its distributing rights agreement with McKeesport. We agree.

Clearly, the Legislature was setting forth two classes of conduct in utilizing the distinct terms "deficiency" and "good cause" in section 4-492(19) of the Liquor Code. "Deficiency" is not defined in the Liquor Code; in common usage and understanding, however, a deficiency is something that is insufficient or lacking in some respect. Under the plain language of section 4-492(19) of the Liquor Code, a deficiency is conduct or a condition that *can* be rectified. "Good cause" is defined in the Liquor Code as:

the *failure* by any party to an agreement, without reasonable excuse or justification, *to comply* substantially

Copyright © 2003, *CCH INCORPORATED.  All rights reserved.*

*with an essential,* reasonable and commercially acceptable *requirement imposed by the other party under the terms of an agreement.*

47 P.S. §4-431(d)(1) (emphasis added). In essence, good cause, as a "failure... to comply," is an unrectified or an unrectifiable deficiency involving an "essential, reasonable and commercially acceptable requirement ... under the terms of an agreement." *Id.*

McKeesport's violation of the Liquor Code, which violation constituted a failure to comply with the *only* requirement imposed by All Brand under the terms of the parties' distributing rights agreement, exposed All Brand to confiscation of its products, fines of up to $10,000, and a prohibition upon the importation of All Brand's products into this Commonwealth for a period of up to three years. 47 P.S. §4-444. Unlike such rectifiable deficiencies as inadequate warehousing, insufficient advertising and sales, tardy deliveries or rude salespersons, McKeesport's violation of the Liquor Code could *not* be rectified by any subsequent action on the part of McKeesport to prevent further sales of All Brand's products outside McKeesport's exclusive geographical area of distribution. Once the Liquor Code violations had occurred, All Brand could not shield itself from the imposition of penalties by promising that its importing distributor would not violate the Liquor Code again.

All Brand had good cause to terminate its distributing rights agreement with McKeesport. The Liquor Code does not give an importing distributor the opportunity to "rectify" alleged cause. As McKeesport did not challenge the alleged cause, All Brand is entitled to terminate the agreement between the parties. Accordingly, we reverse the order of the Superior Court which reversed the order of the Court of Common Pleas of Allegheny County denying McKeesport's request for injunctive relief.

[1] As an entity that has the contractual right to distribute malt beverages and that enters into agreements with licensed importing distributors, All Brand is a "manufacturer" under the Liquor Code. 47 P.S. §4-431(b)(3).

[2] Section 4-431 provides, in relevant part:

"Each out of State manufacturer of malt or brewed beverages whose products are sold and delivered in this Commonwealth shall give distributing rights for such products in designated geographical areas to specific importing distributors, and such importing distributor shall not sell or deliver malt or brewed beverages manufactured by the out of State manufacturer to any person issued a license under the provisions of this act whose licensed premises are not located within the geographical area for which he has been given distributing rights by such manufacturer."

47 P.S. §4-431(b).

[3] It should be noted, in this regard, that McKeesport made the final, illegal, sixteenth sale outside its designated geographical area on December 14, 1985, which was approximately one month following receipt of the notice of termination.

*Copyright © 2003, CCH INCORPORATED. All rights reserved.*

2002 U.S. Dist. LEXIS 16758

THE TOPPS COMPANY INC., Plaintiff, -against- CADBURY STANI S.A.I.C. f/k/a PRODUCTOS STANI SOCIEDAD ANONIMA INDUSTRIAL Y COMMERCIAL, Defendant.

99 Civ. 9437 (CSH)(GWG)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2002 U.S. Dist. LEXIS 16758

September 10, 2002, Decided
September 10, 2002, Filed

**DISPOSITION:** Plaintiff's motion to file fourth amended complaint granted.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff corporation alleged that defendant company improperly used plaintiff's proprietary technology in the manufacture of chewing gum. Plaintiff sought to file a fourth amended complaint that would have added claims that defendant disclosed plaintiff's proprietary technology to its parent and some of its other subsidiaries and that these entities improperly used the technology in the conduct of their business. Defendant opposed the motion.

**OVERVIEW:** Because plaintiff's request for leave to amend was made after the deadline, it was considered under the good cause standard of Fed. R. Civ. P. 16(b). Defendant's argued that there was no personal jurisdiction over the parent company. The court found that, if there was no personal jurisdiction, the parent could have so moved on a complete record following service of the proposed amended complaint. The delay in making the motion to amend was not in any way undue or unreasonable because plaintiff was unaware of its claim until it deposed certain parties in Argentina just prior to its request. Finally, defendant argued that by bringing in a new party and new claims at this late stage, additional discovery would have been required and the final disposition of the matter delayed. However, this same discovery would have been required if the court denied the motion to amend and required plaintiff to file a new action against defendant and its parent. In addition, any prejudice was mitigated somewhat by the fact that the new party that was proposed to be added was defendant's corporate parent. Defendant offered no specific evidence of how a delay in going to trial would have prejudiced it.

**OUTCOME:** Plaintiff was granted leave to file the proposed fourth amended complaint.

**CORE TERMS:** discovery, technology, motion to amend, good cause, proprietary, futility, subsidiary, amend, proposed amendment, judicial economy, separate action, initiate, personal jurisdiction, new party, anyway, opposes

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN1]Under Fed. R. Civ. P. 15(a), leave to amend a complaint shall be freely given when justice so requires.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*

*Civil Procedure > Trials > Pretrial Conferences*
[HN2]Where a plaintiff's request for leave to amend is made after the deadline for seeking amendments, the court may consider the plaintiff's request for leave to amend under the "good cause" standard of Fed. R. Civ. P. 16(b) rather than the less strict standard under Fed. R. Civ. P. 15(a).

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN3]See Fed. R. Civ. P. 15(a).

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN4]The rule in the Second Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith. Delay alone, in the absence of bad faith or prejudice, is normally not a sufficient reason for denying a motion to amend.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN5]The court has discretion to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice other parties.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*

*Civil Procedure > Trials > Pretrial Conferences*
[HN6]In the context of a motion to amend, a finding of "good cause" under Fed. R. Civ. P. 16(b) depends on the diligence of the moving party.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN7]In the context of a motion to amend, case law has recognized that even where the non-movant demon-





strates prejudice, that prejudice must be balanced against the court's interest in litigating all potential claims in a single action.

COUNSEL: [*1] David G. Ebert, Ingram, Yazek, Gainen, Carroll & Bertollotti, L.L.P., New York, N.Y., For Plaintiff.

Richard A. Mescon, Laurie E. Foster, Joseph P. Leon, Morgan, Lewis & Bockius, L.L.P., New York, N.Y., For Defendant.

JUDGES: GABRIEL W. GORENSTEIN, United States Magistrate Judge.

OPINIONBY: GABRIEL W. GORENSTEIN

OPINION: OPINION AND ORDER

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

Plaintiff The Topps Company, Inc.  ("Topps") has moved to file a Fourth Amended Complaint in this matter.  See Notice of Motion, dated July 12, 2002. Defendant Cadbury Stani S.A.I.C. ("Stani") opposes the motion. For the reasons stated below, the motion is granted.

I. Background

The Third Amended Complaint in this matter, filed in February 2002, alleges inter alia that Stani has improperly used Topps proprietary technology in the manufacture of chewing gum.  Discovery has proceeded slowly in this action principally because key witnesses are located in Argentina. Due to the political situation in Argentina and difficulties resulting from the events of September 11, discovery in Argentina did not take place until May 2002.

Topps asserts without contradiction that it did not [*2] learn until the depositions in Argentina in May 2002 (1) that Stani had disclosed to its (future) parent, Cadbury Schweppes, PLC, information about technology that Topps asserts is proprietary and (2) that Cadbury Schweppes had disclosed such technology to certain of its subsidiaries, including those operating in France, China and South Africa. Topps served a discovery request relating to these allegations on June 3, 2002 and on June 21 raised with the Court its desire to move to amend the complaint. The Court thereupon granted it permission to make the instant motion. Topps now seeks to file a Fourth Amended Complaint that would add claims that Stani disclosed Topps' proprietary technology to its parent, Cadbury Schweppes, and some of its other subsidiaries and that these entities have improperly used the proprietary technology in the conduct of their business.

Stani opposes the amendment on the grounds of futility,

delay and prejudice.

II. Discussion

[HN1]Under Fed. R. Civ. P. 15(a), leave to amend a complaint "shall be freely given when justice so requires." In this case, plaintiff's request for leave to amend was made after the August 1, 2001 deadline for seeking amendments [*3] set forth in the scheduling order pursuant to Fed. R. Civ. P. 16. [HN2]As such, this Court may consider plaintiff's request for leave to amend under the "good cause" standard of Fed. R. Civ. P. 16(b) rather than the less strict standard under Rule 15(a). See *Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000)*. Nonetheless, the Court finds it useful to examine Rule 15(a) case law in considering whether plaintiff has demonstrated good cause.

[HN3]Under Rule 15(a), "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . [or] futility of amendment' will serve to prevent an amendment prior to trial." *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87-88 (2d Cir. 2002)* (quoting *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*). [HN4]"The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993)*. [*4] Delay alone, in the absence of bad faith or prejudice, is normally not a sufficient reason for denying a motion to amend. See, e.g., *Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234-35 (2d Cir. 1995); State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981)*; accord *Grace v. Rosenstock, 228 F.3d 40, 53-54 (2d Cir. 2000)* [HN5]("The court also has discretion to deny leave to amend 'where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice' other parties.") (quoting *Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir. 1990)*), cert. denied, *532 U.S. 923 (2001)*.

A. Futility

Stani's argument as to futility is that there will be no personal jurisdiction available in the Southern District of New York over Cadbury Schweppes. Stani has submitted no affidavits to support its contentions regarding lack of personal jurisdiction, however. Nor is it necessary for such briefing to occur now. If in fact there is no personal jurisdiction over Cadbury Schweppes, Cadbury Schweppes may so move on a [*5] complete record following service of the proposed





amended complaint.

## B. Delay

While there is no question that the delay in this case is lengthy inasmuch as the motion was made nearly three years after the filing of the initial complaint, the plaintiff has provided a reasonable justification for this delay: specifically, that it was unaware of its claim until it deposed certain parties in Argentina in May 2002, just prior to its request to make this motion to amend. See *Parker, 204 F.3d at 340* [HN6](a finding of "good cause" under Rule 16(b) "depends on the diligence of the moving party"). Given these facts, the delay in making the motion to amend was not in any way "undue" or unreasonable. See, e.g., *Barrows v. Forest Labs. Inc., 742 F.2d 54, 58 (2d Cir. 1984); Henderson v. U.S. Fidelity & Guar. Co., 620 F.2d 530, 534 (5th Cir. 1980),* cert. denied, *449 U.S. 1034, 66 L. Ed. 2d 495, 101 S. Ct. 608 (1980);* see also *Peters Fabrics, Inc. v. Textiles Fabricato De Nicaragua, SA (Fabritex), 1985 U.S. Dist. LEXIS 20737, 1985 WL 531,* at *2 (S.D.N.Y Apr. 15, 1985) (permitting amendment in a "trial ready" case where party had no [*6] ability to obtain earlier the information that formed the basis for the proposed amendment).

## C. Prejudice

Stani's strongest argument is with respect to prejudice. Stani points out that by bringing in a new party and new claims at this relatively late stage in the case, additional discovery will inevitably be required and the final disposition of the matter delayed. The problem with this argument is that Stani does not contest that this same discovery would be required anyway if the Court were to deny the motion to amend and instead require Topps to file a new action against Stani and Cadbury Schweppes with respect to these allegations.

In addition, any prejudice is mitigated somewhat by the fact that the new party that is proposed to be added is the corporate parent of Stani. Representatives of the parent have been involved in this litigation already and, in any event, its interests are closely aligned with its subsidiary. There is no suggestion that the addition of the parent will require that any discovery already taken in this case be re-taken. The only real prejudice to Stani is that the case will take somewhat longer to go to trial. But Stani offers no specific evidence [*7] of how this delay will prejudice it.

Stani cites *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc., 112 F.R.D. 417 (S.D.N.Y. 1986),* in support of its opposition because in that case the Court denied leave to amend a complaint to add a corporate parent as defendant. But in H.L. Hayden Co., summary judgment motions were already sub judice and there was no justification offered for the

plaintiff's delay in seeking to add the corporate parent. Here, there are no dispositive motions pending and Topps moved to add Cadbury Schweppes as a party as soon as Topps became aware of its potential claims.

Moreover, in H.L. Hayden Co., the court noted that the plaintiffs could file a separate action against the corporate parent that would be governed by the disposition of the initial suit and thus would require no discovery at all. *112 F.R.D. at 423.* The same was true in *L.D. Schreiber Cheese Co., Inc. v. Clearfield Cheese Co., Inc., 495 F. Supp. 313, 315-16 (W.D. Pa. 1980).* In the instant case, however, the filing of a separate action against Stani and Cadbury Schweppes would involve discovery that overlaps with the instant [*8] case. In fact, Topps would have a good argument that discovery in the two cases should be consolidated anyway, thereby causing the same delay that Stani fears will result from the proposed amendment. Thus, while Stani appeals to "judicial economy" in opposing the amendment, a more compelling argument could be made that there will be a loss of judicial economy if Topps is required to initiate a second action. [HN7]Case law has recognized that even where the non-movant demonstrates prejudice, that prejudice must be balanced against the court's interest in litigating all potential claims in a single action. See, e.g., *Bertrand v. Sava, 535 F. Supp. 1020, 1024 (S.D.N.Y. 1982),* rev'd on other grounds, *684 F.2d 204 (2d Cir. 1982); Henderson, 620 F.2d at 534.* As was noted in *Saxholm AS v. Dynal, Inc., 938 F. Supp. 120 (E.D.N.Y. 1996),* "since [plaintiff] has indicated its intention to initiate a second action if leave to amend be denied, and since such an action would involve most of the exact same facts, circumstances, and questions of law as this action, denying leave to amend would simply multiply proceedings in this [*9] court with no apparent benefit to the parties." *Id. at 124.*

## III. Conclusion

For the above reasons, Topps has shown "good cause" for moving to amend at this late date. Accordingly, it is granted leave to file the proposed Fourth Amended Complaint. Service shall be made promptly and Topps is directed to inform the undersigned by letter when such service is made so that a pretrial conference may be scheduled.

SO ORDERED.

Dated: September 10, 2002
New York, New York

GABRIEL W. GORENSTEIN

United States Magistrate Judge

  

2001 U.S. Dist. LEXIS 7895

JOSEPH LADD VERSUS EQUICREDIT CORPORATION OF AMERICA

CIVIL ACTION NO. 00-2688 SECTION "N" (2)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

2001 U.S. Dist. LEXIS 7895

May 31, 2001, Decided
May 31, 2001, Filed; June 1, 2001, Entered

**DISPOSITION:** [*1] Plaintiff's motion for leave to file second amended complaint GRANTED.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff, on behalf of himself and others similarly situated, moved for leave to file a second amended complaint to add an additional jurisdictional allegation, based on facts already set forth, and to clarify that the factual allegations already stated asserted a claim for breach of contract.

**OVERVIEW:** The court granted plaintiff leave to amend. Accepting the allegations as true and viewing them in the light most favorable to plaintiff, defendant did not carry its burden to show that the amendment was futile. Although plaintiff failed to state expressly in his original complaint that he was asserting a breach of contract cause of action, he pled facts that would support and give notice of such a claim. Trial was not for several months. There was ample time for defendant to prepare and assert its defenses to the claim. Any prejudice to defendant from the "clarification" of plaintiffs claim was minimal. The proposal to add an allegation of diversity jurisdiction was sufficient to survive a motion to dismiss on the face of the pleadings. Due to the fact that the amendment was clarifying and the lack of demonstrated prejudice to defendant, plaintiff's untimeliness was excusable, and the desirability of the clarification constituted good cause.

**OUTCOME:** The court granted plaintiff leave to amend the complaint.

**CORE TERMS:** futile, quotation, futility, proposed amendment, leave to file, scheduling, good cause, favorable, discretion to deny, breach of contract, clarification, memorandum, untimely

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN1]Leave to amend shall be freely given when justice so requires, Fed. R. Civ. P. 15(a), but is by no means automatic. Rule 15(a) evinces a bias in favor of granting leave to amend. Unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial. Relevant factors to consider include undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN2]Where the court has entered a scheduling order setting a deadline for the amendment of pleadings, the schedule shall not be modified except upon a showing of good cause. Fed. R. Civ. P. 16(b).

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN3]It is within the district court's discretion to deny a motion to amend if it is futile. While the court has not specifically defined "futility," it interprets it to mean that the amended complaint would fail to state a claim upon which relief could be granted. To determine futility, the court applied the same standard of legal sufficiency as applies under Fed. R. Civ. P. 12(b)(6). The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief. The court may not dismiss a complaint under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN4]Fed. R. Civ. P. 8(a) requires notice pleading only and a short, plain statement of the claim showing that the pleader is entitled to relief.

**COUNSEL:** For JOSEPH LADD, plaintiff: Donni Elizabeth Young, Scott Michael Galante, Ness, Motley, Loadholt, Richardson & Poole, Dawn Adams Wheelahan, Dawn Adams Wheelahan, Attorney at Law, New Orleans, LA.

For EQUICREDIT CORPORATION OF AMERICA, defendant: Stephen Winthrop Rider, Anthony J. Rollo, Jr., Lauren Zimmermann Garvey, Lisa D. Munyon, McGlinchey Stafford, PLLC, New Orleans, LA.

**JUDGES:** JOSEPH C. WILKINSON, JR., UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** JOSEPH C. WILKINSON, JR.





**OPINION:** ORDER AND REASONS

Plaintiff, Joseph Ladd, on behalf of himself and others similarly situated, has moved for leave to file a second amended complaint to "add an additional jurisdictional allegation, based on facts already set forth, and to clarify that the factual allegations already stated in PP 4, 5 and 6 of [his] Complaint assert a claim for breach of contract." Motion for Leave to File Second Amended Complaint, Record Doc. No. 73, at p.1. Defendant, EquiCredit Corporation of America, filed a timely opposition memorandum, arguing that the proposed amendment is untimely under the court's scheduling order and is futile. Record Doc. [*2] No. 75. Plaintiff received leave to file a reply memorandum. Record Doc. Nos. 76, 77.

For the following reasons, plaintiff's motion is GRANTED.

[HN1]Leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), but "is by no means automatic." *Wimm v. Jack Eckerd Corp., 3 F.3d 137, 139 (5th Cir. 1993)* (quotation omitted). Rule 15(a) "evinces a bias in favor of granting leave to amend. Unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Stripling v. Jordan Prod. Co., LLC, 234 F.3d 863, 872 (5th Cir. 2000)* (quotations and citations omitted). Relevant factors to consider include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Wimm, 3 F.3d at 139.* In addition, [HN2]where--as here--the court has entered a scheduling order setting a deadline for the amendment of pleadings, the schedule "shall not be modified except upon a showing of good cause." Fed. R. Civ. P. 16(b).

EquiCredit [*3] primarily argues that Ladd's proposed amendment is futile.

[HN3]It is within the district court's discretion to deny a motion to amend if it is futile. While this court has not specifically defined "futility" in this context, we join our sister circuits that have interpreted it to mean that the amended complaint would fail to state a claim upon which relief could be granted. As these courts have done, to determine futility, we will apply the same standard of legal sufficiency as applies under Rule 12(b)(6).

The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief. The court may not dismiss a complaint under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Stripling, 234 F.3d at 872-73* (quotations and citations omitted).

Accepting Ladd's allegations as true and viewing them in the light most favorable to him, EquiCredit has not carried its burden to show that the amendment is futile. [HN4]Fed. R. Civ. P. 8(a) requires notice pleading only and "a short, [*4] plain statement of the claim showing that the pleader is entitled to relief." Although plaintiff failed to state expressly in his original complaint that he was asserting a breach of contract cause of action, he pled facts in paragraphs 4 through 6 of the original complaint that would support and give notice of such a claim. Trial in this matter is not set until November 5, 2001. There is ample time for defendant to prepare and assert its defenses to this claim. Any prejudice to defendant from Ladd's "clarification" of this claim at this time is minimal.

EquiCredit's argument that the presiding district judge, in her order denying defendant's summary judgment motion, "appears to agree that under the terms of the Note signed by Ladd, EquiCredit was allowed to charge Ladd for both the contested drive-by inspections, as well as the other services," is unsupported by the record. See Record Doc. No. 74, at pp. 2-3. I find no support for this argument in Judge Clement's order.

In addition, plaintiff's proposal to add an allegation of diversity jurisdiction is sufficient to survive a motion to dismiss on the face of the pleadings. He alleged in his original complaint that defendant [*5] services his residential mortgage loan. His proposed second amended complaint states that the amount secured by his mortgage contract exceeds $ 75,000. This is the contract alleged to have been breached. Whether plaintiff's damages actually exceed $ 75,000 can be attacked later in a Rule 12(b)(1) motion or a motion for summary judgment, but the allegation is sufficient for present purposes.

Finally, defendant argues that plaintiff's proposed amendment is untimely under the court's scheduling order. Given the current stage of this litigation, the limits of the court's discretion to deny a leave to amend, the fact that the amendment appears merely clarifying in nature and the lack of demonstrated prejudice to EquiCredit from permitting the amendment, plaintiff's untimeliness is excusable, and the desirability of this clarification constitutes good cause.

Accordingly, plaintiff's motion for leave to file second amended complaint is GRANTED.

New Orleans, Louisiana, this 31st day of May, 2001.

JOSEPH C. WILKINSON, JR.

UNITED STATES MAGISTRATE JUDGE

