UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

DUNKIN' DONUTS INCORPORATED,
a Delaware corporation, and
DUNKIN' DONUTS USA, INC.,
a Michigan corporation,

Plaintiffs,

v.

4 DONUTS, INC.,
a Connecticut corporation,
GRANDO, INC.,
a Connecticut corporation,
GLENN STETZER,
KATHLEEN STETZER,
GEORGE GERMANO, and
JAMES MCMANAMA,

Defendants.

C.A. No. 302 CV 1920 (MRK)

NOVEMBER 12, 2003

**PLAINTIFFS' REPLY TO DEFENDANTS 4 DONUTS, INC.'S, GRANDO, INC.'S AND GLENN STETZER'S OPPOSITION TO PLAINTIFFS' MOTION FOR ADDITIONAL TIME TO DEPOSE DEFENDANTS JAMES MCMANAMA AND 4 DONUTS, INC.**

Defendants' contention that Dunkin's counsel used the seven-hour limitation set forth in Rule 30(b)(6) to bring a halt to the deposition of Mr. Joseph McGowan, an employee of Dunkin' Donuts, is entirely untrue. (Opp'n at 6-7.) Counsel for Defendants was afforded over ten hours to complete Mr. McGowan's deposition. Indeed, as the Defendants themselves concede, Mr. McGowan's deposition lasted a full day on July 30, 2003 and then an *additional* four and a half hours (from 1 p.m. to 5:30 p.m.) on August 1, 2003. *Id.* at 7 ("Defendants . . . took the deposition of . . . Mr. McGowan, in a day and a half . . . ."). At 4:30 p.m. on the second day of testimony, Defendants' counsel asked to continue his questioning of Mr. McGowan until 5:00

p.m. (McGowan depo., Ex. 1 at 372-375.) Counsel for Dunkin' consented to this request. *Id.* Again, at 5:00 p.m. Defendants' counsel asked—and received—an agreement from Dunkin's counsel to continue his questioning until 5:30 p.m. *Id* at 393-397. Defendants' counsel also stated that if he did not finish by that time, that:

> the burden will be on me to ask the [J]udge to bring him back at that point, which is a little different than just trying to continue to pressure you to go further tonight. . . .At 5:30, if I determine that I need more time, I am not even going to ask you, I will just -- I will assume that you will say no and I will go to the [C]ourt.

*Id.* at 397. Only when Defendants' counsel failed to stop his questioning as promised at 5:30 p.m. did the deposition terminate. *Id.* at 415-17. Tellingly, after a full day and a half of testimony, Defendants' counsel never moved for any additional time to question Mr. McGowan. The record shows, therefore, that Mr. McGowan was provided for more than seven hours and that the Defendants were accommodated to allow more questioning—something that they want to deny the Plaintiffs, who are in exactly the same circumstances, but who now seek additional time from the Court because they were forced to by Defendants.

It is bizarre that Defendants would point to the deposition of Mr. McGowan as an example of them being "wronged" by Dunkin' Donuts when they were provided an additional three hours to complete the deposition. Ironically, no such accommodation was given to Dunkin' Donuts for Mr. McManama's deposition. Although Defendants contend that Mr. McGowan is a "key witness" to the case, his personal involvement in this case is limited to one issue: the investigation of Defendants' franchises. (Opp'n at 5.) Mr. McManama, on the other hand, is a party to this litigation and perhaps the most important witness in the case, whose personal knowledge covers virtually the entire length and breadth of the subject matters at issue. He was admittedly involved in the assault of Richard Czuprynski, the former manager of the Stetzer donut network, who had blown the whistle on their financial dealings. This matter goes

beyond the topics identified in Dunkin's Rule 30(b)(6) notice and was the subject of a great deal

of the testimony taken on October 15, 2003. Mr. McManama was also centrally involved in the

operations of the donut business because Glenn Stetzer had ceded all authority to McManama to

run the business and conduct its financial affairs by the time the assault took place and the Notice

of Termination was issued. (McManama depo., Ex. 2 at 156-57.)  Additionally, it would appear

that Defendants are shifting the blame to Mr. McManama, who purportedly left the business five

months ago, although he continues to receive the same weekly salary and benefits, including a

$600 a month car stipend. *Id.* at 75-76, 85-86, 168-169. The remaining questioning goes to this

part of the case, which was not completely covered during the first seven hours of testimony.

Limiting the questioning to seven hours in those circumstances would be significantly prejudicial

to Dunkin' Donuts.

Defendants' further contention that Dunkin' had full knowledge of Mr. Stetzer's and Mr.

McManama's roles in the business carries no weight.  (Opp'n at 3.)  First, there is no basis for

such a statement and, indeed, no citation to anything in Defendants' brief to support it.

Moreover, it is a non sequitur.  Whether or not Dunkin' knew exactly what roles the individual

defendants had in the business had no effect at all on the appropriate length of their depositions.

The Court should further reject the argument that Dunkin' did not need to notice a Rule 30(b)(6)

deposition in the first place.  There is nothing in the Federal Rules of Civil Procedure that limits

a Rule 30(b)(6) deposition to a particular size of corporation.  If there were, no doubt the

Defendants would have pointed it out.  Moreover, if Defendants had any basis at all to raise this

argument, they should have sought a protective order against any further depositions beyond

those of Mr. Stetzer, Mr. McManama and their accountant.  Instead, they designated them as the

persons with the most knowledge of the topics designated in the 30(b)(6) notices and made each

of those individuals available for deposition without comment or complaint. The present opposition is the same kind of "after-the-fact pretextual" tactic that Defendants accuse Dunkin' of engaging in.

This situation does not involve the kind of duplicative questioning the court warned against in *Sabre v. First Dominion Capital, LLC*, 2001 U.S. Dist. LEXIS 20637 (S.D.N.Y. 2001). Defendants claim that Dunkin' was "inefficient" in its questioning, but they fail to cite even one example. (Opp'n at 9.) More to the point, "inefficiency" is not grounds for a protective order, which would have been the appropriate remedy. Here, Defendants never filed a motion for protective order. Instead, they simply canceled the deposition mid-stream. Additionally, the specter of exposure to fourteen hours of deposition testimony raised by the Defendants is simply not present here since Dunkin' has only asked for an additional three hours worth of testimony. Because the parties have accommodated each other regarding the depositions of other witnesses, the failure to do so with respect to Mr. McManama shows itself as nothing but mere gamesmanship.[1] This is exactly the sort of manipulation that the *Sabre* court warned against.

Finally, it should be noted that Mr. McManama's counsel have moved to withdraw on the grounds that they were terminated. This adds—as Dunkin' pointed out in its opening brief—a measure of complexity to this issue and lends support to Dunkin's contention that this issue needs to be resolved on an expedited basis. If Mr. McManama engages new counsel, they will

[1] This is especially true since Mr. McManama's counsel waited for nearly two weeks after Dunkin' requested additional time to depose Mr. McManama to announce that they had finished the process of consulting with their client and that they would oppose any further questioning.

no doubt need additional time to prepare for the resumption of his deposition and add to the confusion regarding the discovery deadlines in this action.

Respectfully submitted,

Robert L. Zisk ct 13503
Jeffrey L. Karlin ct 14965
Christopher M. Loveland ct 24169
SCHMELTZER, APTAKER & SHEPARD, P.C.
2600 Virginia Avenue, N.W.
Suite 1000
Washington, D.C. 20037
(202) 333-8800

Paul D. Sanson ct 05477
Alexandra M. McHugh ct 22428
SHIPMAN & GOODWIN LLP
One American Row
Hartford, CT 06103-2819
(860) 251-5612

Attorneys for Plaintiffs
Dunkin' Donuts Incorporated,
Dunkin' Donuts USA, Inc.

Dated: November 12, 2003

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

* * * * * * * * * * * * * * * * * *

DUNKIN' DONUTS, INCORPORATED AND DUNKIN' DONUTS USA, INC., PLAINTIFFS

VS.

4 DONUTS, INC., GRANDO, INC., GLENN STETZER, KATHLEEN STETZER, GEORGE GERMANO AND JAMES MCNANAMA, DEFENDANTS

CIVIL ACTION NO. 3:02CV1920(JBA)

VOLUME II

* * * * * * * * * * * * * * * * * *

COPY

---

CONTINUED DEPOSITION OF: JOSEPH MCGOWAN

---

Taken before Kathleen S. Norton, Registered Professional Reporter, Lic./Reg. No. 105, and Notary Public in and for the State of Connecticut, pursuant to the Federal Rules of Civil Procedure, at the offices of Axinn, Veltrop & Harkrider, LLP, Connecticut, on August 1, 2003, 90 State House Square commencing at 12:54 p.m.

BRANDON SMITH REPORTING SERVICE, LLC
44 Capitol Avenue
Hartford, CT 06106
Tel: (860) 549-1850
Fax: (860) 549-1537

sell.

MR. KARLIN: We're at 4:30 now. We provided him for an extra three and a half hours.

MR. ORDER: First, it's not extra, because as I pointed out, it wasn't a full seven hours on the first day.

MR. KARLIN: We provided him an extra three hours.

MR. ORDER: He has a lot of information and he's central and he's one of your key witnesses. And, you know, this stuff, first, you dump this a lot of this documentation which had been requested for a long time, you dumped it on us at the beginning of his deposition on Wednesday. For example, the document we're talking about right now, the Retail Sales Analysis, we asked for. And, as you can see from this discussion, this is a fairly complicated document that I have no knowledge of or understanding of, and the witness does.

So, I mean, it's clear that his testimony is necessary, and he's testified

c424051b-1d9b-4bfd-b170-c75d3f5365b5

that he's the one that gave direction to Deloitte & Touche as to how to perform this and to change certain factors, so --

MR. KARLIN: That's not what he testified to, that he gave direction to Deloitte & Touche. If you want, take Deloitte & Touche's deposition in terms of how they conducted it. But you had the documents and we provided the RSA not on Wednesday, but by Fed Ex on Monday. Not that that makes a huge difference --

MR. ORDER: No, that's correct. I misstated that. There were other documents that you provided for the first time Wednesday morning.

MR. KARLIN: You still only get seven hours with Mr. McGowan.

MR. ORDER: Are you going to require me to go to the court?

MR. KARLIN: I'm asking you how much more time you're going to take with him? I mean, you know, again, we're at --

MR. ORDER: I'm trying to go as fast as I can.

MR. KARLIN: I understand that.

MR. ORDER: I would like to finish up with this audit and then there are a couple of other topics that we need to go over with him. I don't know exactly how long it's going to take; a couple of more hours, maybe.

MR. KARLIN: Well, a couple of more hours means 6:30 today. Are you proposing to come back another day?

MR. ORDER: If you want to, we can come back another day. I suggest we go until five o'clock now and see where we are at that point.

MR. KARLIN: Okay. Well, that's fine with me.

MR. ORDER: Maybe I will have a better estimate.

MR. KARLIN: We'll go to five and then discuss either today, or another day, whether we'll provide him again. But my current position is we provided him for longer than the amount of time. You knew, going in, how much in terms of subject matter this witness was going to take and if you had a concern about whether it was

c424051b-1d9b-4bfd-b170-c75d3f5365b5

going to go over, then you should have either reached a stipulation with me with respect to that, or gone to the court and asked for additional time to take his deposition.

MR. ORDER: Well, I disagree on that, that I should have gone to the court at that point, but if you're going to -- well, let's just move on.

MR. KARLIN: So we'll go to five o'clock.

MR. ORDER: Estimates are always difficult to make.

BY MR. ORDER:

Q So, you were explaining how the projected sales of other products was arrived at, or you were actually describing how Deloitte & Touche figured out how much reported sales of other products was made. Right? Okay. So let's move on. Let's go to the second page of Exhibit 62. These are assumptions. Who prepared these assumptions?

A Deloitte & Touche.

Q And item No. 14 says, "Assume all stores have the same prices per the franchisee. Prices

photograph something?
A I carry a disposal camera in my vehicle.
Q And did you check with Town Fair Tire to confirm he had replaced his tires?
A I did not.
Q Now, the police report, you said he gave it to you that day, the 18th?
A I thought so, but if you want to show it to me, I will tell you.
Q I will show you Exhibit 8.
A This is the one I'm referring to. Yeah, I'm fairly sure he gave it to me the following day.
Q Well, he went in to give the police report -- it looks like it was at 6:20 p.m. that he went in the night before, correct?
A Yes.
Q And, in your experience, have police reports been available the next day?
A I can't speak to that. I wouldn't know.
Q Okay.
MR. KARLIN: I have five o'clock at the moment.
MR. ORDER: Well, I'm probably -- I said I'd do a better estimate then. Let me take a quick look. Let's see how much more

time I think I have.

(Discussion off the record.)

MR. ORDER: Well, I think I can finish, but I will be running and not going through everything the way I'd like to, but I think I can get the essence done by 5:30.

MR. KARLIN: Okay.

MR. ORDER: Okay?

MR. KARLIN: Well, if we get done -- excuse me. If we reach 5:30, then we're in agreement we're not going to bring him back?

MR. ORDER: We're not in agreement we won't bring him back. I'm in agreement, if you want, we won't go any further today, but I'm nearing the end. But I just -- I need some more time to get to the end.

MR. KARLIN: Well, I mean, as I said before, you had him for --

MR. ORDER: You don't have to make speeches. You don't have to repeat that.

MR. KARLIN: I will do this: I will allow him only under the agreement that this then ends the deposition. If that's

c424051b-1d9b-4bfd-b170-c75d3f5365b5

not the case, then let's shut down now.

MR. ORDER: Well, I'm not going to agree that it ends the deposition. I'm going to give you -- I'm giving you my best good faith estimate that by 5:30 I can be satisfied that that would be enough, but I can't be absolutely sure. I can't tell right now what he's going to answer.

MR. KARLIN: Well, that's it.

MR. ORDER: No. There are certain documents I need him to identify and authenticate, and they say what they say, but I'm pretty sure I can be done by 5:30.

MR. KARLIN: Again, that's my offer. If you agree to end the deposition at that point, I'll allow you to continue, you know, go through and authenticate the documents and finish by 5:30; otherwise, he's been here for more than enough time in terms of the federal rules.

MR. ORDER: Well, the federal rules are not definitive on that and they say the judge can allow extra time. Do you want me to try to call the judge right now to extend the time?

MR. KARLIN: If you want, go ahead.

MR. ORDER: First, it's a Friday afternoon at five, or after five, so I doubt that Judge Arterton is going to be available and we'll probably waste more time trying to get ahold of her. My suggestion is we go to 5:30. We're wasting time doing this with all this colloquy right now. Let's go to 5:30. I'm pretty sure I can get done. But I can't definitively say there is absolutely no basis for me to continue the deposition after 5:30.

MR. KARLIN: Okay.

MR. ORDER: I don't know where we'll be at the end of 5:30.

MR. KARLIN: Exactly. Again, my position is that if you ended at 5:30, we'll allow you to go; otherwise, we're way beyond the time and, under the federal rules unless you get a court order prior to or afterward, I suppose, or we stipulate to it, you can't go over seven hours.

MR. ORDER: Well, we're getting to a pretty crucial part of your case.

c424051b-1d9b-4bfd-b170-c75d3f5365b5

MR. KARLIN: But you chose to bring this up at this point.

MR. ORDER: It's chronological.

MR. KARLIN: Why you chose to bring it up at this point and just because you chose to bring it up at this point, doesn't allow to the extent that if it was so crucial, and is a crucial part of the case, you should have brought it up first.

MR. ORDER: I will go to 5:30 and -- I'll tell you what I'll do. I'll go to 5:30 and if I don't finish by 5:30, the burden will be on me to ask the judge to bring him back at that point which, I think, is a little different than just trying to continue to pressure you to go further tonight or --

MR. KARLIN: We won't bring him back unless we have a court order.

MR. ORDER: That's what I said. At 5:30, if I determine that I need more time, I am not even going to ask you, I will just -- I will assume you will say no and I will go to the court. But, right now, we spent about five minutes doing that, so we

work product.

BY MR. ORDER:

Q Who was present when he gave the statement?

A Myself, Mr. Karlin, Mr. Czuprynski, and the court reporter.

Q Have you ever seen the transcript?

A I have not.

Q Did someone ask Mr. Czuprynski questions?

A Yes.

MR. KARLIN: It's 5:30, so --

Q Did Mr. Czuprynski ever give you --

MR. KARLIN: Mr. Order, it's 5:30. We had an agreement we would stop at 5:30. If you want to go to court and ask the judge for an order requiring Mr. McGowan, but it's the end of a very long day.

MR. ORDER: Let me ask one more question is.

BY MR. ORDER:

Q Did Mr. Czuprynski give you a copy of any statement that he made retracting his previous allegations?

A I don't believe he gave it to me, no.

Q How did he get it?

A That's two questions.

MR. KARLIN: That's the only question. You have answered.

BY MR. ORDER:

Q You're not going to answer that question?

A No.

MR. ORDER: Let the record reflect that the witness has stood up and he and his defense counsel are preparing to leave.

MR. KARLIN: Again, we had an agreement that we would stop at 5:30, Mr. Order. That's what we're complying with, our agreement that we would stop at 5:30. And I'm sure Mr. McGowan is not standing up for any other reason other than standing up.

THE WITNESS: Stretching my legs.

MR. ORDER: He's not sticking around to answer any more questions.

MR. KARLIN: He's not. That's correct.

MR. ORDER: I wanted the record to reflect that.

MR. KARLIN: That's fine.

MR. ORDER: Do you have any questions, Amy?

Dunkin' Donuts vs 4 Donuts, Inc.
8/1/2003 Joseph McGowan ( Volume II )
Page 417

MS. VAN DYKE: No.

(Deposition adjourned at 5:31 p.m.)

Brandon Smith Reporting Service
c424051b-1d9b-4bfd-b170-c75d3f5365b5

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

No. 3:02CV1920

COPY

DUNKIN' DONUTS INCORPORATED AND DUNKIN' DONUTS USA, INC.

VS

4 DONUTS, INC., GRANDO, INC., GLENN STETZER, KATHLEEN STETZER, GEORGE GERMANO AND JAMES MCMANAMA

Deposition of: JAMES MCMANAMA, taken before Barbara L. Murphy, Licensed Shorthand Reporter, License No. 305 and Notary Public within and for the State of Connecticut, held at the offices of Shipman and Goodwin, One American Row, Hartford, Connecticut on October 15, 2003 commencing at 9:08 a.m.

Q. Do you know what the policy amount is?
A. That I do not.
Q. Do you know what the -- whether the premium is paid by the doughnut businesses?
A. I think I answered that.
Q. Do you know how much the premium is?
A. That I do not know.
Q. Did you have a discussion with Mr. Stetzer about that?
A. About what?
Q. About the life insurance policy?
A. A discussion?
Q. Yes.
A. When it was initially consummated.
Q. When was that?
A. That I'm not sure of the year.
Q. Do you know what company it's through?
A. No, I don't. Aetna maybe but that would be a guess.
Q. I'm not interested in guesses.
A. All right. That would be my guess.
Q. Aside from salary and life insurance do you receive any sort of car allowance?
A. Yes, I do.
Q. How much do you receive?

A. Approximately $600 a month.
Q. When did you start receiving that?
A. You wrote down six twenty.
Q. What my notes say are my business.
A. Okay.
Q. You said approximately six hundred?
A. Right.
Q. Do you know whether it's six twenty?
A. Obviously you do.
Q. Don't make any assumptions. I just want to know.
A. All right. Approximately six hundred, yes.
Q. So approximately six hundred. Do you know in particular whether it's six twenty or not?
A. It must be six twenty.
Q. Don't assume anything from what I wrote down.
A. Approximately six hundred.
Q. And do you use the car allowance to either lease or purchase a car?
MR. GILMORE: Objection as to form.
THE WITNESS: My car is -- my Tahoe is paid for.
Q. (By Mr. Karlin) Okay. In the last year have you -- when was your -- when did you complete

employment at the doughnut businesses?

A. I have to devote more time to other things.

Q. What other things do you have to devote more time to?

A. Family.

Q. Was anything in -- did you and Mr. Stetzer reach some sort of written agreement with respect to the ending of your employment?

A. No.

Q. Did you reach any sort of verbal agreement with Mr. Stetzer with respect to the ending of your employment with him?

A. As far as what?

Q. Well, did you reach an agreement as to when you would stop working?

A. I don't know if there was a specific date.

Q. When did you stop working after the conversation?

A. Very shortly after that.

Q. Are you receiving any sort of severance pay?

A. Yes.

Q. How much severance pay are you receiving?

A. I'm receiving my weekly pay that I was receiving before.

Q. So you're receiving the same $2,000?

A. That's correct.

Q. Are you still receiving payments from both 4 Donuts and 2 Donuts?

A. No.

Q. Are you receiving payments from just 4 Donuts?

A. Yes.

Q. Are you receiving -- are you still covered under that life insurance policy that we spoke about earlier?

A. That I don't know.

Q. Do you still receive a car allowance?

A. Yes, I do.

Q. Do you -- are you receiving money for gas?

A. Occasionally.

Q. When was the last time you got money for gas?

A. Maybe a month ago.

Q. Was that cash -- in the form of cash?

A. As the previous way I stated.

Q. How much was it? How much was the amount that you received in cash at that time?

A. $25.

Q. Since that conversation four or five months ago, have you done any work for the doughnut

A. Yes. I think it did happen.
Q. And what was the circumstances behind writing a check to Mustang Group?
A. To put funds in the account.
Q. And on how many occasions did you write a check to Mustang Group from 4 Donuts, Inc.?
A. I'm not sure.
Q. Did you discuss that with Mr. Stetzer?
A. I'm not sure.
MR. ORDER: Objection.
Q. (By Mr. Karlin) Did you have authority from Mr. Stetzer to write a check from 4 Donuts, Inc. to Mustang Group?
A. I believe so.
Q. Why is it that you believe so?
A. He gave me the authority.
Q. Did Mr. Stetzer give you authority to invest money from 4 Donuts, Inc. into other companies?
A. I had authority.
Q. And did you have to check with him before you invested money from 4 Donuts, Inc. into other companies?
A. No, I did not.
Q. And did you have a conversation about that?
MR. ORDER: About what?

Q. (By Mr. Karlin) About your authority to invest money in 4 Donuts, Inc. into other companies?

MR. GILMORE: Objection as to form.

THE WITNESS: He was sick and he asked me to handle the businesses.

Q. (By Mr. Karlin) What was your understanding about the length and breadth of your authority with respect to that?

A. Just try to do the best.

Q. Did you have any limits with respect to your authority?

A. Not specifically.

Q. Did Mr. Stetzer put any limits on your authority?

A. Not specifically.

Q. What, if anything, did Mustang Group do with any of the money that was -- that it received from 4 Donuts, Inc.?

A. I'm not quite sure.

Q. Did it purchase anything with any of the money that was -- that it received from 4 Donuts, Inc.?

A. Might have purchased a computer but I'm not sure.

Q. Why is it that -- let me withdraw that

Q. You've had the same cell phone -- did you have the same cell phone in September 2002 that you have today?

A. I'm not sure. It was changed at some point in time but I do not know.

Q. Did your cell number -- cell phone number change at any time between August 2002 and today?

A. August 2002 -- I believe it could have.

Q. Do you know when it might have been changed?

A. I'm sorry, no.

Q. Do you know whether you had the same cell phone number in September 2002 that you have today?

A. September 2002?

Q. Yes.

MR. GILMORE: Objection as to form.

THE WITNESS: I don't think I did.

Q. (By Mr. Karlin) You had a different cell phone number in September 2002 than you have today?

A. September 2002? It's a possibility, yes.

Q. What's your current cell phone number?

A. I know you're not going to believe this but I don't know.

Q. Do you get a cell phone statement or cell phone bill every month? Do you get them?

A. Personally?

Q. Yes.
A. No, I don't.
Q. Does the bill go to 4 Donuts, Inc. do you know?
A. My personal --
Q. I'm sorry, you have a cell phone, correct?
A. Yes.
Q. Do you get a bill for that cell phone?
A. Personally?
Q. Yes.
A. Not me personally.
Q. Does a cell phone bill come to your residence?
A. No, it does not.
Q. Do you know where the cell phone bill for your cell phone that you're using now goes to?
A. I believe it goes either to -- a doughnut shop.
Q. One of the doughnut shops?
A. I believe so.
Q. Do you know which doughnut shop it goes to?
A. I think it would be the Hamden doughnut shop.
Q. Do you have your cell phone with you today?
A. No, I don't.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of Plaintiffs' Reply to Defendants 4 Donuts, Inc.'s, Grando, Inc.'s and Glenn Stetzer's Opposition to Plaintiffs' Motion for Additional Time to Depose Defendants James McManama and 4 Donuts, Inc. was served by facsimile and first class mail on November 12, 2003 upon counsel for Defendants at the addresses listed below:

Richard S. Order, Esq.
Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT 06103-3702

Paul N. Gilmore, Esq.
Updike, Kelly & Spellacy, P.C.
One State Street
P.O. Box 231277
Hartford, CT 06123-1277

Robert K. Walsh, Esq.
The Law Offices of Robert K. Walsh
193 State Street
P.O. Box 777
New Haven, CT 06473

Christopher M. Loveland