UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DUNKIN' DONUTS INCORPORATED,<br>a Delaware corporation, and<br>DUNKIN' DONUTS USA, INC.,<br>a Michigan corporation,<br><br>      Plaintiffs,<br><br>  v.<br><br>4 DONUTS, INC.,<br> a Connecticut corporation,<br>GRANDO, INC.,<br> a Connecticut corporation,<br>GLENN STETZER,<br>KATHLEEN STETZER,<br>GEORGE GERMANO, and<br>JAMES MCMANAMA<br><br>      Defendants. | C.A. No. 302 CV 1920 (MRK)<br><br>FILED<br>NOV 18  1 39 PM '03<br><br>NOVEMBER 17, 2003 |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS 4 DONUTS, INC.'S,
GRANDO, INC.'S AND GLENN STETZER'S MOTION TO COMPEL**

Defendants 4 Donuts, Inc., Grando, Inc. and Glenn Stetzer (hereinafter collectively "Defendants") seek the production of Dunkin's Loss Prevention Manual as well as information relating to the investigation of third-party franchisees to show that Dunkin' Donuts' investigation of Defendants' franchises was a pretext to terminate their Franchise Agreements. It is well established, however, that pretext or ulterior motive is not relevant when valid grounds exist to terminate the Franchise relationship. Additionally, Dunkin' Donuts' Loss Prevention Manual is a protected trade secret and constitutes confidential commercial information, which should be protected from disclosure. Only a select few Dunkin' employees have access to this information, and its disclosure in this litigation would irreparably harm Dunkin's efforts to ensure that all of

its franchisees abide by a common set of rules and that they pay their fair share of the franchise and advertising fees that support the Dunkin' system. Moreover, forced disclosure of Dunkin's Loss Prevention Manual in this action would mean that each and every future manual that is created would likewise be discoverable, and thus Dunkin' (as well as any other franchisor) would never be able to protect its proprietary loss prevention investigation procedures. Finally, although Dunkin' suspects that Defendants have failed to verify the employment eligibility of all of their employees, all of the requisite documentation necessary to verify this suspicion either does not exist, has been destroyed, or was not produced. Thus, Dunkin' Donuts is currently not able to identify each "foreigner" who "has worked illegally in any of the franchises."

## I.    Interrogatory No. 1

Interrogatory No. 1 seeks the identity of "each employee that plaintiffs contend was a foreigner working illegally in any of the franchises." (Defs.' mot. to compel at 3.) No such employees were identified in the answer to this interrogatory because, to date, Dunkin' Donuts has not alleged that *any* foreigner has worked illegally at Defendants' shops. Indeed, counsel for Defendants conceded as much in the Motion to Compel. *Id.* The source of this interrogatory is Dunkin's Reply to its Motion to Compel, which stated Dunkin's belief that employees of 4 Donuts, Inc. were being paid off-the-books because it was unable to find any evidence that payroll taxes were paid or reported for a number of checks that were issued to individuals employed by the franchises. (Reply to Dunkin's mot. to compel at 3.) At no time has Dunkin' contended that employees worked illegally at the franchises. Thus far, Dunkin' Donuts has been unable to definitively identify any of Defendants' employees who are citizens of another country and working at their shops illegally. Therefore, Dunkin' did not identify any of Defendants' employees in its answer to this interrogatory. There is thus nothing to compel.

2

Nonetheless, there is some evidence developed through the discovery process to support at least the inference that unauthorized employees were used as production workers at Defendants' shops. Richard Czuprynski, a former manager at one of Defendants' shops, was assaulted by Defendants after he informed Dunkin' Donuts that some of Defendants' employees were working without green cards and were paid off the books. (Czuprynski report, Ex. 1.) Consistent with Mr. Czuprynki's statement, Dunkin' Donuts has uncovered a number of individuals who were employed by Defendants, but not paid by computer-generated payroll checks like the majority of their employees. Instead, they received handwritten checks that were categorized as "food expenses." (Reply to Dunkin's mot. to compel at 3.) Defendant James McManama testified during his deposition that these employees were "outside contract labor."[1] (McManama depo., Ex. 2 at 196.) However, Defendants purport not to have maintained any of the requested Form 1099's (income statements) or W-9's (request for taxpayer identification numbers) for these employees, which they would have to maintain in their records in order to use any contract labor. (Oct. 30, 2003 letter, Ex. 3.) There is no evidence that these documents ever existed, which is a violation of the law and the Franchise Agreements, and supports the conclusion that Defendants did not verify the eligibility of all individuals working at their shops.

Moreover, Defendants' accountant testified that although he never created any Form 1099's or W-9's, he advised Defendants Stetzer and McManama that these documents were necessary to employ contract labor. (Citerella depo., Ex. 8 at 60.) Even assuming that these

---

[1] Interestingly enough, Defendant Glenn Stetzer (the owner of the franchises), Katie Jarvie (Defendants' bookkeeper who prepares the weekly payroll), Anthony Matusik (a manager at Defendants' State Street franchise), and Christopher Matusik (the general manager of all Defendants' shops), all claimed not to recognize the names of Defendants' contract employees during their depositions. (Stetzer depo., Ex. 4 at 185-186; Jarvie depo., Ex. 5 at 22-25; A. Matusik depo., Ex. 6 at 52-53; C. Matusik depo., Ex. 7 at 77-80.) It has thus been difficult to ascertain whether these employees were authorized to work in the United States.

3

documents existed at one time, it is also a violation of the law and the Franchise Agreements for Defendants not to maintain these records for three years. It is certainly possible that Defendants do not have any 1099's or W-9's for their contract employees because they were not qualified to work legally in the United States.

The names of any employees whose employment eligibility was not verified would be reflected on Defendants' own records, including their handwritten payroll checks (which have apparently been destroyed along with their check registers), I-9's (to the extent they exist) and W-9's (which apparently do not exist). Ex. 3. Since the records that are necessary to determine the eligibility of the employees who have worked for Defendants have been destroyed, have never existed, or were never produced, Dunkin' Donuts could only speculate as to which employees were not authorized to work at Defendants' shops. Defendants are the only ones who could identify all of the employees who have worked illegally at their shops.

## II. Interrogatory No. 3

### A. Information Relating to Dunkin's Investigations of Unauthorized Catering Services Offered by Third Party Franchisees Is Not Relevant.

Interrogatory number 3 seeks the identity of franchisees who are either under investigation for operating unauthorized catering services, or who have previously been investigated for operating an unauthorized catering business. Although Dunkin' has already produced the results of its investigation of the Defendants' catering activities -- which were indisputably relevant -- there can be no legitimate argument that an investigation of a third party franchisee has any bearing on the issues in this case. According to well-established case law, the only investigation that is relevant to Dunkin's claims is the one conducted on the Defendants themselves.

4

Defendants contend that interrogatory number 3 is relevant because they are looking for evidence that Dunkin' treated other franchisees more leniently than themselves. (Mot. to Compel at 5.) It is well settled, however, that this evidence is not taken into account in determining whether the termination of a Franchise Agreement was valid. "The fact that the [franchisor] may . . . have treated other franchisees more leniently is no more a defense to a breach of contract than laxity in enforcing the speed limit is a defense to a speeding ticket." *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 279 (7th Cir. 1992). *See also John Keenan Co. v. Norrell Corp.*, 2001 U.S. Dist. LEXIS 10473 *35 (E.D. La. 2001) ("there is no rule that a franchisor must treat all franchisees the same.") (Ex. 9); *Jaguar Cars v. Blackhourse Motorworks, Ltd.*, 1998 U.S. Dist. LEXIS 22858 *17 (E.D. Ky. 1998) (same) (Ex. 10). In *Original Great American Chocolate Chip Cookie*, the franchisee was terminated for receiving three or more notices of default in a twelve-month period. 970 F.2d at 279. The franchisee continued to sell cookies using the franchisor's marks, forcing the franchisor to file suit and seek an injunction. The Seventh Circuit found that the franchisor was entitled to an injunction, rejecting the franchisee's argument that the franchisor had treated other franchisees more leniently as completely irrelevant. *Id.* Thus, any investigations of third-party franchisees in this case regarding how they were treated by Dunkin' Donuts when they were caught operating an unauthorized catering business would be irrelevant. (Defs.' Mot. to compel at 5.) Similar requests for information concerning third-party investigations in other cases have previously merited the issuance of a protective order. *Smith v. Dowson*, 158 F.R.D. 138, 141 (D. Minn. 1994) (issuing protective order against discovery of other investigations on the grounds that they are "wholly irrelevant"). *See also Hall v.*

*Harleysville Ins. Co.*, 164 F.R.D. 172, 173 (E.D. Pa. 1995) (issuing protective order against discovery of files of third parties as not being "relevant to this litigation at all").

In addition to being irrelevant, any investigation of a third party is protected by the work product privilege, which protects against disclosure of documents and things prepared in anticipation of litigation. Fed. R. Civ. P. 26(b)(3). A party can obtain discovery of documents prepared in anticipation of litigation only upon a showing of "substantial need . . . and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." *See Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 703 (10th Cir. 1998). Courts have recognized that "the literal language of [Rule 26(b)(3)] protects materials prepared for *any* litigation or trial so long as they were prepared for or by a party to the subsequent litigation." *See id.* (citation omitted). Moreover, "[w]ork product remains protected even after the termination of the litigation for which it was prepared." *See id.*

It is axiomatic that the privilege covers the results of investigations prepared in advance of litigation, regardless of whether an attorney actually conducted the investigation. Courts have routinely found that documents prepared by an investigator in preparation for litigation are protected by the work product doctrine. *See, e.g., Jason's Enters., Inc. v. Gen. Accident Ins. Co. of Am.*, 1996 U.S. App. LEXIS 15350, *15 (4th Cir. June 3, 1996) (extending work product privilege to documents in the custody of, and prepared by, outside investigation firm) (Ex. 11); *NLRB v. AFL-CIO, 1989 U.S. App. LEXIS 9411*, *6-8 (3rd Cir. 1989) (witness interviews and notes of investigators protected by work product privilege) (Ex. 12); *Kayata v. Foote, Cone & Belding Worldwide, L.L.C.*, 2000 U.S. Dist. LEXIS 5314, *5 (S.D.N.Y. 2000) ("The work-product doctrine extends to those who are enlisted by legal counsel to perform investigative or

6

analytical tasks to aid counsel in preparing for litigation.") (citing *U.S. v. Nobles*, 422 U.S. 225, 238 (1975)) (Ex. 13).

Here, Dunkin' Donuts has investigated several franchisees who Dunkin' suspected were operating an unauthorized catering business. (Reno Cert., Ex. 14 ¶ 12.) These investigations were undertaken with an eye towards litigation because of the company's zero-tolerance policy for the operation of an unauthorized catering business. *Id.* Indeed, if the Loss Prevention Department concludes through its investigation that a franchisee has operated an unauthorized catering business, the matter is forwarded to the legal department to terminate the Franchise Agreement and to determine whether litigation is necessary to enforce the termination. *Id.* As such, these investigations and any instructions relating to the investigations are protected work product. *See, e.g., Jason's Enters., Inc*, 1996 U.S. App. LEXIS 15350 at *15; *NLRB, 1989 U.S. App. LEXIS 9411* at *6-8; *Kayata*, 2000 U.S. Dist. LEXIS 5314 at *5. As discussed above, the discovery sought by Defendants is completely irrelevant. Ipso facto, Defendants simply cannot demonstrate a "substantial need" for the requested material. Fed. R. Civ. P. 26(b)(3).

Dunkin' would suffer severe hardship if Defendants were to obtain discovery relating to third party investigations. If Defendants obtain these records, the identity of the third party franchisees would be revealed. This could compromise any pending investigations since a franchisee that knows it is under investigation will no doubt begin to cover its tracks. This undesirable prospect, coupled with the complete irrelevancy of the subject matter, demands that the Court prevent discovery of any kind relating to the investigations of third party franchisees.

As if the irrelevant and privileged nature of the requested discovery were not enough, the privacy interests of the third party franchisees also would be trampled by Defendants' discovery of any third party investigations. Courts "carefully scrutinize discovery requests made to non-

7

parties when the requests are burdensome or unduly invade the privacy rights of the non-party." *See Adamson v. Radosevic*, 1988 U.S. Dist. LEXIS 7987, *6 (D. Kan. 1988) (Ex. 15). Defendants seek information concerning third-party franchisees who were investigated by Dunkin' for operating an unauthorized catering business. The information sought by Defendants is of a highly confidential nature and would unduly invade the third-party franchisees' privacy rights.

## III.    Document Request No 3.

Document request No. 3 seeks "[t]he Allied Domecq Loss Prevention Underreporting Manual." (Ex. B to Defs.' Mot. to compel at 3.) The Loss Prevention Manual details the investigative and audit process that it utilizes to detect underreporting of sales by rogue franchisees. Ex 14 at ¶ 4. Dunkin's Loss Prevention Manual is a confidential trade secret and constitutes confidential commercial information.[2] Additionally, the loss prevention manual is not relevant to this case. Regardless of whether procedures from the Loss Prevention Manual were used on Defendants' shops, all that is relevant is whether or not the investigation uncovered evidence of underreporting.

### A.    Dunkin's Loss Prevention Manual Is A Trade Secret Entitled To Protection.

There is little dispute that Dunkin's Loss Prevention Manual constitutes a trade secret in light of the applicable standard. *See, e.g., Peat, Marwick, Mitchell & Co. v. Creditor's Comm.*, 65 Bankr. 886, 887 (N.D.N.Y. 1986) (stating that audit procedures "constitute 'trade secrets' under rule 26(c)(7)."). In determining what constitutes a trade secret, courts consider the following factors: (1) the extent to which the information is known outside the business, (2) the

---

[2] Dunkin' Donuts has produced its entire Loss Prevention file regarding the investigation of Defendants' franchises, which includes the investigator's report and video surveillance of Defendants' shops, among other things.

8

extent to which the information is known by employees and others involved in the business, (3) the extent of measures taken to guard the secrecy of the information, (4) the value of the information to the business and its competitors, (5) the amount of effort or money expended by the business to develop the information, and (6) the ease or difficulty with which others could properly acquire or duplicate the information. *Wilson v. Electro Marine Sys., Inc.*, 915 F.2d 1110, 1115 (7th Cir. 1990); *Republic Sys. & Programming, Inc. v. Computer Assistance, Inc.*, 322 F. Supp. 619, 628 (D. Conn. 1970) (same). Each of the relevant factors weighs in favor of a finding that Dunkin's Loss Prevention Manual is a protectable trade secret.

Dunkin's Loss Prevention Manual is a closely-guarded secret and has not been made known outside the company. The Manual is deemed confidential by Dunkin' and has not been distributed outside of Allied Domecq PLC, Dunkin's parent corporation. Ex. 14 at ¶ 5. Recipients of Dunkin's Loss Prevention Manual within the company are instructed to keep it confidential, and not to disclose it to anyone inside or outside of the company. *See id.*

Dunkin' has severely limited distribution of its Loss Prevention Manual, and has gone to great lengths to prevent its inadvertent disclosure. Only a select few Dunkin' employees have access to Dunkin's Loss Prevention Manual. *See id.* ¶ 6. The only individuals with knowledge of Dunkin's Loss Prevention Manual are selected members of the Loss Prevention Department and Dunkin' Donuts' Legal Department. *See id.* Not even all members of Dunkin's own Loss Prevention Department have knowledge of, or access to, its Loss Prevention Manual.

While Dunkin' occasionally retains outside investigators to assist in underreporting investigations, those investigators are only provided with instructions on investigation procedures and not the Loss Prevention Manual itself. *See id.* ¶ 7. They are instructed in writing that: "All work performed for Dunkin' Donuts is confidential. Do not discuss this case (whom

9

you are working for or investigating) with anyone . . . ." *Id.* Investigators also sign a confidentiality agreement whereby they agree not to disclose the investigation procedures. *Id.*

Because of the confidential nature of Dunkin's loss prevention procedures, the disclosure of the Loss Prevention Manual would cause serious harm to Dunkin'. *See id.* ¶ 8. Specifically, disclosure would directly compromise existing and future investigations because it would "teach" rogue franchisees Dunkin's investigative techniques. *See id.* Armed with that knowledge, those franchisees would be able to pattern their behavior to avoid detection of their underreporting. *See id.* If Dunkin's Loss Prevention Manual were to become known to franchisees, Dunkin' would be forced to re-create its procedures at great expense and burden – and with absolutely no guarantee that the new procedures would be protected from discovery in future cases. *See id.* Additionally, Dunkin' would likely lose significant revenue as a result of the dissemination of its Loss Prevention Manual since franchisees would be more likely to get away with underreporting while new procedures were being crafted. *See id.* In sum, Dunkin' would suffer great harm by the disclosure of its Loss Prevention Manual.

Dunkin's Loss Prevention Manual would not be easy for someone outside of its Loss Prevention Department to create or duplicate on their own. *See id.* ¶ 11. Dunkin' invested significant resources in creating its Loss Prevention Manual: at least six Dunkin' Donuts personnel expended several hundred hours preparing the techniques and procedures at a cost of tens of thousands of dollars. *See id.* ¶ 10. Dunkin's Loss Prevention Manual was developed by individuals with extensive training and experience in the fields of loss prevention and investigative techniques, as well as an intimate understanding of the retail business conducted by Dunkin' franchisees. *See id.* ¶ 11. Those procedures are not readily ascertainable by those who

10

lack such a combination of experience and training, and thus it would be extremely difficult for others to duplicate the procedures. *See id.*

In sum, each of the six relevant factors weighs heavily in favor of a finding that Dunkin's Loss Prevention Manual is a trade secret. Dunkin' has expended great effort and expense both in creating its Loss Prevention Manual and in keeping it confidential. Disclosure of that information would cause severe harm to Dunkin's ability to detect and deter underreporting by dishonest franchisees, to the Dunkin' system, and to the vast majority of Dunkin' franchisees who play by the rules.

### B. Even if Dunkin's Loss Prevention Manual Was Not A Trade Secret, It Is Highly Confidential Commercial Information Entitled to Protection.

Under Fed. R. Civ. P. 26(c)(7), confidential commercial information is afforded the same level of protection as trade secrets. Even if Dunkin's Loss Prevention Manual were somehow not deemed a trade secret, it certainly constitutes confidential commercial information. As with other types of business methods and procedures, Dunkin's Loss Prevention Manual is entitled to protection. *See, e.g., Pate v. Nat'l Fund Raising Consultants, Inc.*, 20 F.3d 341 (8th Cir. 1994) (holding that a collection of time- and cost-saving measures which permitted customers to generate substantial income in a short period of time were protectable methods); *Snelling & Snelling, Inc. v. Armel*, Inc., 179 U.S.P.Q. 699 (W.D. La. 1973) (finding training manuals, instructional guides, and methods of operation to be confidential). There can be no question that Dunkin's Loss Prevention Manual is highly confidential and closely guarded commercial information.

### C. The Loss Prevention Manual Is Not Relevant To This Action.

Not only is Dunkin's Loss Prevention Manual confidential, it is also completely irrelevant to this matter. The only relevant Loss Prevention investigation in this case is the one

11

conducted on Defendants' shops, and Dunkin' does not object to this line of inquiry.[3] *Cf. Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 279 (7th Cir. 1992) ("The fact that the [franchisor] may . . . have treated other franchisees more leniently is no more a defense to a breach of contract than laxity in enforcing the speed limit is a defense to a speeding ticket."). Defendants can show no need to delve into Dunkin's generalized loss prevention procedures, especially given the harm that would come to Dunkin' by their disclosure.

Defendants contend that the Loss Prevention Manual is necessary for their "defense" that Dunkin' Donuts "manufactured a charge of underreporting against Mr. Stetzer as a pretext to terminate him from the Dunkin' Donuts system." (Defs.' Mot. to compel at 10.) Courts in other jurisdictions have repeatedly held that purported evidence of a franchisor's "pretext" or "motive" is irrelevant and inadmissible when valid grounds to terminate a franchise otherwise exist. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1309 (11th Cir. 1998) (franchisor's ulterior motive is irrelevant when franchisee breaches material term of franchise agreement); *Dunkin' Donuts Incorporated v. Martinez*, 2003 U.S. Dist. LEXIS 2694 (S.D. Fla. Feb. 21, 2003) (allegations of retaliatory motive are immaterial to franchisee's unlawful conduct under franchise agreement) (Ex. 16); *Major Oldsmobile v. GMC*, 1995 U.S. Dist. LEXIS 7418, * (S.D.N.Y. May 31, 1995) ("[S]ince defendant had the right to terminate the Agreement upon plaintiff's breach, it is legally irrelevant whether defendant was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract."), *aff'd*, 101 F.3d 684 (2d. Cir. 1996) (Ex. 17). Thus, because Defendants' "pretext defense" is irrelevant, it fails to justify the production of Dunkin's confidential Loss Prevention Manual.

---

[3] Indeed, Dunkin' has already produced the Loss Prevention File regarding the investigation of Defendants' shops.

12

## CONCLUSION

Accordingly, for the reasons stated above, Dunkin' Donuts respectfully requests that Defendants' Motion to Compel be denied.

Respectfully submitted,

Robert L. Zisk ct 13503
Jeffrey L. Karlin ct 14965
Christopher M. Loveland ct 24169
SCHMELTZER, APTAKER & SHEPARD, P.C.
2600 Virginia Avenue, N.W.
Suite 1000
Washington, D.C. 20037
(202) 333-8800

Paul D. Sanson ct 05477
Alexandra M. McHugh ct22428
SHIPMAN & GOODWIN LLP
One American Row
Hartford, CT 06103-2819
(860) 251-5612

Attorneys for Plaintiffs
Dunkin' Donuts Incorporated,
Dunkin' Donuts USA, Inc.

Dated: November 17, 2003

13

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of Plaintiffs' Opposition to Defendants 4 Donuts, Inc.'s, Grando, Inc.'s and Glenn Stetzer's Motion to Compel was served by first class mail on November 18, 2003 upon counsel for Defendants at the addresses listed below:

    Richard S. Order, Esq.
    Axinn, Veltrop & Harkrider LLP
    90 State House Square
    Hartford, CT 06103-3702

    Paul N. Gilmore, Esq.
    Updike, Kelly & Spellacy, P.C.
    One State Street
    P.O. Box 231277
    Hartford, CT 06123-1277

    Robert K. Walsh, Esq.
    The Law Offices of Robert K. Walsh
    193 State Street
    P.O. Box 777
    New Haven, CT 06473

                                                          Alexandra M. McHugh