# Consumer Contact Report
## Allied Domecq QSR Consumer Care Center
### Case Number 17543

| | | |
|---|---|---|
| **Case Recieved Date & Time:** | 11/16/2001 2:03PM | **Franchise** |
| **Customer Support Rep:** | Corrie Plasse | GLENN STETZER & GEORGE GERMANO |
| **Method of Contact:** | Telephone | **308629-DD** |
| **Shop PC:** | 308629-DD | 1950 State St |
| **BC:** | BASLER, FRANK | Hamden CT 06517 USA |
| **FMM:** | HEALY, PATTY | 203-562-7701 |
| **GM:** | COBA, TOM | |
| **Manufacture #:** | | |

| | |
|---|---|
| **Customer Name:** | Mr. Richard Czuprynski |
| **Day:** | 702-614-8163 |
| **Inc. Date/Time:** | |
| **Product:** | **Area Of Service:** |
| **Reason for Contact:** | Employee Issue W/franchisee    **Foreign Object:** |
| **Resolution:** | Notify Bc |

**Case Text:**        REP NOTES

The caller says that he worked for this Franchisee. He was terminated on 9/10/01. He says tht the F/ee has employees working for him w/out green cards, they are not on the pay roll and are recieving cash instead of paychecks.
The F/ee is selling products and not reporting it to DD. (caller says that he has taken a large order for and been told to tape the money in the register w/out ringing it in so that the sale would not be reported.

Daily logs were forged (temps, throw aways, ect) for the M.A.G.I.C.
They only bake donuts once a day.

The F/ee pays his managers half by pay check and the other half by cash so that it does not have to be reported.

will notify the GM. The caller wasvery clear bout not wanting hi s name revealed to the F/ee. He said that if the Joe wanted to call him and speak with him that would be fine, but he did not want the F/ee to have his name or to contact him.

**Case Text:**        REP NOTES

DD 003537

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

No. 3:02CV1920

COPY

DUNKIN' DONUTS INCORPORATED AND
DUNKIN' DONUTS USA, INC.

VS

4 DONUTS, INC., GRANDO, INC., GLENN STETZER, KATHLEEN
STETZER, GEORGE GERMANO AND JAMES MCMANAMA

         Deposition of:  JAMES MCMANAMA, taken before
Barbara L. Murphy, Licensed Shorthand Reporter,
License No. 305 and Notary Public within and for the
State of Connecticut, held at the offices of Shipman
and Goodwin, One American Row, Hartford, Connecticut
on October 15, 2003 commencing at 9:08 a.m.

196

1                    MR. GILMORE:  Objection as to form.

2                    THE WITNESS:  Contracted outside labor.

3                    MR. ORDER:  Move to strike.

4        Q.   (By Mr. Karlin)  Did you have people -- did

5   you have contracted outside labor in the doughnut

6   network from 1998 to 2002?

7                    MR. GILMORE:  Objection as to form.

8                    THE WITNESS:  I believe there was some,

9   yes.

10       Q.   (By Mr. Karlin)  Who -- what purpose did you

11  use contracted outside labor during that period?

12       A.   Production.

13       Q.   I'm sorry?

14       A.   For production.

15       Q.   For production.  Production of what?

16       A.   Of product.

17       Q.   Of doughnuts and bagels and muffins?

18       A.   Correct.

19       Q.   Why is it that you used outside labor for

20  production?

21       A.   It was an easier way to handle the

22  production.

23       Q.   Why was it easier?

24       A.   There was a network of people that did the

25  production.

## SCHMELTZER, APTAKER & SHEPARD, P.C.

COUNSELORS AT LAW
THE WATERGATE
2600 VIRGINIA AVENUE, NORTHWEST, SUITE 1000
WASHINGTON, D.C. 20037-1922
WEB SITE http://www.saspc.com
E-MAIL sas@saslaw.com
FAX (202) 337-6065
(202) 333-8800

October 30, 2003

**VIA FACSIMILE – (860) 275-8101**

Eric Palmquist, Esq.
Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT 06103-3702

      Re:   *Dunkin' Donuts Incorporated, et al. v. 4 Donuts, Inc. et al.*

Dear Eric:

      This letter is to confirm our earlier discussion regarding the production of documents requested in my previous letters to you. You stated that the following documents do not exist: (1) cancelled handwritten checks for 4 Donuts, Inc., Grando, Inc. and 2 Donuts, Inc. from 1998 to the present; (2) credit card statements with handwritten expense designations from 1998 to the present; (3) the One Right System check registers for 4 Donuts, Inc., Grando, Inc. and 2 Donuts, Inc. from 1998 to the present; (4) Form 1099's from 1998 to the present; and (5) Form W-9's from 1998 to the present.

      You also stated during our conversation that you have spoken with Mr. Citerella and he told you that there is no separate adjusting journal entry document and that all adjustments are made directly to the general ledgers. During his deposition, Mr. Citerella testified that he could print out adjusting journal entries from the Champion System and that he maintained adjusting journal entries for the prior two tax years. Since 2002 returns have not yet been completed, adjusting journals should exist for 2000 and 2001 and should be produced immediately.

      Finally, you stated that all documents related to the Pennsoft payroll system have already been produced.

## SCHMELTZER, APTAKER & SHEPARD, P.C.

Eric Palmquist, Esq.
October 30, 2003
Page 2 of 2


Please let me know if this letter does not accurately reflect our conversation.  Thank you for your prompt attention to this matter.

Sincerely,

Christopher M. Loveland


cc:  Amy Leete Van Dyke (via facsimile)
     Robert Walsh (via first class mail)

COPY

1

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF CONNECTICUT

2

3

                        No. 3:02CV1920

4

5

6    DUNKIN' DONUTS INCORPORATED AND

     DUNKIN' DONUTS USA, INC.

7

     VS

8                                              \

     4 DONUTS, INC., GRANDO, INC., GLENN STETZER, KATHLEEN

9    STETZER, GEORGE GERMANO AND JAMES MCMANAMA

10

11

12

13

14          Deposition of:  GLENN STETZER, taken before

15   Barbara L. Murphy, Licensed Shorthand Reporter,

16   License No. 305 and Notary Public within and for the

17   State of Connecticut, held at the offices of Shipman

18   and Goodwin, One American Row, Hartford, Connecticut

19   on October 13, 2003 commencing at 9:05 a.m.

20

21

22

23

24

25

185

1          MR. GILMORE:  Objection to form.

2          THE WITNESS:  I do not know.

3      Q.   (By Mr. Karlin)  Do you have an employee at

4  any time between 1998 and the present by the name of

5  Irma Kalman K-A-L-M-A-N?

6      A.   I do not know.

7      Q.   Do you have an employee at any time between

8  1998 and 2000 -- I'm sorry, and the present by the

9  name of Isabelle Cali C-A-L-I?

10     A.   I don't know.

11     Q.   Do you have an employee -- did you have an

12  employee at any time between 1998 and the present by

13  the name of Lio L-I-O Cali C-A-L-I?

14     A.   I don't know.

15     Q.   Did you ever have an employee from 1998 to

16  the present by the name of Alex Portilla,

17  P-O-R-T-I-L-L-A?

18     A.   I don't know.

19     Q.   Ever have an employee by the name of -- from

20  1998 to the present by the name of George Bereslow

21  B-E-R-E-S-L-O-W?

22     A.   I don't know.

23     Q.   Did you ever have an employee by the name of

24  Frank Kun K-U-N?

25     A.   I don't remember.

186

1      Q.   Does that name sound familiar to you?

2      A.   Could have had a Frank.  I don't know these

3    people's names anymore.

4      Q.   Did you ever have an employee by the name of

5    Zolton Kun Z-O-L-T-O-N same last name?

6      A.   Not that I remember.

7      Q.   Did you ever have an employee by the name of

8    Nikki N-I-K-K-I Kovac K-O-V-A-C?

9      A.   Not that I remember.

10     Q.   Did you ever have an employee by the name of

11   Bela Bereslow, B-E-L-A?

12     A.   Not that I remember.

13     Q.   Ever have an employee by the name of Tiberio

14   T-I-B-E-R-I-O Portilla P-O-R-T-I-L-L-A?

15     A.   Not that I recall.

16     Q.   Ever have an employee by the name of Gobor

17   G-O-B-O-R?

18     A.   No.

19     Q.   Ever have an employee by the name of Tunde,

20   T-U-N-D-E?

21     A.   Never heard of it.

22          MR. ORDER:  What was that last name?

23          MR. KARLIN:  T-U-N-D-E, Tunde.

24     Q.   (By Mr. Karlin)  Your wife is named

25   Kathleen, correct?

COPY

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - -X

DUNKIN' DONUTS, INCORPORATED AND : 

DUNKIN' DONUTS USA, INC., :

               PLAINTIFFS :

     :

VS                       :3:02CV1920 (JBA)

     :

4 DONUTS, INC., GRANDO, INC., :

GLENN STETZER, KATHLEEN STETZER, :

GEORGE GERMANO, AND JAMES :

McMANAMA, :

             DEFENDANTS :

- - - - - - - - - - - - - - - - -X

            Deposition of KATHLEEN JARVIE,
taken at the offices of Shipman & Goodwin,
One American Row, Hartford, Connecticut
06103-2819, before Clifford Edwards, LSR,
Connecticut License No. SHR.407, a
Professional Shorthand Reporter and Notary
Public, in and for the State of
Connecticut on July 17, 2003, at 1:30 p.m.

1    A    No.

2    Q    What's the process when somebody leaves

3 the donut business in terms of keeping records,

4 especially the I-9s?  Is there any sort of process

5 with what happens to the I-9s at that point?

6    A    I pull them from the store files and put

7 them in a box.

8    Q    And then what happens to the box?

9    A    It goes into a storeroom.

10    Q    And where is the storeroom located?

11    A    I don't know.

12    Q    Who is responsible for taking the boxes,

13 if anyone, to the storeroom?

14    A    I don't know.

15    Q    When you put the materials in the box,

16 where is the box located?  In the office?

17    A    Yes.

18    Q    And then where do you leave it, if

19 anywhere?  In the office?

20    A    Just stack it in the corner.

21    Q    I'm going to read a few names, and I'm

22 going to ask you to tell me whether you know whether

23 they are citizens of the United States -- whether

24 they are employees first and whether they are

25 citizens of the United States.

1              Erma Kalman, K-a-l-m-a-n, do you know

2    whether she's an employee of the donut business?

3        A    No.

4        Q    What about Isabelle Cali, C-a-l-i, do you

5    know whether she's an employee of the donut

6    business?

7        A    No.

8        Q    What about Lito Cali, L-i-t-o C-a-l-i, do

9    you know if that person is an employee of the donut

10   business?

11       A    No.

12       Q    Alex Portilla?

13       A    No.

14       Q    George Breslow, do you know whether George

15   Breslow is an employee of the donut business?

16       A    No.

17       Q    Frank Kun, K-u-n, do you know whether he's

18   an employee of the donut business?

19       A    No.

20       Q    Zolton Kun, do you know whether he's an

21   employee of the donut business?

22       A    No.

23       Q    Have you ever heard that name before,

24   Zolton Kun?

25       A    No.

1  Q Ever heard the name Frank Kun before?

2  A Yes.

3  Q And in what connection -- do you recall

4 when you last heard the name Frank Kun?

5  A No.  Not recently.

6  Q When was the last time that you heard the

7 name Frank --

8  A I don't know.

9  Q I'm sorry?

10  A I don't know.

11  Q And do you recall in what the connection

12 you heard the name Frank Kun?

13  A No.

14  Q So you just have -- that name sounds

15 familiar, is that it?

16  A Yes.

17  Q What about Nicky Kovach (phonetic), does

18 that name sound familiar to you?

19  A No.

20  Q Bella Breslow, does that sound familiar?

21  A No.

22  Q Tiberio Partillo, does that name sound

23 familiar?

24  A No.

25  Q How about Constantin Radulescu, does that

1    sound familiar?

2        A    No.

3        Q    In terms of the time sheets that are filed

4    out and then you calculate them, can you take me

5    through the process of what happens with that?

6            It may seem simple to you, but I just want

7    to know what happens, what you receive, in general

8    what you do with them and then where they go.

9        A    I get the timecard, I add up the hours,

10    and I put it on a payroll sheet.

11        Q    And the payroll sheet that you have that

12    you prepare --

13        A    Yes.

14        Q    -- is that a sheet that is -- tell me how

15    you go about preparing that sheet.

16        A    The sheet is prepared.  I just write in

17    the hours.

18        Q    So there is a list of employees; is that

19    correct?

20        A    Yes.

21        Q    And how frequently do you fill out the

22    payroll sheets?

23        A    Once a week.

24        Q    And the payroll sheets that you fill out,

25    would that include every employee of the donut



IN THE UNITED STATES DISTRICT COURT    **ORIGINAL**

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
             :

DUNKIN' DONUTS INCORPORATED AND :
DUNKIN' DONUTS USA, INC.,    :
             :
     Plaintiffs,   :
             :
   vs.        : 3:02CV1920
             :
4 DONUTS, INC., GRANDO, INC., GLENN :
STETZER, KATHLEEN STETZER, GEORGE :
GERMANO, AND JAMES MCMANAMA,  :
             :
     Defendants.   :
             :
- - - - - - - - - - - - - - - - - x

     Deposition of ANTHONY MATUSIK, taken

pursuant to the Federal Rules of Civil

Procedure, at the law offices of Shipman &

Goodwin LLP, One American, Row, Connecticut,

before Jenny L. Albert, License #00207, a

Registered Professional Reporter and Notary

Public in and for the State of Connecticut,

on Tuesday, September 9, 2003, at 10:55 a.m.

        SCRIBES, INC.

1      A.    I don't know.

2      Q.    Were you ever given a corporate credit card

3  to use?

4      A.    I don't believe so.

5      Q.    Do you know if Mr. Stetzer has ever tried to

6  sell the franchises?

7      A.    I don't know.

8      Q.    Do you know someone by the name of Alex

9  Portilla?

10     A.    No.

11     Q.    How about George Brezlow?

12     A.    No.

13     Q.    Frank Coone?

14     A.    No.

15     Q.    Vicky Coone?

16     A.    No.

17     Q.    Zulton Coone?

18     A.    No.

19     Q.    Nicki Kovak?

20     A.    There might have been a girl named Nicki that

21  worked for us in the past but not that I can recall her

22  last name.

23     Q.    Do you know approximately when she worked for

24  you?

25     A.    Who?

SCRIBES, INC.

1      Q.    Nicki.

2      A.    I don't know.  I don't know.  I can't pick

3   out a particular Nicki.  I don't recall hiring a

4   particular Nicki, but --

5      Q.    Have you ever heard of Bella Brezlow?

6      A.    I'm sorry?

7      Q.    Bella Brezlow.

8      A.    No.

9      Q.    Do you know if Tiberio's last name is

10   Portilla, P-o-r-t-i-l-l-o?

11      A.    I don't know any of those names.  I'm not

12   sure.

13      Q.    Have you ever heard of Chris Dunlap?

14      A.    No.

15      Q.    Constantine Radulescu?

16            MR. ORDER:  How do you spell that?

17            MR. LOVELAND:  I think it's

18         R-a-d-u-l-e-s-c-u.

19      A.    Not that I can recall.

20      Q.    How about an employee named Tundy or Gabor?

21      A.    What was the name?

22      Q.    Tundy or Gabor.

23      A.    Two people?

24      Q.    Two people.

25      A.    Not that I can recall.

SCRIBES, INC.

ORIGINAL

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - -X
DUNKIN' DONUTS, INCORPORATED AND      :
DUNKIN' DONUTS USA, INC.,             :
                    PLAINTIFFS        :
                                      :
VS                                    :3:02CV1920 (JBA)
                                      :
4 DONUTS, INC., GRANDO, INC.,         :
GLENN STETZER, KATHLEEN STETZER,      :
GEORGE GERMANO, AND JAMES             :
McMANAMA,                             :
                    DEFENDANTS        :
- - - - - - - - - - - - - - - -X
```

Deposition of CHRISTOPHER
MATUSIK, taken at the offices of Shipman &
Goodwin, One American Row, Hartford,
Connecticut  06103-2819, before Clifford
Edwards, LSR, Connecticut License No.
SHR.407, a Professional Shorthand Reporter
and Notary Public, in and for the State of
Connecticut on July 17, 2003, at 9:02 a.m.

1    Q    There are times when you didn't see that,

2  you just handed a cheek over to -- an envelope with

3  a check in it and not see the employee open it up?

4    A    Sure.

5    Q    We spoke before about some names of bakers

6  and finishers, and you testified that Erma was one

7  of the bakers.  Do you know whether her last name is

8  Kalman, K-a-l-m-a-n?

9    A    I don't believe that I testified to Erma.

10   Q    I have a list here that -- we talked about

11  bakers?

12   A    If you look, it says Ermil.  I testified

13  to Ermil.

14   Q    Right.  And that's what I'm asking.  Do

15  you know whether her last name is Kalman?

16   A    That's not the same person.

17   Q    So the Erma Kalman is somebody different

18  than the Ermil you were discussing before?

19   A    Yes.

20   Q    And who is Erma Kalman?

21   A    She is a former employee of ours.

22   Q    When did she leave the employment?

23   A    She left during the remodel.

24   Q    And do you know why she left?

25   A    No, I don't.

1    Q    Do you know where she is working now?

2    A    No, I do not.

3    Q    And we spoke earlier about Lito.  Do you

4    know whether his last name is Cali, C-a-l-i?

5    A    Could be.

6    Q    But you don't know for sure?

7    A    No.

8    Q    You also spoke of Isabel as somebody who

9    is a finisher at the Frontage Road store.

10         Is that correct?

11    A    Yes.

12    Q    Do you know if her last flame is Cali?

13    A    Could be.  I'm not sure.

14    Q    Do you know if Isabel and Cali are married

15    or somehow related?

16    A    I don't know.

17    Q    Do you know who Alex Portilla is,

18    P-o-r-t-i-l-l-a?

19         MR. ORDER:  P-o-r --

20         MR. KARLIN:  -- t-i-l-l-a.

21    A    I don't recall.

22         MR. ORDER:  First name is --

23         MR. KARLIN:  First name is Alex.

24    BY MR. KARLIN:

25    Q    What about George Breslow?

1      A    I don't recall.

2      Q    What about Frank Kun, K-u-n, do you know

3 who that is?

4      A    I don't recall.

5      Q    Do you know whether he was an employee of

6 the donut business?

7      A    Could have been possibly.

8      Q    Do you know what store he worked at?

9      A    I don't recall.

10     Q    Do you know whether he's currently an

11 employee?

12     A    I'm not sure.

13     Q    What about Zoltan Kun, is that name

14 familiar to you?

15     A    No.

16     Q    What about Vicky Kun, is that name

17 familiar to you?

18     A    No.

19     Q    Do you have an employee by the name of

20 Zoltan working in any of the donut businesses?

21     A    I'm not sure.  I don't think so.

22     Q    What about Frank, do you have an employee

23 by the name of Frank working in any of the donut

24 businesses?

25     A    I'm sure there could be a Frank, yeah.

1      Q   Do you know whether you've ever had an

2  employee by the name of Zoltan or Zolton?

3      A   I don't recall.

4      Q   What about Nicky Kovac, K-o-v-a-c, do you

5  know if that is one of the employees of the donut

6  business?

7      A   I'm not sure.

8      Q   What about Bella Breslow, is that an

9  employee of the donut business?

10     A   Could be.

11     Q   And before you spoke about Tiberio,

12  T-i-b-e-r-i-o.  Do you know whether his last name is

13  Portillo, P-o-r-t-i-l-l-o?

14     A   No, I don't know.

15     Q   And what about Chris Dunlop (phonetic), do

16  you know whether he or she is an employee of the

17  donut businesses?

18     A   I don't know.

19     Q   Constantin Radulescu, R-a-d-u-l-e-s-c-u?

20          MR. ORDER:  Wait a minute.  Can you

21          read it a little slower?

22          MR. KARLIN:  Sure.

23          R-a-d-u-l-e-s-c-u.

24     A   I don't recall.

25

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

2

3

No. 3:02CV1920

4

5

6    DUNKIN' DONUTS INCORPORATED AND

DUNKIN' DONUTS USA, INC.

7

VS

8

4 DONUTS, INC., GRANDO, INC., GLENN STETZER, KATHLEEN

9    STETZER, GEORGE GERMANO AND JAMES MCMANAMA

10

11

12

13

14    Deposition of: ANTHONY CITERELLA, taken

15    before Barbara L. Murphy, Licensed Shorthand Reporter,

16    License No. 305 and Notary Public within and for the

17    State of Connecticut, held at the offices of Shipman

18    and Goodwin, One American Row, Hartford, Connecticut

19    on October 24, 2003 commencing at 9:08 a.m.

20

21

22

23

24

25

1    except for the check that was made out to the

2    accounting firm.

3        Q.    Aside from that one conversation you had

4    with Mr. McManama and Mr. Stetzer, did you have any

5    subsequent conversation with them about subcontractors

6    used for production?

7        A.    We talked about the need to issue W-9 forms

8    to get a federal tax number from the subcontractors.

9    We talked about the requirement to issue 1099 forms to

10   the subcontractors at year end.

11       Q.    What did you tell them with respect to the

12   W-9 forms?

13       A.    Before a check was issued to a subcontractor

14   you should have in your possession a signed W-9 form

15   with a federal tax number on it.

16       Q.    Do you know whether that was done with

17   respect to subcontractors for production purposes in

18   the doughnut businesses?

19       A.    No.

20       Q.    What did you tell them with respect to 1099

21   forms?

22       A.    There was a requirement within thirty days

23   of year end, generally January 31, that a 1099 should

24   be sent to the subcontractors.

25       Q.    Do you know whether 1099 forms were

JOHN KEENAN COMPANY, INC. d/b/a NORRELL TEMPORARY SERVICES VERSUS NORRELL CORPORATION, f/k/a NORRELL SERVICES, INC., AND INTERIM SERVICES, INC.

CIVIL ACTION NUMBER 99-1924 SECTION "L" (2)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

2001 U.S. Dist. LEXIS 10473

July 17, 2001, Decided
July 18, 2001, Filed; July 19, 2001, Entered

**DISPOSITION: [*1]** Plaintiff entitled to recover damages resulting from the miscalculation of the Gross Margin in the sum of $ 90,599.00, plus interest from the date of judgment. Plaintiff's remaining claims against Defendants dismissed with prejudice.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff franchisee's claims for specific performance and damages for breach of contract, tortious interference with contract, unfair trade practices, and violation of the Georgia Trade Secrets Act of 1990, Ga. Code Ann. § 10-1-760 et seq., against the successor franchiser came before the court for trial without a jury.

**OVERVIEW:** Plaintiff was a long time franchisee of defendant franchisor. After many years and change of ownership of both entities, franchisor began operating wholly owned businesses within the franchisee's territory, and franchisee sued, asserting multiple claims. After trial without a jury, the court found for the franchisee only on its claim that the franchisee had wrongly calculated a gross profit margin. The franchiser had not breached the contract, because it did not allow another franchisee under the same trade name operate in the franchisee's area, and franchisee had proven no damages from any purported breach of contract or implied covenant, let alone tortious interference, or misappropriation of trade secrets. The new owners of the franchisee were aware the franchisor was no longer mailing direct advertising.

**OUTCOME:** The franchisee was entitled to recover damages resulting from the franchiser's miscalculation of the gross margin as determined under the licensing agreement, plus interest from the date of judgment. Franchisee's remaining claims were dismissed with prejudice, as franchisee had not shown a breach of contract or any tort for which it could recover.

**CORE TERMS:** license agreement, franchisee, merged, territorial, territory, franchise, exclusivity, temporary, merger, franchisor, breach of contract, derivative, breached, duty, tortious interference, failure to provide, successor, proprietary, advertising, franchised, customers, max, franchise agreement, direct mail, addendum, subsidiary, mailings, unambiguous, implied covenant, fair

dealing

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Contracts Law > Breach > Causes of Action*
[HN1]Under Georgia law, the elements of a right to recover for a breach of contract are (1) actual breach of the contract and (2) resultant damages to the non-breaching party.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem*
[HN2]Under Georgia law, a court first considers whether a contract is ambiguous as a matter of law. Ga. Code Ann. § 13-2-1.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN3]In interpreting provisions of a contract, a court should first look to the plain language of the document. Words in the contract must be given their plain and ordinary meaning, and dictionaries may be used to determine such meaning. If the language is unambiguous, the contract must be enforced according to its terms and no construction is necessary or permissible. If ambiguity exits, the court must resolve the ambiguity by applying the relevant jurisdiction's rules of construction.

*Contracts Law > Contract Interpretation > Parol Evidence Rule*
[HN4]Parol evidence is admissible to explain an ambiguity in a written contract, although such evidence is inadmissible to add to, take from, or vary a written contract. Ga. Code Ann. § 13-2-2(1) (1994).

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN5]Under Georgia law, interpretations which render portions of a contract meaningless should be avoided. A contract cannot be interpreted to read out express limitations on contract rights. Ga. Code Ann. § 13-2-2(4).

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN6]Under Georgia law, prefatory "whereas" clauses and other recitals are not binding and do not create contract rights beyond those established by the substantive

  

terms of the contract. Such clauses cannot be used to extend or broaden restrictions contained in the body of the substantive contract terms, although such clauses can be used to ascertain the parties' intent when construing the contract.

### Contracts Law > Contract Interpretation > Interpretation Generally

[HN7] Under Georgia law, the cardinal rule of contract construction is to ascertain the intention of the parties. Ga. Code Ann. § 13-2-3. The "intent of the parties" is the meaning intended by the parties at the time the contract was made. The statute contemplates an expression of meaning contemporaneous with the execution of the contract, and it does not indicate that an expression of meaning by one party years after such execution imposes any obligation upon the other party to object to such an expression.

### Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

[HN8] A duty of good faith and fair dealing is implied in all contracts under Georgia law. However, that duty is intended to modify the explicit terms of the contract, not to create a separate, independent contract term or to override express contractual terms. The implied covenant is not an undertaking that can be breached apart from the express terms of the contract itself.

### Contracts Law > Remedies > Compensatory Damages

[HN9] The proper measure of damages in a breach of a territorial exclusivity provision in a franchise agreement is an amount which will compensate the injured party for its loss which fulfillment of the contract would have prevented. The purpose of contract damages is to place an injured party, so far as it is possible to do so by monetary award, in the same position that he or she would have been in had the contract been performed.

### Contracts Law > Remedies > Compensatory Damages

[HN10] Lost profits may be recoverable damages in a breach of contract case if the profits are lost by the non-breaching party and are directly traceable to the alleged breach. To form a basis of recovery for breach of contract damages, the damages must be such as could be traced solely to the breach and as the parties contemplated as a probable result of such breach. Lost profits are an appropriate measure of contract damages, where a business is well established and reasonable data exits to determine the amount of the lost profits.

### Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses

[HN11] Georgia law imposes a six-year limitations period on claims for breach of contract. Ga. Code Ann. § 9-3-24.

### Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

[HN12] There is no breach of contract or breach of an implied duty of good faith if a franchisor operates dual systems in which the franchiser segregates information and does not share confidential business information.

### Contracts Law > Remedies > Punitive Damages

[HN13] Under both Louisiana and Georgia law, to prevail on a tortious interference claim, a plaintiff must show that he was injured by the alleged interference. The five elements of tortious interference with a contract under Louisiana law are: (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causing the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; and (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

### Contracts Law > Remedies > Punitive Damages

[HN14] To establish a cause of action for tortious interference with existing and prospective contractual relations, a claimant must show that the defendant (1) acted improperly and without privilege, (2) purposely and with malice and intent to injure, (3) induced a third party or third parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury.

### Torts > Business & Employment Torts > Unfair Business Practices

[HN15] To prevail on a claim for misappropriation of trade secrets under the Georgia Trade Secrets Act of 1990, Ga. Code Ann. § 10-1-760, et seq., a plaintiff must prove that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret. A party asserting the existence of a trade secret has the burden of proving that the information so qualifies and that the accused party violated the Georgia Trade Secrets Act of 1990.

### Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices

[HN16] Under Louisiana Unfair Trade Practices Act, La. Rev. Stat. Ann. §§ 51:1401-1419, an act constitutes an "unfair trade practice" if it is unethical, oppressive, unscrupulous, or substantially injurious to consumers.

**COUNSEL:** For JOHN KEENAN COMPANY, INC., plaintiff: Michael J. Mestayer, Leger & Mestayer, New Orleans, LA.

  

For NORRELL CORPORATION, defendant: Ronald T. Coleman, Veronica J. Cherniak, Paul, Hastings, Janofsky & Walker, LLP, Atlanta, GA.

For NORRELL CORPORATION, INTERIM SERVICES INC, defendants: Jesse R. Adams, Jr., D. Russell Holwadel, Adams & Johnston, New Orleans, LA.

For INTERIM SERVICES INC, defendant: David J. Butler, Wendy C. McGraw, Swidler, Berlin, Shereff, Friedman, LLP, Washington, DC.

**JUDGES:** Eldon E. Fallon, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Eldon E. Fallon

**OPINION: FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff, John Keenan Co., Inc., d/b/a/ Norrell Temporary Services ("Keenan") seeks specific performance and damages for breach of contract, tortious interference with contract, unfair trade practices, and violation of the Georgia Trade Secrets Act against Norrell Corporation, Norrell Services, Inc., and Interim Services, Inc. [*2]

This case came on for trial before the Court without a jury. The Court, having carefully considered the testimony of all the witnesses, the exhibits entered at trial, the record, and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes, in whole or in part, a finding of fact, the Court adopts it as such.

## I. FINDINGS OF FACT

### A. License Agreement

(1)

On January 6, 1970, Keenan, a Louisiana corporation, and Norrell Services, Inc., a Georgia corporation, entered into a license agreement (the "1970 License Agreement"). Keenan has been a Norrell franchisee or licensee since that time. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 The parties use the terms "licensee" and "franchisee" interchangeably. The Court will likewise observe no distinction between the two terms.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

(2)

In the 1970 License Agreement, [*3] Norrell granted Keenan the right to provide temporary employment services within a fifteen parish area including and surrounding New Orleans. Norrell also agreed to provide Keenan with other services including payroll and collections. In exchange, Keenan assumed certain responsibilities, including an agreement to pay 40% of Keenan's profits to Norrell Services, Inc.

(3)

On December 23, 1975, Keenan and Norrell Services, Inc. entered into a second agreement (the "1975 License Agreement") that added Norrell Southeastern Corporation as a party and modified other terms of the 1970 License Agreement, including changing the profit sharing ratio to 70/30% in favor of Keenan (together with the January 6, 1970 agreement, the "License Agreement"). Section I of the 1975 License Agreement changed the contract's renewal terms. Norrell gave up its right to terminate the License Agreement at the expiration of its term. Instead, the 1975 Agreement created an automatic and perpetual franchise renewal unless Keenan took action to terminate it.

(4)

In 1992, Norrell proposed that Keenan enter into a new form of License Agreement with Norrell in connection with Norrell's attempt to standardize its [*4] License Agreements with all of its franchisees. Over the course of the parties relationship, Norrell had proposed new forms of agreements. Keenan declined Norrell's various proposals, including the 1992 proposal, and the parties have continued to operate under the License Agreement.

### B. History of Keenan

(5)

Keenan was originally owned by John Keenan and certain of his relatives. David and Hansen Koch (the "Kochs") and Richard Schmidt purchased the stock of Keenan in November, 1991. Schmidt and the Kochs each acquired one-third of Keenan's stock. For approximately one year prior to the stock purchase, Schmidt had been employed by Keenan and was in charge of the day-to-day operations of the business. After the stock purchase, Schmidt became the president of Keenan and remained in charge of its operations.

(6)

In 1994 or 1995, the Kochs learned that Schmidt had been misappropriating funds from Keenan and mismanaging the business. The Kochs terminated Schmidt and filed criminal and civil charges against him. David

  

Koch took over the day-to-day operation of the Keenan business after Schmidt was terminated.

(7)

Schmidt filed for bankruptcy in the United States Bankruptcy Court [*5] for the Northern District of Georgia.

(8)

During the bankruptcy proceedings, Schmidt and the bankruptcy trustee each approached Norrell about purchasing Schmidt's one-third share of Keenan. At the time, Norrell indicated that it might be interested in purchasing 100% of Keenan, but that it was not interested in purchasing a one-third interest in Keenan. The transaction went no further and Norrell did not purchase any shares of Keenan.

(9)

Norrell's actions during the Schmidt's bankruptcy with regard to its potential purchase of Keenan stock were not improper.

(10)

The Kochs subsequently purchased Schmidt's shares of Keenan.

(11)

Defendant's evidence at trial showed that Keenan's annual revenues declined during the period from 1991 to 1998.

(12)

Defendant's evidence at trial also showed that Keenan's revenues for the first six months of 2000 were higher than revenues for the first six months of 1999.

(13)

Keenan has not shown that it lost any business to any Interim Service, Inc. branch office since July 2, 1999.

C. History of Norrell

(14)

At the time Keenan filed this lawsuit, Norrell Services, Inc. was a wholly-owned subsidiary of Norrell Corporation. Norrell [*6] Corporation was originally formed in 1961 as Southeastern Personnel. Southeastern was renamed Norrell Southeastern Corporation in 1963. In 1972, the entity became known as Norrell Corporation.

(15)

Norrell Corporation, a Georgia corporation, provided a variety of services, including professional, outsourcing and temporary staffing services, through numerous subsidiaries and joint ventures.

(16)

Norrell Services, Inc. refers to its system of operating its business as the "Norrell system." Norrell Services, Inc. sold franchise operations of its "Norrell system" to businesses that would operate under the "Norrell" trade name. Norrell Services, Inc. also operated company-owned temporary help services under the "Norrell" trade name.

(17)

In March of 1999, Norrell Corporation and Interim Services, Inc. ("Interim"), a Delaware corporation, announced their intention to merge.

(18)

Interim Services, Inc. was also in the temporary help business, providing various services to clients including flexible staffing, search and/or recruitment, consulting and outsourcing services. Like Norrell, Interim has company-owned, franchised, and licensed branch offices.

(19)

On July 2, 1999, Norrell [*7] Corporation merged into Interim Merger Corporation, a wholly-owned subsidiary of Interim. Immediately thereafter, Interim Merger Corporation changed its name to Norrell Corporation.

(20)

On January 2, 2000, Norrell Services, Inc., was merged into Norrell Corporation, which then contributed its assets to Interim U.S. Inc., a subsidiary of Interim. Effective January 2, 2000, Interim U.S. Inc. contributed certain of its assets to Interim Atlantic Enterprises, LLC, another subsidiary of Interim Services., Inc.

(21)

On July 7, 2000, Interim Services, Inc., Interim U.S. Inc., and Interim Atlantic Enterprises, LLC changed their names to Spherion Corporation, Spherion U.S. Inc. and Spherion Atlantic Enterprises, LLC, respectively.

(22)

Spherion Atlantic Enterprises, LLC (initially Interim Atlantic Enterprises, LLC) assumed the obligations of Norrell Services, Inc. under the License Agreement between Norrell Services, Inc., and Keenan.

(23)

Although the merged company has announced its intent to move toward one brand -- the Spherion brand -- Interim will continue to own and operate other brands including "Norrell."

(24)

  

Norrell is significantly smaller than it was prior to the merger. [*8] Many Norrell franchised and corporate-owned offices converted to the Interim/Spherion name and system after the merger and the revenues from Norrell branded business have dramatically decreased.

(25)

The credible evidence at trial shows that since the merger, the Interim/Spherion system has been, and will continue to be, operated separately from the Norrell system, using separate accounting and field support staffs. The merged company has a field support staff dedicated exclusively to the Norrell system and to helping Norrell offices compete against both Interim and other competitors. The merged company has developed and is continuing to develop programs exclusively for Norrell franchisees.

(26)

The Norrell system and the Interim/Spherion system use different components and are managed by different individuals. A business using the Interim/Spherion system is not a Norrell office "in fact" because the systems are managed and supported separately.

(27)

However, even if aspects of the Norrell system have been incorporated into the merged company or adopted for use by Interim/Spherion offices, Plaintiff has not shown this resulted in the elimination of any business advantage previously [*9] enjoyed by Plaintiff, or gave any Interim/Spherion office in Plaintiff's Norrell territory any new business advantage over Plaintiff.

(28)

The merged company has implemented protections to assure that no competitive business information of Keenan or other Norrell franchisees is or will be accessible by Interim officers or operation support personnel. No branch office locations, whether corporate owned or franchised have access to business information of any other office that does not want to share such information. Plaintiff's evidence did not show that its competitive information has been or will be shared with the Interim branch offices in Keenan's Norrell territory.

(29)

At the time of the trial, the Norrell system was an ongoing and viable system that was separate from the Interim/Spherion system. The merged company continues to provide support services to Norrell franchisees including billing, collection and payroll processing. The merged company also provides services solely to Norrell branch offices to further their businesses. For example, the Norrell Franchise Advisory Council is composed of Norrell franchise owners in overlap markets. This Council interacts with the [*10] merged company to make decision on franchisee/franchisor relations issues, to identify and address the concerns of Norrell franchisees.

(30)

While Norrell and its successor provide support and promotional services to Keenan, Norrell stopped providing direct mail advertising for Keenan in 1990. In 1991, when the Kochs purchased Keenan, Norrell was no longer providing direct mailings for the franchise. Instead, Norrell shifted to other forms of advertising, which in its business judgment, were more valuable to its franchisees. At the time of trial, the merged company had not sent out any direct mail advertising to Keenan's customers.

(31)

The merged company has purchased many former Norrell franchisees. It is possible that eventually the remaining franchises will either expire under the terms of their franchise agreements or that they will be purchased by the merged company, leaving Keenan as the sole Norrell franchisee.

## D. Protected Area

(32)

The principal issue in this case is whether the Norrell/Interim merger violates the "Protected Area" provision of the 1970 License Agreement. This provision states:[Norrell Services, Inc.] agrees that during the term of [*11] this agreement (as extended, if extended), it, nor its parent or affiliated companies, will not itself operate or license another person or persons to operate under the trade names "Norrell", "Norrell Services" or "Norrell Temporary Services", or any derivative thereof, any similar type business to that which is to be conducted by [Keenan] within the protected area. n2

1970 License Agreement, p. 4-5, Sec. 3.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n2 The Protected Area is defined as: "Metropolitan New Orleans Area, including the Parishes of Orleans, Jefferson, St. Charles, St. Bernard, St. Tammany, Plaquemine, La Fourche, Terrebone, Assumption, St. Marys, Tangipahoa, St. John the Baptist, Washington, Ascension, and St. James." 1970 License Agreement, p. 5, Sec. 3.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

Page 8

  

™ LexisNexis™    ™ LexisNexis™    ™ LexisNexis™

(33)

At the time the merger was announced, Interim had a number of company-owned Interim temporary help branch locations in Keenan's fifteen parish Norrell territory.

(34)

In the past, Norrell has attempted to locate temporary staffing businesses in Keenan's Norrell territory. [*12] One of these businesses was Tascor, Inc. ("Tascor").

(35)

Tascor was initially named "Norrell Contract Services, Inc." On January 10, 1992, Norrell changed the entity's name to "Norrell Support Services, Inc." On September 10, 1992, the entity's name was changed again to Tascor.

(36)

Tascor provided "management services" to large clients. These services involved Tascor taking over responsibility for an entire function or group within a client company. On February 3, 1993, Keenan sent Norrell a memorandum stating that Keenan and its legal counsel believed that Tascor had no legal right to solicit or do any business in Keenan's Norrell territory. On February 16, 1993, Gene Obermeyer, President of Norrell's Franchise Division, responded that Norrell and its legal counsel believed that Tascor did have the right to conduct business in Keenan's territory. Despite this position, Tascor did not provide any management services in Keenan's fifteen parish Norrell territory, with the exception of a single IBM employee.

(37)

The parties disagreed about whether Tascor could do business in Keenan's Norrell territory and neither party waived its purported rights on this issue.

(38)

Similarly, [*13] the evidence presented at trial regarding other Norrell efforts to own or operate other temporary staffing business in Keenan's Norrell territory does not show that Norrell accepted Keenan's interpretation of the Protected Area provision of the License Agreement. Instead, Norrell's actions merely show that there has been previous disagreement between the parties regarding the interpretation of this provision.

(39)

After the Norrell/Interim merger was announced, Keenan advised Norrell that Keenan believed it had the exclusive right to operate any temporary help businesses affiliated with Norrell in his fifteen parish territory, and that the merger would violate that purported right.

Norrell disputed Keenan's interpretation of its rights under the License Agreement.

(40)

Many Norrell franchised and corporate owned offices have converted to the Interim name. However, generally Interim does not permit Norrell offices located in areas with existing Interim offices to convert to the Interim name. Because there are Interim branch locations in Keenan's fifteen parish Norrell territory, Interim has prohibited Keenan's franchise from converting to the Interim name.

(41)

The Norrell/Interim [*14] merged company attempted to address potential conflict situations arising in overlap markets (i.e., markets where there were both Norrell and Interim offices) by offering to repurchase the Norrell franchises in those overlap markets. Many of Norrell's other franchise agreements contained end-of-term buy-back provisions, where the buy-back price was determined using a set formula. Norrell offered to purchase Norrell offices in overlap markets at a premium over the buy-back formula amounts. Norrell offered to buy Keenan's franchise at a premium over the buy-back formula amount. Keenan rejected Norrell's offer.

(42)

Keenan, of course, is free to accept a buy back offer from the merged company or terminate his License Agreement at the end of its term.

## II. CONCLUSIONS OF LAW

(1)

The Court has jurisdiction over this matter pursuant to Title 28, *United States Code, Section 1332.*

### A. Breach of Contract

(2)

The License Agreement is governed by Georgia law. *See* 1970 License Agreement, p. 30, Sec. 43(e).

(3)

[HN1]Under Georgia law, the elements of a right to recover for a breach of contract are (1) actual breach of the contract and (2) resultant damages [*15] to the non-breaching party. *See, e.g., Budget Rent-A-Car v. Webb, 220 Ga. App. 278, 469 S.E.2d 712, 713 (Ga. Ct. App. 1996); Graham v. C.W. Matthews Contracting Co., 159 Ga. App. 546, 284 S.E.2d 282, 286 (Ga. Ct. App. 1981).*

(4)

Interpretation of the License Agreement is a matter of

  

law. *See Grier v. Brogdon*, 234 Ga. App. 79, 505 S.E.2d 512, 514 (Ga. Ct. App. 1998); *Travelers Ins. Co. v. Blakey*, 255 Ga. 699, 700, 342 S.E.2d 308 (1986).

**(5)**

[HN2]Under Georgia law, the court first considers whether a contract is ambiguous as a matter of law. *See O.C.G.A. § 13-2-1; Copy Systems of Savannah, Inc. v. Page*, 197 Ga. App. 435, 398 S.E.2d 784, 785 (Ga. Ct. App. 1990).

**(6)**

[HN3]In interpreting provisions of a contract, the Court should first look to the plain language of the document. Words in the contract must be given their plain and ordinary meaning, and dictionaries may be used to determine such meaning. *See McDuffie v. Argroves*, 230 Ga. App. 723, 497 S.E.2d 5, 7 (Ga. App. 1998).

**(7)**

If the language is unambiguous, the contract must be enforced according to its terms and no construction [*16] is necessary or permissible. *See, e.g., Associated Mech. Contractors, Inc. v. Martin K. Eby Constr. Co. Inc.*, 964 F. Supp. 1576, 1580 (M.D. Ga. 1997); *Walker v. Virtual Packaging, LLC*, 229 Ga. App. 124, 493 S.E.2d 551, 554 (Ga. Ct. App. 1997).

**(8)**

If ambiguity exits, the court must resolve the ambiguity by applying Georgia rules of construction. *Copy Systems of Savannah*, 398 S.E.2d at 785.

**(9)**

The "cardinal rule of contract construction is to ascertain the intention of the parties." O.C.G.A. § 13-2-3. [HN4]Parol evidence is admissible to explain an ambiguity in a written contract, although such evidence "is inadmissible to add to, take from, or vary a written contract." O.C.G.A. § 13-2-2(1) (1994); *Andrews v. Skinner*, 158 Ga. App. 229, 279 S.E.2d 523, 524 (Ga. Ct. App. 1981).

**(10)**

The License Agreement contains an integration clause that states that the "agreement and those things referred to herein constitute the entire contract between the Company and the Franchisee." *See* 1970 License Agreement, para. 43(b). The parties cannot rely on statements or conduct outside the License Agreement to establish any right [*17] or duty beyond or contrary to those expressly provided in or limited by the License Agreement. *See Kelson Cos., Inc. v. Feingold*, 168 Ga. App. 391, 309 S.E.2d 394, 396 (Ga. Ct. App. 1983).

**(11)**

In the Pre-Trial Order, Keenan contends that Norrell is liable for breach for contract for each of the following alleged actions:(a) failing to abide by the exclusivity grant in the License Agreement;
(b) failing to continue the level of support and sales services formerly provided to such a point that the name Norrell will cease to exist;
(c) failing to provide economic benefits for which it was contractually bound;
(d) deducting expense items from the profit split in violation of the franchise agreement
(e) competing directly and indirectly against Keenan in the exclusive territory;
(f) referring local and national accounts to a competitor, i.e. Interim, instead of to Keenan;
(g) failing to provide the New Orleans territorial offices with the same level of sales and technical support enjoyed by the other franchisees of Norrell in the United States, including the failure to provide four direct mail advertisements to customers of the New Orleans office at the [*18] sole expense of Norrell;
(h) failure to provide national advertising and brand name recognition; and
(i) failure to protect and maintain the integrity of proprietary Norrell systems and information.

These claims fall into two categories: (1) alleged breach of Keenan's territorial exclusivity, and (2) alleged breach of other express and implied duties under the License Agreement.

**Territorial Exclusivity**

**(12)**

Three provisions in the License Agreement are relevant to determining the scope of the territorial exclusivity Norrell granted to Keenan in the License Agreement. n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Keenan argues that Section 4 of the License Agreement, which allows Norrell to change or modify the Norrell system, including the adoption of new trade names, is relevant to Keenan's territorial exclusivity rights. Keenan believes, without citation to any authority, that by requiring Keenan to accept and use any changes made by the franchisor, Norrell Services Inc. or its assignee, is required to make such changes to the Norrell system since it has merged and to either Keenan opportunities with any new or different system. This argument has no merit and this provision is not relevant to

Page 10

