

JOHN KEENAN COMPANY, INC. d/b/a NORRELL TEMPORARY SERVICES VERSUS NORRELL CORPORATION, f/k/a NORRELL SERVICES, INC., AND INTERIM SERVICES, INC.

CIVIL ACTION NUMBER 99-1924 SECTION "L" (2)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

2001 U.S. Dist. LEXIS 10473

July 17, 2001, Decided
July 18, 2001, Filed; July 19, 2001, Entered

**DISPOSITION:** [*1] Plaintiff entitled to recover damages resulting from the miscalculation of the Gross Margin in the sum of $ 90,599.00, plus interest from the date of judgment. Plaintiff's remaining claims against Defendants dismissed with prejudice.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff franchisee's claims for specific performance and damages for breach of contract, tortious interference with contract, unfair trade practices, and violation of the Georgia Trade Secrets Act of 1990, Ga. Code Ann. § 10-1-760 et seq., against the successor franchiser came before the court for trial without a jury.

**OVERVIEW:** Plaintiff was a long time franchisee of defendant franchisor. After many years and change of ownership of both entities, franchisor began operating wholly owned businesses within the franchisee's territory, and franchisee sued, asserting multiple claims. After trial without a jury, the court found for the franchisee only on its claim that the franchisee had wrongly calculated a gross profit margin. The franchiser had not breached the contract, because it did not allow another franchisee under the same trade name operate in the franchisee's area, and franchisee had proven no damages from any purported breach of contract or implied covenant, let alone tortious interference, or misappropriation of trade secrets. The new owners of the franchisee were aware the franchisor was no longer mailing direct advertising.

**OUTCOME:** The franchisee was entitled to recover damages resulting from the franchiser's miscalculation of the gross margin as determined under the licensing agreement, plus interest from the date of judgment. Franchisee's remaining claims were dismissed with prejudice, as franchisee had not shown a breach of contract or any tort for which it could recover.

**CORE TERMS:** license agreement, franchisee, merged, territorial, territory, franchise, exclusivity, temporary, merger, franchisor, breach of contract, derivative, breached, duty, tortious interference, failure to provide, successor, proprietary, advertising, franchised, customers, max, franchise agreement, direct mail, addendum, subsidiary, mailings, unambiguous, implied covenant, fair dealing

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Contracts Law > Breach > Causes of Action*
[HN1] Under Georgia law, the elements of a right to recover for a breach of contract are (1) actual breach of the contract and (2) resultant damages to the non-breaching party.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem*
[HN2] Under Georgia law, a court first considers whether a contract is ambiguous as a matter of law. Ga. Code Ann. § 13-2-1.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN3] In interpreting provisions of a contract, a court should first look to the plain language of the document. Words in the contract must be given their plain and ordinary meaning, and dictionaries may be used to determine such meaning. If the language is unambiguous, the contract must be enforced according to its terms and no construction is necessary or permissible. If ambiguity exits, the court must resolve the ambiguity by applying the relevant jurisdiction's rules of construction.

*Contracts Law > Contract Interpretation > Parol Evidence Rule*
[HN4] Parol evidence is admissible to explain an ambiguity in a written contract, although such evidence is inadmissible to add to, take from, or vary a written contract. Ga. Code Ann. § 13-2-2(1) (1994).

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN5] Under Georgia law, interpretations which render portions of a contract meaningless should be avoided. A contract cannot be interpreted to read out express limitations on contract rights. Ga. Code Ann. § 13-2-2(4).

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN6] Under Georgia law, prefatory "whereas" clauses and other recitals are not binding and do not create contract rights beyond those established by the substantive





terms of the contract. Such clauses cannot be used to extend or broaden restrictions contained in the body of the substantive contract terms, although such clauses can be used to ascertain the parties' intent when construing the contract.

**Contracts Law > Contract Interpretation > Interpretation Generally**
[HN7]Under Georgia law, the cardinal rule of contract construction is to ascertain the intention of the parties. Ga. Code Ann. § 13-2-3. The "intent of the parties" is the meaning intended by the parties at the time the contract was made. The statute contemplates an expression of meaning contemporaneous with the execution of the contract, and it does not indicate that an expression of meaning by one party years after such execution imposes any obligation upon the other party to object to such an expression.

**Contracts Law > Contract Interpretation > Good Faith & Fair Dealing**
[HN8]A duty of good faith and fair dealing is implied in all contracts under Georgia law. However, that duty is intended to modify the explicit terms of the contract, not to create a separate, independent contract term or to override express contractual terms. The implied covenant is not an undertaking that can be breached apart from the express terms of the contract itself.

**Contracts Law > Remedies > Compensatory Damages**
[HN9]The proper measure of damages in a breach of a territorial exclusivity provision in a franchise agreement is an amount which will compensate the injured party for its loss which fulfillment of the contract would have prevented. The purpose of contract damages is to place an injured party, so far as it is possible to do so by monetary award, in the same position that he or she would have been in had the contract been performed.

**Contracts Law > Remedies > Compensatory Damages**
[HN10]Lost profits may be recoverable damages in a breach of contract case if the profits are lost by the non-breaching party and are directly traceable to the alleged breach. To form a basis of recovery for breach of contract damages, the damages must be such as could be traced solely to the breach and as the parties contemplated as a probable result of such breach. Lost profits are an appropriate measure of contract damages, where a business is well established and reasonable data exits to determine the amount of the lost profits.

**Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses**
[HN11]Georgia law imposes a six-year limitations period on claims for breach of contract. Ga. Code Ann. § 9-3-24.

**Contracts Law > Contract Interpretation > Good Faith & Fair Dealing**
[HN12]There is no breach of contract or breach of an implied duty of good faith if a franchisor operates dual systems in which the franchiser segregates information and does not share confidential business information.

**Contracts Law > Remedies > Punitive Damages**
[HN13]Under both Louisiana and Georgia law, to prevail on a tortious interference claim, a plaintiff must show that he was injured by the alleged interference. The five elements of tortious interference with a contract under Louisiana law are: (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causing the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; and (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

**Contracts Law > Remedies > Punitive Damages**
[HN14]To establish a cause of action for tortious interference with existing and prospective contractual relations, a claimant must show that the defendant (1) acted improperly and without privilege, (2) purposely and with malice and intent to injure, (3) induced a third party or third parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury.

**Torts > Business & Employment Torts > Unfair Business Practices**
[HN15]To prevail on a claim for misappropriation of trade secrets under the Georgia Trade Secrets Act of 1990, Ga. Code Ann. § 10-1-760, et seq., a plaintiff must prove that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret. A party asserting the existence of a trade secret has the burden of proving that the information so qualifies and that the accused party violated the Georgia Trade Secrets Act of 1990.

**Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices**
[HN16]Under Louisiana Unfair Trade Practices Act, La. Rev. Stat. Ann. §§ 51:1401-1419, an act constitutes an "unfair trade practice" if it is unethical, oppressive, unscrupulous, or substantially injurious to consumers.

**COUNSEL:** For JOHN KEENAN COMPANY, INC., plaintiff: Michael J. Mestayer, Leger & Mestayer, New Orleans, LA.

  

2001 U.S. Dist. LEXIS 10473

For NORRELL CORPORATION, defendant: Ronald T. Coleman, Veronica J. Cherniak, Paul, Hastings, Janofsky & Walker, LLP, Atlanta, GA.

For NORRELL CORPORATION, INTERIM SERVICES INC, defendants: Jesse R. Adams, Jr., D. Russell Holwadel, Adams & Johnston, New Orleans, LA.

For INTERIM SERVICES INC, defendant: David J. Butler, Wendy C. McGraw, Swidler, Berlin, Shereff, Friedman, LLP, Washington, DC.

JUDGES: Eldon E. Fallon, UNITED STATES DISTRICT JUDGE.

OPINIONBY: Eldon E. Fallon

OPINION: FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, John Keenan Co., Inc., d/b/a/ Norrell Temporary Services ("Keenan") seeks specific performance and damages for breach of contract, tortious interference with contract, unfair trade practices, and violation of the Georgia Trade Secrets Act against Norrell Corporation, Norrell Services, Inc., and Interim Services, Inc. [*2]

This case came on for trial before the Court without a jury. The Court, having carefully considered the testimony of all the witnesses, the exhibits entered at trial, the record, and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes, in whole or in part, a finding of fact, the Court adopts it as such.

I. FINDINGS OF FACT

A. License Agreement

(1)

On January 6, 1970, Keenan, a Louisiana corporation, and Norrell Services, Inc., a Georgia corporation, entered into a license agreement (the "1970 License Agreement"). Keenan has been a Norrell franchisee or licensee since that time. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 The parties use the terms "licensee" and "franchisee" interchangeably. The Court will likewise observe no distinction between the two terms.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

(2)

In the 1970 License Agreement, [*3] Norrell granted Keenan the right to provide temporary employment services within a fifteen parish area including and surrounding New Orleans. Norrell also agreed to provide Keenan with other services including payroll and collections. In exchange, Keenan assumed certain responsibilities, including an agreement to pay 40% of Keenan's profits to Norrell Services, Inc.

(3)

On December 23, 1975, Keenan and Norrell Services, Inc. entered into a second agreement (the "1975 License Agreement") that added Norrell Southeastern Corporation as a party and modified other terms of the 1970 License Agreement, including changing the profit sharing ratio to 70/30% in favor of Keenan (together with the January 6, 1970 agreement, the "License Agreement"). Section I of the 1975 License Agreement changed the contract's renewal terms. Norrell gave up its right to terminate the License Agreement at the expiration of its term. Instead, the 1975 Agreement created an automatic and perpetual franchise renewal unless Keenan took action to terminate it.

(4)

In 1992, Norrell proposed that Keenan enter into a new form of License Agreement in connection with Norrell's attempt to standardize its [*4] License Agreements with all of its franchisees. Keenan declined Norrell's various proposals, including the 1992 proposal, and the parties have continued to operate under the License Agreement.

B. History of Keenan

(5)

Keenan was originally owned by John Keenan and certain of his relatives. David and Hansen Koch (the "Kochs") and Richard Schmidt purchased the stock of Keenan in November, 1991. Schmidt and the Kochs each acquired one-third of Keenan's stock. For approximately one year prior to the stock purchase, Schmidt had been employed by Keenan and was in charge of the day-to-day operations of the business. After the stock purchase, Schmidt became the president of Keenan and remained in charge of its operations.

(6)

In 1994 or 1995, the Kochs learned that Schmidt had been misappropriating funds from Keenan and mismanaging the business. The Kochs terminated Schmidt and filed criminal and civil charges against him. David

  

Koch took over the day-to-day operation of the Keenan business after Schmidt was terminated.

(7)

Schmidt filed for bankruptcy in the United States Bankruptcy Court [*5] for the Northern District of Georgia.

(8)

During the bankruptcy proceedings, Schmidt and the bankruptcy trustee each approached Norrell about purchasing Schmidt's one-third share of Keenan. At the time, Norrell indicated that it might be interested in purchasing 100% of Keenan, but that it was not interested in purchasing a one-third interest in Keenan. The transaction went no further and Norrell did not purchase any shares of Keenan.

(9)

Norrell's actions during the Schmidt's bankruptcy with regard to its potential purchase of Keenan stock were not improper.

(10)

The Kochs subsequently purchased Schmidt's shares of Keenan.

(11)

Defendant's evidence at trial showed that Keenan's annual revenues declined during the period from 1991 to 1998.

(12)

Defendant's evidence at trial also showed that Keenan's revenues for the first six months of 2000 were higher than revenues for the first six months of 1999.

(13)

Keenan has not shown that it lost any business to any Interim Service, Inc. branch office since July 2, 1999.

**C. History of Norrell**

(14)

At the time Keenan filed this lawsuit, Norrell Services, Inc. was a wholly-owned subsidiary of Norrell Corporation. Norrell [*6] Corporation was originally formed in 1961 as Southeastern Personnel. Southeastern was renamed Norrell Southeastern Corporation in 1963. In 1972, the entity became known as Norrell Corporation.

(15)

Norrell Corporation, a Georgia corporation, provided a variety of services, including professional, outsourcing and temporary staffing services, through numerous subsidiaries and joint ventures.

(16)

Norrell Services, Inc. refers to its system of operating its business as the "Norrell system." Norrell Services, Inc. sold franchise operations of its "Norrell system" to businesses that would operate under the "Norrell" trade name. Norrell Services, Inc. also operated company-owned temporary help services under the "Norrell" trade name.

(17)

In March of 1999, Norrell Corporation and Interim Services, Inc. ("Interim"), a Delaware corporation, announced their intention to merge.

(18)

Interim Services, Inc. was also in the temporary help business, providing various services to clients including flexible staffing, search and/or recruitment, consulting and outsourcing services. Like Norrell, Interim has company-owned, franchised, and licensed branch offices.

(19)

On July 2, 1999, Norrell [*7] Corporation merged into Interim Merger Corporation, a wholly-owned subsidiary of Interim. Immediately thereafter, Interim Merger Corporation changed its name to Norrell Corporation.

(20)

On January 2, 2000, Norrell Services, Inc., was merged into Norrell Corporation, which then contributed its assets to Interim U.S. Inc., a subsidiary of Interim. Effective January 2, 2000, Interim U.S. Inc. contributed certain of its assets to Interim Atlantic Enterprises, LLC, another subsidiary of Interim Services., Inc.

(21)

On July 7, 2000, Interim Services, Inc., Interim U.S. Inc., and Interim Atlantic Enterprises, LLC changed their names to Spherion Corporation, Spherion U.S. Inc. and Spherion Atlantic Enterprises, LLC, respectively.

(22)

Spherion Atlantic Enterprises, LLC (initially Interim Atlantic Enterprises, LLC) assumed the obligations of Norrell Services, Inc. under the License Agreement between Norrell Services, Inc., and Keenan.

(23)

Although the merged company has announced its intent to move toward one brand -- the Spherion brand -- Interim will continue to own and operate other brands including "Norrell."

(24)

  

Norrell is significantly smaller than it was prior to the merger. [*8] Many Norrell franchised and corporate-owned offices converted to the Interim/Spherion name and system after the merger and the revenues from Norrell branded business have dramatically decreased.

(25)

The credible evidence at trial shows that since the merger, the Interim/Spherion system has been, and will continue to be, operated separately from the Norrell system, using separate accounting and field support staffs. The merged company has a field support staff dedicated exclusively to the Norrell system and to helping Norrell offices compete against both Interim and other competitors. The merged company has developed and is continuing to develop programs exclusively for Norrell franchisees.

(26)

The Norrell system and the Interim/Spherion system use different components and are managed by different individuals. A business using the Interim/Spherion system is not a Norrell office "in fact" because the systems are managed and supported separately.

(27)

However, even if aspects of the Norrell system have been incorporated into the merged company or adopted for use by Interim/Spherion offices, Plaintiff has not shown that this resulted in the elimination of any business advantage previously [*9] enjoyed by Plaintiff, or gave any Interim/Spherion office in Plaintiff's Norrell territory any new business advantage over Plaintiff.

(28)

The merged company has implemented protections to assure that no competitive business information of Keenan or other Norrell franchisees is or will be accessible by Interim officers or operation support personnel. No branch office locations, whether corporate owned or franchised have access to business information of any other office that does not want to share such information. Plaintiff's evidence did not show that its competitive information has been or will be shared with the Interim branch offices in Keenan's Norrell territory.

(29)

At the time of the trial, the Norrell system was an ongoing and viable system that was separate from the Interim/Spherion system. The merged company continues to provide support services to Norrell franchisees including billing, collection and payroll processing. The merged company also provides services solely to Norrell branch offices to further their businesses. For example, the Norrell Franchise Advisory Council is composed of Norrell franchise owners in overlap markets. This Council interacts with the [*10] merged company to make decision on franchisee/franchisor relations issues, to identify and address the concerns of Norrell franchisees.

(30)

While Norrell and its successor provide support and promotional services to Keenan, Norrell stopped providing direct mail advertising for Keenan in 1990. In 1991, when the Kochs purchased Keenan, Norrell was no longer providing direct mailings for the franchise. Instead, Norrell shifted to other forms of advertising, which in its business judgment, were more valuable to its franchisees. At the time of trial, the merged company had not sent out any direct mail advertising to Keenan's customers.

(31)

The merged company has purchased many former Norrell franchisees. It is possible that eventually the remaining franchises will either expire under the terms of their franchise agreements or that they will be purchased by the merged company, leaving Keenan as the sole Norrell franchisee.

## D. Protected Area

(32)

The principal issue in this case is whether the Norrell/Interim merger violates the "Protected Area" provision of the 1970 License Agreement. This provision states:[Norrell Services, Inc.] agrees that during the term of [*11] this agreement (as extended, if extended), it, nor its parent or affiliated companies, will not itself operate or license another person or persons to operate under the trade names "Norrell", "Norrell Services" or "Norrell Temporary Services", or any derivative thereof, any similar type business to that which is to be conducted by [Keenan] within the protected area. n2

1970 License Agreement, p. 4-5, Sec. 3.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The Protected Area is defined as: "Metropolitan New Orleans Area, including the Parishes of Orleans, Jefferson, St. Charles, St. Bernard, St. Tammany, Plaquemine, La Fourche, Terrebone, Assumption, St. Marys, Tangipahoa, St. John the Baptist, Washington, Ascension, and St. James." 1970 License Agreement, p. 5, Sec. 3.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

  

LexisNexis™    LexisNexis™    LexisNexis™

(33)

At the time the merger was announced, Interim had a number of company-owned Interim temporary help branch locations in Keenan's fifteen parish Norrell territory.

(34)

In the past, Norrell has attempted to locate temporary staffing businesses in Keenan's Norrell territory. [*12] One of these businesses was Tascor, Inc. ("Tascor").

(35)

Tascor was initially named "Norrell Contract Services, Inc." On January 10, 1992, Norrell changed the entity's name to "Norrell Support Services, Inc." On September 10, 1992, the entity's name was changed again to Tascor.

(36)

Tascor provided "management services" to large clients. These services involved Tascor taking over responsibility for an entire function or group within a client company. On February 3, 1993, Keenan sent Norrell a memorandum stating that Keenan and its legal counsel believed that Tascor had no legal right to solicit or do any business in Keenan's territory. On February 16, 1993, Gene Obermeyer, President of Norrell's Franchise Division, responded that Norrell and its legal counsel believed that Tascor did have the right to conduct business in Keenan's territory. Despite this position, Tascor did not provide any management services in Keenan's fifteen parish Norrell territory, with the exception of a single IBM employee.

(37)

The parties disagreed about whether Tascor could do business in Keenan's Norrell territory and neither party waived its purported rights on this issue.

(38)

Similarly, [*13] the evidence presented at trial regarding other Norrell efforts to own or operate temporary staffing business in Keenan's Norrell territory does not show that Norrell accepted Keenan's interpretation of the Protected Area provision of the License Agreement. Instead, Norrell's actions merely show that there has been previous disagreement between the parties regarding the interpretation of this provision.

(39)

After the Norrell/Interim merger was announced, Keenan advised Norrell that Keenan believed it had the exclusive right to operate any temporary help businesses affiliated with Norrell in his fifteen parish territory, and that the merger would violate that purported right.

Norrell disputed Keenan's interpretation of its rights under the License Agreement.

(40)

Many Norrell franchised and corporate owned offices have converted to the Interim name. However, generally Interim does not permit Norrell offices located in areas with existing Interim offices to convert to the Interim name. Because there are Interim branch locations in Keenan's fifteen parish Norrell territory, Interim has prohibited Keenan's franchise from converting to the Interim name.

(41)

The Norrell/Interim [*14] merged company attempted to address potential conflict situations arising in overlap markets (i.e., markets where there were both Norrell and Interim offices) by offering to repurchase the Norrell franchises in those overlap markets. Many of Norrell's other franchise agreements contained end-of-term buy-back provisions, where the buy-back price was determined using a set formula. Norrell offered to purchase Norrell offices in overlap markets at a premium over the buy-back formula amounts. Norrell offered to buy Keenan's franchise at a premium over the buy-back formula amount. Keenan rejected Norrell's offer.

(42)

Keenan, of course, is free to accept a buy back offer from the merged company or terminate his License Agreement at the end of its term.

## II. CONCLUSIONS OF LAW

(1)

The Court has jurisdiction over this matter pursuant to Title 28, United States Code, Section 1332.

### A. Breach of Contract

(2)

The License Agreement is governed by Georgia law. See 1970 License Agreement, p. 30, Sec. 43(e).

(3)

[HN1]Under Georgia law, the elements of a right to recover for a breach of contract are (1) actual breach of the contract and (2) resultant damages [*15] to the non-breaching party. See, e.g., Budget Rent-A-Car v. Webb, 220 Ga. App. 278, 469 S.E.2d 712, 713 (Ga. Ct. App. 1996); Graham v. C.W. Matthews Contracting Co., 159 Ga. App. 546, 284 S.E.2d 282, 286 (Ga. Ct. App. 1981).

(4)

Interpretation of the License Agreement is a matter of





law. *See Grier v. Brogdon, 234 Ga. App. 79, 505 S.E.2d 512, 514 (Ga. Ct. App. 1998); Travelers Ins. Co. v. Blakey, 255 Ga. 699, 700, 342 S.E.2d 308 (1986).*

**(5)**

[HN2]Under Georgia law, the court first considers whether a contract is ambiguous as a matter of law. *See O.C.G.A. § 13-2-1; Copy Systems of Savannah, Inc. v. Page, 197 Ga. App. 435, 398 S.E.2d 784, 785 (Ga. Ct. App. 1990).*

**(6)**

[HN3]In interpreting provisions of a contract, the Court should first look to the plain language of the document. Words in the contract must be given their plain and ordinary meaning, and dictionaries may be used to determine such meaning. *See McDuffie v. Argroves, 230 Ga. App. 723, 497 S.E.2d 5, 7 (Ga. App. 1998).*

**(7)**

If the language is unambiguous, the contract must be enforced according to its terms and no construction [*16] is necessary or permissible. *See, e.g., Associated Mech. Contractors, Inc. v. Martin K. Eby Constr. Co. Inc., 964 F. Supp. 1576, 1580 (M.D. Ga. 1997); Walker v. Virtual Packaging, LLC, 229 Ga. App. 124, 493 S.E.2d 551, 554 (Ga. Ct. App. 1997).*

**(8)**

If ambiguity exits, the court must resolve the ambiguity by applying Georgia rules of construction. *Copy Systems of Savannah, 398 S.E.2d at 785.*

**(9)**

The "cardinal rule of contract construction is to ascertain the intention of the parties." *O.C.G.A. § 13-2-3.* [HN4]Parol evidence is admissible to explain an ambiguity in a written contract, although such evidence "is inadmissible to add to, take from, or vary a written contract." *O.C.G.A. § 13-2-2(1) (1994); Andrews v. Skinner, 158 Ga. App. 229, 279 S.E.2d 523, 524 (Ga. Ct. App. 1981).*

**(10)**

The License Agreement contains an integration clause that states that the "agreement and those things referred to herein constitute the entire contract between the Company and the Franchisee." *See 1970 License Agreement, para. 43(b).* The parties cannot rely on statements or conduct outside the License Agreement to establish any right [*17] or duty beyond or contrary to those expressly provided in or limited by the License Agreement. *See Kelson Cos., Inc. v. Feingold, 168 Ga. App. 391, 309 S.E.2d 394, 396 (Ga. Ct. App. 1983).*

**(11)**

In the Pre-Trial Order, Keenan contends that Norrell is liable for breach for contract for each of the following alleged actions:(a) failing to abide by the exclusivity grant in the License Agreement;
(b) failing to continue the level of support and sales services formerly provided to such a point that the name Norrell will cease to exist;
(c) failing to provide economic benefits for which it was contractually bound;
(d) deducting expense items from the profit split in violation of the franchise agreement
(e) competing directly and indirectly against Keenan in the exclusive territory;
(f) referring local and national accounts to a competitor, i.e. Interim, instead of to Keenan;
(g) failing to provide the New Orleans territorial offices with the same level of sales and technical support enjoyed by the other franchisees of Norrell in the United States, including the failure to provide four direct mail advertisements to customers of the New Orleans office at the [*18] sole expense of Norrell;
(h) failure to provide national advertising and brand name recognition; and
(i) failure to protect and maintain the integrity of proprietary Norrell systems and information.

These claims fall into two categories: (1) alleged breach of Keenan's territorial exclusivity, and (2) alleged breach of other express and implied duties under the License Agreement.

**Territorial Exclusivity**

**(12)**

Three provisions in the License Agreement are relevant to determining the scope of the territorial exclusivity Norrell granted to Keenan in the License Agreement. n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Keenan argues that Section 4 of the License Agreement, which allows Norrell to change or modify the Norrell system, including the adoption of new trade names, is relevant to Keenan's territorial exclusivity rights. Keenan believes, without citation to any authority, that by requiring Keenan to accept and use any changes made by the franchisor, Norrell Services Inc. or its assignee, is required to make such changes to the Norrell system since it has merged and to offer Keenan opportunities with any new or different system. This argument has no merit and this provision is not relevant to

  

territorial exclusivity.

- - - - - - - - - - - End Footnotes- - - - -
- - - - - - - -

[*19]

**1. Section 3, Protected Area**

(13)

Section 3 of the 1970 License Agreement, entitled "Protected Area" sets out the scope of Keenan's territorial exclusivity. This section prohibits Norrell Services, Inc., its parent or affiliated companies from operating or licensing another to operate "under the trade names 'Norrell', 'Norrell Services', or 'Norrell Temporary Services' or any derivative thereof, any similar type business to that which is to be conducted by the Franchisee within the protected area."

(14)

This is the only substantive provision in the License Agreement that addresses the issue of Keenan's territorial exclusivity.

(15)

The American Heritage College Dictionary defines "derivative" as a "word formed from another by derivation, such as electricity from electric." American Heritage College Dictionary, (4th Ed. 2000).

(16)

As used in Section 3, "derivative" clearly and unambiguously means a name that contains some or all of the name "Norrell," such as "Norrell Contract Services, Inc" or "Norrell Temporary Service."

(17)

As used in Section 3, "derivative" does not mean a derivative of the Norrell System as urged by Plaintiff. A plain reading of the provision [*20] shows that "any derivative thereof" unambiguously refers to derivatives of the words "'Norrell', 'Norrell Services' or 'Norrell Temporary Services.'"

(18)

As this Court finds this provision unambiguous, it is in need of no further interpretation. However, if the Court were to interpret it under Georgia law, the result would be the same.

(19)

[HN5]Under Georgia law, interpretations which render portions of the language of a contract meaningless should be avoided. *See, e.g., Holloman v. D.R. Horton, Inc.,* 241 Ga. App. 141, 524 S.E.2d 790, 793 (Ga. Ct. App. 1999). Further, a contract cannot be interpreted to read out express limitations on contract rights. *See* O.C.G.A. § 13-2-2(4); *Board of Regents v. A.B.&E., Inc.,* 182 Ga. App. 671, 357 S.E.2d 100, 103 (Ga. Ct. App. 1987) (stating that contract interpretation that renders portions of contract language meaningless should be avoided).

(20)

In this case, Plaintiff's interpretation of Section 3 of the License Agreement (i.e., that Norrell or its successor is not entitled to do any business in Plaintiff's territory, regardless of the name under which that business is conducted) would render meaningless [*21] that portion of Section 3 which states "under the trade names 'Norrell', 'Norrell Services', or 'Norrell Temporary Service', or any derivative thereof." As such, Plaintiff's construction is not proper and is not adopted.

(21)

Section 3 of the License Agreement unambiguously limits Keenan's exclusive territorial rights to temporary services businesses operated under the "Norrell" name or a name that has some or all of the "Norrell" name in it.

(22)

Neither Interim nor Spherion is a "derivative" of the name Norrell. Therefore, the merged company is not restricted from continuing to operate the preexisting temporary services businesses in Keenan's territory under either the names Interim or Spherion.

(23)

Keenan relies on the decision in *BJM & Associates, Inc. v. Norrell Services, Inc.* to show that the Protected Area provision prohibits the merged company from operating any similar type of business under any name. *See* 855 F. Supp. 1481 (E.D.Ky. 1994). In that case, BJM, a Norrell franchisee, alleged a breach of contract by Norrell through the actions of Norrell's wholly-owned subsidiary Tascor. *Id. at 1482-83.* Tascor was soliciting business [*22] from BJM clients, without BJM's knowledge, for its new "management services" business. *Id. at 1492.* The *BJM* Court found that "through Tascor Norrell has marketed its Management Services business in BJM's protected area and that such activity by Norrell is a material breach of [the Protected Area Provision] of [BJM's License Agreement] because the Management Services business is a 'similar type of business' to that which BJM is presently providing and has provided to its clientele for many years." *Id. at 1494.* The language of BJM's "Protected Area" provision was identical to Section 3 of Keenan's License Agreement. *See id. at 1485.*

(24)

  

While the issues in these two cases appear the same at first blush, they are in fact different. In *BJM*, Norrell redefined "management services" and completely prohibited BJM from offering these types of services. Norrell then solicited clients to whom BJM had previously provided "management services" in hopes of getting them to purchase these services from Tascor. *Id. at 1485-90.* The Court found that this behavior, forbidding a franchisee from providing a certain type of service that it had been previously allowed [*23] to provide, while promoting Tascor to step in and provide the service, was a breach of the territorial exclusivity provision in BJM's license agreement. *Id. at 1491.* The issue of whether Tascor was precluded from doing business in BJM's territory because the name "Tascor" is not a derivative of the "Norrell" name was not an issue raised by either party or decided by the Court in that case. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 Another difference between the instant case and *BJM* is the remedy sought by the parties. In BJM, the franchisee sought to terminate the relationship through re-cission of the License Agreement. The Court granted that unusual remedy stating: At this point in time, the impasse between BJM and Norrell has become impossible to bridge. It is time for the bickering between BJM and Norrell to come to an end. Based on the evidence and the facts peculiar to this case, the Court concludes that the only sure-fire way to stop the bickering between BJM and Norrell is to rescind the Agreement. In this situation, recission of the Agreement is equitable to both parties.

*See BJM, 855 F. Supp. at 1498-99.*

While, of course, the choice of the proposed remedy is irrelevant to this Court's analysis of Plaintiff's claims, it is noteworthy that in the instant case the demands of the parties are reversed. Norrell wants to free itself from the unfavorable, perpetual franchise Agreement and Keenan wants to force Norrell to perform under the Agreement.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*24]

## 2. Prefatory Clause

(25)

The second provision of the License Agreement relating to territorial exclusivity is a prefatory clause in the 1970 License Agreement.

That clause states: WHEREAS, [Keenan] wishes to be the only one franchised by the Company to use said methods and techniques in the area hereinafter described, and [Norrell Services, Inc.] agrees that it will not itself license any other person to operate a temporary help business in said area[.]

1970 License Agreement, p. 3.

(26)

[HN6]Under Georgia law, prefatory "whereas" clauses and other recitals are not binding and do not create contract rights beyond those established by the substantive terms of the contract. *See, e.g., Rosenberg v. Rosenberg, 232 Ga. 725, 208 S.E.2d 824, 825 (Ga. 1974).* Such clauses cannot be used to extend or broaden restrictions contained in the body of the substantive contract terms. *208 S.E.2d at 825.* While such clauses can be used to ascertain the parties' intent when construing the contract, such construction of Section 3 of the License Agreement is not necessary or permissible because this Court has found that Section 3 unambiguously limits [*25] Keenan's exclusive territorial rights to only those temporary services business operated under a derivative of the "Norrell" name.

(27)

Even if the "whereas" clause were relevant to Keenan's territorial rights, the Defendants have not acted contrary to this clause because the Interim/Spherion offices in Keenan's Norrell territory are not licensed or franchised, but are company-owned and operated. The "whereas" clause, however, only refers to Norrell's ability to "license any other person" to operate a temporary help business in the territory, it does not refer to offices owned by Norrell or its successor. *See Camp Creek Hospitality Inns v. Sheraton Franchise Crop., 139 F.3d 1396, 1404 (11th Cir. 1998).*

## 3. Addendum to the 1970 License Agreement

(28)

An Addendum to the 1970 License Agreement provides: As part of this franchise agreement, the Company grants to the Franchisee the right to operate all temporary employment services within the franchise area. This would include the placement of temporary office workers, laborers, technicians, sales personnel, and any other type workers the franchisee is able to place on temporary assignments.

  

1970 [*26] License Agreement, Addendum.

(29)

The 1975 License Agreement unambiguously states the parties' intent as to this Addendum. Section V, of the 1975 License Agreement states that "the parties hereto mutually agree that the sheet entitled 'addendum' which is attached to the original franchise or license agreement simply relates to the kind and type of temporary workers which the Franchisee is authorized to place and the addendum has no other meaning." 1975 License Agreement, p. 8, Sec. V.

(30)

In light of this statement of intent, it is clear that the Addendum was intended to describe the range of temporary workers that Keenan was authorized to provide. It does not relate to territorial exclusivity and does modify the express grant of territorial exclusivity provided to Keenan in Section 3.

#### 4. Implied Grants of Territorial Exclusivity

(31)

These express provisions govern the extent of the territorial exclusivity Norrell granted to Keenan in the License Agreement. Plaintiff's position that the License Agreement "as a whole" embodies a concept of exclusivity not tied to any particular provision is unavailing considering the unambiguous express grants of territorial exclusivity [*27] in the Agreement.

(32)

However, even if these provisions were ambiguous, Keenan's argument that the intent of parties as embodied in the entire contract still would not prevail. [HN7]Under Georgia law, the "cardinal rule of contract construction is to ascertain the intention of the parties." O.C.G.A. § 13-2-3. However, the "intent of the parties" is the meaning intended by the parties at the time the contract was made. *See Smith v. Freeport Kaolin Co., 687 F. Supp. 1550, 1557 (M.D. Ga. 1988).* The *Smith* Court explained that, "the statute contemplates an expression of meaning contemporaneous with the execution of the contract, and it does not indicate that an expression of meaning by one party years after such execution imposes any obligation upon the other party to object to such an expression." *Id.* The intent and expectations of the current owners when they purchased the franchise are irrelevant to construing the intent of the parties at the time the License Agreement was executed.

(33)

Here, the current owners of Keenan were not party to the formation of the License Agreement. Plaintiff has not shown that their proposed interpretation is the one

intended by [*28] the parties at the time the Agreement was made.

(34)

The implied covenant of good faith and fair dealing does not grant Keenan exclusive territorial rights beyond those expressly granted by Section 3 of the License Agreement.

(35)

[HN8]A duty of good faith and fair dealing is implied in all contracts under Georgia law. *See, e.g., Alan's of Atlanta, Inc., v. Minolta Corp., 903 F.2d 1414, 1429 (11th Cir. 1990)* (applying Georgia law); *Re/Max Executives, Inc. v. Vacalis, 234 Ga. App. 659, 507 S.E.2d 235, 237 (Ga. App. Sept. 22, 1998).* However, this duty is intended to modify the explicit terms of the contract, not to create a separate, independent contract term or to override express contractual terms. *See Minolta, 903 F.2d at 1429.* The implied covenant "is not an undertaking that can be breached apart from" the express terms of the contract itself. *Alan's of Atlanta, Inc., 903 F.2d at 1429.*

(36)

Because Keenan's License Agreement's grant of exclusivity is limited to business operated under a derivative of the name "Norrell," and, at the time of trial, the merged company was not operating or licensing any such business, [*29] Norrell has not breached the implied covenant of good faith and fair dealing with regard to any alleged "implied" territorial protection.

(37)

While this Court is concerned with the unambiguous, express territorial rights granted in the License Agreement, at least one Georgia Court has allowed a franchisee to expand their express rights in limited circumstances. *See Re/Max of Georgia v. Real Estate Group of Peachtree, 201 Ga. App. 787, 412 S.E.2d 543 (Ga. App. 1991).* In *Re/Max of Georgia,* the Court found that a franchisor may violate a franchise agreement by allowing a franchise "in fact" to operate in a franchisee's exclusivity territory. *Id.* In that case, a franchisee sued Re/Max of Georgia, the franchisor, for violation of the territorial exclusivity provisions of the franchise agreement. *Id.* Re/Max of Georgia argued that there was no violation because the allegedly infringing office did not use the "Re/Max" name or the "Re/Max System." *Re/Max of Georgia, 412 S.E.2d at 545.* At trial, the Franchisor moved for a directed verdict which was denied. The jury awarded a verdict in favor of the franchisee. On appeal, the Court found that there [*30] was no error in denial of the directed verdict stating, "although [the new office] did not use the name 'Re/Max,' their office operated as a Re/Max

  

office in fact, thereby infringing the franchise agreement." *Id.* In the instant case, this Court has found that the Norrell and Interim/Spherion offices are operated separately. They use different "systems," have different field support staff, and their competitive business information is not shared between the two brands. The Interim/Spherion offices located in Keenan's Norrell territory are not Norrell offices "in fact" and Keenan's offices are not Interim/Spherion offices "in fact."

(38)

However, if in the future, the merged company no longer provides separate support and management to Norrell branded offices, it is possible that the Interim/Spherion offices could become "in fact" Norrell offices.

**B. Damages**

(39)

This Court has found that the merged company has not breached the territorial exclusivity granted by License Agreement. However, even if a breach had occurred, Keenan could not recover because it failed to prove that it suffered any damages from the alleged breach. *See, e.g., Budget Rent-A-Car v. Webb, 220 Ga. App. 278, 469 S.E.2d 712, 713 (Ga. Ct. App. 1996); [*31] Graham v. C.W. Matthews Contracting Co., 159 Ga. App. 546, 284 S.E.2d 282, 286 (Ga. Ct. App. 1981).*

(40)

[HN9]The proper measure of damages in a breach of a territorial exclusivity provision in a franchise agreement is an amount which will compensate the injured party for its loss which fulfillment of the contract would have prevented. *See Re/Max of Georgia, 412 S.E.2d at 546 (citing Bennett v. Associated Food Stores, Inc., 118 Ga. App. 711, 165 S.E.2d 581, 585 (Ga. Ct. App. 1968))* (noting that no Georgia cases have specifically addressed the issue of damages for such breaches and applying standard measures of contract damages). The purpose of contract damages is to place an injured party, so far as it is possible to do so by monetary award, in the same position that he or she would have been in had the contract been performed. *See id.*

(41)

[HN10]Lost profits may be recoverable damages in a breach of contract case if the profits are lost by the non-breaching party and are directly traceable to the alleged breach. *See Crawford & Assocs v. Groves-Keen, Inc., 127 Ga. App. 646, 194 S.E.2d 499, 501 (Ga. Ct. App. 1972)*(in order [*32] to form a basis of recovery for breach of contract damages, the damages must be such as could be traced solely to the breach and as the parties contemplated as a probable result of such breach). Lost profits are an appropriate measure of contract damages, where a business is well

established and reasonable data exits to determine the amount of the lost profits. *See Re/Max of Georgia, 412 S.E.2d at 546.*

(42)

In this case, Keenan has not shown that it has suffered any damages since the merger. Keenan did not establish that it had lost any business that it had before the merger to the Interim branch offices in its Norrell territory or to any other Interim office.

(43)

Keenan's profits after the merger were greater than its profits for the same six-month period prior to the merger. Keenan did not provide credible evidence that the value of its franchised business decreased as a result of the merger. It appears that the value of the franchise increased for the first six months after the merger.

(44)

Because Keenan did not show any monetary damages or loss of business as a result of the merger, the alleged "damages" that Keenan is seeking would not place Keenan in [*33] the same position that it would have been in had the alleged breach not occurred, but would place him in a better position.

**C. Other Contract Claims**

(45)

After disposing with Plaintiff's territorial exclusivity claims, the following breach of contract claims remain:(a) the franchisor's alleged failure to continue the level of support and sales services formerly provided to such a point that the name Norrell will cease to exist;

(b) failure to provide economic benefits for which it was contractually bound;

(c) improper deduction of expense items from the profit split in violation of the License Agreement;

(d) referring local and national accounts to a competitor, i.e. Interim, instead of to Keenan;

(e) failure to provide the New Orleans territorial offices with the same level of sales and technical support enjoyed by the other franchisees of Norrell in the United States, including the failure to provide four direct mail advertisements to customers of the New Orleans office at the sole expense of Norrell;

(f) failure to provide national advertising and brand name recognition; and

(g) failure to protect and maintain the integrity of proprietary Norrell systems [*34] and information.

(46)

Keenan's claims for failure to continue the level of support and sales services formerly provided, failure to provide the New Orleans territorial offices with the

  

same level of sales and technical support enjoyed by the other franchisees, and failure to provide national advertising and brand name recognition will be considered together.

(47)

Defendants did not breach the express terms of the License Agreement or the implied covenant of good faith and fair dealing by virtue of the fact that the Norrell system is now smaller than it once was or otherwise failing to provide support to Keenan's franchise, or by not providing national advertising and brand name recognition.

(48)

Keenan does not point to, and the Court cannot find, any substantive provision in the License Agreement that imposes on Norrell or its successor any obligation to maintain any particular size of system or scope of services, or national presence.

(49)

The License Agreement does not require the franchisor to provide any particular level or type of field support for Keenan's franchise, to group franchises in any particular way, to visit Keenan's franchise a particular number of times [*35] or to assign particular staff to Kennan's territory.

(50)

There is no provision in the License Agreement that guarantees that each franchisee will receive identical sales and technical support. Further, there is no rule that a franchisor must treat all franchisees the same. *See, e.g., BJM, 855 F. Supp. 1481* (finding that Norrell Services, Inc. did not discriminate against a franchisee by refusing to allow the franchisee to participate in a bonus program offered to other franchisees).

(51)

As discussed, the implied covenant of good faith and fair dealing under Georgia law is "not an independent contract term" and thus, cannot be breached apart from an express contractual provision. *Alan's of Atlanta, Inc., 903 F.2d at 1429.*

(52)

Therefore, Norrell is not contractually or otherwise obligated always to maintain the same size system and to provide the same types of support that it provides to other offices or that it provided in the past. The License Agreement does not confer on Keenan any right to receive ongoing benefits from other franchisees or company-owned operations. It does not refer to any form of national account program or national [*36] advertising program.

(53)

Because the License Agreement does not obligate Norrell to provide or maintain any particular size or scope of system, it does not grant Keenan any rights relating to a "national" system of business from other offices.

(54)

The License Agreement does not impose a duty on the franchisor to maintain a large company. While Norrell is certainly smaller than it was prior to the merger, this fact alone in not a breach of any contact provision. There are no substantive provisions in the License Agreement addressing the size or scope of the Norrell System. Keenan does not have any right to impose such conditions on the franchisor. Without a substantive provision to backup a franchisee's desire that the franchisor grant more franchises, a franchisee's fortunes follow the franchisor's.

(55)

However, the License Agreement does impose certain express duties on Norrell, including: to provide billing, collection, pay-roll, and bookkeeping services (sec.16), to supply Keenan with stationary supplies and forms at cost (sec. 22), to cooperate with Keenan in the development of sales and promotion programs (sec.14), and to participate in arbitration of disputes if requested [*37] by Keenan (sec. 39). If the merged company shrinks its Norrell operations to the point that it is no longer providing these services, then the Plaintiff may have a claim for breach of the substantive responsibility.

(56)

In Section 14, Promotional Assistance of Company, Norrell or it successor agrees to provide four direct mail advertisements to customers of the New Orleans office at the sole expense of Norrell. The relevant paragraph provides:The Company agrees to direct the Franchisee in the development of a list of prospective customers. However, the primary responsibility for actually compiling said list shall be that of Franchisee. The Company agrees to set up and maintain (at cost) a direct mail list with no limitation to number of names. The Company further agrees to provide (at cost) direct mail advertising for prospective clients and to send at least four (4) mailings per year to Franchise's customers.

1970 License Agreement, p. 12-13, sec.14.

(57)

Plaintiff believes that the Defendants have breached this provision because they have not provided four direct mail advertisements to Keenan's customers of the New Orleans office at the sole expense of Norrell.

  

[*38]

(58)

Norrell stopped providing the direct mailings for Keenan in 1990. At the time that the Kochs purchased Keenan, Norrell was no longer providing direct mailings for the franchise.

(59)

As used in the License Agreement, "at cost" clearly and ambiguously means that Norrell is allowed to charge Keenan what it costs Norrell to provide the direct mail advertisements. "At cost" does not mean that Norrell or its successor must provide the direct mailings at its sole cost and at no cost to Keenan

(60)

While this failure is a breach, it is not a material breach of the License Agreement.

(61)

Keenan has presented no evidence that he suffered damages from Norrell's business decision to provide other forms of advertising rather than the direct mailings. Therefore, Keenan cannot recover damages for this breach.

(62)

Keenan's next claim is that the Defendants' breached the License Agreement by failing to provide economic benefits for which they were contractually bound. In the Pre-trial order and in trial testimony, Plaintiffs made various complaints about Defendant's failure to use due diligence to collect Keenan's accounts receivable. However, again, Plaintiff cannot point to a provision [*39] of the License Agreement that requires Defendant to meet the Plaintiff's subjective standards regarding the appropriate manner to collect the accounts receivable.

(63)

Keenan also claims that Norrell breached the License Agreement by improperly deducting expense items from the profit split in violation of the License Agreement. Under the License Agreement, Keenan and Norrell are to split 70/30 the Gross Margin that Norrell received

from the operation of Keenan's franchise. The 1975 License Agreement modified the definition of Gross Margin in paragraph 18 of the 1970 License Agreement. The 1975 License Agreement enumerates 11 specific items that are to be deducted from Keenan's total billing to obtain the Gross Margin from which the 70/30 profit split is calculated. Under the unambiguous, plain language of the License Agreement, Norrell may not deduct any amounts other than those listed in paragraph 18 before calculating Keenan's Gross Margin. Norrell has deducted items not enumerated in paragraph 18 and, therefore, has miscalculated the Gross Margin.

(64)

[HN11]Georgia law, which governs the License Agreement, imposes a six year limitations period on claims for breach of contract. [*40] See O.C.G.A. § 9-3-24. Plaintiff filed the initial compliant in this case on June 21, 1999. Plaintiff cannot recover damages from any beaches of the License agreement that occurred before June 21, 1993.

(65)

Keenan's evidence of the miscalculation of the Gross Margin is annual income statements. The income statement for the period ending October 31, 1993 does not show the amount, if any, of the miscalculation of the Gross Margin between June 21, 1993 to October 31, 1993. Therefore, Keenan has not proven any damages due to miscalculation of the Gross Margin prior to November 1, 1993.

(66)

Keenan alleges that he is owed $ 199,866.71 because the Defendants' improperly deducted certain items from the Gross Margin calculation, in violation of paragraph 18 of the License Agreement. However, the evidence at trial failed to establish that Keenan is entitled to the full $ 199,866.71 The Court finds that the following items were improperly deducted from Keenan's Gross Margin, in violation of paragraph 18 of the Licence Agreement. Keenan's evidence failed to establish that any other items were improperly deducted.





| | |
|---|---|
| Date | 1993-1994 |
| Pre-Employment Screening | $ 1,146.00 |
| Holiday Pay | $ 15,813.54 |
| Date | 1994-1995 |
| Pre-employment Screening | $ 784.00 |
| Holiday Pay | $ 5,015.00 |
| Other Costs of Sales | $ 5,865.00 |
| Date | 1995-1996 |
| Holiday Pay | $ 19,891.00 |
| Other Costs of Sales | $ 7,241.00 |
| Drug Testing | $ 357.00 |
| Background Check Exp. | $ 246.00 |
| Date | 1996-1997 |
| Holiday Pay | $ 21,125.00 |
| Other Costs of Sales | $ 3,292.00 |
| Drug Testing | $ 80.00 |
| Background Check Exp. | $ 274.00 |
| Pre-Employment Screening | $ 19.00 |
| Date | 1997-1998 |
| Holiday Pay | $ 19,634.00 |
| Other Costs of Sales | $ 6,577.00 |
| Drug Testing | $ 59.00 |
| Background Check Exp. | $ 155.00 |
| Pre-Employment Screening | $ 86.00 |
| Date | 1998-1999 |
| Holiday Pay | $ 5,494.00 |
| Other Costs of Sales | $ 4,863.00 |
| Drug Testing | $ 1,395.00 |
| Pre-Employment Screening | $ 68.00 |
| Billing for Drug Testing | ($ 63.00) |
| Billing for Background Chks | ($ 10.00) |
| Date | Nov. 1999-Feb. 2000 |
| Test/Professional Fees | $ 705.00 |
| Other Direct Costs | $ 2,873.90 |
| Date | Mar. 2000-May 2000 |
| Test/Professional Fees | $ 1,303.50 |
| Other Direct Costs | $ 1,015.32 |
| Date | June 2000-July 2000 |
| Test/Professional Fees | $ 741.50 |
| Other Direct Costs | $ 3,381.38 |
| Date | 1993-1994 |
| Pre-Employment Screening | $ 1,146.00 |
| Holiday Pay | $ 15,813.54 |
| Date | 1994-1995 |
| Pre-employment Screening | $ 784.00 |
| Holiday Pay | $ 5,015.00 |
| Other Costs of Sales | $ 5,865.00 |
| Date | 1995-1996 |
| Holiday Pay | $ 19,891.00 |
| Other Costs of Sales | $ 7,241.00 |
| Drug Testing | $ 357.00 |
| Background Check Exp. | $ 246.00 |


LexisNexis™   LexisNexis™   LexisNexis™

Page 17

| Date | 1993-1994 |
|---|---|
| Pre-Employment Screening | $ 1,146.00 |
| Holiday Pay | $ 15,813.54 |
| Date | 1994-1995 |
| Pre-employment Screening | $ 784.00 |
| Holiday Pay | $ 5,015.00 |
| Other Costs of Sales | $ 5,865.00 |
| Date | 1995-1996 |
| Holiday Pay | $ 19,891.00 |
| Other Costs of Sales | $ 7,241.00 |
| Drug Testing | $ 357.00 |
| Background Check Exp. | $ 246.00 |
| Date | 1996-1997 |
| Holiday Pay | $ 21,125.00 |
| Other Costs of Sales | $ 3,292.00 |
| Drug Testing | $ 80.00 |
| Background Check Exp. | $ 274.00 |
| Pre-Employment Screening | $ 19.00 |
| Date | 1997-1998 |
| Holiday Pay | $ 19,634.00 |
| Other Costs of Sales | $ 6,577.00 |
| Drug Testing | $ 59.00 |
| Background Check Exp. | $ 155.00 |
| Pre-Employment Screening | $ 86.00 |
| Date | 1998-1999 |
| Holiday Pay | $ 5,494.00 |
| Other Costs of Sales | $ 4,863.00 |
| Drug Testing | $ 1,395.00 |
| Pre-Employment Screening | $ 68.00 |
| Billing for Drug Testing | ($ 63.00) |
| Billing for Background Chks | ($ 10.00) |
| Date | Nov. 1999-Feb. 2000 |
| Test/Professional Fees | $ 705.00 |
| Other Direct Costs | $ 2,873.90 |
| Date | Mar. 2000-May 2000 |
| Test/Professional Fees | $ 1,303.50 |
| Other Direct Costs | $ 1,015.32 |
| Date | June 2000-July 2000 |
| Test/Professional Fees | $ 741.50 |
| Other Direct Costs | $ 3,381.38 |

[*41]

Keenan is owed the amount of the underpayment on these improper deductions. The Court will allow $ 90,599.00 for damages for this amount (the total of the improper deductions, $ 129,427.14 multiplied by 70%, the amount of Keenan's percentage of the Gross Margin).

(67)

Next, Plaintiff alleges that the Defendants have breached the License Agreement by referring local and national accounts to a competitor, i.e., Interim, instead of to Keenan. Again, Plaintiff does not point to any substantive provision of the License Agreement that requires Norrell or its successor to refer all accounts to Keenan. Georgia law does not allow the Court to read such a duty into the contract.



(68)

Finally, Keenan's last contract claim is that the Defendants failed to protect and maintain the integrity of proprietary Norrell systems and information.

(69)

Plaintiff argues, without citation, that a franchisor may not require that its franchisee maintain confidential and proprietary secrets under penalty of breach of contract, but itself reveal such information without consequence. Again, Plaintiff does not point to any provision of the License Agreement that states Norrell or its successor may not do [*42] so. Defendants have not breached the License Agreement by incorporating certain parts of the Norrell system into the merged company.

(70)

Section 1 of the Agreement grants Keenan, "the non-exclusive right, license and privilege to adopt and use the Norrell System, including . . . trade secrets and confidential information."

(71)

Even if certain aspects of the Norrell system have been incorporated into the merged company, Keenan is only a non-exclusive licensee under the License Agreement. This status does not give Keenan a basis to complain about Norrell's use or disposition of its proprietary information. Moreover, there is no restriction in the License Agreement on Norrell's ability to merge or enter into strategic alliances with other businesses. In fact, Norrell has done so on a number of occasions in the past.

(72)

Further, Defendants have not improperly disclosed confidential and/or proprietary information about Keenan's business.

(73)

Keenan did not show that Interim branch offices in Keenan's Norrell territory have or will have access to Keenan's financial and other proprietary information, or that the merged company has or will use information about Keenan's business [*43] to Keenan's detriment or for any improper purpose. In fact, Defendants' credible evidence at trial showed that the merged company has gone to great lengths to ensure the confidentiality of such information.

(74)

[HN12]There is no breach of contract or breach of the implied duty of good faith if a franchisor operates dual systems in which the franchisor segregates information and does not share confidential business information.

*See Clark v. America's Favorite Chicken, 110 F.3d 295, 299 (5th Cir. 1997).*

### E. Tortious Interference With Contract

(75)

Keenan argues that the Defendants' conduct constitutes tortious interference with Keenan's contract. Specifically, the issue as set out in the Pre-trial Order is whether the action of Interim in inducing Norrell to breach its contractual obligations with Keenan constitutes tortious interference with a contract and entitles Keenan to damages on these grounds

(76)

[HN13]Under both Louisiana and Georgia law, in order to prevail on a tortious interference claim, the Plaintiff must show that he was injured by the alleged interference. *See 9 to 5 Fashions, Inc. v. Spurney, 538 So. 2d 228, 234 (La. 1989)* (stating [*44] that the five elements of tortious interference with a contract under Louisiana law are: (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causing the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; and (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer); *Green v. Johnston Realty, Inc., 212 Ga. App. 656, 442 S.E.2d 843 (Ga. App. Ct. 1994)* ([HN14]to establish a cause of action for tortious interference with existing and prospective contractual relations, a claimant must show that the defendant (1) acted improperly and without privilege, (2) purposely and with malice and intent to injure, (3) induced a third party or third parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury).

(77)

Because this Court has found that there has been [*45] no breach of the License Agreement, and that Plaintiff has not suffered any damage, Keenan's claim for tortious interference fails as a matter of law.

### F. Violation of the Georgia Trade Secrets Act

(78)

[HN15]To prevail on a claim for misappropriation of trade secrets under the Georgia Trade Secrets Act of 1990, O.C.G.A. § 10-1-760, et seq. (1997), a plaintiff must prove that "(1) it had a trade secret and (2) the opposing party misappropriated the trade secret." *Capital Asset Research Corp. v. Finnegan, 160 F.3d*

  

*683, 685 (11th Cir. 1998).*

(79)

The party asserting the existence of a trade secret "has the burden of proving that the information so qualifies and that the accused party violated the [Georgia Trade Secrets Act]." *Id. at 685-86* (citing *Essex Group, Inc. v. Southwire Co., 269 Ga. 553, 501 S.E.2d 501 (1998); Salsbury Labs., Inc. v. Merieux Labs., Inc., 735 F. Supp. 1555, 1568 (M.D.Ga.1989), aff'd, 908 F.2d 706 (11th Cir.1990)).*

(80)

This Court finds that the Defendants did not make any "improper" use or disclosure of Keenan's confidential or trade secret information. Plaintiff's evidence [*46] did not establish that such information about Plaintiff's business was improperly disclosed. Therefore, Plaintiff's claims against the Defendants for alleged improper use of Keenan's trade secrets also fails as a matter of law.

### G. Unfair or Deceptive Trade Practices

(81)

Plaintiff has not shown that the Defendant's conduct violated the Louisiana Unfair Trade Practices Act ("LUTPA"), LA. Rev. stat. Ann. §§ 51:1401-1419.

(82)

[HN16]Under LUTPA, an act constitutes an "unfair trade practice" if it is "unethical, oppressive, unscrupulous, or substantially injurious to consumers." *See Turner v. Purina Mills, Inc. 989 F.2d 1419, 1422*

*(5th Cir. 1993).* As the Fifth Circuit explained in *Turner,* "there is a great deal of daylight between a breach of contract claim and the egregious behavior that the statute describes." *Id. at 1422.*

(83)

Plaintiff's claims for unfair or deceptive trade practices fails because Keenan has not even shown a breach of contract by the Defendants, much less conduct that amounts to unfair and deceptive trade practices.

### III. SUMMARY

On the basis of the foregoing findings of fact and conclusions of law, the Court finds [*47] that the Defendants have fulfilled their contractual obligations under the License Agreement and have not breached any material duty to the Plaintiff, except to the extent that the Gross Margin was miscalculated under the plain language of paragraph 18 of the License Agreement. Further, even if Defendants did breach any other aspect of the License Agreement, John Keenan Company has failed to prove it has sustained any damages due to the Defendants' actions other than from the miscalculation of the Gross Margin. Accordingly, Plaintiff is entitled to recover damages resulting from the miscalculation of the Gross Margin in the sum of $ 90,599.00, plus interest from the date of judgment. Plaintiff's remaining claims against Defendants are hereby dismissed with prejudice.

Done this 17 day of July, 2001, New Orleans, Louisiana.

Eldon E. Fallon

UNITED STATES DISTRICT JUDGE

  

JAGUAR CARS, a Division of Ford Motor Company, PLAINTIFF, v. BLACKHORSE MOTORWORKS, LTD., and J. DOUGLAS ROOD, DEFENDANTS.

CIVIL ACTION NO. 94-289

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY, PIKEVILLE DIVISION

1998 U.S. Dist. LEXIS 22858

November 2, 1998, Decided
November 2, 1998, Filed

**DISPOSITION:** [*1] Plaintiff's motion for partial summary judgment [Record No. 263] GRANTED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff franchisor filed a motion for partial summary judgment in its action against defendant franchisee. The franchisor had commenced the action and sought to terminate its franchise agreement with the franchisee after receiving overwhelming evidence that the franchisee had been submitting fraudulent warranty claims.

**OVERVIEW:** The franchisor received information that its franchisee had been submitting fraudulent warranty claims and sought to terminate its dealership. The court granted the franchisor's motion for partial summary judgment. A franchisor may not terminate a car dealer's franchise agreement unless it had acted honestly and observed reasonable commercial standards of fair dealing, i.e. good faith. Ky. Rev. Stat. Ann. §§ 190.045(1), 190.010. Based on the overwhelming evidence of fraud, the court found that the franchiser's actions were commercially justified. The fact that the franchisor might have misled the franchisee as to the nature of the audit was irrelevant. The good faith requirement related to the grounds upon which the franchisor based its decision to terminate the dealership, not its investigation. The franchiser's decision to terminate was not based on speculation and conjecture, which would have been bad faith, but rather on an extensive and fair investigation. Franchisee's counterclaims of fraud, discrimination, implied covenant, tortious interference, and business defamation lacked factual support in the record and were dismissed.

**OUTCOME:** The court granted the franchiser's motion for partial summary judgment and dismissed franchisee's counterclaims.

**CORE TERMS:** dealer, fraudulent, warranty, summary judgment, terminate, audit, termination, franchise, dealership, franchise agreement, former employees, counterclaim, franchisor, partial, contractual, videotape, manufacturer, commercially, submitting, contradict, undisputed, issues of material fact, overwhelming evidence, noted earlier, fair dealing, conducting, defrauded, financing, meritless, genuine

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Business & Corporate Entities > Franchises & Distributorships > Terminations*
[HN1]In Kentucky, a manufacturer can terminate a dealer's franchise if it meets the notice requirement, has good cause for termination, and acts in good faith. Ky. Rev. Stat. Ann. § 190, et seq.

*Business & Corporate Entities > Franchises & Distributorships > Terminations*
[HN2]A franchisor may not terminate a car dealer's franchise agreement unless it has acted honestly and observed reasonable commercial standards of fair dealing, i.e. good faith. Ky. Rev. Stat. Ann. § 190.045(1), 190.010. Good faith is defined as honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade.

*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Fraud & Misrepresentation*
[HN3]In order to maintain its fraud claim, the claimant must establish six elements by clear and convincing evidence: (1) a material misrepresentation, (2) which is false, (3) which was known to be false, or made recklessly, (4) made with inducement to be acted upon, (5) which is acted upon in reliance thereon, and (6) causes injury.

**COUNSEL:** For BOWLES, RICE, MCDAVID, GRAFF & LOVE, PLLC: Spencer D. Noe, Bowles, Rice, McDavid, Graff & Love, P.L.L.C., Lexington, KY.

For JAGUAR CARS, plaintiff: Carl J. Chiappa, Warren H. Colodner, Jason P. Isralowitz, John Sullivan, Greg Shaffer, Kirkpatrick & Lockhart LLP, New York, NY.

For JAGUAR CARS, plaintiff: Barbara B. Edelman, Mindy G. Barfield, Dinsmore & Shohl LLP, Lexington, KY.

For BLACKHORSE MOTORWORKS LTD., J. DOU-

  

GLAS ROOD, plaintiffs: Richard A. Getty, Gregory A. Keyser, Getty, Keyser & Mayo, LLP, Lexington, KY.

For BLACKHORSE MOTORWORKS LTD., J. DOUGLAS ROOD, defendants: Richard A. Getty, Gregory A. Keyser, Getty, Keyser & Mayo, LLP, Lexington, KY.

For JAGUAR CARS, defendant: Warren H. Colodner, Jason P. Isralowitz, Kirkpatrick & Lockhart LLP, New York, NY.

For JAGUAR CARS, defendant: Barbara B. Edelman, Dinsmore & Shohl LLP, Lexington, KY.

For BLACKHORSE MOTORWORKS LTD., J. DOUGLAS ROOD, counter-claimants: Richard A. Getty, Gregory A. Keyser, Getty, Keyser & Mayo, LLP, Lexington, KY.

**JUDGES:** JOSEPH M. HOOD, JUDGE.

**OPINIONBY:** JOSEPH M. HOOD

**OPINION: MEMORANDUM OPINION AND [*2] ORDER**

The plaintiff, Jaguar Cars ("Jaguar"), has moved the Court [Record No. 263] for partial summary judgment. The defendants, Blackhorse Motorworks and J. Douglas Rood (collectively, "Blackhorse"), have responded [Record No. 322], to which Jaguar has replied [Record No. 356]. This matter is now ripe for decision.

This action arises from Jaguar's eight-month investigation of Blackhorse's alleged fraudulent business practices. The investigation was initiated when, in November of 1993, Jaguar's warranty department received an unsolicited telephone call from David Kohlman, a service technician at Blackhorse. This investigation revealed that between 1992 and 1994, Blackhorse systematically defrauded Jaguar through the submission of sham warranty claims. Some of Jaguar's undeniable proof consists of sworn statements from former employees of Blackhorse Tom Cadwallader, Blackhorse's Service Director, Terri Wyatt, Blackhorse's Parts Manager, and Ken McLaughlin, a Blackhorse service technician, have all sworn that they participated in defrauding Jaguar through the submission of sham warranty claims. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Although Jaguar has much more evidence of Blackhorse's fraudulent activities, the statements of Cadwallader, Wyatt, and McLaughlin alone are enough to ter-

minate Blackhorse's franchise. Whether Mr. Rood knew of his employees' fraudulent activities is irrelevant because it is clear that Blackhorse, via its management, was engaged in fraudulent activities.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*3]**

With the overwhelming evidence of Blackhorse's fraudulent activities, Jaguar commenced this action alleging, inter alia, violations of the Racketeer Influenced and Corrupt Practices Act and seeking termination of its franchise agreement with Blackhorse. Confronted with Jaguar's allegations, Blackhorse filed a massive counterclaim asserting, inter alia, that Jaguar's investigation was conducted in an inappropriate manner and that Jaguar's fraud charges were meritless.

This case has been going on since July 29, 1994, and is in its seventeenth volume at the time of this Opinion. The Court has given Blackhorse the benefit of the doubt on many of its claims and has allowed it to pursue a vigorous course of discovery. Discovery, however, is now complete, and the Court must shine the light of reality on Blackhorse's counterclaims and arguments.

Jaguar has moved for partial summary judgment on the following points: (1) Jaguar asks that the Court authorize the termination of its franchise agreement with Blackhorse; and (2) Jaguar wants the Court to grant it summary judgment as to all of the claims in Blackhorse's third amended counterclaim. Each of Jaguar's points will be dealt with [*4] separately.

The first issue to be addressed is whether to grant Jaguar summary judgment on its termination claim. In a previous opinion, denying Blackhorse's motion for partial summary judgment, the Court found that there were genuine issues of material fact surrounding Jaguar's termination of Blackhorse's franchise. The Court will now revisit that finding in light of Jaguar's motion.

[HN1]In Kentucky, a manufacturer can terminate a dealer's franchise if it meets the notice requirement, has good cause for termination, and acts in good faith. See KRS 190, et seq. Because it is clear that the 15-day notice requirement has been satisfied, the only issues to be determined are whether Jaguar acted with good cause and in good faith in issuing the termination notice.

First, it should be pointed out that Jaguar has the right to terminate any of its dealerships if one of them is engaging in fraudulent activity. Multiple employees of Blackhorse have sworn out affidavits that Blackhorse





was submitting fraudulent warranty claims. n2 This undisputed testimony alone warrants summary judgment, but it should be noted, in order to be comprehensive, that Jaguar's auditors also found that Blackhorse [*5] routinely obtained reimbursement for repair work by falsely identifying the cars on which the work had allegedly been performed. n1 See *L.J. Dreiling Motor Co. v. Peugeot Motors, 850 F.2d 1373, 1377-78 (10th Cir. 1988)* (holding that submission of fraudulent warranty claims by a service manager constitutes proper grounds for termination); *Ormsby Motors v. GMC, 842 F. Supp. 344 (N.D. Ill. 1994)* (holding that a dealer may be terminated for warranty fraud). n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Blackhorse's attack on the creditibility of its former employees is merely speculation. Blackhorse has produced no evidence that would contradict these former employees or show that these employees have committed perjury. In fact, the testimony from the employees is extremely credible because they acknowledge that their own conduct was improper. See *Robinson v. Cheney, 277 U.S. App. D.C. 393, 876 F.2d 152, 162 (D.C. Cir. 1989).*

n3 The parts journal revealed a pattern of fraudulent activities. Additionally, Jaguar's National Warranty Manager, Don Krumholz, provided an affidavit supplying documentary evidence of fraud. Although Blackhorse notes the affidavits of Spurlock and Langley, customers of Blackhorse, they certainly do not contradict the statements of Blackhorse's former employees.

[*6]

n4 The fact that Rood may not have directed the warranty fraud is irrelevant because the conduct of his managers is imputed to him. See *Frederick v. Collins, 378 S.W.2d 617 (Ky. 1964).*

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

Having found no genuine issues of material fact surrounding Blackhorse's fraudulent activities, the Court will now address whether there are any genuine issues of material fact as to whether Jaguar acted in good faith in attempting to terminate Blackhorse's dealership. As noted earlier, [HN2]a franchisor may not terminate a car dealer's franchise agreement unless it has acted honestly and observed reasonable commer-

cial standards of fair dealing, i.e. good faith. See KRS 190.045(1), 190.010.

In *Jim White Agency Co. v. Nissan Motor Corp., 126 F.3d 832, 834 (6th Cir. 1997),* the provision at issue defined good faith as "honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade." The Sixth Circuit noted that the Ohio dealer statute, much like the Kentucky statute, derives the good faith definition from the Uniform [*7] Commercial Code. *Id. at 834.* The Sixth Circuit then held that the operative inquiry is whether the manufacturer's actions were "commercially justifiable." *Id. at 835.* Applying this standard, the Jim White court affirmed an entry of summary judgment for Nissan on the ground that the manufacturer had merely exercised its contractual rights, and thus, it had acted with commercial justification in refusing to grant a dealer's request to relocate its dealership. *Id.*

In the case at bar, Jaguar exercised its clear contractual right to audit Blackhorse's warranty records and to terminate the dealership based on the submission of fraudulent claims. The record clearly shows that Jaguar was acting out of commercial necessity when it asserted its contractual right to audit Blackhorse's books and terminate its franchise based upon clear fraud. n5 See *Bill Call Ford, Inc. v. Ford Motor Company, 48 F.3d 201, 207 (6th Cir. 1994)* (awarding summary judgment to a manufacturer on a good faith issue where it "exercised its clearly expressed contractual rights"); *Hickman v. American Honda Motor Co., 982 F. Supp. 881, 885-886 (N.D. Ga. 1997)* [*8] (finding no violation of Georgia's good faith requirement where franchisor acted "with a legitimate business interest in mind").

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 No business has to sit back and allow another business to cheat it. At the same time, Jaguar did not want to jump the gun and falsely accuse Blackhorse. Hence, Jaguar conducted a methodical investigation which yielded some of the overwhelming evidence before the Court today. The Court notes that Ginther's attacks on Jaguar's audit does not change the clear and undisputed testimony of Blackhorse's former employees.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

In rebuttal, Blackhorse claims that Jaguar was not honest and failed to observe reasonable commercial standards of fair dealing regarding its investigation. Specif-

  

ically, Blackhorse asserts that Jaguar wrongfully disguised its investigation as a routine warranty audit when in fact it suspected fraud. In essence, Blackhorse is claiming that the "good faith" requirement dictates that Jaguar disclose its information to Blackhorse and give it an opportunity to [*9] dispose of incriminating evidence before the audit.

The Court, however, finds that good faith does not require a franchisor who is conducting a fraud investigation to apprise the target of its findings. n6 The appropriate inquiry, like in Jim White, is whether Jaguar's actions were commercially justified. Based on the overwhelming evidence of fraud, the Court finds that Jaguar's actions are commercially justified. The fact that Jaguar may have misled Blackhorse as to the nature of the audit is irrelevant.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n6 The Court agrees with Jaguar that Blackhorse is attempting to use the good faith standard to carve out a procedural escape clause for perpetrators of fraud. Although Blackhorse's attempt is creative, it is also meritless. It should be pointed out that police often use deceptive tactics in order to investigate criminal activity. It would defy common sense for this Court to find that it is perfectly fine for the police to use deceptive tactics to help put people behind bars, but a business who suspects it is being cheated by one of its business partners has to be perfectly open and honest with the alleged perpetrator. This Court refuses to give Kentucky's good faith standard such a ludicrous interpretation.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*10]

Moreover, the good faith requirement relates to the grounds upon which Jaguar based its decision to terminate, not its investigation. See *Scuncio Motors v. Subaru of New England, 555 F. Supp. 1121, 1131-33 (D.R.I. 1982).* Jaguar's decision to terminate was not based on speculation and conjecture, which would have been bad faith, but rather an extensive and fair investigation. The fact that Jaguar may have mislead or withheld information from Blackhorse relating to its fraud investigation does not in any way mean that Jaguar did not have a good faith belief to conduct its investigation and seek to terminate Blackhorse's dealership. Based on the above analysis, the Court will grant Jaguar summary judgment on its termination claim. n7

- - - - - - - - - - - - - - Footnotes - - - - - - -

n7 In other words, Jaguar is free to terminate its franchise agreement with Blackhorse.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

The Court will now address Blackhorse's counterclaims. [HN3]In order to maintain its fraud claim, Blackhorse must establish six elements by clear and convincing evidence: "(1) a material [*11] misrepresentation, (2) which is false, (3) which was known to be false, or made recklessly, (4) made with inducement to be acted upon, (5) which is acted upon in reliance thereon, and (6) causes injury." See *Compressed Gas Corp. v. U.S. Steel Corp., 857 F.2d 346, 349-50 (6th Cir. 1988).* Blackhorse's fraud claims are based on the following: (1) the two alleged promises made by Lawrence Williams, Jaguar's National Franchise Development Manager; (2) statements made by Jaguar's president, Michael Dale, in a videotape distributed to all dealers on or about April 1991, and (3) Jaguar's alleged failure to disclose certain internal corporate information.

In a letter dated July 5, 1991 from Jaguar's counsel n8 to First Security, Blackhorse's counsel summarized the state of affairs among Blackhorse, the bank, and Jaguar and candidly acknowledged that "Jaguar has not made a written commitment to Blackhorse, or for that matter any definitive oral commitment . . ." See Jaguar's Exhibit 27, p. 3. This letter is subsequent to the dates upon which Lawrence Williams allegedly made his promises to Mrs. Rood that Jaguar would "step in" and act as a guarantor for financing if [*12] Blackhorse's application was denied and that Jaguar would "see to it" that Blackhorse had inventory.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n8 Blackhorse's counsel at that time was the late C. Gibson Downing.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

Furthermore, in a July 15, 1991 response to Blackhorse's letter, First Security's counsel, Charles Shivel, confirmed the Bank's understanding that Jaguar had made no commitments to Blackhorse. See Jaguar's Exhibit 26. On July 30, 1991, Blackhorse's counsel sent Mr. Shivel a follow-up letter, and it did not contradict or refute in any way Mr. Shivel's letter dated July 15.

 

The Court finds that Blackhorse's above correspondence precludes its fraud claims as a matter of law. See *Glass v. Kemper Corp.*, 949 F. Supp. 1341, 1349 (N.D. Ill. 1997). Blackhorse's attempts to explain away its letter dated July 5, 1991 is disingenuous. n9 Blackhorse sent the letter to First Security at a time when the dealership was desperate to persuade First Security of Jaguar's commitment to the franchise. The letter, however, not only neglects to [*13] mention Jaguar's alleged commitments, it expressly states that no such written or oral commitments had been made.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n9 The letter is clear and unambiguous. Blackhorse is attempting to make a factual issue where there is not one. Additionally, Mrs. Rood does not dispute that she reviewed Downing's July 5 letter before it was sent to First Security.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

Notwithstanding the above analysis, it is not reasonable for Blackhorse to have relied on Williams's alleged promises. After the purported promises but before the settlement with First Security, Mrs. Rood acknowledged that Williams advised her that Blackhorse should give up its Jaguar franchise n10 and declare bankruptcy. n11 This advice renders any reliance by Blackhorse on Williams's alleged prior inconsistent statements unreasonable. n12

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n10 The pertinent testimony concerns a July 29 phone conversation between Williams and Mrs. Rood that occurred shortly after First Security had terminated Blackhorse's floor-plan financing. At that time, Williams allegedly advised Mrs. Rood that, in light of the loss of its floor-plan financing, Blackhorse did not have much of a choice but to go into Chapter 11. See Jaguar's Exhibit 17, p. 98-99. According to Mrs. Rood, Williams also advised her that Mr. Rood should give up the franchise before he filed Chapter 11 and that he could apply to be reappointed as a Jaguar dealer in the future. Id. at 99-100. Based on Mrs. Rood's testimony, Williams advised the Roods to do the opposite of the course they ultimately chose.

[*14]

n11 This was a detailed conversation, and

the implications of the conversation were clear.

n12 In other words, Williams advised the Roods to give up the franchise and ask the bank to release them from their personal debt in exchange for the deed on Palumbo Drive. Finally, on this point, the Court finds that there is no evidence of Jaguar's fraudulent intent or that Jaguar intended to induce Blackhorse to act upon any promise; as to this point, the Court adopts the reasoning laid out in Jaguar's motion and reply.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

As to the alleged promise made in the videotape by Michael Dale, president of Jaguar, Blackhorse stated in the above-mentioned letter that it had not received any oral or written commitments from Jaguar. Because this writing was made long after Blackhorse had received the videotape with Dale's alleged promise, Blackhorse has failed to meet its burden on this claim.

Moreover, Dale's generic statements to all Jaguar dealers about possible financial support are not actionable because no dealer could have reasonably relied on a non-specific videotape to incur substantial new debts and [*15] risks. See *Schott Motorcycle Supply v. American Honda Motor*, 976 F.2d 58, 65 (1st Cir. 1992) (holding that no reasonable person would rely on franchisor's "trade talk").

In regard to the nondisclosure claims, the Court finds that Blackhorse has failed to adduce any pertinent evidence in which to support these claims. There is simply no evidence demonstrating that the parties' relationship gave rise to a duty of disclosure on the part of Jaguar. See *O'Neal v. Burger Chef Systems*, 860 F.2d 1341, 1349-50 (6th Cir. 1988). Likewise, no evidence is presented which would show that Blackhorse relied to its detriment on the nondisclosures relating to Jaguar's financial condition. In fact, the record shows that Mr. Rood was aware that Jaguar was losing a million dollars a day. See Jaguar Exhibit 9. n13

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n13 If a company is losing a million dollars a day, there is a pretty good chance that it might not be able to offer financial assistance to others. Additionally, because Blackhorse concedes that the claim surrounding the budgets for repair expenses







should be dismissed, the Court will summarily dismiss it.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*16]

Blackhorse also claims that Jaguar defrauded it by failing to disclose the real reason behind the warranty audits. As the Court has noted earlier, this is frivolous.

Furthermore, Blackhorse's claims concerning the 1992 and 1994 notices of termination fail to raise a genuine issue of material fact. The Court finds that Jaguar properly attempted to terminate Blackhorse based upon undisputed testimony from multiple employees of Blackhorse that it was submitting fraudulent warranty claims. Along with being employees of Blackhorse, the employees in question were central to the fraud and were able to provide explicit detail of how the fraud was carried out. Because the Court is granting Jaguar authorization to terminate Blackhorse, Blackhorse's claims in regard to the notices lack merit. n14

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n14 Blackhorse's contract claims based upon the auditing procedures are meritless. Jaguar had every right to conduct its audit as it saw fit so long as it was performed in good faith. There certainly was no set procedure it had to follow. It should also be noted that there is no evidence of an occasion where Jaguar refused to pay a goodwill claim that Blackhorse submitted. Even if such evidence was available, the dealer agreement imposes no obligation on Jaguar to pay goodwill claims on repairs of out-of-warranty vehicles.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*17]

As to Blackhorse's discrimination claims, there is nothing in the dealer's agreement that states that every dealer must be treated the same way. See *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, 970 F.2d 273, 279 (7th Cir. 1992)* (holding that even if a franchisor treats other franchisees more leniently this is "no more a defense to a breach of contract than laxity in enforcing the speed limit is a defense to a speeding ticket"). Hence, Blackhorse's claims in this respect are dismissed. n15

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n15 It should also be noted that Blackhorse's claim that Jaguar violated the Dealership Agreement by threatening to file a RICO suit lacks merit.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

Blackhorse also asserts that Jaguar refused to provide vehicles to Blackhorse in accordance with its own allocation system. Because, however, there is no evidence that Jaguar failed to provide Blackhorse with a single vehicle to which Blackhorse was entitled under the allocation system, the Court will grant Jaguar summary judgment as [*18] to this claim. n16

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n16 The Court finds that Article 5.2 does not impose any duty on Jaguar not to grant more than one Jaguar Dealer Agreement to another authorized dealer. Even if, however, this provision conferred some right on Blackhorse, it has failed to produce any proof that Jaguar ever approved any such proposal by another dealer. Additionally, Blackhorse has failed to support its claim that Jaguar breached its duty to defend and indemnify Blackhorse pursuant to Articles 13.1 and 13.3(b). In other words, Blackhorse has failed to produce any documentary proof that it received or paid a legal bill for any of the cases in issue. Even if it could show that it had paid some legal fees, the language of Article 13.3(b) precludes the claim because Jaguar agreed to defend and indemnify Blackhorse as to each of the suits.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

The next issue to be addressed is Blackhorse's implied covenant claim. After reviewing the pleadings, the Court finds that the record does not support the imputation of any such obligation on Jaguar. [*19] n17

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n17 The Court further finds that the parties' agreement does not give rise to any fiduciary duties on the part of Blackhorse. See *Lagrew v. Hooks-Superx, Inc., 905 F. Supp. 401, 405 (E.D.Ky. 1995)* (hold-





ing that "implied covenants can only rise where there is no express provision on the subject in the Agreement").

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In regard to Blackhorse's tortious interference claim, the Court notes that the manufacturer-dealer relationship is governed by the contract between the parties. See *Tractor & Farm Supply v. Ford New Holland, 898 F. Supp. 1198 (W.D. Ky. 1995).* In this case, the record shows that Jaguar acted pursuant to its rights under the dealer agreement, and there was no wrong doing on the part of Jaguar. Notwithstanding the fact that the manufacturer-dealer relationship is governed by the dealer agreement, Blackhorse's claim would also fail because there is no pertinent evidence of an improper motive on Jaguar's part. See *CMI, Inc. v. Intoximeters, Inc., 918 F. Supp. 1068, 1080 (W.D.Ky. 1995)* [*20] (holding that the tort of interference with existing contractual relations requires the pleading party to proof of an improper motive). n18

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n18 The Court adopts Jaguar's arguments on this point as set out in its memorandum in support of its motion for partial summary judgment as well as its reply.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Moving on to the next issue, Blackhorse has failed to support its claims of business defamation with respect to the Bassett and Dealer Directory claims. Thus, these claims will be dismissed. As to the statement that Dale allegedly made to the Roods at the Detroit Auto Show, the Court notes that there is insufficient evidence of publication to support this claim. n19 Hence, this claim will also be dismissed.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n19 There is no evidence as to the pecuniary loss because of the alleged defamation. Once again, Jaguar has done a good job of setting out the defects of these claims in its briefs, and the Court will adopt Jaguar's arguments and reasoning on these claims.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*21]

In summary, this action has been vigorously litigated for many years, but the dust has now settled, and it is clear that Blackhorse defrauded Jaguar by submitting fraudulent warranty claims. Hence, Jaguar was well within its contractual rights when it attempted to terminate Blackhorse. As noted earlier, the fact that Jaguar made some misrepresentations in conducting its audit investigation is irrelevant and does not preclude it from terminating its franchise agreement with Blackhorse. n20 Lastly, even though many of Blackhorse's counterclaims were skillfully crafted by able-bodied attorneys, this does not change the fact they lack factual support in the record and must be dismissed. n21 Accordingly,

**IT IS ORDERED** that the plaintiff's motion for partial summary judgment [Record No. 263] be, and the same hereby is, **GRANTED**.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n20 Police departments everywhere use deception in investigating wrongdoing. There is certainly nothing in Kentucky law and/or the dealer agreement that would impose on Jaguar a more stringent standard in conducting its audit than what is appropriate for law enforcement; of course, law enforcement must also conduct its investigation in good faith.

[*22]

n21 In other words, many of Blackhorse's claims fail to meet one or more of the necessary elements and often do not have enough factual support for other elements in order to raise a genuine issue of material fact for the jury.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

This the 2nd day of November, 1998.

JOSEPH M. HOOD, JUDGE


