JASON'S ENTERPRISES, INCORPORATED, d/b/a Jason's Furniture Center, Plaintiff-Appellant, v. GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA, d/b/a General Accident Fire & Life Assurance Corporation, P.L.C., d/b/a General Accident Insurance, Defendant-Appellee. JASON'S ENTERPRISES, INCORPORATED, d/b/a Jason's Furniture Center, Plaintiff-Appellee, v. GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA, d/b/a General Accident Fire & Life Assurance Corporation, P.L.C., d/b/a General Accident Insurance, Defendant-Appellant.

No. 95-2553, No. 95-2554

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

1996 U.S. App. LEXIS 15350; 35 Fed. R. Serv. 3d (Callaghan) 274

June 3, 1996, Argued
June 25, 1996, Decided

**NOTICE:**
**PUB-STATUS: [*1]** RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 89 F.3d 828, 1996 U.S. App. LEXIS 34469.

**PRIOR HISTORY:** Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Chief District Judge. (CA-94-1489-A).

**DISPOSITION:** AFFIRMED

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Appellant insured challenged an order of the United States District Court for the Eastern District of Virginia, which after a jury verdict held that appellant's action against appellee insurer for breach of contract failed because of material misrepresentations made by appellant that had voided the contract. Appellant argued that Va. Code Ann. § 38.2-231 (1994) and the doctrine of equitable estoppel barred appellee's defense.

**OVERVIEW:** Appellant insured filed an action for breach of contract against appellee insurer after appellant's policy had been voided. The district court, after a jury trial, entered an order for appellee, which had argued that appellant's material misrepresentations voided the contract. Appellant argued that Va. Code Ann. § 38.2-231 (1994) and the doctrine of equitable estoppel barred appellee from asserting the defense of material misrepresentation. On appeal, the court affirmed. First, the court distinguished cancellation of an insurance contract, a prospective act that barred coverage of claims after cancellation, from the voiding of an insurance contract, an abrogation of the entire agreement that returned the parties to the status quo. The Virginia Code spoke in terms of cancellation. Assuming that the Code section applied, however, appellee had met its notice requirements. There was no showing that appellant had adversely relied on appellee's representations. Moreover, appellee's work product was correctly barred from discovery under Fed. R. Civ. P. 26, because it was prepared in anticipation of litigation and appellant demonstrated no need for it.

**OUTCOME:** The court affirmed the district court's order and held that neither the Virginia Insurance Code nor the doctrine of equitable estoppel barred appellee insurer from asserting against appellant insured the defense of material misrepresentation in appellant's action for breach of contract. Assuming that the Virginia Code applied to this transaction, appellee met its notice requirements. There was no detrimental reliance by appellant.

**CORE TERMS:** misrepresentation, void, insurer, cancellation, arson, material misrepresentation, rescission, subpoena, voiding, ab initio, anticipation of litigation, insurance policy, written notice, discovery, disclosure, cancelled, willful, notice, renew, coverage, work product doctrine, insurance application, suspicious origin, fire loss, probative, effective, averred, lawsuit, insured, opened

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Insurance Law > Claims & Contracts > Cancellation & Nonrenewal*
[HN1]See Va. Code Ann. § 38.2-231 (1994).

*Insurance Law > Claims & Contracts > Cancellation & Nonrenewal*
[HN2]There is a fundamental distinction between a decision to cancel a policy and a decision to void a policy from the outset. In the case of the former, termination of coverage is prospective only. In other words, the insured remains covered for losses occurring prior to the effective date of the cancellation. In contrast, when an insurer voids a policy from the outset, as in the present case, the termination of coverage is total. The policy is rescinded and the premium returned under the the-

  

ory that the parties never had a sufficient meeting of the minds to form a legally-binding contract.

*Insurance Law > Claims & Contracts > Cancellation & Nonrenewal*

*Contracts Law > Remedies > Rescission & Redhibition*

[HN3]To rescind a contract is not merely to terminate it, but to abrogate and undo it from the beginning: that is, not merely to release the parties from further obligation to each other in respect to the subject of the contract and restore the parties to the relative positions which they would have occupied if no such contract had ever been made. Rescission necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it. But this by itself would constitute no more than a breach of the contract or a refusal of performance, while the idea of rescission involves the additional and distinguishing element of a restoration of the status quo.

*Insurance Law > Claims & Contracts > Cancellation & Nonrenewal*

*Insurance Law > Claims & Contracts > Representations & Warranties*

[HN4]An insurer voids a policy from the outset for material misrepresentation because, had it known the truth, it would never have issued the policy in the first instance, or it would have issued the policy pursuant to different terms.

*Insurance Law > Claims & Contracts > Cancellation & Nonrenewal*

*Governments > Legislation > Interpretation*

[HN5]The plain language of Va. Code Ann. § 38.2-231 (1994) does not reveal whether the Virginia General Assembly intended use of the word "cancellation" to also encompass "rescissions" or "voidings." The Virginia Insurance Code does not define the term "cancellation." No published authority in Virginia has interpreted § 38.2-231.

*Insurance Law > Claims & Contracts > Cancellation & Nonrenewal*

[HN6]Apart from requiring the insurer to enumerate specific reasons for cancelling the policy, Va. Code Ann. § 38.2-231 (1994) also requires that the insurer state in its written notice the date upon which the cancellation is effective. Under § 38.2-231(A)(2), that date cannot be less than forty-five days after the delivery or mailing of the notice of cancellation. Thus, it appears that the notice requirement of § 38.2-231 does not apply to a rescission, which by its very nature is effective immediately and applies retroactively to discharge all obligations past and future.

*Insurance Law > Claims & Contracts > Cancellation*

*& Nonrenewal*

[HN7]The terms "cancelled," "rescinded," and "void" are often used synonymously in the insurance context.

*Insurance Law > Claims & Contracts > Cancellation & Nonrenewal*

[HN8]Va. Code Ann. § 38.2-231 (1994) does not state when the notice must be given; it merely requires that the notice be written and that it specify the reasons for the cancellation.

*Insurance Law > Claims & Contracts > Estoppel & Waiver*

[HN9]To invoke the equitable doctrine of estoppel, an insured must show its prejudicial reliance on some act, conduct, or non-action of the insurer. In other words, the insured must establish that it relied to its detriment on a belief that the insurer would not assert further instances of misrepresentations. Such detrimental reliance cannot typically be established where the insurer fairly informs the insured of its position and gives timely notice.

*Civil Procedure > Disclosure & Discovery > Work Product*

*Legal Ethics > Client Relations > Attorney-Client Privilege*

[HN10]The work product doctrine serves to protect from disclosure material prepared by an adversary's counsel with an eye toward litigation. The privilege encompasses such things as interviews, statements, memoranda, correspondence, briefs, mental impressions, and personal beliefs.

*Civil Procedure > Disclosure & Discovery > Work Product*

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*

*Legal Ethics > Client Relations > Attorney-Client Privilege*

[HN11]An appellate court reviews a district court's decision concerning application of the work product privilege for abuse of discretion.

*Civil Procedure > Disclosure & Discovery > Work Product*

*Legal Ethics > Client Relations > Attorney-Client Privilege*

[HN12]Fed. R. Civ. P. 26(b)(3) provides that a party may obtain discovery of documents prepared by an adversary, or an adversary's representatives, in anticipation of litigation upon a showing of substantial need for the documents and an inability to obtain their substantial equivalent without undue hardship.

*Civil Procedure > Disclosure & Discovery > Work Product*

  

*Legal Ethics > Client Relations > Attorney-Client Privilege*

[HN13]The work product privilege applies to protect documents prepared in anticipation of litigation by or for another party or by or for that other party's representative, including the other party's attorney, consultant, surety, indemnitor, insurer, or agent. Fed. R. Civ. P. 26(b)(3).

*Insurance Law > Claims & Contracts > Representations & Warranties*

[HN14]The Virginia Insurance Code provides that no statement in an application for insurance will bar recovery unless the statement was material and untrue. Va. Code Ann. § 38.2-309 (1994). There is no statutory requirement that the misrepresentation also be willful.

**COUNSEL: ARGUED:** A. Andrew Giangreco, Fairfax, Virginia, for Appellant.

Tina Lynn Snee, Deborah Aileen Lisker, SLENKER, BRANDT, JENNINGS & JOHNSTON, Merrifield, Virginia, for Appellee.

**JUDGES:** Before RUSSELL, HALL, and LUTTIG, Circuit Judges.

**OPINION: PER CURIAM:**

Jason's Enterprises, Inc. ("Jason's Enterprises") appeals the district court's order entering judgment upon jury verdict in favor of General Accident Insurance Company of America ("GAI") on Jason's Enterprises' claims seeking damages for GAI's rescission for material misrepresentation of a policy of business owner's insurance. Jason's Enterprises contends, inter alia, that GAI was estopped from defending its decision to void the policy with any reason not specifically enumerated in its initial letter notifying Jason's Enterprises that the policy was void for material misrepresentation. We [*2] reject this argument because the additional items of misrepresentation were timely disclosed and Jason's Enterprises suffered no prejudice.

**I.**

Taiser Ramamni owned and operated furniture stores in Maryland and Northern Virginia. In 1988, Taiser Ramamni opened his first store in Waldorf, Maryland, which was operated by Jason's Furniture Center, Inc., a corporation owned by Taiser. His brother, Jamal Ramamni, co-owned and managed the Waldorf store. Taiser Ramamni also opened a furniture store in Glen Burnie, Maryland in 1988, which was owned by another of Taiser's corporate identities--Jason's International Service. In 1990, Taiser Ramamni opened a third store in Virginia, which was operated in Manasses under the trade name Jason's Furniture Center by Jason's Enterprises, Inc., a third corporation owned by Taiser.

In May 1992, Taiser Ramamni, on behalf of Jason's Enterprises, Inc., purchased a business owner's insurance policy from GAI for the Virginia store. In January 1993, the Virginia store burned under suspicious circumstances, and the local police considered Taiser Ramamni an arson suspect. n1 GAI independently investigated the loss, and discovered that Jason's Enterprises had [*3] made material misrepresentations on the insurance application. Specifically, GAI discovered that on March 3, 1992, the Waldorf store also sustained a fire loss under suspicious circumstances, and the police suspected Jamal Ramamni of arson. In the GAI insurance application for the Virginia store, Taiser Ramamni averred that Jason's Enterprises, Inc. had not sustained a previous loss. Because of the closely-held nature of both Jason's Enterprises and Jason's Furniture Center, Inc., GAI considered their corporate identities to be virtually identical, and Taiser Ramamni's statement that no previous loss was sustained to be a misrepresentation.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 The police investigation was inconclusive as to the source of the fire except that it was of suspicious origin.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

For the same reason, GAI also considered Jason's Enterprises to have made a material misrepresentation when it averred that no previous insurance policies were cancelled or non-renewed. GAI discovered that State Farm provided a policy of business insurance for [*4] the Waldorf store. Jason's Furniture Center, Inc. had filed a $ 400,000 claim for losses sustained in the March 1992 fire at the Waldorf store, which State Farm settled for $ 25,000. Because of the large discrepancy between the claim and the settlement amount, GAI considered this equivalent to a cancellation of that policy. Hence, GAI considered Taiser Ramamni's statement that no previous policy was cancelled to be another misrepresentation.

On April 23, 1993, GAI notified Jason's Enterprises by letter that it was voiding the insurance policy for material misrepresentation. GAI stated that it would not have entered into the contract for insurance if it had known of the previous loss to the Waldorf store. Jason's Enterprises thereafter filed the present lawsuit contending, inter alia, that GAI breached the insurance contract.

During discovery, GAI disclosed three more misrep-

  

resentations Jason's Enterprises had made in the application for insurance. n2 These additional instances were disclosed through answers to interrogatories. At trial, GAI defended Jason's Enterprises' lawsuit with all instances of misrepresentation. The jury returned a verdict in favor of GAI. This appeal followed. [*5]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Although not completely clear from the record, it appears the additional instances of alleged misrepresentation were the following statements that Jason's Enterprises: (1) does not own or operate any other business; (2) does not own or operate any other business not covered by this insurance policy; (3) has been in business for 15 years.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

## II.

Jason's Enterprises argues on appeal, as it did below, two grounds why GAI should have been barred from defending this lawsuit with any other allegations of misrepresentation not specifically enumerated in GAI's April 23 letter voiding the policy. Jason's Enterprises contends that under the Virginia Insurance Code, insurers are limited in their defense of a decision to void a policy by the specific reasons stated in the initial written notice to the insured. Alternatively, Jason's Enterprises asserts that principles of the equitable doctrine of estoppel barred GAI from arguing additional instances of misrepresentation.

## A.

[HN1]The Virginia Insurance Code provides in relevant [*6] part:
No cancellation or refusal to renew by an insurer of a policy of insurance as defined in . . . § 38.2-118 insuring a business entity . . . shall be effective unless the insurer delivers or mails to the named insured . . . written notice of the cancellation or refusal to renew. Such notice shall:

* * *

3. State the specific reason or reasons of the insurer for cancellation or refusal to renew;

Va. Code Ann. § 38.2-231 (Michie 1994). Extrapolating from this language, Jason's Enterprises contends that because a policy cancellation is effective only if the written notice states the specific reasons for the cancellation, then logically GAI could defend its decision to void the policy only with reference to those specific reasons.

We do not think it is at all clear that GAI "cancelled"

the policy within the meaning of § 38.2-231. n3 [HN2]There is a fundamental distinction between a decision to cancel a policy and a decision to void a policy ab initio. In the case of the former, termination of coverage is prospective only. In other words, the insured remains covered for losses occurring prior to the effective date of the cancellation. In contrast, [*7] when an insurer voids a policy ab initio, as in the present case, the termination of coverage is total. The policy is rescinded and the premium returned under the theory that the parties never had a sufficient meeting of the minds to form a legally-binding contract:[HN3]

To rescind a contract is not merely to terminate it, but to abrogate and undo it from the beginning; that is, not merely to release the parties from further obligation to each other in respect to the subject of the contract and restore the parties to the relative positions which they would have occupied if no such contract had ever been made. Rescission necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound to it. But this by itself would constitute no more than a breach of the contract or a refusal of performance, while the idea of rescission involves the additional and distinguishing element of a restoration of the status quo. . . . 1 Black on Rescission and Cancellation, § 1.

*Wall v. Zynda*, 283 Mich. 260, 278 N.W. 66, 68 *(Mich. 1938)* (internal quotations omitted). Such is the case [HN4]when an insurer voids a policy ab initio for material misrepresentation. The [*8] insurer voids the policy because, had it known the truth, it would never have issued the policy in the first instance, or it would have issued the policy pursuant to different terms.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Jason's Enterprises does not argue that voiding the policy amounted to a "refusal to renew" within the meaning of § 38.2-231.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[HN5]The plain language of § 38.2-231 does not reveal whether the Virginia General Assembly intended use of the word "cancellation" to also encompass "rescissions" or "voidings." The Virginia Insurance Code does not define the term "cancellation," and no published authority in Virginia has interpreted § 38.2-231. But, the requirements of § 38.2-231 itself intimate an answer. [HN6]Apart from requiring the insurer to enu-

  

merate specific reasons for cancelling the policy, § 38.-231 also requires that the insurer state in its written notice the date upon which the cancellation is effective. Under § 38.2-231(A)(2), that date cannot be less than forty-five days after the delivery or mailing of the notice of cancellation. **[*9]** Thus, it appears that the notice requirement of § 38.2-231 does not apply to a rescission, which by its very nature is effective immediately and applies retroactively to discharge all obligations past and future.

Nonetheless, in recognition of the fact that [HN7]the terms "cancelled," "rescinded," and "void" are often used synonymously in the insurance context, see *Van Horn v. Atlantic Mut. Ins. Co., 334 Md. 640, 641 A.2d 195, 203 n.6 (Md. 1994),* we will refrain from further attempting to resolve this question of Virginia state law. We hold instead, as did the district court, that even if § 38.2-231 applies to rescissions or voidings, GAI adequately satisfied the statutory requirements. [HN8]Section 38.2-231 does not state when the notice must be given; it merely requires that the notice be written and that it specify the reasons for the cancellation. We believe GAI satisfied this notice requirement by detailing the additional instances of alleged misrepresentation in answers to interrogatories during discovery.

The district court appears to have added an additional requirement when it further found that it was uncontroverted that GAI could not have disclosed the additional instances of misrepresentation **[*10]** in its April 23 letter because it was not yet aware of their existence. We agree with Jason's Enterprises that this finding is not supported by the record. At oral argument before this court, GAI's counsel inexplicably averred that GAI was not on notice of the additional instances until after April 23; however, Thomas Tonks, GAI's own witness and the author of the April 23 letter, clearly testified at trial to the contrary. Tonks stated he was aware of all instances of misrepresentation at the time he prepared the letter, but that he only included two because they were independently sufficient to support the decision to void the policy. (J.A. at 157, 161, 163-64).

Any error in the district court's finding, however, was harmless because we do not believe the timing of GAI's knowledge to be relevant. As previously stated, GAI gave written notice of the additional reasons prior to trial, which we believe is all § 38.2-231 requires. Accordingly, we reject Jason's Enterprises' argument based upon the Virginia Insurance Code.

**B.**

We similarly reject Jason's Enterprises' argument grounded on estoppel. [HN9]To invoke the equitable doctrine of estoppel, Jason's Enterprises must show its prejudicial **[*11]** reliance on "some act, conduct, or non-action of

the insurer." *Western World Ins. Co. v. Harford Mut. Ins. Co., 784 F.2d 558, 563 (4th Cir. 1986).* In other words, Jason's Enterprises must establish that it relied to its detriment on a belief that GAI would not assert further instances of misrepresentations. Such detrimental reliance cannot typically be established where the insurer "fairly informs [the insured] of its position and gives timely notice." *Norman v. Insurance Co. of North America, 218 Va. 718, 239 S.E.2d 902, 907 (Va. 1978).* Because we believe that GAI fairly and timely informed Jason's Enterprises in advance of trial of its intent to rely on additional instances of misrepresentations, GAI was not equitably estopped from asserting those instances in its defense.

**III.**

We turn next to Jason's Enterprises' contention that the district court erred in ruling that forty-one documents sought from GAI were privileged from disclosure under the work product doctrine, and in granting GAI's motion to quash a subpoena served on its investigators.

**A.**

During discovery, GAI claimed that forty-one of the numerous documents requested by Jason's Enterprises were protected from disclosure **[*12]** by the work product doctrine. Although not part of the joint appendix before us, GAI submitted these documents under seal for an in camera review by the district court. n4 The court subsequently denied Jason's Enterprises' motion to compel discovery.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 GAI contends the documents contain such items as: an assessment and evaluation determining the case's worth should it proceed to trial; opinions requested of counsel; notes of a criminal investigation against Jamal Ramamni; and opinions of an investigator hired by GAI discussing progress in the criminal investigation against Jamal Ramamni.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[HN10]The work product doctrine serves to protect from disclosure material prepared by an adversary's counsel "'with an eye toward litigation.'" *Commonwealth v. Edwards, 235 Va. 499, 370 S.E.2d 296, 302 (Va. 1988)* (quoting *Hickman v. Taylor, 329 U.S. 495, 511, 91 L. Ed. 451, 67 S. Ct. 385 (1947)).* The privilege encompasses such things as "'interviews, statements, memoranda, correspondence, briefs, mental impressions, [and] personal beliefs.'" Id. [HN11]We





review [*13] the district court's decision concerning application of this evidentiary privilege for abuse of discretion. See *In re Grand Jury Subpoena, 884 F.2d 124, 128 (4th Cir. 1989).*

Jason's Enterprises attacks the district court's denial of its motion to compel discovery, contending that the district court erred in determining that the documents at issue were prepared in anticipation of litigation. According to Jason's Enterprises, every document prepared by an insurance company is in some respects prepared in anticipation of litigation. Hence, Jason's Enterprises contends insurance companies should be subjected to a more narrow construction of the privilege, and GAI should at least be required to disclose those materials prepared prior to the time litigation became a realistic possibility.

In effect, Jason's Enterprises asks this court to hold that litigation only became a realistic possibility on April 23, 1993, when GAI sent the letter voiding the policy. By this logic, any documents prepared prior to that date cannot be privileged as work product. We reject this contention. Obviously, GAI was investigating the fire loss prior to April 23, and it likely formed an opinion about Jason's [*14] Enterprises' misrepresentations and the possibilities of litigation prior to that date. We see no merit to a bright-line holding which would render only those documents prepared after a claim is denied or a policy voided subject to the work product privilege. Hence, we reject this claim.

Jason's Enterprises also contends that even if the documents were prepared in anticipation of litigation, it is entitled to their discovery under [HN12]Fed. R. Civ. P. 26(b)(3), which provides that a party may obtain discovery of documents prepared by an adversary, or an adversary's representatives, in anticipation of litigation upon a showing of substantial need for the documents and an inability to obtain their substantial equivalent without undue hardship. We reject this assignment of error because Jason's Enterprises has utterly failed to articulate any reason to believe that it had a substantial need for the documents, or that it would be unable to obtain their equivalent without undue hardship. We therefore hold that the district court did not abuse its discretion in protecting these documents from disclosure after examining them in camera.

## B.

On a related note, Jason's Enterprises also challenges [*15] the district court's order granting GAI's motion to quash a subpoena seeking some of the materials determined to be work product. GAI hired the firm of Cotter, Neimeyer & Lynch ("CNL") to assist with investigation of the claim. As part of its investigation, CNL prepared documents for GAI. Unsuccessful in obtaining those documents from GAI, Jason's Enterprises served a subpoena directly on CNL. The district court granted GAI's subsequent motion to quash the subpoena. However, because the subpoena was served on the investigative firm hired by GAI, rather than on GAI itself, Jason's Enterprises contends GAI lacked standing to move to quash the subpoena.

We disagree. [HN13]The work product privilege applies to protect documents prepared in anticipation of litigation "by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3). Because CNL was an agent or consultant to GAI, CNL's documents generated pursuant to that relationship clearly fall within the scope of protection contemplated by Rule 26. Accordingly, GAI was entitled to assert the privilege over documents prepared [*16] for it by CNL, which were in CNL's possession. It follows, therefore, that GAI had standing to move to quash the subpoena that sought those documents directly from CNL.

## IV.

Jason's Enterprises next contends the district court abused its discretion by overruling its motion for a mistrial and permitting GAI to introduce evidence that the police consider both Taiser and Jamal Ramamni to be arson suspects in fires at the Virginia and Waldorf stores, respectively. According to Jason's Enterprises, this evidence was irrelevant to GAI's material misrepresentation defense and it was highly prejudicial.

One of the reasons cited by GAI for its decision to void the policy ab initio was that Taiser Ramamni failed to disclose the prior fire loss at the Waldorf store. Accordingly, evidence of the existence of that prior loss was certainly relevant to GAI's material misrepresentation defense. While some district court judges may have limited the evidence to the mere fact of the loss, we do not think it was an abuse of discretion for the district court here to allow introduction of foundation or background evidence concerning the circumstances of that fire.

However, we are not similarly persuaded [*17] that the district court acted within the permissible scope of its discretion when it admitted evidence that the fire at the Virginia store was of suspicious origin, or that Taiser Ramamni was an arson suspect. This evidence was not probative of any of the grounds upon which GAI relied to support its material misrepresentation defense. Recognizing this, GAI asserts that it was entitled to introduce the arson evidence to rebut Jason's Enterprises' claim for attorneys fees under Va. Code Ann. § 38.2-209(A) (Michie 1994), which required establishing that GAI acted in bad faith when it voided the policy. According to GAI, it was entitled to introduce

  

evidence that it acted in good faith, which encompassed introduction of evidence of everything its investigation discovered about Taiser Ramamni, including the suspicious nature of the fire and that he was an arson suspect.

We disagree with GAI's reasoning. Because GAI specifically limited its decision to void the policy to the misrepresentations in the insurance application, the district court should have similarly limited the focus of the good faith inquiry to evidence concerning those misrepresentations. The fire at the Virginia store [*18] may have been the event which precipitated GAI's discovery of the misrepresentations, but we see nothing about the circumstances surrounding the fire that was relevant to misrepresentations made eight months earlier. n5

– – – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n5 We do not believe, however, that this evidence was as prejudicial as Jason's Enterprises asserts. It is indisputable that the fire at the Virginia store was of a suspicious origin and that the police suspect Taiser Ramamni of arson. GAI could have elected to cancel coverage under the policy on this ground and pursued that defense at trial, at which point the arson evidence would clearly have been material and probative. That GAI opted instead to void the policy for misrepresentation in the application is all that prevented the arson evidence from being relevant.

– – – – – – – – – – – – End Footnotes– – – – – – – – –

Nonetheless, to the extent the district court may have erred in this regard, we believe that error was harmless. GAI introduced ample evidence that Jason's Enterprises misrepresented, among other things, that it had not sustained a [*19] prior loss, that it operated no other businesses, and that it had been in business fifteen years. We are satisfied the jury reached its verdict with reference to the specific evidence probative of GAI's misrepresentation defense.

V.

Lastly, Jason's Enterprises contends that the district court erred in instructing the jury on misrepresentation. According to Jason's Enterprises, the district court was required to instruct the jury that GAI could not void the insurance policy ab initio for misrepresentation unless that misrepresentation was willful.

This argument is without merit. [HN14]The Virginia Insurance Code provides that no statement in an application for insurance will bar recovery unless the statement was material and untrue. Va. Code Ann. § 38.2-309 (Michie 1994). There is no statutory requirement that the misrepresentation also be willful. The authorities cited by Jason's Enterprises in support of its position involve insurance policies specifying that only a "willful" misrepresentation will void the policy. See *Glens Falls Ins. Co. v. Long, 213 Va. 776, 195 S.E.2d 887, 889 (Va. 1973)* (language in automobile insurance application provided that insurer could reject application only [*20] if applicant willfully made incorrect or misleading statements therein); *Old Republic Life Ins. Co. v. Bales, 213 Va. 771, 195 S.E.2d 854, 856 (Va. 1973)* (stating that in the ordinary case, mere proof of the misrepresentation is enough to void a policy, but in this case the insurer must establish that misrepresentation was done knowingly because signature recital on application stated that the answers therein were correct to the best of applicant's knowledge). In contrast, the insurance policy at issue here did not specify that only willful misrepresentations would void the policy. Accordingly, we reject Jason's Enterprises' argument.

VI.

For the foregoing reasons, we affirm the district court's order entering judgment upon the jury's verdict. By reaching this holding we dispense with the need to examine GAI's cross-appeal challenging the district court's decision to allow the issue of bad faith to be decided by the jury.

AFFIRMED

  

National Labor Relations Board, Petitioner v. Building and Construction Trades Council of Philadelphia and Vicinity, AFL-CIO, Respondent and Patrick Gillespie, Additional Respondent, In Contempt

No. 88-3495

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

1989 U.S. App. LEXIS 9411; 131 L.R.R.M. 2022

April 6, 1989, Decided

## CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner, the National Labor Relations Board (board), filed a motion for the issuance of a protective order pursuant to Fed. R. Civ. P. 26(c)(1) directing that the deposition of a board regional director not be taken and that certain documents sought in respondent trade council's second request for production of documents not be divulged.

**OVERVIEW:** The board filed a motion for a protective order, pursuant to Fed. R. Civ. P. 26(c)(1), directing that the deposition of a board regional director not be taken, and that certain documents requested by the trade council be protected from discovery. The trade counsel sought to authenticate documents through the regional director, and to obtain factual information bearing on the claims at issue. On review, the court granted the board's motion for a protective order with regard to the deposition. The board stipulated to the authenticity of any board documents, and provided a list of witnesses relevant to the underlying claims. The court also found that the information sought was privileged as trial preparation material, and that the trade counsel failed to make a showing of substantial need for that information. In addition, the factual information possessed by the regional director was a distillation of the thought processes of the board's investigators and attorneys and was, as a result, privileged. The court also granted the motion as to the trade council's request for inter-agency notes as these were also protected as trial preparation material or work product.

**OUTCOME:** The court granted the board's motion for the issuance of a protective order. The information sought in the deposition of the regional director was protected by the privilege pertaining to trial preparation material, and the trade counsel failed to make a showing of substantial need for that information. Likewise, the inter-agency memoranda sought by the trade counsel were protected as work product or trial preparation material.

**CORE TERMS:** discovery, deposition, privileged, protective order, investigator, work site, work product, production of documents, discoverable, anticipation of litigation, factual information, undue hardship, unavailability, investigative, disclosure, deposing, Federal Rules of Civil Procedure, documentation, deliberative, inter-agency, authenticity, interviewed, impressions, interview, accorded, unsigned

## LexisNexis(TM) HEADNOTES - Core Concepts

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
[HN1]Information that is so intertwined with the litigation processes of a party is privileged absent a showing of substantial need and inability to obtain the information by other means.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
[HN2]The distillation of the reports and the thought processes of a party's attorneys and investigators are privileged.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
[HN3]Documents which relate to the investigation and the evaluation of the merits of a case are protected from disclosure.

*Civil Procedure > Disclosure & Discovery > Work Product*
[HN4]The work product privilege extends to an attorney acting as an investigator, for example, where he personally prepares a memorandum of an interview of a witness with an eye toward litigation.

*Civil Procedure > Disclosure & Discovery > Work Product*

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
[HN5]Work product, trial preparation material, etc., is ordinarily privileged matter, except upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. Fed. R. Civ. P. 26(b)(3).

*Civil Procedure > Disclosure & Discovery > Protective Orders*
[HN6]The possibility of discovering information which may be useful in impeaching witnesses is not a sufficient reason to permit discovery.

*Civil Procedure > Disclosure & Discovery > Work*

Page 38

  

Product

[HN7]Statements taken in anticipation of a contempt proceeding are in anticipation of litigation and are privileged.

**OPINIONBY: [*1]**

SISK

**OPINION: MEMORANDUM ORDER**

PRESENT: P. Douglas Sisk, (Special Master)

Presented for consideration is the motion of Petitioner, National Labor Relations Board (N.L.R.B. or Board), for the issuance of a protective order pursuant to Rule 26(c)(1), Federal Rules of Civil Procedure, directing that the deposition of Regional Director Peter Hirsch not be taken and that certain documents sought in Respondent's second request for production of documents not be divulged. Respondents, Building and Construction Trades Council (B.C.T.C.) and Patrick Gillespie, have filed an answer in opposition. Additional argument was offered by the parties during a discovery hearing on March 31, 1989.

Deposition of Peter Hirsch

On or about February 15, 1989, counsel for Respondent served a notice to take the deposition of Regional Director Peter Hirsch. The Board seeks a protective order asserting, pertinently, that there is no legitimate reason to depose Mr. Hirsch, that the knowledge which the Director has is the result solely of his official capacity in the Board, that examination of his thought processes is improper, and that the deliberative processes of government agencies are privileged. Further, the [*2] Board asserts that to the extent that Respondents may wish to probe the substance of any interviews the Regional Director may have had with potential witnesses or investigators, that such communications are privileged absent a showing of substantial need, and that none has been shown here. At the discovery hearing the Board further stated that whatever information which Mr. Hirsch possesses has come to him by virtue of his official capacity. Counsel for the Board maintained that any and all information available to Mr. Hirsch has been given in discovery to the extent it is properly discoverable.

Through its answer and argument offered by counsel at the discovery hearing, B.C.T.C. argues that the protection motion is premature in that Mr. Hirsch should be deposed and any objections to specific questions should be interposed at that time. Respondent contends that the deposition of Mr. Hirsch is necessary to establish facts and circumstances critical to Respondent's defense. Respondent argues that the questioning would go not to the state of mind or legal conclusions of the Director, but rather his knowledge of certain facts. Respondents' position, as set forth at the discovery hearing, [*3] is that Mr. Hirsch is needed 1) to authenticate documents n1, 2) to state facts relating to Mr. Hirsch's initial decision to discharge a claim relating to the Ponderosa work site, a claim which the Board has pursued in these proceedings despite the Regional Director's initial determination, and 3) to recite names of witnesses relevant to the Marriott work site. n2 Respondents assert, in general, that the broad latitude normally accorded in discovery should obtain here and that Respondent is not seeking discovery of thought processes, but rather facts within the knowledge and control of the Regional Director.

> n1 At the discovery hearing counsel for the Board agreed to stipulate to the authenticity of any discoverable Board documents.

n2 In the course of the hearing, Respondents were supplied with the names of those witnesses relevant to the Marriott work site, thereby obviating Mr. Hirsch's participation on this point.

I will grant the Board's motion for a protective order with regard to Mr. Hirsch. In view of the Board's stipulation of authenticity of any Board documents and its provision of the list of witnesses for the Marriott work site, footnotes 1 & 2, supra, the [*4] only question is the propriety of deposing Mr. Hirsch on factual information in his knowledge, and specifically, the facts he used in determining to dismiss charges on the Ponderosa work site. It is highly improbable that the proposed inquiry could be limited to only fact and exclude work product or deliberative processes. [HN1]The information within the knowledge and control of Mr. Hirsch is so intertwined with the litigation processes of the Board as to be privileged absent a showing of substantial need and inability to obtain the information by other means. *Hickman v. Taylor, 329 U.S. 495, 512-513 (1946); Bogosian v. Gulf Oil Corp., 738 F.2d 587, 592-593 (3d Cir. 1984.)* It is clear that in his official capacity as Regional Director, Mr. Hirsch is the recipient of information distilled from the investigations of his agents and of analysis which is clearly the work product of his attorneys and investigators. (See discussion of production of documents, infra.) To the extent that the Regional Director has factual information (barring his actual presence at the job sites, and there is no such assertion here) relevant to the inquiries, it is [HN2]the distillation of the reports and [*5] thought processes of the Board's attorneys and investigators, and therefore, privileged. *Hickman, supra at 511; Bogosian, supra at 592; Upjohn v, United States, 449 U.S. 383, 400 (1981)* To the extent that the Regional Director could offer his opinions with respect to his dismissal of the Ponderosa claim, though certainly highly useful for Respondents,

  

they would be irrelevant and immaterial to these proceedings, which will turn on questions of fact, such as whether specific gates were tainted. *N.L.R.B v. Whittier Mills Co., 123 F.2d 725, 728 (5th Cir. 1941)*

Finally, B.C.T.C. has made no serious showing of substantial need or inability to obtain the information it seeks through any other means than deposing the Regional Director. The facts surrounding the Ponderosa incident, and all other incidents, can be developed through other depositions, and the relevance and materiality of those facts will abide the eventual hearing.

Production of Documents

Petitioner also requests a protective order with respect to specific documentation sought in Respondents' second request for production of documents. Respondents seek, inter alia, production of 1) inter-agency memoranda [*6] and notes relating to the investigation and evaluation of the merits of the incidents, and 2) production of witness statements, signed or unsigned, and (3) notes taken by Board investigators while interviewing witnesses, including B.C.T.C.'s agents and representatives.

The request for inter-agency memoranda and notes, which are clearly privileged, will be denied and the protective order granted. The [HN3]documents sought relate to the investigation and the evaluation of the merits of the cases, and they are protected from disclosure by the well established privilege accorded to such memoranda. *N.L.R.B. v. Sears Roebuck & Co., 421 U.S. 132, 150-154 (1975); N.L.R.B. v. Sun Drug Co., 359 F.2d 408, 413 (3d Cir. 1966).* n3

> n3 [HN4]This privilege extends to an attorney acting as an investigator, i.e., where he personally prepares a memorandum of an interview of a witness with an eye toward litigation. *Harper & Row Publishers, Inc. v. Decker, 423 F.2d 487, 492 (7th Cir. 1970).*

With respect to the balance of the documents, Petitioner and Respondents properly assert that their production is governed by the doctrine of *Hickman v. Taylor, 329 U.S. 495 (1946);* Rule 26(b)(3), Federal Rules [*7] of Civil Procedure. Briefly, [HN5]work product, trial preparation material, etc., is ordinarily privileged matter, except "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Rule 26(b)(3). The Court of Appeals for the Third Circuit reviewed the Hickman doctrine in *Bogosian v. Gulf Oil Corp., 738 F.2d 587, 592-593 (1984).* Bogosian renders it clear that the documents sought by Respon-

dents fall squarely within the privilege explained by the Hickman Court. Unless Respondents can proffer a very strong showing of substantial need for the documents, which they can not otherwise obtain without undue hardship, their request for documentation must be denied. *Bogosian, 738 F.2d at 593.* Moreover, the court of appeals' analysis of *Upjohn v. United States, 449 U.S. 383, 400 (1981),* underscores the very strong requirement of showing necessity and unavailability to overcome the protection. Id.

Specifically, Respondents seek 1) witness statements, signed and unsigned, of B.C.T.C.'s [*8] "own" witnesses/agents and those of third parties interviewed by the Board during initial investigations, and 2) the notes and impressions of agents who interviewed the witnesses. Respondents candidly admit that they need the notes of their own agents' statements to refresh their recollections, in view of failing memories and the absence of their own notes. Further, that notes may lead to discoverable matter which will substantially reduce the amount of discovery and obviate the need for certain depositions. The Board counters, in its moving papers and during the hearing, that no affidavits exist and that all notes taken by the Board's investigators and attorneys are privileged. n4

> n4 The usual redactive process, in which the affiant gives a statement, reviews, revises, and ultimately swears to, did not occur here. Instead, the Board has in its possession only the notes and impressions of its agents and attorneys.

Respondents reasons do not qualify as an exception to the ordinary protection afforded work product. The identity of the witnesses is known, and therefore, the information sought can be developed through the normal, though time-consuming, processes of deposition. 8 [*9] Wright & Miller 215, commenting on Rule 26(b)(3); see, *Hickman, 329 U.S. at 508-9.* While the goal of controlling unnecessary discovery is laudable, the salutary purpose of depositions is to discover relevant information. The mere unavailability of one's own investigative notes does not warrant disclosure of one's opponents' investigative process. Finally, [HN6]the possibility of discovering information which may be useful in impeaching witnesses is not a sufficient reason to permit discovery. *In Re Grand Jury Investigation, 599 F.2d 1224, 1232-33 (3d Cir. 1979).*

To the extent Respondents seek third party witness statements on the theory that they were not taken in anticipation of litigation and are, therefore, not privileged, the Board's motion for a protective order will be granted. It is clear that [HN7]statements taken in anticipation of a contempt proceeding are in anticipation of litigation and are privileged. *Kent Corp. v.*

  

789 U.S. App. LEXIS 9411; 131 L.R.R.M. 2

*N.L.R.B., 530 F.2d 612, 623 (5th Cir. 1976.)*

**Summary:**

In light of the above, I will grant the Board's motion to preclude the deposition of Regional Director Peter W. Hirsch and the motion to preclude production of

the documents set forth in the **[*10]** Board's motion.

n5

n5 This order is without prejudice to the recognized practice of producing "Jencks Act" witnesses' prior statements just prior to the ultimate hearing.

  

JOANNA KAYATA, Plaintiff, -against- FOOTE, CONE & BELDING WORLDWIDE, L.L.C., ET ANO.,
Defendants.

99 Civ. 9022 (VM)(KNF)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2000 U.S. Dist. LEXIS 5314; 83 Fair Empl. Prac. Cas. (BNA) 239

April 25, 2000, Decided
April 26, 2000, Filed

**DISPOSITION:** [*1] Plaintiff's application to compel disclosure of documents generated during defendants' investigation of plaintiff's EEOC charge of discrimination denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff filed a motion to compel disclosure of documents generated during defendants' investigation of plaintiff's Equal Employment Opportunity Commission's charge of discrimination.

**OVERVIEW:** A telephonic conference was held with counsel to the respective parties to discuss certain discovery disputes that the parties had brought to the court's attention via correspondence. Among the matters raised and discussed with counsel to the parties, during the telephonic conference, was the viability of a work-product privilege claim made by defendants to shield from disclosure the investigation conducted by defendant's human resources director after she received notice of plaintiff's charge of discrimination. Plaintiff maintained that data generated as a result of defendant's human resources director's investigation should have been disclosed. Defendants maintained that the investigation was conducted at the direct request of legal counsel because litigation was anticipated. The court found that the documents generated during the course of the investigation were protected by the work-product doctrine. The court also finds that these documents were obtained or prepared because of the prospect of litigation.

**OUTCOME:** Motion denied; the actions defendant's human resource director took in connection with the investigation into plaintiff's complaint of discrimination were taken at the direction of legal counsel. Consequently, the work-product doctrine protected the disclosure of documents related to the investigation.

**CORE TERMS:** legal counsel, work-product, disclosure, deposition transcript, telephonic, discovery, investigative, legal theories, undue hardship, contacted, fired

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Civil Procedure > Disclosure & Discovery*

[HN1]Fed. R. Civ. P. 26(b)(3) provides that subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

*Civil Procedure > Disclosure & Discovery > Work Product*

[HN2]The work-product doctrine extends to those who are enlisted by legal counsel to perform investigative or analytical tasks to aid counsel in preparing for litigation. A document should be shielded from disclosure pursuant to the work-product doctrine if, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.

**COUNSEL:** For JOANNA KAYATA, plaintiff: Daniel J. Kaiser, William Heywood Kaiser, Kaiser, Saurborn & Mair, P.C., New York, NY.

For FOOTE, CONE & BELDING WORLDWIDE, L.L.C., defendant: Edward Cerasia, III, Seyfarth, Shaw, Fairweather & Geraldson, New York, NY.

**JUDGES:** KEVIN NATHANIEL FOX, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** KEVIN NATHANIEL FOX

**OPINION:** MEMORANDUM and ORDER

KEVIN NATHANIEL FOX

  

UNITED STATES MAGISTRATE JUDGE

## BACKGROUND

A telephonic conference was held with counsel to the respective parties on March 22, 2000, to discuss certain discovery disputes that the parties had brought to the Court's attention via correspondence. Among the matters raised and discussed with counsel to the parties, during the telephonic conference, was the viability of a work-product privilege claim made by defendants to shield from disclosure the investigation conducted by Foote, Cone & Belding's ("FCB") Vice President and Director of Human Resources, Linda Fraser, after she received notice of plaintiff's charge of discrimination filed with the [*2] Equal Employment Opportunity Commission ("EEOC").

At the time of the telephonic conference, counsel to the parties expressed very divergent views concerning the responses given to counsel to the plaintiff, by Ms. Fraser, during her deposition, when she was asked questions concerning the purpose for which she undertook the subject investigation. To resolve the dispute presented by the parties concerning this issue of privilege, the Court directed the parties to await receipt of the relevant deposition transcript, to review same and to provide the Court with a copy.

The parties have complied with the directive of the Court. Counsel to the plaintiff maintains that data generated as a result of Ms. Fraser's investigation should be disclosed because she testified that she conducted her investigation: (a) pursuant to FCB's discrimination complaint policy; (b) in the ordinary course of FCB's business; and (c) in accordance with her routine duties as FCB's Vice President and Director of Human Resources. Defendants maintain that the deposition transcript makes clear that, upon receipt of notice of the EEOC charge, Ms. Fraser contacted counsel immediately and conducted her investigation at [*3] the direction of counsel and did so because litigation was anticipated. A review of the relevant portions of the deposition transcript reveals that the following questions were put to Ms. Fraser by plaintiff's counsel and that the following answers were given by Ms. Fraser:

Question: I am asking whether you conducted an investigation into discrimination once you learned that Ms. Kayata had alleged that she was fired because of discriminatory reasons?

Answer: I did conduct an investigation.

Question: And did you do that pursuant to FCB's antidiscrimination policy?

Answer: I did that at the advice of legal counsel.

Question: So you did not conduct an investigation of

discrimination pursuant to the company's discrimination policy upon learning that Ms. Kayata had alleged that she was fired for discriminatory reasons?

Answer: I called the attorney right away.

Question: And did you conduct your investigation into Ms. Kayata's allegations of discrimination because of company policy or for some other reason?

Answer: Both because of company policy and because there was a charge filed. See Fraser Dep. Tr. at 67-69, passim.

\* \* \*

Question: [*4] Did you take any actions in connection with Ms. Kayata's complaint of discrimination that were not done at the direction of legal counsel?

Answer: No.
See Fraser Dep. Tr. at 74.

## DISCUSSION

[HN1]Fed. R. Civ. P. 26(b)(3), which is relevant to the instant dispute, in its most pertinent part provides the following:

Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other [*5] representative of a party concerning the litigation.

"The work-product doctrine codified for the federal court's in Fed. R. Civ. P. 26(b)(3) is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategies 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998)(citing Hickman v. Taylor, 329 U.S. 495, 510-11, 67 S. Ct. 385, 393-94, 91 L. Ed. 451 (1947).*

[HN2]The work-product doctrine extends to those who

  

Case 3:02-cv-01926-MRK  Document 132-4   Filed 11/18/2003   Page 16 of 21

2000 U.S. Dist. LEXIS 5314; 83 Fair Empl. Prac. (BNA) 239

are enlisted by legal counsel to perform investigative or analytical tasks to aid counsel in preparing for litigation. See *U.S. v. Nobles, 422 U.S. 225, 238, 95 S. Ct. 2160, 2170, 45 L. Ed. 2d 141 (1975).* In Adlman, the Second Circuit Court of Appeals made clear that a document should be shielded from disclosure pursuant to the work-product doctrine "if, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *U.S. v. Adlman, 134 F.3d at 1202.* [*6]

In the case at bar, Ms. Fraser testified that, immediately upon receiving notice of plaintiff's EEOC charge of discrimination, she contacted legal counsel. In response to a hypothetical question posed by plaintiff's counsel to determine how FCB processes complaints of discrimination under its antidiscrimination policy, Ms. Fraser explained that an investigation would be undertaken and then legal counsel would be consulted. See Fraser Dep. Tr. at 39. However, Ms. Fraser deviated from FCB's normal procedure with regard to plaintiff's claim of discrimination. First, she advised counsel of the EEOC charge. Then, Ms. Fraser conducted an investigation that was counsel-directed. Indeed, she testified that every action she took in connection with the investigation of plaintiff's complaint of discrimination was taken at the direction of legal counsel.

It is reasonable to infer that counsel, having been apprised of the filing of a charge of discrimination with the EEOC, would manage the investigation of that charge with an eye toward litigation. The Court finds,

based on the facts before it, that the documents generated by Ms. Fraser, during the course of the investigation that her counsel [*7] directed her to perform after counsel was advised of plaintiff's EEOC charge are protected by the work-product doctrine. The Court also finds that these documents were obtained or prepared because of the prospect of litigation. Counsel to plaintiff has made no showing to the Court that plaintiff has a substantial need of the materials generated during Ms. Fraser's investigation in preparation of plaintiff's case. Moreover, plaintiff has not demonstrated to the Court that she is unable, without undue hardship, to obtain the substantial equivalent of the subject investigative materials by means other than their disclosure by defendants. Under these circumstances, the Court finds that no basis exists to disregard the asserted privilege and to direct disclosure of the materials sought by plaintiff from the defendants.

## CONCLUSION

For the reasons set forth above, plaintiff's application to compel disclosure of documents generated during defendants' investigation of plaintiff's EEOC charge of discrimination is denied.

Dated: New York, New York

April 25, 2000

SO ORDERED:

KEVIN NATHANIEL FOX

UNITED STATES MAGISTRATE JUDGE

  

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DUNKIN' DONUTS INCORPORATED,<br>a Delaware corporation, and<br>DUNKIN' DONUTS USA, INC.,<br>a Michigan corporation,<br><br>Plaintiffs,<br><br>v.<br><br>4 DONUTS, INC.,<br>a Connecticut corporation,<br>GRANDO, INC.,<br>a Connecticut corporation,<br>GLENN STETZER,<br>KATHLEEN STETZER,<br>GEORGE GERMANO, and<br>JAMES MCMANAMA<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 302 CV 1920 (MRK)

NOVEMBER 18, 2003

## CERTIFICATION OF CHARLES RENO

1.      My name is Charles Reno.  I am a resident of the State of New Jersey, and I make this certification based on personal knowledge.

2.      I am the Divisional Manager of Loss Prevention for Allied Domecq Quick Service Restaurants (QSR), which is a division of Allied Domecq PLC.  Allied Domecq PLC is the parent corporation of Dunkin' Donuts Incorporated and owns the brands and franchise systems of Dunkin' Donuts, Baskin-Robbins, and Togo's Eateries.  Dunkin' Donuts and its franchisees currently operate approximately 4,000 shops in the United States and approximately 1,400 shops outside of the United States.  Baskin-Robbins and its franchisees currently operate approximately 2,300 stores in the United States and 2,200 stores outside of the United States.  Togo's and its franchisees currently operate approximately 300 stores in the United States.

3.      I have held the position of Divisional Manager of Loss Prevention for Allied Domecq QSR since June 2000 and have been an employee in the Loss Prevention Department

since March 1999.  As Divisional Manager of Loss Prevention, I supervise a staff of Loss Prevention Managers and outside investigators to achieve the mission of the Loss Prevention Department.  This mission includes preventing financial loss to both the enterprise and franchisees caused by inaccurate reporting of sales by franchisees.  Underreporting of sales by some franchisees is a significant problem to franchisors like Allied Domecq and to honest franchisees.  Underreporting of sales results in substantial lost revenues for both Allied Domecq and its franchisees.

4.      As part of my job duties, I helped prepare the Loss Prevention Manual used in investigating underreporting of sales by franchisees in all three of Allied's franchise systems. The Loss Prevention Manual details the investigative and audit process that it utilizes to detect underreporting of sales by rogue franchisees

5.      The Loss Prevention Manual is considered confidential by Allied Domecq and the Loss Prevention Department.  To my knowledge, Loss Prevention Manual has not been distributed outside of Allied Domecq PLC.  In fact, recipients of the Loss Prevention Manual within the company were told to keep it confidential and not to disclose it to anyone inside or outside of the company.

6.      The Loss Prevention Manuals are distributed to a select few employees.  To my knowledge, the only persons who should have knowledge of the Loss Prevention Manual are selected members of the Loss Prevention Department and Dunkin' Donuts' Legal Department. Within the Loss Prevention Department, the Loss Prevention Manual is only given to the Loss Prevention Managers, a Loss Prevention Analyst, the Divisional Managers and the Director.

7.      Outside investigators are sometimes hired by Dunkin' Donuts to assist in underreporting investigations.  These investigators are not given Dunkin's Loss Prevention Manual, but only instructions on investigation procedures.  They are instructed in writing that:

2

"All work performed for Dunkin' Donuts is confidential. Do not discuss this case (whom you are working for or investigating) with anyone . . . ." Investigators also sign a confidentiality agreement whereby they agree not to disclose the investigation procedures.

8.      Due to the confidential nature of Dunkin's Loss Prevention Manual, public dissemination would cause severe harm to Dunkin' Donuts. Dunkin's Loss Prevention Manual is detailed. The disclosure of the Loss Prevention Manual would compromise existing and future investigations since dishonest franchisees would know Dunkin's investigative techniques. With knowledge of these techniques, dishonest franchisees would be able to pattern their behavior in such a way as to make detection of underreporting far more difficult. In fact, if the Loss Prevention Manual were made known to franchisees, Dunkin' Donuts would be forced to re-write its procedures and compile entirely procedures and techniques, at great expense and burden to Dunkin' Donuts. Furthermore, Dunkin' Donuts likely would lose significant revenues as a result of dissemination of the Manual since franchisees who are underreporting would be more likely to evade detection while new procedures are crafted.

9.      One example of the Loss Prevention Manual that would be compromised by disclosure is the investigation procedures used by Dunkin' Donuts. The Loss Prevention Manual includes detailed instructions on how to perform investigations, including specifics on how to record suspicious activity and the best times and places to uncover improper transactions. If the Manual were disclosed to the franchisees, they could be used to pattern behavior to make future investigations fruitless.

10.     Dunkin' Donuts invested a large amount of resources in preparing the Loss Prevention Manual. I estimate that at least six Dunkin' Donuts personnel expended several hundred hours preparing the Manual at a cost of tens of thousands of dollars.

3

11.    The Loss Prevention Manual would not be easy for someone outside of Allied Domecq's Loss Prevention Department to create or duplicate on their own. The Manual was developed by people who have extensive training and experience in the fields of loss prevention and investigative techniques as well as an intimate understanding of the retail business conducted by Dunkin' Donuts, Baskin-Robbins, and Togo's franchisees. The Manual is not readily ascertainable by people without such a combination of experience and training.

12.    Dunkin' Donuts has investigated several franchisees who Dunkin' suspected were operating an unauthorized catering business. These investigations were undertaken with an eye towards litigation because of the company's zero-tolerance policy for the operation of an unauthorized catering business. Indeed, if the Loss Prevention Department concludes through its investigation that a franchisee has operated an unauthorized catering business, the matter is forwarded to the legal department to terminate the franchisee's Franchise Agreement and to determine whether litigation is necessary to enforce the termination.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 18th day of November 2003.

_____
Charles Reno

4