
1988 U.S. Dist. LEXIS 7987

DAVID V. ADAMSON, Plaintiff, v. DONALD RADOSEVIC, Chief, Real Estate Division, Corps of Engineers, Department of Army, and UNITED STATES OF AMERICA, Defendants

CIVIL ACTION No. 87-2105-O

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

1988 U.S. Dist. LEXIS 7987

July 26, 1988, Decided and Filed

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff lessor brought an action for declaratory and injunctive relief arising from the termination of residential leases by defendants, the Army Corps of Engineers and the United States. Lessor filed a motion to extend discovery. Several non-parties filed motions for protective orders or to quash deposition subpoenas.

**OVERVIEW:** The lessor had deposed various non-parties, then filed second and third requests for depositions of some of the deponents. A non-party, whose lease with the United States had not been terminated, moved to quash his third deposition upon the grounds that the request was burdensome. The court denied the motion to quash because some of the evidence that the lessor sought to obtain was relevant to the action. However, the court limited the scope of tangible evidence, such as check ledgers and other minutia, which the non-party would have had to produce at the deposition in order to avoid an undue burden on him. The court granted a motion to quash the subpoena to the non-party's bank requesting his financial records, holding that the non-party's privacy interest outweighed the lessor's interest in the documents. In addition, the lessor's interest was sufficiently protected by his opportunity to question the non-party at deposition. The court applied a similar analysis to the other non-parties motions and denied motions to quash while limiting the evidence to be produced.

**OUTCOME:** The court denied the motions of some non-parties to quash. However, it granted, in part, their motions for protective orders by limiting the evidence that they would have to produce. The court granted the motion of a non-party's bank to quash a subpoena for his financial records. Finally, the court granted the lessor's motion to extend discovery.

**CORE TERMS:** subpoena, discovery, deposition, lease, protective order, duces tecum, deponent, subpoena duces tecum, motion to quash, reopened, burdensome, pertaining, non-party, motions to quash, terminated, cancelled, phone, discovery of admissible evidence, reasonably calculated to lead, pretrial conference, injunctive relief, declaratory, pretrial, unduly, documents presented, relevant evidence, failed to produce, staff members, income tax, nonexistence

## LexisNexis(TM) HEADNOTES - Core Concepts

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

*Civil Procedure > Disclosure & Discovery > Protective Orders*

[HN1]A deponent is required to produce any documents reasonably within the scope of the subpoena unless he obtains a protective order or some other type of relief.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

*Civil Procedure > Disclosure & Discovery > Relevance*

[HN2]Under Fed. R. Civ. P. 26 parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. For evidence to be relevant under Rule 26, the information sought must appear reasonably calculated to lead to the discovery of admissible evidence, Fed. R. Civ. P. 26(b)(1).

*Civil Procedure > Disclosure & Discovery > Relevance*

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*

[HN3]The question of whether unprivileged matter is relevant and thus discoverable under Fed. R. Civ. P. 26 is a decision within the trial court's discretion. The trial court's decision on this matter is reversible only when abuse of discretion is shown.

*Civil Procedure > Disclosure & Discovery > Protective Orders*

[HN4]Discovery rules are to be accorded broad and liberal treatment. However, there are limits to the use of discovery tools. Discovery may be limited when the information sought is unreasonably cumulative or unduly burdensome, Fed. R. Civ. P. 26(b)(1). Courts also carefully scrutinize discovery requests made to non-parties when the requests are burdensome or unduly invade the privacy rights of the non-party. A party seeking to quash a subpoena duces tecum, however, has a particularly heavy burden as contrasted to a party seeking only limited protection from discovery.

  

COUNSEL: [*1]

Carston C. Johannsen, Thomas L. Thurston, Perry & Hamill, Overland Park, Kansas

Benjamin L. Burgess, Jr., United States Attorney, Robert A. Olsen, Assistant United States Attorney, Kansas City, KS

Jane Cornwell, Corps of Engineers, Kansas City, Missouri

MOTION FOR PROTECTIVE ORDER ON DAROL & KAREN RODROCK, Lewis A. Heaven, Holbrook, Ellis & Heaven, Merriam, Kansas

MOTION FOR PROTECTIVE ORDER ON Walt Riker, Mike Pettit, Steve Coen and Tom Carter, Michael Davidson, Senate Legal Counsel, Ken U. Benjamin, Jr., Deputy Senate Legal Counsel, Morgan J. Frankel, Ass't Senarte Legal Counsel, Washington, D.C.

Attorneys for Sara L. Cedarholm & David Owen, Douglas F. Behm, Michael A. Rump, Morrison Hecker Curtis Kuder & Parrish, KC, Mo

Attorneys for Leavenworth Nat'l Bank, Jeffery L. Baxter, Chapman & Waters, Leavenworth, KS

OPINIONBY: O'CONNOR

OPINION: MEMORANDUM AND ORDER

EARL E. O'CONNOR, CHIEF UNITED STATES DISTRICT JUDGE

Plaintiff, David V. Adamson, brought this action for declaratory and injunctive relief pursuant to 5 U.S.C. §§ 702, 703 and 28 U.S.C. §§ 1331, 1346. This action arises from certain leases entered into by the Army Corps of Engineers with several motel and apartment complexes [*2] in the Leavenworth, Kansas area. A final pretrial conference was held in this matter on November 16, 1987, and the pretrial order was filed December 31, 1987. Under that order, discovery was said to be completed. Subsequently, plaintiff moved to reopen discovery, claiming that he had recently learned of new facts pertaining to the case. The court granted plaintiff's request and reopened discovery for ninety (90) days. The matter is presently before the court on the motions of numerous non-parties for protective orders or to quash deposition subpoenas. plaintiff has also filed a motion to extend discovery.

The court discussed the factual background of this case in an earlier order and we will not repeat it in detail here. See Adamson v. Radosevic, F.Supp. (D. Kan. 1988). Pursuant to Congressional authority, the Army Corps of Engineers (hereinafter "the Corps") issued Solicitation No. 135 seeking bids for the leasing of 300 residential units. The units were for military personnel temporarily assigned to Fort Leavenworth for the Combined Arms Services Staff School (CAS3).

The Corps entered into four leases pursuant to this Solicitation Two of the lessors involved were [*3] the Cody Motor Inn, owned by the plaintiff, and Magnolia Manor, owned by Darol and Karen Rodrock. These leases contained provisions for the optional renewal of the units each year and also gave either party the right to terminate the lease on thirty days notice. All the leases were renewed on September 30, 1986. In early 1987, however, the need for off-post housing declined. As a result, the Corps terminated all these leases except that of Magnolia Manor, which had the largest number of units available at one location. Plaintiff objected to the termination of his lease.

Plaintiff subsequently filed this action for declaratory and injunctive relief. In his complaint, plaintiff alleges that the Corps violated federal statutes governing the bidding on government contracts when it terminated all the leases (including plaintiff's) but one. Plaintiff also contends that the Corps' decision to retain one of the leases, to the exclusion of all others, was based on improper grounds. With this very brief factual statement, the court will turn to the pending motions.

I. The Rodrock Depositions.

According to the pretrial order, discovery in this matter was said to be completed at the time [*4] of the pretrial conference. Subsequently, plaintiff requested that discovery be reopened; the court granted the plaintiff's request. After discovery was reopened, the plaintiff served deposition subpoenas duces tecum on Darol E. Rodrock, Karen S. Rodrock and two banks in which the Rodrocks had accounts. The Rodrocks are not named as parties in this action. However, they are the record owners of the Magnolia Manor, the holder of the only CAS3 lease that was not terminated by the Corps.

The record shows that plaintiff took Darol Rodrocks' deposition on September 16, 1987, and again in October of 1987. At his first deposition, Mr. Rodrock failed to produce a contract between himself (or his business) and David C. Owen, a consultant, which contract pertained to the CAS3 leases. Plaintiff knew of that contract at least by October 2, 1987, when Mr. Owen's deposition was taken. However, plaintiff did not pursue the matter in Mr. Rodrock' second deposition There was also evidence of a relationship between Mr. Rodrock and one Lt. Col. Michael Jacobi, an employee of Fort Leavenworth who was involved in the procurement of these leases. Plaintiff issued a third deposition subpoena duces tecum [*5] to Mr. Rodrock. The subpoena served on Mrs. Rodrock is the first time her deposition has been requested The Rodrocks have moved to quash these subpoenas on the ground that they are burdensome and harassing. In the alternative,

  

1988 U.S. Dist. LEXIS 7987

the Rodrocks request a protective order.

Plaintiff contends that the repeated depositions of Darol Rodrock and David Owen are necessary because these individuals failed to produce relevant information previously requested through earlier subpoenas duces tecum. [HN1]A deponent is required to produce any documents reasonably within the scope of the subpoena unless he obtains a protective order or some other type of relief. In this case, the deponents failed to obtain such relief. However, we note that plaintiff made no attempt to enforce the subpoenas or otherwise compel production of the documents before the date discovery was originally scheduled to close.

[HN2]Under Rule 26 of the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. For evidence to be relevant under Rule 26, "the information sought [must appear] reasonably calculated to lead to the [*6] discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). [HN3]The question of whether unprivileged matter is relevant and thus discoverable is a decision within the trial court's discretion. *Ryan v. Hatfield, 578 F.2d 275, 276 (10th Cir. 1978)*. The trial court's decision on this matter is reversible only when abuse of discretion is shown. *Silkwood v. Kerr-McGee Corp., 563 F.2d 433, 436 (10th Cir. 1977)*.

Generally, [HN4]discovery rules are to be accorded broad and liberal treatment. *Casson Constr. Co., Inc. v. Armco Steel Corp., 91 F.R.D. 376, 380 (D. Kan. 1980)*. However, there are limits to the use of discovery tools. Discovery may be limited when the information sought is unreasonably cumulative or unduly burdensome. Fed. R. Civ. P. 26(b)(1). Courts will also carefully scrutinize discovery requests made to nonparties when the requests are burdensome or unduly invade the privacy rights of the non-party. See, e.g., *Fein v. Numex Corp., 92 F.R.D. 94, 96 (S.D.N.Y. 1981); Hecht v. Pro-Football, Inc., 46 F.R.D. 605, 606-07 (D.D.C. 1969)*. A party seeking to quash a subpoena duces tecum, however, has a particularly heavy burden as contrasted to a party seeking only limited [*7] protection from discovery. In re Coordinated Pretrial Proceedings in *Petroleum Prod. Antitrust Litigation, 669 F.2d 620, 623 (10th Cir. 1982)*.

Based on these principles, the court finds that the Rodrocks' motion for protective order should be granted in part and denied in part. It is clear that some of the evidence sought by the plaintiff is calculated to lead to the discovery of relevant evidence in this case. However, the court also finds that the subpoenas duces tecum are in some respects overbroad and burdensome. Therefore, Darol and Karen Rodrock shall present themselves for depositions at a time and place agreed on by the parties and shall produce all documents that

fall within the descriptions of their respective deposition subpoenas unless the documents are specifically excepted. The Rodrocks' motion for protective order shall be granted to the following extent:

(1) The Rodrocks shall not be required to produce "all check ledgers, cancelled checks, bank statements or any other records" as requested by the plaintiff. The Rodrocks shall only be required to produce any cancelled checks, bank statement, or entries of payment which reflect payments made to Dave C. Owen, to [*8] any business in which Dave Owen has an ownership interest or is employed by, or to Michael Jacobi from 1982 to the present.

(2) The Rodrocks need not produce their phone records in regard to long distance calls made from their personal home phone and/or from their business phones.

(3) The Rodrocks need not produce their personal or business financial statements or income tax returns as requested.

(4) The Rodrocks shall not be required to produce any documentation regarding their ownership in Magnolia Manor or improvements made to that property.

(5) Since plaintiff has already deposed Darol Rodrock twice, the deposition of Mr. Rodrock shall be limited to questions pertaining to the following: (a) the relationship between the Rodrocks and/or Magnolia Manor and Dave C. Owen and/or Michael Jacobi; (b) the documents presented by the deponents pursuant to the subpoena duces tecum; and (c) the existence or nonexistence of any other documents described in the subpoenas duces tecum but not protected by this order.

(6) Counsel shall make reasonable accommodation for the taking of Mrs. Rodrocks' deposition in light of her physical condition.

Based on these conditions, the Rodrocks' [*9] motion for protective order is granted in part and denied in part. The motion to quash the deposition subpoenas and for attorney's fees is denied.

II. The Rodrocks' Bank Records.

The plaintiff also served subpoenas duces tecum on the Leavenworth National Bank and the Mark Twain Bank of Kansas City requesting all bank records of accounts of Darol and/or Karen Rodrock or accounts on which the Rodrocks are signators. Both the Rodrocks and the two banks involved have moved to quash those subpoenas.

The court finds that the Rodrocks' privacy interest in

Page 65

  

their financial affairs, plus the fact that they are not named as parties in this action, requires that these motions to quash be granted. The plaintiff's interest in discovering relevant evidence is sufficiently protected by the subpoena served on Mr. Rodrock which requires him to produce financial documents, cancelled checks, etc., which directly relate to the CAS3 contract and his dealings with Owen and Jacobi. There is no need to allow plaintiff a fishing expedition through the private financial records of a nonparty. Therefore, the motions to quash the subpoenas served on Leavenworth National Bank and Mark Twain Bank of Kansas [*10] City are granted.

## III. Dave Owen's Deposition.

Plaintiff deposed Dave Owen on October 2, 1987, regarding his involvement as a consultant for Darol Rodrock and Magnolia Manor with respect to the CAS3 leases. After discovery was reopened, plaintiff served a second subpoena duces tecum on Mr. Owen. Although Mr. Owen is not a party to this litigation, the court will permit the plaintiff to depose him a second time For the same reasons stated above, the court finds that Mr. Owen's motion for a protective order should be granted in part Therefore, the deponent is ordered to present himself for a deposition at a time mutually convenient for all concerned. However, the following limitations shall be imposed.

(1) Owen need not provide any contracts or other writing evidencing agreements between himself or his businesses and Darol Rodrock and/or his businesses that predate 1982, except for any consulting contract(s) pertaining to the CAS3 leases.

(2) Owen need not provide any financial statements or income tax returns.

(3) Owen need not provide any consulting agreements entered into with any other company that do not involve the CAS3 leases.

(4) Plaintiff shall limit his questioning [*11] of this deponent to the following: (a) the relationship between the deponent, Darol and Karen Rodrock and/or Magnolia Manor and/or Michael Jacobi; (b) the documents presented by the deponent pursuant to the subpoena duces tecum; and (c) the existence or nonexistence of any other documents described in the subpoenas duces tecum but not protected by this order.

On the conditions described above, Dave Owen's motion for a protective order shall be granted in part and denied in part. Owen's motion to quash the subpoena shall be denied.

## IV. Sara L. Cedarholm's Deposition.

Plaintiff has served a deposition subpoena duces tecum on Sara L. Cedarholm, executive assistant to David Owen at Owen and Associates. Like the other deponents, Ms. Cedarholm is not a party to this litigation. The subpoena requires Ms. Cedarholm to provide certain records. The court finds that some of these requests are duplicative of the subpoena served on Mr. Owen. Others do not appear reasonably calculated to lead to the discovery of admissible evidence.

Therefore, the court denies Ms. Cedarholm's motion to quash the subpoena. However, her motion for a protective order is granted to the following extent: the deponent [*12] need only provide records or documents that pertain to Mr. Owen's contacts and dealings with Michael Jacobi, Darol and/or Karen Rodrock, Magnolia Manor or the CAS3 housing contracts under Solicitation No. 135 at Fort Leavenworth, Kansas.

## V. Depositions of Senatorial Staff.

Plaintiff has also served subpoenas duces tecum on several staff members of Kansas Senator Robert Dole. These staff members also have filed a motion to quash or for a protective order. Since the filing of this motion, however, the plaintiff and deponents have worked out their differences and entered into a stipulation regarding the depositions of these persons. Therefore, this motion is denied as moot.

## VI. Plaintiff's Motion to Extend Discovery.

The final matter pending before the court is the plaintiff's motion to extend time in which to complete discovery. For good cause shown, this motion shall be granted. The parties have thirty (30) days from the date of this order to complete all remaining discovery. The parties are forewarned that, unless unusual circumstances arise, the court will not look favorably on any further requests for extensions of discovery in this matter.

IT IS THEREFORE ORDERED that [*13] the motion of Darol and Karen Rodrock to quash deposition subpoenas is denied. However, the Rodrocks' motion for protective order is granted in part as specified in this order.

IT IS FURTHER ORDERED that the motion for sanctions and attorney's fees filed by Darol and Karen Rodrock is denied.

IT IS FURTHER ORDERED that the motions of the Leavenworth National Bank and the Mark Twain Bank of Kansas City to quash subpoenas duces tecum is granted.

IT IS FURTHER ORDERED that the motions to quash subpoenas duces tecum filed by David C. Owen and

  

Sara L. Cedarholm are denied. However, Owen's and Cedarholm's motions for protective order shall be granted in part as specified in this order.

IT IS FURTHER ORDERED that the motion to quash or for protective order filed by Walt Riker, Mike Pettit, Steve Coen and Tom Carter shall be denied as moot.

IT IS FURTHER ORDERED that plaintiff's motion to extend time to complete discovery is granted. Discovery shall be completed within thirty (30) days from the date of this order.

Dated this 26th day of July, 1988, at Kansas City, Kansas.







DUNKIN' DONUTS INCORPORATED, et al., Plaintiffs, vs. OMAR MARTINEZ, et al., Defendants.

CASE NO. 01-3589-CIV-HUCK

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

2003 U.S. Dist. LEXIS 2694; 2003-1 U.S. Tax Cas. (CCH) P50,291; 92 A.F.T.R.2d (RIA) 5671

February 21, 2003, Decided
February 21, 2003, Filed

**DISPOSITION: [*1]** Plaintiffs entitled to their reasonable attorney's fees and expenses, with the amount to established by post-judgment motion.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff franchisor sued defendant franchisees, asserting breach of the franchise agreements and a lease justifying termination of the agreements, based on failure to comply with tax *(26 U.S.C.S. § 7206)* and immigration *(8 U.S.C.S. § 1324a)* statutes, and continued use of the franchisor's trademarks, trade names, and trade dress in violation of the Lanham Act, *15 U.S.C.S. § 1114* et seq. The court entered its findings.

**OVERVIEW:** The franchisor presented evidence that the franchisees failed to comply with federal tax and employment laws, by willfully filing tax returns containing materially false information and failing to complete and maintain I-9 forms for a substantial number of their employees. The franchisees argued they should be granted time to come into compliance, and that they had not been convicted of any tax or employment offense. The court found that a material breach of the franchise agreements did not require that the franchisees admit to or be convicted of a crime, only that they failed to comply with the law. The franchise relationship was based on good faith and trust, and the violations seriously jeopardized the franchisor's ability to maintain the essential integrity of the franchise system for the benefit of all its franchisees. The franchisees also argued the franchisor had improper motives in seeking to terminate their valuable franchises, but the court found motivation irrelevant in light of the material breaches. Once the franchise agreements were terminated, the franchisees were no longer licensed to use the trademarks and were infringing on the trademarks under the Lanham Act.

**OUTCOME:** Judgment was entered in favor of the franchisor ordering the termination of the franchise agreements and enjoining the franchisees from further use of the trademarks, and requiring the franchisees to comply with post-termination obligations. The franchisor was also entitled to judgment for reasonable attorney's fees and expenses incurred in connection with this action.

**CORE TERMS:** franchise, franchisee, donut, termi-

nation, franchise agreement, trademark, shop, post-termination, terminated, lease, personal expenses, tax evasion, injurious, principal place of business, business expenses, prejudicial, obey, franchisor, noncompliance, trade dress, evidence presented, material breach, child support, federal tax, proprietary, accountant, terminate, Lanham Act, breached, supplier

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Tax Law > Federal Tax Administration & Procedure > Audits & Investigations > Fraud (IRC secs. 6662-6664, 6674, 6690, 7204-7207, 7268, 7434, 7454, 7623)*
[HN1]See *26 U.S.C.S. § 7206(1)*.

*Tax Law > Federal Tax Administration & Procedure > Audits & Investigations > Fraud (IRC secs. 6662-6664, 6674, 6690, 7204-7207, 7268, 7434, 7454, 7623)*
[HN2]Whether a false statement in a tax return is material is a question of law for the court to decide. In tax cases, the making of a false statement must be willful, which is defined as a voluntary, intentional violation of a known legal duty. Filing false returns and related documentation with the Internal Revenue Service constitutes tax evasion.

*Immigration Law > Employer Prohibitions*
[HN3]*8 U.S.C.S. § 1324a* establishes an employment verification system under the auspices of the United States Department of Justice's Immigration and Naturalization Service. The statute requires the employer to execute an employment verification form (I-9 form) for each employee, attesting, under penalty of perjury, that the employer has verified the employee's identity and employment eligibility by examining one or a combination of specified documents. *8 U.S.C.S. § 1324a(b)(1)(A)*. Within three business days of hiring an employee, an employer is required to examine documents showing both the identity of the employee and his or her employment authorization.

*Immigration Law > Employer Prohibitions*
[HN4]See *8 U.S.C.S. § 1324a(b)(3)*.

*Immigration Law > Employer Prohibitions*
[HN5]See *8 U.S.C.S. § 1324a(e)(5)*.

  

*Business & Corporate Entities > Franchises & Distributorships > Terminations*

[HN6]A franchisee's violation of the law may justify termination of its franchise agreement on the principle that the good faith belief of the franchisor that the franchisee is untrustworthy or engages in fraudulent practices undermines the entire franchise relationship.

*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*

[HN7]A franchisee's criminal conduct is presumed to harm its franchisor's goodwill as a matter of law.

*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*

[HN8]Even in the absence of an arrest, indictment or conviction, the franchisee's ongoing criminal activity, once known by the franchisor, is sufficiently potentially injurious and prejudicial to a franchisor's goodwill to justify termination.

*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*

[HN9]A court is not empowered to rewrite the parties' agreements in order to relieve one party from the hardship resulting from strictly enforcing the clear terms of their agreement.

**COUNSEL:** For DUNKIN' DONUTS INCORPORATED, DUNKIN' DONUTS USA, INC., THIRD DUNKIN' DONUTS REALTY, INC., BASKIN-ROBBINS, INC., BASKIN-ROBBINS USA, CO., plaintiffs: David Worthen, Robert L. Zisk, Stephen J. Vaughan, Schmeltzer, Aptaker & Shepard, Washington, DC., Jeffrey Mitchell Goodz, Buchanan Ingersoll, Miami, FL.

For PHILOMAR, INC., OMAR MARTINEZ, JESLISA, INC., defendants: Roberto Zarco, Robert Francis Salkowski, Himanshu M. Patel, Zarco Einhorn & Salkowski, Miami, FL.

**JUDGES:** Paul C. Huck, United States District Judge.

**OPINIONBY:** Paul C. Huck

**OPINION: MEMORANDUM OPINION**

THIS CAUSE was tried non-jury by the Court on February 3rd through February 7, 2003. After [*2] considering the evidence presented, together with the parties' Joint Pretrial Stipulation, the Court makes the following findings of fact and conclusions of law.

**Introduction**

This is an action by Plaintiffs, Dunkin' Donuts Incorporated, Dunkin' Donuts USA, Inc., Third Dunkin' Donuts Realty, Inc., Baskin-Robbins, Inc. and Baskin-Robbins USA, Co., for breach of contract and trademark infringement based on Defendants, Omar Martinez, Jeslisa, Inc. and Philomar, Inc.'s operation of four Dunkin' Donuts shops and one Dunkin' Donuts/

Baskin-Robbins combination shop in the Miami Beach, Florida area. Plaintiffs allege that Defendants breached their Franchise Agreements (Counts I & II) and a lease (Counts III & IV), justifying Plaintiffs' termination of those agreements. Plaintiffs further allege that Defendants' continued use and enjoyment of Dunkin' Donuts' and Baskin-Robbins' trademarks, trade names, and trade dress are in violation of the provisions of the Lanham Act, *15 U.S.C. §§ 1114* et. seq. (Counts V-VII). Plaintiffs seek injunctive and other relief against Defendants. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 Plaintiffs abandoned their claim for monetary damages prior to trial.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*3]

Defendants deny these allegations and have raised several affirmative defenses to Plaintiffs' Complaint. Defendants dispute whether Plaintiffs' claims for Defendants' alleged failure to violate tax laws were properly raised by the pleadings and do not believe they are properly before the Court. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n2 On Friday, January 3, 2003, Plaintiffs advised the Court that they were no longer pursuing their claims for under-reporting of gross sales. Accordingly, Plaintiffs only pursued their claims based on Defendants' alleged violation of federal tax and employment laws. At the conclusion of the evidence, Plaintiffs argued that their complaint adequately raised the issue of Defendants' violation of the tax laws. Nevertheless, Defendants requested, that to the extent Defendants' alleged tax violations were not so raised, Plaintiff moved the Court to allow the pleadings to be amended to conform to the evidence presented on that issue pursuant to Fed.R.Civ.P. 15(b). It appears to the Court that the Complaint fairly raised Plaintiffs' claim that Defendants had violated the laws, including the tax laws. However, to the extent that there is any need for an amendment to conform to the evidence of tax evasion, that motion is granted. As the pretrial stipulation reflects, the parties were well aware that Plaintiffs were accusing Defendants of tax

  

evasion and had ample opportunity to, and did, in fact, adequately prepare for the resolution of the tax evasion issue at trial.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*4]

Based on unsolicited information provided to Plaintiffs by an anonymous caller, follow-up investigations completed by Plaintiffs' internal and non-party investigators, and records obtained from Defendants, Plaintiffs came to believe that Defendants were, among other things, violating federal tax and employment laws. Based on those conclusions, on August 16, 2001, Plaintiffs served notice on Defendants that the Franchise Agreements and a lease for one of the five Dunkin' franchises were terminated. Defendants received the notice of termination but have continued to operate the franchises and continue to utilize Dunkin' Donuts and Baskin-Robbins' proprietary marks. Plaintiffs filed this lawsuit to enforce the termination and enjoin Defendants from further infringing on Plaintiffs' trademarks.

During discovery, Plaintiffs subpoenaed numerous third-party financial institutions, the Social Security Administration, Defendants' accountant, and requested documents relating to the Defendants. Upon review of the documents, Plaintiffs deposed Defendants, their accountant, Defendant Martinez's ex-wife, Elizabeth Martinez, and the manager of Defendants' network of franchises, Rosana Larez. Plaintiffs [*5] assert that this discovery provides additional evidence that Defendants violated applicable tax laws during the tax years 1999-2001 and federal employment laws. Plaintiffs contend that the Defendant corporations regularly paid for Omar Martinez and Elizabeth Martinez's personal charges on a corporate credit card, that those charges were classified as business expenses on the Defendant corporations' tax returns, and that the Martinezes failed to report the payments as income on their personal federal income tax returns. Plaintiffs also contended that, during and after the marriage, Omar Martinez and Elizabeth Martinez improperly classified personal income received from the Defendant corporations as business expenses, thus, failing to accurately report their true income to the Internal Revenue Service. Also, Plaintiffs contend that Omar Martinez made child support payments with corporate funds, that he failed to treat the money as income, and that the corporations improperly classified the payments as business expenses.

Finally, Plaintiffs reviewed employment records, including I-9 forms, produced by Defendants. Plaintiffs contend that Defendants failed to comply with their legal obligations [*6] to prepare an I-9 form for each employee hired, accurately complete the I-9 form, maintain the I-9 form for the applicable period, verify the employee's eligibility for employment, and verify the accuracy of the identification information submitted by the employee.

Plaintiffs assert that these activities, among others, demonstrate that Defendants violated federal tax and employment laws and that such violations justify termination of the Franchise Agreements and the Lease for the Collins Avenue Shop. Plaintiffs also contend that the continued operation of the franchises by Defendants, subsequent to the receipt of the Notice of Default and Termination, constitutes trademark and trade dress infringement and unfair competition in violation of the Lanham Act. Plaintiffs seek an order: (1) enforcing the termination of the Franchise Agreements and the Lease for the Collins Avenue shop, (2) requiring Defendants to comply with their post-termination obligations, including surrendering possession of the franchised premises to Plaintiffs, and (3) requiring Defendants to pay Plaintiffs attorneys' fees and costs incurred in this action pursuant to the express terms of the Franchise Agreements [*7] and the Collins Avenue Lease.

Defendants generally deny Plaintiffs' allegations and have asserted various affirmative defenses to the allegations raised by Plaintiffs, including but not limited to, waiver and estoppel. In defense of the allegations of tax fraud, Defendants rely on the testimony of Omar Martinez and Defendants' accountant, Jack C. Miller, along with Defendants' accounting and financial records. Defendants assert that they did not engage in any tax fraud and properly differentiated between business and personal expenses on their tax returns. Moreover, Defendant Martinez contends that he has properly reported all of his personal income to the Internal Revenue Service.

Defendants also contend that they properly completed and maintained I-9 forms for each of their employees as required under the terms of the Franchise Agreements and applicable federal law. Lastly, Defendants argue that they were authorized to continue to use Plaintiffs' trademarks, trade name and proprietary marks pending a judicial determination of this action.

In summary, Defendants contend that they have fully complied with the terms of the Franchise Agreements and deny the allegations brought against [*8] them in this matter. Defendants seek to recover their reasonable attorneys' fees and costs incurred in having to defend this lawsuit.

**Basis of Federal Jurisdiction**

This Court has jurisdiction pursuant to §§ 34(a) and 39

  

of the Lanham Act, *15 U.S.C. §§ 1116*(a) & 1121, and *28 U.S.C. §§ 1331*, 1332 (a), 1338, & 1367(a). Diversity of citizenship exists and the amount in controversy exceeds $ 75,000, exclusive of costs and interest.

## FINDINGS OF FACT

### The Parties

Plaintiff, Dunkin' Donuts Incorporated ("Dunkin"), is a Delaware corporation with its principal place of business at 14 Pacella Park Drive, Randolph, Massachusetts.

Plaintiff, Dunkin' Donuts USA, Inc., is a Michigan corporation with its principal place of business at 3000 Town Center, Suite 3000, Southfield, Michigan and a wholly-owned subsidiary of Dunkin' Donuts Incorporated.

Plaintiff, Third Dunkin' Donuts Realty, Inc. ("Third Dunkin' Realty"), formerly Dunkin' Donuts of Florida, Inc., is a Massachusetts corporation with its principal place of business at 14 Pacella Park Drive, Randolph, Massachusetts. Third Dunkin' Realty is a wholly-owned subsidiary of Dunkin' [*9] Donuts Incorporated.

Plaintiff Baskin-Robbins Incorporated is a Delaware corporation with its principal place of business at 14 Pacella Park Drive, Randolph, Massachusetts.

Plaintiff, Baskin-Robbins U.S.A., Co. is a California corporation with its principal place of business at 14 Pacella Park Drive, Randolph, Massachusetts.

Defendant Jeslisa, Inc. ("Jeslisa"), is a Florida corporation with its principal place of business at 6772 Collins Avenue, Miami Beach, Florida. Defendant Jeslisa was the owner and operator of a Dunkin' Donuts franchise located at 6772 Collins Avenue, Miami Beach, Florida (the "Collins Avenue Shop") pursuant to a Franchise Agreement dated August 17, 1989 (the "Collins Avenue Agreement").

Defendant Jeslisa was the owner and operator of a Dunkin' Donuts franchise located at 1608 Alton Road, Miami Beach, Florida (the "Alton Road Shop") pursuant to a Franchise Agreement dated September 19, 1990 (the "Alton Road Agreement").

Defendant Jeslisa was the owner and operator of a Dunkin' Donuts franchise located at 427 Jefferson Avenue, Miami Beach, Florida (the "Jefferson Avenue Shop") pursuant to a Franchise Agreement dated January 23, 1995 (the "Jefferson Avenue Agreement"). [*10]

Defendant Jeslisa was the owner and operator of a Dunkin' Donuts franchise located at 1667 Washington Avenue, Miami Beach, Florida (the "Washington Avenue Shop") pursuant to a Franchise Agreement dated August 8, 1998 (the "Washington Avenue Agreement").

Defendant Philomar, Inc. ("Philomar") is a Florida corporation with its principal place of business at 333 41st Street, Miami Beach, Florida. Defendant Philomar was the owner and operator of a combination Dunkin' Donuts and Baskin-Robbins franchise located at 333 41st Street, Miami Beach, Florida (the "41st Street Combo"). Defendant Philomar was a Dunkin' Donuts franchisee pursuant to a Franchise Agreement dated October 27, 1996 (the "41st Street Dunkin' Agreement"), and was a Baskin-Robbins franchisee for the store pursuant to a Franchise Agreement dated June 13, 1997 (the "41st Street Baskin Agreement").

On August 17, 1989, Defendant Jeslisa entered, as lessee, into a Lease of Dunkin' Donuts Shop with Third Dunkin' Realty's predecessor in interest, Dunkin' Donuts of Florida, Inc., for the Collins Avenue Shop (the "Collins Avenue Lease").

Defendant Omar Martinez is a citizen and resident of the State of Florida. Under the terms [*11] of the respective Franchise Agreements, Omar Martinez was designated a franchisee of the Collins Avenue, Alton Road, and Jefferson Avenue shops. Omar Martinez is an officer and shareholder of Jeslisa and Philomar and generally manages the business operations of the several shops. Until their divorce in October 2000, Elizabeth Martinez assisted her husband. Jack Miller, CPA, was the accountant for all of the Defendants' and Elizabeth Martinez's business and personal accounting and tax matters.

Until October 2000, Omar Martinez was a shareholder, with Elizabeth Martinez, of OJM Group, Inc. In accordance with their Martial Settlement Agreement, Omar Martinez transferred his interest in OJM Group, Inc., to his former wife, Elizabeth Martinez. In turn, Elizabeth Martinez transferred her interest in Jeslisa and Philomar to Omar Martinez. OJM Group, Inc., is the owner of the building in which the Washington Avenue Shop is located.

The Collins Avenue Shop is known as a "producing unit" where doughnuts and related products are baked. The Alton Road, Jefferson Avenue, 41st Street Combo, and Washington Avenue Shops are "satellite shops," which do not bake goods of their own, but sell products [*12] produced at the Collins Avenue Shop. The termination of the Collins Avenue Franchise Agreement constitutes an incurable default under the Franchise Agreements for the satellite shops, permitting their termination.

### The Relevant Terms of the Franchise Agreements and Lease

Paragraph 5.Q of the Collins Avenue Agreement pro-

  

Case 3:02-cv-01920-MRK    Document 132-5    Filed 11/18/2003    Page 11 of 16

2003 U.S. Dist. LE\_/2694; 2003-1 U.S. Tax Cas. (CCH) P50,29\_, \_2 A.F.T.R.2d (RIA) 5671

vides that:Franchisee agrees to comply promptly with all applicable laws, rules, regulations, ordinances, and orders of public authorities including, but not limited to, health departments, Board of Fire Underwriters and other similar organizations.There are slight variations in language between the Collins Avenue Agreement and the other Franchise Agreements, but each agreement requires compliance with all laws. n3 This type of provision is commonly called the "obey all laws" provision.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 For example, P 5.Q of the Jefferson Avenue franchise agreement states:Franchisee agrees to comply promptly with all applicable laws, rules, regulations, ordinances and orders of public authorities including, but not limited to, Government Agencies, Board of Fire Underwriters and other similar organizations. The term "Government Agencies" shall include without limitation all governmental units, however designated, which address health, safety, sanitation, environmental or other issues affecting operations of the Dunkin' Donuts Shop.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*13]

Paragraph 8.A.1 of the Franchise Agreements provide that franchisee shall not "... do or perform, directly or indirectly, any other act injurious or prejudicial to the good will associated with the Dunkin' Donuts Proprietary Marks and the Dunkin' Donuts Systems."

Paragraph 9.F.2 of the Franchise Agreement provides that:Franchisee shall immediately cease to use, by advertising or in any other manner whatsoever, any methods associated with the name "Dunkin' Donuts", any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, signs, symbols or devices forming part of the Dunkin' Donuts System or otherwise used in connection with the operation of the Dunkin' Donuts Shop. Franchisee agrees that any unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm subject to injunctive relief.

The Baskin-Robbins Franchise Agreement contains provisions similar to the Dunkin' Donut agreements.

Under paragraphs 15(a) and 19(e) of the Collins Avenue Franchise Agreement, Third Dunkin' Realty has the right to terminate the Collins Avenue Lease if the Collins Avenue Franchise Agreement [*14] is terminated for any reason and to enter and repossess the premises upon any termination of the Collins Avenue Lease.

Defendants also agreed to pay to Plaintiffs its costs and expenses, including reasonable attorneys' fees, incurred by reason of any termination of the Franchise Agreements.

**The Default Notice**

On August 16, 2001, the Plaintiffs sent Defendants a notice of default letter declaring that Defendants were in default of the above referenced provisions of the Franchise Agreements and that those agreements, and the Collins Avenue Lease, were terminated. However, Plaintiffs further advised Defendants that if the Defendants challenged the termination Defendants could continue to operate under the Franchise Agreements pending a judicial determination of the parties' rights under the Franchise Agreements. Four days later Plaintiff filed this action. On September 10, 2001, Defendants filed their answer. Defendants have continued to occupy the premises and to operate the Dunkin' Donuts and Baskin-Robbins franchises.

**Non-Compliance With Federal Income Tax Laws**

Based on the evidence presented, the Court finds that the Defendants failed to comply with applicable [*15] federal income tax laws for the tax years 1999, 2000, and 2001 by willfully filing tax returns containing materially false information. [HN1]Title 26, U.S.C. § 7206(1) expressly applies to "any return, statement, or other document" signed under the penalties of perjury and requires that a tax return, statement or other document be "true and correct as to every material matter." *United States v. Bishop, 412 U.S. 346, 350, 36 L. Ed. 2d 941, 93 S. Ct. 2008 (1973); United States v. Gollapudi, 130 F.3d 66, 71-72 (3d Cir. 1997).* Defendants' tax returns contain a declaration that they were submitted under penalty of perjury. [HN2]Whether a false statement in a tax return is material is a question of law for the court to decide. *United States v. Gaines, 690 F.2d 849, 858 (11th Cir. 1982).* In tax cases, the making of a false statement must be willful, which is defined as a "voluntary, intentional violation of a known legal duty." *Cheek v. United States, 498 U.S. 192, 200, 112 L. Ed. 2d 617, 111 S. Ct. 604 (1991); United States v. Lankford, 955 F.2d 1545 (11th Cir. 1992).* Filing false returns [*16] and related documentation with the IRS constitutes tax evasion. *United States v. Conley, 826 F.2d 551, 556-557* (filing false W-4 information is an affirmative act of tax evasion); *United States v. Hughes, 766 F.2d 875, 878 (5th Cir. 1985)* ("The requisite affirmative act can be found in the filing of false tax returns for each year in the indictment."). "Willfulness may be inferred from circumstantial evidence." *United States v. Ashfield, 735 F.2d 101, 105 (3d Cir.1984).*

The Defendants evaded federal taxes by willfully, sys-

  

tematically, pervasively, and repeatedly deducting Omar Martinez and Elizabeth Martinez's personal expenses as the business expenses of Jeslisa and Philomar. The amounts deducted in each of the three tax years were substantial, in the tens of thousands of dollars each year, and material to the accuracy of the Defendants' tax returns. Some of the personal expenses wrongfully deducted as business expenses include the Martinezes' child's private school tuition, personal automobile lease payments, fuel and other automobile expenses, their own and their children's clothing, restaurant bills, groceries, household furnishings [*17] and related items, toys, jewelry, non-business services, and other personal expenses. In addition, in accordance with the terms of their Marital Settlement Agreement, Omar Martinez was obligated to pay child support to Elizabeth Martinez. Omar Martinez fulfilled his child support obligations from Jeslisa and Philomar's funds, disguising such payments as legitimate business expenses. By falsely categorizing these personal expense payments as ordinary business expense payments on their income tax returns, Jeslisa and Philomar wrongly reduced their net profit as reflected on their respective corporate income tax returns. Conversely, the corporate payments of the Martinezes' personal expenses, including the child support payments, were not disclosed as income on the Martinezes' personal federal income tax returns. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n4 Jeslisa and Philomar paid Elizabeth Martinez for various, periodic consulting work she allegedly performed after the Martinezes were divorced. However, neither company issued any W-2, 1099 or other required income tax form recording such payments and Elizabeth Martinez did not declare these consulting fees on her personal income tax returns. Moreover, the total amount paid monthly for her consulting work and reimbursements for her related expenses were, coincidentally and suspiciously, the same each month and equal to child support payments due from Omar Martinez.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*18]

Defendants had no supporting documentation to support their contention that the questioned business expense deductions were legitimate business expenses. Moreover, the manner in which identifiable deducted expenses were categorized in Jeslisa and Philomar's

general ledger was patently irrational and left unexplained by Defendants and Defendants' accountant. A few representative examples of this irrational categorization are: private school tuition categorized as bank service charges; restaurant meals as repair and maintenance; optician and eye glasses as bank service charges; video amusement games, men's, women's and children's clothing and jewelry as bakery/kitchen and trucking; expenses associated with a vacation home as repairs and maintenance; and groceries as bank service charges.

In view of the large volume, the repetition, the irrational categorization, the lack of supporting documentation and the obvious personal nature of Defendants' improper business expense deductions, Defendants could not have reasonably believed that their tax treatment of those deductions were in conformance with federal tax laws. Rather, the Defendants' failure to comply with the tax laws and submit [*19] accurate tax returns was voluntary and intentional and, therefore, willful.

The Defendants have offered numerous explanations for the deducted business expenses in an attempt to justify deductions of what facially appear to the Martinezes' personal expenses. Defendants also suggest that any misclassifications of personal expenses as business expenses were inadvertent. Defendants' explanations were not credible in light of the overwhelming documentary evidence presented, the absence of backup documentation supporting a business purpose, and the reoccurring nature of the misclassification of obviously personal expenses. Moreover, the Defendants' testimony in this regard was facially incredible and inconsistent with common knowledge and reason.

In summary, the Martinezes, both before and after their divorce, used Jeslisa and Philomar funds as their personal checkbooks in violation of federal tax laws. n5

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n5 On February 7, 2003, following the presentation of the evidence and closing arguments, the Court orally made certain findings of fact related to Defendants' tax evasion. To the extent that those findings are not specifically enumerated above, they are incorporated herein by reference.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*20]

**Compliance with Employment Verification Requirements**

  

Title [HN3]*8, U.S.C.* § *1324a* establishes an employment verification system under the auspices of the United States Department of Justice's Immigration and Naturalization Service. The statute requires the employer to execute an employment verification form ("I-9 form") for each employee, attesting, under penalty of perjury, that the employer has verified the employee's identity and employment eligibility by examining one or a combination of specified documents. *Id.* § 1324a(b)(1)(A). Within three business days of hiring an employee, an employer is required to examine documents showing both the identity of the employee and his or her employment authorization.

[HN4]The employer "must retain the [I-9] form and make it available for inspection by officers of the Service, the Special Counsel for Immigration-Related Unfair Employment Practices, or the Department of Labor during a period beginning on the date of the hiring, recruiting, or referral of the individual and ending ... three years after the date of such hiring, or ... one year after the date the individual's employment is terminated, whichever [*21] is later." *Id.* § 1324a(b)(3), 1324a(b)(3)(B)(I), 1324a(b)(3)(B)(ii). In other words, an employer must maintain an I-9 form for every employee hired for a minimum of three years.

An employer's failure to maintain I-9 information has significant consequences. *8, U.S.C. 1324a*(e)(5) sets forth the penalties for failing to maintain required I-9 form documentation:

[HN5](5) Order for civil money penalty for paperwork violationsWith respect to a violation of subsection (a)(1)(B) of this section, the order under this subsection shall require the person or entity to pay a civil penalty in an amount of not less than $ 100 and not more than $ 1,000 for each individual with respect to whom such violation occurred.*Id.*

Based on the evidence presented, the Court finds that Defendants did not materially complied with the applicable federal employment laws by virtue of their failure to complete and maintain I-9 forms for a substantial number of their employees. Unlike the clear evidence presented on the tax evasion issue, the evidence regarding Defendants' compliance with federal requirements for verification of qualification for employment is [*22] less than clear. Plaintiffs have presented evidence, based on the I-9 forms and other employee information produced in pretrial discovery, that Defendants neither completed nor properly maintained I-9 forms for a substantial number of its employees. Plaintiffs presented a summary, based upon those I-9 forms and other employee data produced in discovery, which established that Jeslisa had only 34 I-9 forms for its 123 employees and Philomar had only 11 forms for its 60 employees.

Defendants have offered testimony that they have materially complied with the I-9 form requirements and that the I-9 forms produced in discovery do not represent all of the forms which Defendants had obtained for its employees. Defendants' general manager, Maximilian Rodriguez, who oversees the day-to-day operation of the shops, including hiring employees and assuring that Defendants comply with all applicable federal employment laws, testified that Defendants' required a properly completed I-9 form, with supporting documentation, for all of its employees. Omar Martinez testified that prior to the termination notice, he had delivered originals of all of the I-9 forms to Plaintiffs' representatives, who had [*23] unexpectedly visited his shops to conduct an inspection and demanded that all I-9 forms be immediately provided to them. Martinez testified that the I-9 forms produced in pretrial discovery were incomplete only because Plaintiffs failed to return all of the I-9 forms delivered to them.

Plaintiffs did not offer testimony of its inspectors with regard to which I-9 forms were delivered and returned to Plaintiffs and to directly contradict Defendant Martinez's testimony. However, Plaintiffs challenged the credibility of Martinez and Rodriguez' testimony with Defendants' own contemporaneous documents which were inconsistent with their trial testimony. With regard to Martinez, he first testified that he had given only original I-9 forms to Plaintiffs, in two separate groups. The first group given during Plaintiffs' unexpected visit and the second group delivered by Federal Express the next day or so. Martinez testified that it was this second group of forms which were not returned. However, when confronted with his cover letter accompanying the second group, which stated that "only copies" were delivered, Martinez testified that he was not sure whether he delivered copies or originals to [*24] Plaintiffs. Plaintiffs also established, based on Defendants' records, that for the 24 new employees hired by Jeslisa and Philomar after Martinez delivered the I-9 forms to Plaintiffs's inspectors, Defendants had only 14 I-9 forms. Finally, though Rodriguez testified that he oversaw the completion of all or most of the new employees' I-9 forms, of the 13 I-9 forms for employees hired in 2001, only two were signed by Rodriguez. Rodriguez could offer no explanation for this apparent discrepancy other than to say there should have been more.

While there is conflicting evidence about whether Defendants materially complied with *8 U.S.C.* § *1324*(a), based on the contemporaneous documentary evidence and the inconsistencies in Defendants' witnesses' testimony, which calls into question its credibility, the preponderance of the evidence reveals that Defendants did not comply.

  

### Lack of Criminal Charges and Adverse Publicity

The Defendants have not been convicted, indicted, fined or otherwise cited by any governmental agency as a result of the Defendants' noncompliance with federal income tax or employment laws. Moreover, the Plaintiffs have not shown that [*25] any person, other than the parties and their representatives, are aware of the Defendants' noncompliance with the federal laws or that Plaintiffs have lost any customers or attracted any adverse public attention as a result of Defendants' noncompliance with the federal laws.

### CONCLUSIONS OF LAW

The Defendants' noncompliance with the federal income tax and employment laws constitute a material breach of the Franchise Agreements justifying their termination. The parties agreed that Plaintiffs would be entitled to terminate their Franchise Agreements for Defendants' failure "to comply promptly with all applicable laws, rules and regulations." Plaintiffs have validly terminated the Franchise Agreements entitling them to require Defendants to comply with all applicable post-termination obligations. Defendants have failed to comply with their post-termination obligations by continuing to operate as Dunkin' Donuts and Baskin-Robbins franchisees, by continuing to use Plaintiff's trademarks and trade dress and by failing to vacate the Collins Avenue premises.

Defendants' violation of the Internal Revenue Code and of the 8 U.S.C. § 1324(a) each represent a [*26] material breach of the franchise agreements which require Defendants to "comply promptly with all applicable laws, rules, regulations, ordinances, and orders of public authorities" in the operation of their shops. As a general proposition, [HN6]a franchisee's violation of the law may justify termination of its franchise agreement on the principle that the "good faith belief of the franchisor that the franchisee is untrustworthy or engages in fraudulent practices undermines the entire franchise relationship." *Humboldt Oil Co., v. Exxon Co., 695 F.2d 386, 389 (9th Cir. 1982), cert. denied, 485 U.S. 1021 (1988).* Here, the Plaintiffs have contracted for the right to terminate Defendants when Defendants engage in unlawful activity which undermines their franchise relationship.

Other district courts, applying the same "obey all laws" provision at issue here, have held that a failure to comply with federal or local law is a material breach warranting termination of the franchise agreement. *See, e.g., Dunkin' Donuts, Inc. v. Chetminal, Inc., No.97-6413-CIV-MARCUS,* Bus. Franchise Guide (CCH) P 11,290 (S.D. Fla. Oct. 30, 1997) (upholding termination of franchise [*27] agreement where a Dunkin' franchisee sold cigarettes to minors); *Dunkin' Donuts Inc. v. Barr Donut, LLC, 242 F. Supp. 2d 296, 309-*

310, 2003 U.S. Dist. LEXIS 783, *38-40 (S.D.N.Y. 2003) (upholding termination for drug smuggling); and holding that the franchise agreement's obey all laws provision was violated by defendants' criminal behavior and warranted termination); *Dunkin' Donuts, Inc. v. Gav-Stra Donuts, Inc., 139 F. Supp. 2d 147, 154 (D. Mass. 2001)* (holding that Dunkin' franchisees' commission of tax fraud breached the obey all laws provision, warranting termination); *Dunkin' Donuts, Inc. v. Taseski, 47 F. Supp. 2d 867, 877 (E.D. Mich. 1999)* (enforcing Dunkin's termination of franchise agreement under the obey all laws provision when franchisees under-reported sales, underpaid their obligations and falsified financial records); *Dunkin' Donuts Inc. v. Thiem,* No. CV 93-0419JSL (Tx), slip op. at 3 (C.D. Cal. March 9, 1993) (holding that franchisee breached obey all laws provision when the court was presented with duplicate sets of tax returns prepared by the franchisees, from which it could only conclude that the law had been [*28] violated); *Dunkin' Donuts of America, Inc. v. Middletown Donut Corp., 100 N.J. 166, 495 A.2d 66 (N.J. 1984)* (upholding Dunkin's right to terminate franchise agreements where Dunkin' established that the franchisee committed tax fraud).

Defendants contend that, even if they violated the Internal Revenue Code or 8 U.S.C. § 1324(a), the Court should not consider such violation a material breach of the franchise agreements because only the federal government is empowered to enforce those laws and, also because Defendants have not either admitted to or been convicted of violating those laws. The Court rejects both of these contentions based on the clear wording of the obey all laws provision. That provision does not require that Defendants' admit to or be convicted of a crime, only that Defendants comply with the law. *See Chetminal, supra,* at 3. In *Chetminal,* Judge Stanley Marcus upheld the termination of a Dunkin' Donuts franchisee who unlawfully sold cigarettes to minors, even though the criminal charges against the franchisee had been dropped when the state concluded that it could not convict. Plaintiffs' right to enforce its bargained [*29] for private contract rights to do business with only law abiding franchisees is not, and should not be, dependant upon Defendants' willingness to admit guilt or the pertinent governmental agency's ability and desire to uncover and successfully prosecute a franchisee's violation of the law. Plaintiffs need only prove Defendants' violation of the law in order to enforce their contractual right to terminate.

The Court also concludes that Defendants' noncompliance with the tax laws and with 8 U.S.C. § 1324(a) violates P 8.A.1, prohibiting Defendants from doing anything injurious or prejudicial to the good will as-

  

sociated with the Plaintiffs' proprietary marks or their franchise systems. Many district courts have held that a Dunkin' Donuts franchisee's criminal conduct arising out of the operation of its franchise is, by its very nature, injurious and prejudicial or potentially injurious and prejudicial to the franchisor's good will as contemplated by P 8.A.1. *See Chetminal, supra,* at 3; *Gav-Stra Donuts, 139 F. Supp. 2d at 153* (citing several district court decisions and holding that Dunkin' Donuts franchisees' commission of tax fraud constituted [*30] conduct injurious and prejudicial to the Dunkin' system in violation of the Dunkin' Donuts franchise agreement, warranting termination); *Thiem, supra,* slip op. at 3 (holding that "Defendants' intentional under-reporting of sales to the taxing authorities was injurious and prejudicial to the goodwill associated with Dunkin' Donuts' proprietary marks and the Dunkin' Donuts system, in breach of Paragraph 8.A.1 of both Franchise Agreements" and justified termination of the franchise); *Dunkin Donuts, Inc. v. Panagakos,* No. 96-11040-RGS, Bus. Franchise Guide (CCH) P 11,174 (D. Mass. May 13, 1997) (holding that "no reasonable jury could find that Panagakos' involvement in a tax evasion scheme intimately connected with the operation of his Dunkin' Donuts franchise was not a material breach" of P 8.A.1 of the franchise agreement). *See also Palombi v. Getty Oil Co., 501 F. Supp 158, 162 (E.D. Pa. 1980); Serubo Cadillac Co., Inc. v. Cadillac Motor Car, Div. of General Motors Corp., 1986 U.S. Dist. LEXIS 26759,* No. Civ. A 79-613, 1986 WL 4524 at *9 (E.D. Pa. April 15, 1986); *Shell Oil Co. v. Altina Assoc., Inc., 866 F. Supp. 536, 541-42 (M.D. Fla. 1994).*

As the Court [*31] in *Palombi* court observed: Certainly there can be few more compelling justifications for terminating a service station franchise than the indictment and conviction of the franchisee for price-gouging. Through trademarks and advertising, the consumer comes to link supplier and dealer. When the dealer is convicted of price-gouging, the suggestion of fraud necessarily taints the supplier's reputation. That such a charge and conviction would support a dealer's termination seems indisputable. *501 F. Supp. at 162.*

[HN7]A franchisee's criminal conduct is presumed to harm its franchisor's goodwill as a matter of law. *See, e.g., Palombi, 501 F. Supp. at 162-63* ("the suggestion of fraud necessarily taints the supplier's reputation ... [A] *dealer's* conviction for price-gouging cannot help injuring the *supplier's* reputation for integrity and fairness.") (emphasis added).

[HN8]Even in the absence of an arrest, indictment or conviction, the franchisee's ongoing criminal activity, once known by the franchisor, is sufficiently potentially injurious and prejudicial to Plaintiffs' goodwill to justify termination. As Judge Marcus stated

in *Chetminal,* [*32] even if the franchisee's criminal activity has not yet been publicized, as in the instant case, it could be injurious to franchisor's good will and, thereby, still violate Section 8.A.1. *Chetminal. supra,* at 2. It is reasonable to conclude that once Plaintiffs learned that Defendants' systematically committed tax fraud and violated employment and immigration laws in connection with the operation of the franchises, Plaintiff should not wait, nor be required to wait, until the criminal activity is publicized before terminating the Franchise Agreements. Were it otherwise, Plaintiffs themselves could be subject to even greater criticism and potential harm for knowingly ignoring, and thereby seeming to have condoned, their franchisees' criminal conduct. Moreover, the very nature of Defendants' illegal activity not only undermines their franchise relationship, which is based on good faith and trust, but seriously jeopardizes Plaintiffs' ability to maintain the essential integrity of the franchise system for the benefit of all franchisees who comply with the law.

The Plaintiffs properly terminated each of their franchise agreements with the Defendants. In accordance with the terms [*33] of the Collins Avenue Lease, the Plaintiffs also properly terminated that lease, thereby, entitling Plaintiff to enter and possess the leased premises.

## Defendants' Defenses

Defendants contend that Plaintiffs should not be allowed to terminate the franchise agreements because Plaintiffs were improperly motivated to remove Defendants and take over the valuable franchises built by Defendants' hard work.

During trial, Defendant Martinez testified that Plaintiffs' motivation to terminate the Franchise Agreements was to get rid of Defendants because they weren't going along with Plaintiffs' demands for change and to bring "new blood" into their franchise systems. Martinez testified that Plaintiffs threatened that if he was unwilling to change his Blimpie's franchises to Plaintiffs' competing Togo's franchise, then Plaintiffs would terminate the Franchise Agreements. Defendants made no reference to these allegations in the Pretrial Stipulation or in their Proposed Findings of Fact and Conclusions of Law. Nevertheless, the Court allowed Defendants to present this testimony over Plaintiffs' objection. Plaintiffs elected not to offer testimony to refute Defendants' claims of improper [*34] motive. Rather, Plaintiffs argue that Defendants' evidence of improper motive is irrelevant based on clear Eleventh Circuit precedent, *McDonald's Corp. v. Robertson, 147 F.3d 1301, 1309 (11th Cir. 1998),* and accordingly, Defendants' noncompliance with tax and employment laws may not be excused by Plaintiffs' other motives to eliminate Defendants as franchisees.

  

The Court concludes, based on the holding in *McDonald's Corp. v. Robertson,* that Defendants' unrefuted evidence of Plaintiffs' improper motive for terminating the franchise agreements is irrelevant in light of Defendants' material breaches of those agreements. *See also Dunkin' Donuts, Inc. v. Patel, 174 F. Supp. 2d 202, 212 (D. N.J. 2001).*

Accordingly, the Court concludes that Defendants have failed in their affirmative defenses, including the defense of unclean hands.

At the close of the evidence, Defendants argued that if the Court should find Defendants in violation of their franchise agreements, this Court should exercise its equitable powers to fashion an equitable remedy which takes into account the great value which Defendants have built into their franchises and which is less severe **[*35]** than outright termination. In response to the Court's oral announcement at trial, that it found that Defendant had violated the tax laws, Defendants then suggested that the Court should give them a reasonable opportunity to amend their tax returns, pay the taxes, penalties and interest then owed, and be returned to the status quo vis-a-vis the Plaintiffs.

Based on the Court now finding that Defendants also violated 8 U.S.C. § 1324(a), the Court assumes that Defendants would suggest that they also be given a reasonable opportunity to retroactively comply with that law.

The Court concludes that it may not fashion such a remedy. Plaintiffs' right to terminate the franchise agreements is clear and the result of the parties' bargain. [HN9]The Court is not empowered to rewrite the parties' agreements in order to relieve one party from the hardship resulting from strictly enforcing the clear terms of their agreement. *See, e.g., Marriott Corp. v. Dosta Const. Co., 26 F.3d 1057, 1068; Chetminal, supra,* at 2.

### The Remedies

The Court has now determined that the Plaintiffs have validly terminated the Defendants' Franchise Agreements and Collins **[*36]** Avenue Lease. Accordingly, Plaintiffs are entitled to enforce their rights on ter-
mination. Defendants failed to vacate the premises, cease operating under the Dunkin' Donuts and Baskin-Robbins trademarks, and otherwise comply with their post-termination obligations. Thus, Defendants have breached the express terms of the Franchise Agreements and Collins Avenue Lease relating to post-termination obligations. Defendants are obligated to comply with the post-termination obligations in their Franchise Agreement and Lease and to deliver the Collins Avenue premises to Plaintiffs.

Defendants' continued use of Plaintiffs' trademarks and trade dress after the termination of their Franchise Agreements constitutes trademark infringement, trade dress infringement, and unfair competition. Once the Franchise Agreements were terminated, Defendants were no longer licensed to use the trademarks and, thus, were committing trademark infringement under the Lanham Act. *See Robertson, 147 F.3d at 1308-09; S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992).*

Plaintiffs are entitled to an injunctive Order enforcing the termination of the Defendants' **[*37]** Franchise Agreements and the Collins Avenue Lease, and requiring Defendants to comply with their post-termination obligations, including delivering possession the Collins Avenue shop. Thus, the Court enjoins Defendants from further use of the Dunkin' and Baskin trademarks and requires Defendants to comply with their post-termination obligations. *See, e.g., Robertson, 147 F.3d at 1309-10; S & R Corp., 968 F.2d at 376* (instructing district court to enjoin former franchisee from post-termination use of the franchisor's trademarks).

Under the Franchise Agreements, Plaintiffs are entitled to a judgment for their reasonable attorneys' fees and expenses incurred in connection with this action, with the amount to be established by post-judgment motion. *See* Fed. R. Civ. P. 54(d).

DONE AND ORDERED in Chambers, Miami, Florida, this 21st day of February 2003.

Paul C. Huck

United States District Judge

