MAJOR OLDSMOBILE, INC., Plaintiff, - against - GENERAL MOTORS CORPORATION, Defendant.

93 Civ. 2189 (SWK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1995 U.S. Dist. LEXIS 7418

May 30, 1995, Decided
May 31, 1995, FILED

**CORE TERMS:** termination, customary, dealership, notice, dealer, summary judgment, franchise, termination notice, lease, matter of law, notice of termination, consecutive, genuine issue, moving party, terminate, cessation, entity, site, franchisor, non-moving, ambiguous, contractual language, statutory language, new motor vehicle, terminating, display, summary judgment motion, contracting parties, extrinsic evidence, ulterior motive

**COUNSEL:** [*1]
For GENERAL MOTORS CORP., defendant: Mary Elizabeth McGarry, Simpson Thacher & Bartlett, New York, NY. Roy L. Reardon, Simpson Thacher & Bartlett, New York, NY. Roy L. Reardon, SIMPSON THACHER & BARTLETT, New York, NY.

**JUDGES:** NAOMI REICE BUCHWALD, CHIEF MAGISTRATE JUDGE

**OPINIONBY:** NAOMI REICE BUCHWALD

**OPINION: MEMORANDUM AND ORDER**

**NAOMI REICE BUCHWALD
CHIEF MAGISTRATE JUDGE**

This action was originally filed in New York state court and was subsequently removed to federal court on April 6, 1993. By Notices of Motion dated December 15, 1994, the parties cross-moved for summary judgment under Fed. R. Civ. P. 56. The parties have consented by written stipulation to have the undersigned decide their cross-motions for summary judgment and to waive their right to appeal our ruling to the assigned District Judge. For the reasons discussed below, I grant defendant's motion and deny plaintiff's motion.

**FACTS**

Plaintiff Major Oldsmobile, Inc. ("Major") n1 entered into a Dealer Sales and Service Agreement ("Agreement") with defendant General Motors Corporation on January 28, 1991, whereby plaintiff would sell and service Oldsmobile vehicles. Major had recently entered into a lease assignment from Paragon Oldsmobile, Inc. for the premises at 56-02 Northern Boulevard in Long Island City, New York. The Agreement specified that this site would serve as plaintiff's "main" location and was to have [*2] new and used vehicle displays, a service reception area, and a general office area. Major's lease for this property expired on September 30, 1991 when it did not exercise its contractual option to extend the lease term. Prior to the expiration of the lease, plaintiff had contacted General Motors and requested authorization to relocate, but the latter did not respond to the request. Thus, on the day the lease expired, Major relocated its dealership sales operations to 44-01 Northern Boulevard in Long Island City, where another Major entity, Major Chrysler-Plymouth, Inc., had recently entered into a lease with the property owner, Gloria Hinsch. Major then delivered another letter to General Motors, on November 8, 1992, discussing its plans to construct a new showroom on the Hinsch property for the display and sale of Oldsmobiles.

- - - - - - - - - - - - - - Footnotes - - - - - - -

n1 Major was originally owned by Bruce Bendell and is now owned equally by Bruce and Harold Bendell. These two individuals also share ownership of the other Major entities referred to in this Memorandum and Order.

- - - - - - - - - - - - End Footnotes- - - - - -

[*3]

The Oldsmobile division of General Motors ("Oldsmobile") ultimately sent a letter to Major on November 14, 1991, stating that Major had breached the Agreement by moving without prior written approval and by storing and displaying Oldsmobile vehicles under only a canvas tent. The letter asserted that although these breaches were grounds for termination, Oldsmobile would take no immediate action except to demand a letter from Major within 30 days explaining its conduct and proposal for resolving the breaches. Major timely responded by letter dated November 26, 1991 but, despite repeated requests for a reply, received neither approval nor opposition from General Motors for several months. Finally, on July 4, 1992, plaintiff received a letter from Oldsmobile tentatively

 


approving the relocation and the request to build a new showroom, provided that, inter alia, the new premises would be devoted to Major's dealership operations "in accordance with the terms of the Oldsmobile Dealer Agreement." Meanwhile, on July 3, 1992, another Major entity, Major Dodge, Inc., had proposed to Chrysler Corporation that it be awarded the "Chrysler/Plymouth Jeep/Eagle franchise of Long Island City." [*4] In the letter, Major offered to give Chrysler "site control" on all facilities to be used for the sales and service of Chrysler products, including the premises at 44-01 Northern Boulevard. Then, by letter dated October 22, 1992, Bruce Bendell informed Oldsmobile's zone manager that Major was releasing site control of its dealership to Chrysler Corporation and that Major would need to relocate. The next day, Major Chrysler-Plymouth, Inc., the tenant of the Hinsch property, entered into an Assignment of Lease with yet another Major entity, Major Chrysler Plymouth Jeep Eagle, Inc., providing that all rights in the property are transferred and that possession of the premises would be delivered to the sub-tenant on that day. Hinsch and Major Chrysler Plymouth/Jeep Eagle, Inc. then executed an option contract on November 5, 1992 whereby Chrysler Realty Corporation obtained an exclusive option to acquire by assignment all rights and interests of Major Chrysler Plymouth/Jeep Eagle, Inc. in the property if the premises cease to be occupied by an authorized Chrysler dealer.

On November 16, 1992, Oldsmobile sent Major a letter and a notice of termination. The letter referred to the separately [*5] delivered termination notice and stated that Major had relocated and established a new sales facility without authorization and, after receiving approval for these actions from Oldsmobile, had then given site control over the new facility to Chrysler Corporation. The termination notice stated that, pursuant to Article 14.5.3 of the Agreement, Oldsmobile was terminating the franchise effective in fifteen days for Major's failure to conduct customary sales operations. The termination was effective as of December 1, 1992. Later that month or in January 1993, Major Chrysler Plymouth/Jeep Eagle, Inc. opened a dealership in the newly-constructed showroom on the Hinsch property.

On September 3, 1993, General Motors entered into a franchise agreement with City Cadillac-Oldsmobile, Inc., located in Long Island City, whereby the latter would sell and service Oldsmobile vehicles.

In this action, plaintiff seeks monetary damages, a declaration that Major may operate an Oldsmobile dealership in Long Island City, and a permanent injunction barring General Motors from providing City Cadillac-Oldsmobile, Inc. with any Oldsmobile products.

## DISCUSSION

### I. Standard for Summary Judgment [*6]

The principles guiding the consideration of a motion for summary judgment are well-established. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* The moving party bears the initial burden of showing the absence of a genuine issue of material fact, which can be done by pointing to the lack of evidence to support an essential element of the non-moving party's claim. See *Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991).*

Once the moving party has met its burden, the non-moving party must then set forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). See also *Anderson, 477 U.S. at 256; Western World Ins. Co. v. Stack Oil, Inc.,* [*7] *922 F.2d 118, 121 (2d Cir. 1990).* The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* Furthermore, the non-moving party cannot rely on conclusory allegations alone, see *Twin Laboratories v. Weider Health Fitness, 900 F.2d 566, 568 (2d Cir. 1990),* nor will "'mere speculation or conjecture as to the true nature of the facts'" suffice to overcome a summary judgment motion. *Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990)* (quoting *Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986),* cert. denied, *480 U.S. 932, 94 L. Ed. 2d 762, 107 S. Ct. 1570 (1987)).*

When viewing the evidence, "all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester, 863 F.2d 205, 210 (2d Cir. 1988)* (citations omitted). See also *Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 26 L. Ed. 2d 142,* [*8] *90 S. Ct. 1598 (1970); Consarc Corp. v. Marine Midland Bank, 996 F.2d 568, 572 (2d Cir. 1993); Lendino v. Trans Union Credit Information Co., 970 F.2d 1110, 1112 (2d Cir. 1992); Cartier v. Lussier, 955 F.2d 841, 845 (2d Cir. 1992).* However, if a "rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of judgment is appropriate." *Binder v. Long Island*

  

Page 5

*Lighting Co., 933 F.2d 187, 191 (2d Cir. 1991).* In other words, "entry of summary judgment indicates that no reasonable jury could return a verdict for the losing party." *Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162 (2d Cir. 1991).*

The procedural rules governing summary judgment cannot properly be applied without first examining the substantive law underlying the litigation "since that law dictates which facts are material in a given case." *Consarc Corp., 996 F.2d at 572.* See also *Anderson, 477 U.S. at 248* ("it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs"). Thus, I now turn to an examination of the substantive law.

## II. Merits of Defendant's Summary Judgment Motion [*9]

The central issue in this case is whether defendant's termination of plaintiff's Oldsmobile dealership contravened either the Agreement or New York law. n2 The gravamen of plaintiff's claim is that defendant's termination of the franchise upon fifteen days notice without an opportunity to cure breached the Agreement and violated the Franchised Motor Vehicle Dealer Act, N.Y. Veh. & Traf. Law §§ 460-472, in that sufficient grounds for termination did not exist and because the notice of termination was so defective on its face as to be a nullity. Defendant contends that plaintiff committed multiple breaches of the Agreement, any of which justified the termination, and that the notice given was fully adequate. n3

- - - - - - - - - - - - - - - Footnotes - - - - - - -
- - - - - - - -

n2 The Dealership Agreement specifies that it is governed by the laws of the State of Michigan. Because this is a diversity case, we apply the choice-of-law rules of the forum state, which in this case is New York. *Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51, 55 (2d Cir. 1991)* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)).* Absent a violation of a fundamental state policy, New York courts generally defer to the choice of law made by parties to a contract. *Cargill, 941 F.2d at 55.* "However, New York law allows a court to disregard the parties' choice when the 'most significant contacts' with the matter in dispute are in another state." Id. (quoting *Haag v. Barnes, 9 N.Y.2d 554, 559, 216 N.Y.S.2d 65, 68, 175 N.E.2d 441 (1961)).* Moreover, even when parties include a choice-of-law clause in their agreement, "their conduct during litigation may indicate assent to the application of another state's laws." *Cargill, 941 F.2d at 55.* Here, nearly all the significant contacts with this dispute are in New York. Major is a New York corporation and its principal place of business was in Queens, New York. General Motors is a foreign corporation doing business in New York. Further, both parties in their moving papers assume the applicability of the New York Vehicle and Traffic Law, provisions of which delineate the grounds upon which a franchisor may terminate a motor vehicle franchise. See *N.Y. Veh. & Traf. Law § 463.* Neither party seeks to apply Michigan law in support of their motions. Thus we will apply New York law. We also note that the New York Vehicle and Traffic law was amended in the year after the Dealership Agreement was signed to limit the ability of contracting parties to choose another jurisdiction's laws as applicable in litigation concerning the contract. See id.

[*10]

n3 An enormous portion of the parties' briefs are devoted to a series of alternative arguments advanced by defendant to justify the termination. For example, defendant maintains that it can terminate under Article 13.1.5 of the Agreement because of either Major's unauthorized relocation in 1991 or its ultimate relinquishment of dealership premises to Chrysler--even though these breaches were not listed in the termination notice. In response, plaintiff contends that General Motors' own misconduct forced plaintiff to take these actions and that a termination under Article 13 would have required both greater notice and an opportunity to cure. Plaintiff also argues that Article 14.6, entitling General Motors to subsequently rely on breaches other than those listed in the termination notice, is invalid. We need not reach the merits of any of these alternative contentions because we have concluded, infra, that Article 14.5.3 of the Agreement provides an independent and sufficient ground for termination in this case.

- - - - - - - - - - - - End Footnotes- - - - - -
- - - - - - - -

## A. Grounds for Termination

  

Both the Agreement and N.Y. Veh. & Traf. [*11] Law § 463 enumerate a limited number of grounds upon which a franchisor may terminate a dealership without giving the dealer an opportunity to cure the problem. Under Article 14.5.3 of the Agreement, one such ground is the "failure of Dealer to conduct customary sales and service operations during customary business hours for seven consecutive business days." Likewise, the New York statute allows termination "upon at least 15 days written notice" where the dealer fails "to conduct its customary sales and service operations for a continuous period of seven business days." Defendant's notice of termination dated November 16, 1992 reprints Article 14.5.3 and states that "Major Oldsmobile, Inc. has not been conducting customary sales operations for Oldsmobile since at least 7-1-92." The notice concludes that, based upon this failure, Oldsmobile Division is terminating the Agreement effective fifteen days from receipt of the notice.

Plaintiff contends that the above-quoted provisions of the Agreement and the New York statute should be read to apply only where the dealer fails to conduct both sales and service for seven consecutive business days. Following this logic, plaintiff argues [*12] that since it continued to service vehicles during the period in question--a fact undisputed by defendant--it cannot be said that plaintiff breached the Agreement. We disagree with plaintiff's interpretation of the contractual and statutory provisions and find that the cessation of customary sales activity for seven consecutive business days is sufficient grounds for unconditional termination under either source of authority.

The legal standards applicable to issues of statutory interpretation have evolved separately from those involving matters of contract interpretation. Thus, despite the fact that in this case the statutory and contractual language are essentially identical, it is theoretically possible that the application of each set of legal standards would yield divergent results on summary judgment. For example, the legislature may have intended the statutory language to have a different meaning than the one contemplated by the contracting parties, even though the contract's drafters may have merely parroted the language of the existing statute. Neither of these potential inconsistencies need concern us here, however, because, as explained below, we interpret the words of [*13] the statute and the contract to mean the same thing. Further, we note that neither party has submitted any evidence of either legislative intent or the parties' expectations with respect to this language.

We begin with the statute. Our research has uncovered no case, state or federal, in which the meaning of this statutory language was at issue. "Undoubtedly, questions of statutory interpretation, especially when arising in the first instance in judicial proceedings, are for the courts to resolve . . . ." *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 130-31, 88 L. Ed. 1170, 64 S. Ct. 851 (1944); see also *United States v. Montoya*, 827 F.2d 143, 146 (7th Cir. 1987) ("Statutory interpretation is something a district court undertakes as a matter of law."); *Lorenz v. Sauer*, 807 F.2d 1509, 1511 (9th Cir. 1987). A federal court's interpretation of a state statute "begins with the language itself and the rule that the language will be controlling when its context makes its meaning sufficiently clear." *National Foods, Inc. v. Rubin*, 936 F.2d 656, 659-60 (2d Cir. 1991) (citations omitted). However, even if the statutory language is clear, a court is not required to follow [*14] it if "such a literal reading of a statutory term [would] compel an odd result." *Greenblatt v. Delta Plumbing & Heating Corp.*, 818 F. Supp. 623, 628 (S.D.N.Y. 1993). See also *United States v. O'Neil*, 11 F.3d 292, 297 (1st Cir. 1993) ("It is also an established canon of statutory construction that a legislature's words should never be given a meaning that produces a stunningly counter-intuitive result--at least if those words, read without undue straining, will bear another, less jarring meaning."); *National Foods*, 936 F.2d at 660 (in interpreting statutes, courts should attempt to avoid "unreasonable results"); *Litwin v. American Express Company*, 838 F. Supp. 855, 859 (S.D.N.Y. 1993) ("When a litigant would give a statute a meaning that yields absurd results, that is a fair indication that the statute doesn't mean what that litigant has suggested.")

In this case, the statute clearly states that termination upon fifteen days notice is authorized when the dealer fails to conduct "customary sales and service." Plaintiff argues that if the legislature had intended to allow the franchisor to terminate upon a dealer's cessation of sales or service, the statute would [*15] have been written with an "or" and not an "and." In this Court's view, however, such an interpretation leads to a wholly unreasonable and even counter-intuitive result, for it cannot be disputed that the cessation of sales activity effectively eliminates the primary purpose of a new motor vehicle franchise. Yet, plaintiff's interpretation would prevent a franchisor from unconditionally terminating a dealership where the dealer completely stops selling vehicles, so long as the dealer continued to service vehicles previously sold. We cannot believe that the legislature intended such an illogical result. n4

- - - - - - - - - - - - - - - Footnotes - - - - - - -
- - - - - - - -

> n4 In support of its argument, defendant points to a 1991 decision by the California New Motor Vehicle Board, Doten's Olds/GMC Truck, Inc. v. General Motors Corporation (see Deft.'s Mem. of

  

Page 7

Law in Supp. of Mot. for Summ. J., Ex. A), which also involved the termination of a new motor vehicle franchise. At issue in that case was the meaning of a California statutory provision, Cal. Veh. Code § 3060(a)(2)(E), which contains language identical to the New York law in the same context, i.e., dealership termination upon failure to conduct "customary sales and service." Ruling against the protesting dealership, the administrative court construed the language in the same manner as we have construed the New York law, namely, that cessation of customary sales is sufficient grounds for termination, even if the dealer continues service operations. We concur with that court's observation that "the cessation of new motor vehicle sales effectively eliminates the primary purpose of a new motor vehicle franchise, even if service operations continue." Id.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*16]

We now turn to the interpretation of the similar contractual language. The rules of contract interpretation are well known and are set forth in the summary judgment context in *Seiden Associates, Inc. v. ANC Holdings, Inc., 959 F.2d 425 (2d Cir. 1992)*: In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use. When the question is the contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity. Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate, since it is only when there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law. *Id. at 426* (citations omitted). The first issue for our determination is thus whether the contractual provision at hand is indeed ambiguous, which, under New York law, [*17] is a legal question. See, e.g., *Consarc Corporation v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993); Seiden, 959 F.2d at 426; Curry Road Ltd. v. K Mart Corporation, 893 F.2d 509, 511 (2d Cir. 1990)*. The Second Circuit has defined ambiguous language as that which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement . . . ." *Walk-In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987)* (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F. Supp. 987, 994 (S.D.N.Y. 1968)* (Mansfield, J.)). The language of a contract is not ambiguous "simply because the parties urge different interpretations." *Seiden, 959 F.2d at 426*. Our role is therefore to decide whether the "sales and service" language is susceptible to more than one reasonable interpretation. As mentioned earlier, the parties have submitted no relevant extrinsic evidence. Therefore, for the same reason we found plaintiff's interpretation of the statutory language unreasonable, we also find its interpretation of the contractual language unreasonable. The [*18] only reasonable interpretation of the provision is that the dealer is required to perform both sales and service operations, with the failure to perform either one constituting a breach of the provision.

A judicial determination that a conjunctive phrase in a contract was intended to be disjunctive in operation is hardly unprecedented. It is well established that "the word 'or' is frequently construed to mean 'and' and vice versa, in order to carry out the evident intent of the parties." *Dumont v. United States, 98 U.S. 142, 143, 25 L. Ed. 65 (1878)*; see also *Noell v. American Design, Inc., 764 F.2d 827, 833 (11th Cir. 1985)* (to avoid an "unreasonable result," "and" was interpreted as "or" in clause of an employee benefit plan, such that employer had authority to forfeit employees' benefits upon occurrence of any one of three conditions); *State Mut. Life Assur. Co. of Worchester, Mass. v. Heine, 49 F. Supp. 786, 788 (W.D. Ky. 1943)*, aff'd, *141 F.2d 741 (6th Cir. 1944)* ("Cases show that the word 'and' or 'or' will not be given its literal meaning when such meaning would do violence to the evident intent and purpose of the contracting parties, and the other meaning [*19] would give effect of such intent."); cf. *Decker v Carr, 11 A.D. 432, 433, 42 N.Y.S. 243, 244 (3d Dept. 1896)*, aff'd, *154 N.Y. 764, 49 N.E. 1096 (1897)* (referring to many cases in which courts effectuate parties' intent by construing "or" to mean "and" in a written instrument).

Accordingly, we find that the statutory and contractual language can only be interpreted to allow defendant's unconditional termination of its Agreement with plaintiff upon fifteen days notice, so long as plaintiff in fact failed to conduct customary sales activities during customary business hours for seven consecutive days. n5 We now turn to plaintiff's alternative claims.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n5 Defendant also argues that plaintiff is not entitled to relief because it was unable





to perform its obligations under the Agreement at the time of termination. Given our determination that plaintiff failed to conduct customary sales activity (see discussion infra) and that this failure justified termination on fifteen days notice, we need not reach this alternative argument.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*20]

### B. Plaintiff's Sales Activities

Plaintiff attacks the truth of the assertion in the termination notice that plaintiff failed to conduct customary sales operations from July 1, 1992 onward. Defendant submitted as exhibits to its motion three memoranda signed by James Zubor, Oldsmobile's local Zone Manager, dated October 30, November 4, and November 10, 1992, all stating that Major was not conducting Oldsmobile sales activity. In particular, the November 10 memorandum stated that Major had "no sales operation with regards to facility, manpower and display" as of October 30 based on review of the site "by John Bustetter or myself through November 5, 1992 as well as November 6, 7, 9, 10, 1992." n6 This evidence is clearly sufficient to shift to plaintiff the burden of setting forth specific facts showing that there is a genuine issue for trial as to whether plaintiff conducted customary sales operations. See *Windon Third Oil and Gas Drilling Partnership v. FDIC*, 805 F.2d 342, 346 (10th Cir. 1986), cert. denied, 480 U.S. 947, 94 L. Ed. 2d 791, 107 S. Ct. 1605 (1987) ("the moving party's burden cannot be enhanced to require his proof of a negative").

- - - - - - - - - - - - - - Footnotes - - - - - - - -

n6 We take judicial notice of the fact that November 1 and 8, 1992 were Sundays. Additionally, we infer from the record that Major Oldsmobile was customarily open for business Monday through Saturday.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*21]

The only proof submitted by plaintiff to show that any sales activities were in fact conducted on or after October 30 is contained in Exhibit Z to Bruce Bendell's Affidavit in Opposition to Summary Judgment, dated January 31, 1995. n7 Exhibit Z is a one-inch thick collection of photocopied documents put together in no apparent order and without a summary or index, which appear to indicate Oldsmobile sales entered into with customers as late as the end of October 1992. However, the documents utterly fail to show that Major engaged in sales activity from November 3-10, 1992, the period including the last seven consecutive business days that defendant claims to have observed no sales activity. According to the documents, the only activity during that period was (1) a "dealer swap" of automobiles on November 6, which by definition is not a new vehicle sale, and (2) further activity involving earlier Oldsmobile sales, such as customer pick-up of new vehicles. Additionally, none of the documents from sales entered into in late October 1992 show that the vehicles were sold at the Hinsch property; in fact, most of these sales appear to have occurred at the premises of Major Chevrolet [*22] (another Major entity). Finally, plaintiff does not controvert the statements in the Zubor memoranda that Major had no sales facility, sales force, or new vehicle display for Oldsmobiles as of October 30, 1992, except for the ambiguous and conclusory allegation in its memorandum of law that "nothing changed" after July 1, 1992 with respect to sales and service operations.

- - - - - - - - - - - - - - Footnotes - - - - - - - -

n7 The affidavit repeatedly asserts that "the documents in this case unequivocally demonstrate that Major was conducting sales during this period of time," referring to the attached Exhibit Z. See B. Bendell Aff. in Opp. PP 104, 118-19. We find it significant both that the affidavit fails to allege the occurrence of "customary" sales activity during the relevant period (see discussion infra) and that it relies solely on the content of documents, without any allegation by Bendell of personal knowledge that sales activity in fact occurred. Finally, we note that the 56-page affidavit is in essence a reproduction of defendant's memorandum of law opposing summary judgment, replete with redundant legal argument and conclusions of law, and almost entirely lacking in first-person language. It is unhelpful and altogether inappropriate for an affidavit submitted in the context of a summary judgment motion to contain legal argument and conclusions. See Fed. R. Civ. P. 56(e); *Universal Film Exchanges, Inc. v. Walter Reade, Inc.*, 37 F.R.D. 4, 5-6 (S.D.N.Y. 1965); 6 James W. Moore et al., Moore's Federal Practice P 56.22[1], at 746, 748 (2d ed. 1995) ("The affidavit is no place for . . . conclusions of law . . . nor for argument of the party's

  

cause.").

---------- End Footnotes- - - - - -
- - - - - - -

[*23]

We cannot conclude that upon this evidence a reasonable jury could find that plaintiff was engaged in sales activity as of November 3, 1992. Moreover, even if sales operations occurred on or after this date, plaintiff neither alleges nor adduces evidence that such operations were "customary" as required by Article 14.5.3 of the Agreement. Although neither the Agreement nor the statute defines what "customary" means, the parties neither claim the term is ambiguous nor point to any extrinsic evidence of its meaning. It is therefore proper for the Court to interpret the term "customary" as a matter of law for the same reasons as discussed earlier with respect to the meaning of "sales or service." In this connection, we observe that the Agreement mandates a franchisee to operate from approved locations (Article 4.1) and maintain an adequate sales force to promote and sell vehicles (Article 5.1). As plaintiff has failed to present any evidence that it was complying with these provisions as of the end of October, it is impossible to consider its operations to be "customary" according to any reasonable definition of this term.

### C. Sufficiency of the Termination Notice

Plaintiff's [*24] third argument is that the written notice of termination itself is fatally defective and void as a matter of law because it failed to list the days and hours during which Major allegedly did not conduct customary sales operations. n8 In plaintiff's view, this failure makes the notice too vague and indefinite to serve as a predicate for termination of the franchise. The flaw in plaintiff's argument is that neither the statute nor the Agreement requires such specificity in a notice of termination. Both sources of authority only refer to "written notice" of termination. Moreover, plaintiff neither articulates a rationale nor cites precedent for the proposition that the Court should read such a requirement into the contract or the statute. The only case cited by plaintiff, *Chinatown Apartments, Inc. v. Chu Cho Lam, 51 N.Y.2d 786, 433 N.Y.S.2d 86, 412 N.E.2d 1312 (1980)*, arises under residential landlord-tenant law and, in any event, lends absolutely no support to plaintiff's position. In Chinatown, the Court of Appeals held that a notice of termination of a lease was defective where it failed to cite a specific prohibition in the lease that had been violated. *Id. at 788, 433* [*25] *N.Y.S.2d at 88*. Even assuming that this holding extends beyond the landlord-tenant context, the notice of termination at issue here would be sufficient because it referred to and quoted a specific contractual provision. We thus find that the notice was not defective as a matter of law. Cf. *Sharpe v. Great Lakes Steel Corp., 9 F.R.D. 691, 694 (S.D.N.Y. 1950)* (where dealer franchise agreement contains provision for termination upon short notice, only purpose of such notice is to apprise other party of intent to terminate the contract); *A. S. Rampell, Inc. v. Hyster Company, 3 N.Y.2d 369, 381-82, 165 N.Y.S.2d 475, 486, 144 N.E.2d 371 (1957)* (where parties agreed to termination clause in distributorship contract, courts will enforce clause as written and will not read in requirement of reasonable notice).

- - - - - - - - - - - - - - Footnotes - - - - - - -
- - - - - - - -

n8 Plaintiff also argues that the notice was fatally defective because it did not state that Major's alleged failure to conduct sales operations was for "seven consecutive business days" and during "customary business hours." Under the facts of this case, we find it puzzling that plaintiff would even advance this argument. After all, the one-page termination notice sets out the full text of Article 14.5.3, which contains the quoted language, and then states that "based on your failure to conduct customary sales operations in violation of your Dealer Agreement as set forth above," the dealership would be terminated.

- - - - - - - - - - - - - End Footnotes- - - - - -
- - - - - - - -

[*26]

### D. Defendant's Ulterior Motive

Finally, plaintiff devotes a substantial portion of its moving papers to a claim that defendant terminated plaintiff's franchise on purely pretextual grounds. According to plaintiff, defendant's ulterior motive in terminating the franchise was to further its corporate agenda of moving all area dealerships affiliated with General Motors' six divisions onto the same plot of land in Long Island City and then appointing itself as the single operator-owner of the facilities. However, since defendant had the right to terminate the Agreement upon plaintiff's breach, it is legally irrelevant whether defendant was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract. *Refinemet International Company v. Eastbourne N. V., 815 F. Supp. 738, 742 (S.D.N.Y. 1993)*, aff'd on other grounds, *25 F.3d 105 (2d Cir. 1994); Filmline (Cross-Country) Productions, Inc. v. United Artists Corp., 662 F. Supp. 798, 804 n.5 (S.D.N.Y. 1987)*, aff'd on other

  

grounds, *865 F.2d 513 (2d Cir. 1989); Two Wheel Corp. v. American Honda Corp., 506 F. Supp. 806, 815* (E.D.N.Y.) (on motion for preliminary injunction, [*27] motive behind distributor's termination of motorcycle dealership becomes irrelevant if court finds that termination was properly based on contract breach), aff'd *633 F.2d 206 (1980)* (table); *Big Apple Car, Inc. v. City of New York, 204 A.D.2d 109, 111, 611 N.Y.S.2d 533, 534 (1st Dept. 1994)* (party with right to terminate may do so "without court inquiry into whether the termination was activated by an ulterior motive").

## CONCLUSION

For the foregoing reasons, I grant defendant's motion, deny plaintiff's motion, and dismiss the complaint.

**IT IS SO ORDERED.**

Dated: New York, New York
May 30, 1995

NAOMI REICE BUCHWALD

CHIEF MAGISTRATE JUDGE




Page 11