# EXHIBIT B

100

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-----------------------------------------------------------x

DUNKIN' DONUTS INC. ET AL.                 :      3:02 CV 1920 (MRK)

v.                                         :

4 DONUTS, INC. ET AL.                      :      DATE: SEPT.11, 2003

-----------------------------------------------------------x

### RULING ON PLAINTIFFS' MOTION TO COMPEL INTERROGATORY ANSWERS AND DOCUMENTS

Although familiarity with the factual and procedural history of this case is presumed,

a brief summary of the procedural history relevant to this motion follows. Plaintiffs

commenced this action on October 29, 2002 (Dkt. #1) and on February 13, 2003, this case

was referred to this Magistrate Judge for discovery purposes. (Dkt. #53).

On July 2, 2003, plaintiffs filed their Motion to Compel Interrogatory Answers and

Documents and brief in support.[1] (Dkts. ##74-75). On July 23, 2003, defendants James

---

[1]Attached are nineteen exhibits: copy of Defendant Glenn Stetzer's Response to Plaintiff's First Request for Production of Documents, dated February 3, 2003 (Exh. 1); copy of Defendant James McManama's Responses to Plaintiff's First Request for Production of Documents, dated February 3, 2003 (Exh. 2); copy of Defendant James McManama's Supplemental Responses to Plaintiff's First Request for Production of Documents, dated February 11, 2003 (Exh. 3); copy of correspondence between counsel, dated April 11, 2003 (Exh. 4); copy of Dunkin' Donuts Franchise Agreement, dated November 12, 1996 (Exh. 5); copy of Form 1120S U.S. Income Tax Return for 2 Donuts, Inc., dated June 20, 2001 (Exh. 6); copy of bank statement from New Haven Savings Bank for 2 Donuts Inc., Glenn Stetzer and James McManama, dated March 29, 2002 (Exh. 7); copy of Form 941, Employer's Quarterly Federal Tax Return for 2 Donuts, Inc., dated October 31, 2002 (Exh. 8); copy of 2 Donuts, Inc., CT Unemployment Insurance Wage Listing for the period 7/1/2001 to 9/30/01 and copy of correspondence between counsel, dated April 16, 2003 (Exh. 9); copy of correspondence between counsel, dated April 15, 2003 (Exh. 10); copy of lease agreement between 3 Kings, LLC (Lessor) and 4 Donuts, Inc. (Lessee), dated January 3, 2000 (Exh. 11); copy of check roster and attached sheet of handwritten notes, dated November 6, 2001 (Exh. 12); copy of checks issued by 3 Kings, LLC to Richard Czuprynski (Exh. 13); copy of Defendant James McManama's Supplemental Responses to Plaintiff's First Set of Interrogatories, dated February 11, 2003 (Exh. 14); copy of Form 1120S tax return for 2 Donuts, Inc., dated December 31, 1999 (Exh. 15); copy of Defendant George Germano's Response to Plaintiff's Second Set of Request[s] for Production of Documents, dated May 20, 2003 (Exh. 16); copy of

1

McManama ["McManama"] and George Germano ["Germano"] filed their brief in opposition[2] (Dkt. #78) and the next day defendants 4 Donuts, Inc. ["4 Donuts"], Grando, Inc. ["Grando"] and Glenn Stetzer filed their brief in opposition.[3] (Dkt. #80). Plaintiffs filed a reply brief to McManama's and Germano's brief in opposition on August 7, 2003[4] (Dkt. #86) and on

---

First Amendment to Dunkin' Donuts Franchise Agreement, dated July 10, 1997 (Exh. 17); copy of correspondence between counsel, dated February 14, 2003 (Exh. 18); and copy of Weekly Wholesale Sales receipts, dated December 10, 2001, December 17, 2001, and January 17, 2001 (Exh. 19).

Although the motion is captioned as "Plaintiff Dunkin' Donuts Incorporated's" Motion to Compel, both plaintiffs are listed beneath the signature line. Therefore, for purposes of this Ruling, the Court will refer to both plaintiffs, and not just plaintiff Dunkin' Donuts, Inc.

[2]Attached are the following four exhibits: copy of Stock Release and Agreement, dated September 1, 1994, Stock Redemption Agreement, dated September 1, 1994, Stock Purchase Agreement, dated August 31, 1994, Promissory Note Agreement, dated September 1, 1994, copies of stock certificates in 4 Donuts, Inc., and copy of Pledge Agreement, dated September 1, 1994 (Exh. A); copy of Defendant James McManama's Amended Responses to Plaintiff's First Set of Interrogatories, dated July 23, 2003 (Exh. B); copy of correspondence between counsel, dated April 15 & 16, 2003 (Exhs. C-D).

[3]Nineteen exhibits are attached: copy of correspondence between counsel, dated July 14, 1997 (Exh. 1); copy of Plaintiff Dunkin' Donuts Incorporated's Answers to Defendants' First Set of Interrogatories, dated February 14, 2003 (Exh. 2); copy of letter to franchisees from counsel for Dunkin' Donuts, dated October 24, 2002 (Exh. 3); copy of investigation report, dated February 25, 2002 (Exh. 4); copies of daily cash reports, dated January 21, 2002, February 2, 2002, February 14-15 & 21-22, 2002 (Exh. 5); copy of excerpts from deposition of Richard Czuprynski, taken on July 3, 2003 (Exh. 6); copy of Franchise Agreement, dated May 28, 1992 (Exh. 7); copy of affidavit of Anthony T. Citerella, dated July 17, 2003 (Exh. 8); copies of correspondence between counsel, dated April 29, 2003 and July 16, 2003 (Exh. 9); copy of correspondence between counsel, dated July 21, 2003 (Exh. 10); copy of correspondence between counsel, dated June 18, 2003 (Exh. 11); copy of subpoena for New Haven Savings Bank, dated January 22, 2003 (Exh. 12); copy of correspondence between counsel, dated June 26, 2003 (Exh. 13); copy of plaintiffs' privilege log (Exh. 14); copy of Commitment Letter, dated February 17, 1995 (Exh. 15); copy of Wholesale Products Survey, dated June 8, 1999 (Exh. 16); copy of subpoena for Hospital of Saint Raphael, dated June 4, 2003, and copies of subpoenas for DeliMasters, Inc. and Yale-New Haven Hospital, Inc., dated June 2, 2003 (Exh. 17); another copy of Pledge Agreement, dated September 1, 1994, Stock Redemption Agreement, dated September 1, 1994, Stock Release and Agreement, dated September 1, 1994, Stock Purchase Agreement, dated August 31, 1994, Promissory Note, Agreement, dated September 1, 1994 (Exh. 18); and copy of correspondence between counsel, dated March 21, 2003 (Exh. 19).

[4]Attached is a website printout for dragraceresults.com, dated August 6, 2003 (Exh. 1).

2

August 12, 2003, plaintiffs filed their corrected[5] reply to defendants 4 Donuts, Grando and

Glenn Stetzer.[6] (Dkt. #91). On August 25, 2003, defendants 4 Donuts, Grando and Glenn

Stetzer filed a surreply brief.[7] (Dkt. #95; see also Dkt. #94 and 8/25/03 endorsement

thereon). On September 2, 2003, plaintiffs filed a reply to the surreply brief (Dkt. #97), to

which defendants 4 Donuts, Grando and Glenn Stetzer filed a response three days later.[8]

(Dkt. #99).[9]

Under the present scheduling order, fact discovery is to be completed by September

12, 2003 and expert discovery is to be completed by December 12, 2003. (Dkt. #42, at 12).

In their motion, plaintiffs also seek a three-month extension of fact discovery from

September 12, 2003 until December 12, 2003. (Dkt. #74; Dkt. #75, at 2). On August 28,

---

[5]Plaintiffs originally filed their reply brief on August 7, 2003. (Dkt. #87). In their corrected reply, plaintiffs "correct[] page 9 of [their] reply, which states that [d]efendants have not produced any bank records relating to 2 Donuts, Inc. Defendants have produced a limited number of statements. Dunkin' also deleted a footnote on page 10 of the brief." (Dkt. #91, at 1, fn.1).

[6]Attached are the following thirteen exhibits: copy of excerpts from 4 Donuts, Inc. - Dunkin' Donuts General Ledger from 1/02 to 12/02 (Exh. 1); copy of Defendant Glenn Stetzer's Responses to Plaintiff's First Set of Interrogatories, dated February 3, 2003 (Exh. 2); copy of 4 Donut's Inc. bank statement for September 2000 (Exh. 3); affidavit of Christopher M. Loveland, dated August 11, 2003 (Exh. 4); copy of cash receipts journal from 4 Donuts for 2000 and 200 (Exh. 5); copies of checks from Deli Masters Inc. to Dunkin' Donuts (Exh. 6); copy of weekly sales reporting form, dated January-February, 2000 (Exh. 7); copy of Dunkin' Donuts Retail Sales analysis, dated June 7, 2002 (Exh. 8); copy of 4 Donuts Inc. bank statement for April 2001 (Exh. 9); copy of Defendant 4 Donuts, Inc.'s Responses to Plaintiff's First Set of Interrogatories, dated February 3, 2003 (Exh. 10); copy of email correspondence, dated April 23, 2003 (Exh. 11); copy of excerpts from 4 Donuts, Inc. - Dunkin' Donuts General Ledger from 1/00 to 12/00 (Exh. 12); and copy excerpts from 4 Donuts, Inc. - Dunkin' Donuts General Ledger from 1/02 to 12/02 (Exh. 13).

[7]Three exhibits are attached: copy of labels relating to documents produced to verify sales of the franchises: PC #302769, PC #302697, PC #330525, PC #302069, PC # 304966, PC # 302769, PC #302697, PC #330525, PC #302069, PC #308629, PC #304966, PC # 308629, PC #308629 (Exh. A); copy of notes, dated April 30, 2002 (Exh. B); and copy of Plaintiff Dunkin' Donuts Incorporated's Third Request for Production of Documents to Defendants 4 Donuts, Inc., Grando, Inc., and Glenn Stetzer, dated July 16, 2003. (Exh. C).

[8]The following three exhibits were attached: copies of correspondence between counsel, dated August 28, August 22, and August 4, 2003. (Exhs. A-C).

[9]As these various filings indicate, all counsel here have an almost obsessive need to have the "last word."

2003, plaintiffs filed a Supplemental Memorandum (Dkt. #96), which indicated that counsel

for defendants McManama and Germano consented to such extension, and that counsel

for defendants 4 Donuts, Grando and Glenn Stetzer provisionally consented, as long as

discovery was limited to depositions already noticed by the parties. (Id. at 2).[10] Counsel for

defendants 4 Donuts, Grando and Glenn Stetzer, denies that he agreed to any extension.

(Dkt. #99).

For the reasons stated below, plaintiff's Motion to Compel (Dkt. #74) is granted in

part and denied in part to the extent set forth below.

## I. FACTUAL BACKGROUND

On December 20, 2002, plaintiffs served document requests and interrogatories on

defendants as to which defendants Glenn Stetzer and McManama responded on February

3, 2003. (Dkt. #75, at 3 & Exhs. 1-2). On January 22, 2003, plaintiffs served subpoenas

on defendants' supplier, D.D. Northeast Distribution Center Inc. ["D.D. Northeast"],

defendants' accountant, Anthony Citerella ["Citerella"], Countrywide Home Loans, Inc.

["Countrywide"], Wells Fargo Mortgage Inc. ["Wells Fargo"], and New Haven Savings Bank.

(Dkt. #75, at 3). Nine days later, defendants filed an Emergency Motion to Quash or, in the

Alternative, Motion for Protective Order. (Id.; see Dkt. #45). On February 12, 2003, after

conferring with counsel for plaintiffs, defendant McManama agreed to supplement some

responses and provide responsive documents. (Dkt. #75, at 3 & Exh. 3). On February 14,

2003, this Magistrate Judge issued a Ruling ["February Ruling"](Dkt. #54), which granted

in part and denied in part Defendants' Emergency Motion and Plaintiffs' Cross-Motion to

---

[10]The supplemental brief also recounted additional reasons why a continuance is
necessary. (Id. at 2-4).

AO 72A
(Rev. 8/82)

Compel Compliance with its Subpoenas ["February Ruling"].[11] On March 20, 2003, this

Magistrate Judge filed a Ruling on Defendants' Motion for Clarification ["March Ruling"](Dkt.

#58), which granted in part and denied in part defendants' motion.[12] In the March Ruling, this

Magistrate Judge reiterated that the February Ruling was without prejudice and ordered

compliance with plaintiffs' subpoenas by April 4, 2003. (Id.). Plaintiffs' pending Motion to

Compel was filed on July 2, 2003 (Dkt. #74).

In the pending motion, plaintiffs contend that defendants should be compelled to

produce documents related to 2 Donuts, Inc. ["2 Donuts"] because the corporation has

operated one or more of defendants' franchises (Dkt. #75, at 4-5); defendants should be

compelled to produce documents related to 3 Kings, LLC ["3 Kings"] because it is the

---

[11]Pursuant to the February Ruling, D.D. Northeast was required to produce the requested information for the past three years, with respect to each signatory to the six Franchise Agreements for the six individual franchises, without prejudice to plaintiffs later seeking additional years (Dkt. #54, at 7); Citerella was required to produce the tax returns and all other financial records directly or indirectly relating to the franchises involved, but with the exceptions specifically articulated in the Franchise Agreements, without prejudice to plaintiffs later seeking additional information (id. at 7-9); Countrywide, Wells Fargo and New Haven Savings Bank were required to produce information directly relating to the franchisees but plaintiffs' request for documents relating to defendants' spouses and dependents was found to be overbroad, without prejudice to plaintiffs later seeking additional information (id. at 9-11); and plaintiffs' cross motion to compel was granted to the extent that production was ordered as to the above-referenced entities and was denied in all other respects, without prejudice to plaintiffs later filing a motion for reconsideration after production by defendants. (Id. at 11). Defendants were to comply on or before February 24, 2003. (Id. at 11).

For each of the above-referenced requests, this Magistrate Judge also found that to the extent there are documents for which defendants seek guidance as to their production, they could submit copies to the Magistrate Judge for her *in camera* review on or before February 28, 2003. (Id.). Defendants did not submit copies of any documents for *in camera* review.

[12]Pursuant to the March Ruling, D.D. Northeast was not required to produce the requested information relating to defendant McManama as he is not a franchisee or defendant Germano because he transferred all of his interest in the franchises in 1994; however, D.D. Northeast was ordered to produce the remaining requested information for the past three years (Dkt. #58, at 2-4); Citerella was ordered to produce the tax returns and other financial records directly or indirectly relating to the franchises involved in the case, commencing with the tax year 1995 (id. at 4-5); and Countrywide, Wells Fargo and New Haven Savings Bank were ordered to produce the requested information for the past three years for defendants Glenn Stetzer, 4 Donuts and Grando. (Id. at 5-6).

5

landlord for one or more of defendants' shops, has been the recipient of inter-company transfers from 4 Donuts, and has paid wages to at least one employee working at the shops (id. at 6-7); defendant McManama should be compelled to produce discovery responses because he has had an interest in one or more of the franchises since 1996 (id. at 7-8); defendant Germano represented to plaintiffs that he was a franchisee years after he purportedly transferred his interest in 4 Donuts, thus he should be compelled to produce discovery responses (id. at 8-10); defendant Glenn Stetzer should be compelled to submit adequate responses to the document requests and interrogatories with which he was served because Glenn Stetzer's personal financial records will shed light on how much money has been unreported and where it has gone (id. at 10-22); and defendants Glenn Stetzer, 4 Donuts and Grando should be compelled to answer specific interrogatories. (Id. at 22-27).

Defendants McManama and Germano contend that the franchise agreements do not require the production of documents as to non-franchisees (Dkt. #78, at 3-4) and since McManama is not a franchisee, partner or shareholder (id. at 5-7) and Germano ceased ownership interest in the franchises in 1994 (id. at 7-9), these defendants should not be compelled to produce documents. In response, plaintiffs contend that the evidence gathered by plaintiffs to date demonstrates that money has been diverted from the franchises to other companies owned and operated by defendants and that McManama owns an interest in the franchises (Dkt. #86, at 2-4); discovery of Germano's personal finances is necessary for plaintiffs to fully measure their damages (id. at 4-5); and defendants' tactics in failing to produce relevant discovery warrant an extension of the discovery deadline. (Id. at 5-6).

Defendants 4 Donuts, Grando and Glenn Stetzer assert that plaintiffs' motion should be denied in its entirety because plaintiffs assume the existence of under reporting (Dkt.

6

#80, at 3-6); plaintiffs' arguments would allow them unlimited discovery (id. at 6-12); plaintiffs have already obtained such substantial discovery that further discovery would exceed the limits of Rule 26(b)(2) of the Federal Rules of Civil Procedure (id. at 13-18); plaintiffs' specific requests seek irrelevant material or are not narrowly tailored (id. at 19-31); and extending the discovery deadline is unnecessary. (Id. at 31-32). Plaintiffs respond that despite defendants' failure to produce relevant documents, plaintiffs have uncovered ample evidence to support their claims (Dkt. #91, at 2[13]-4); the Court has already ruled that information relating to defendants' personal finances is relevant and the discovery requests are narrowly tailored to the discovery of admissible evidence (id. at 5-8); and because 2 Donuts and 3 Kings are interconnected with defendants' franchises, their financial information is discoverable. (Id. at 8-10).

## II. DISCUSSION

Under the Federal Rules of Civil Procedure, the scope of discovery extends to "any matter not privileged which is relevant to the subject matter in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . ." FED. R. CIV. P. 26(b)(1). The phrase "'relevant to the subject matter involved in the pending action' has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)(citation omitted). The party receiving a request must not only produce information which is admissible as evidence, but also information which "appears reasonably calculated to lead to the discovery of admissible evidence." Martin v. Valley Nat'l Bank of Arizona, 140

---

[13]The pages of plaintiffs' reply brief are misnumbered. The Court is referring to the unnumbered page 2.

AO 72A
(Rev. 8/82)

F.R.D. 291, 300 (S.D.N.Y. 1991)(internal quotations & citations omitted). "Reasonably calculated" in Rule 26 means "*any* possibility that the information sought may be relevant to the subject matter of the action." Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Maryland, 122 F.R.D. 447, 449 (S.D.N.Y. 1988)(citations & internal quotation marks omitted)(emphasis in original). Discovery, however, is not without limitations and this Court has a duty to ensure that discovery requests are reasonable. FED. R. CIV. P. 26(b)(2); In re: Sur. Ass'n of Am., 388 F.2d 412, 414-15 (2d Cir. 1967).

### A. PRODUCTION OF DOCUMENTS RELATED TO 2 DONUTS

On November 12, 1996, plaintiffs entered into a Franchise Agreement with franchisee Grando for a ten-year franchise at 475 Forbes Avenue in New Haven, Connecticut ["Forbes Avenue"]. (Dkt. #75, Exh. 5). However, according to plaintiffs, the tax returns and gross receipts for the Forbes Avenue franchise reveal that 2 Donuts, rather than Grando, is the operating corporation and "thus the entity through which the income flows and expenses are paid for the business." (Dkt. #75, at 1 & 5; see Dkt. #75, Exhs. 6-9). Consequently, plaintiffs assert that although they have requested all documents relating to all businesses owned by defendants, they have received only a limited number of documents relating to 2 Donuts, which defendants claim are all of the documents from 2 Donuts related to the franchises. (Dkt. #75, at 5; Dkt. #91, at 9 & n.1).

According to defendants, 2 Donuts is a "management real estate company that, among other things, operates the donut shop at Forbes Ave. . . . At no time has 2 Donuts had an ownership interest in any of the Dunkin' Donuts franchises owned by 4 Donuts and Glenn Stetzer. " (Dkt. #80, at 20; Exh. 8, at ¶ 5). Rather, according to defendants, 2 Donuts is an S Corporation wholly owned by defendant Glenn Stetzer. (See Dkt. #75, Exh. 10, at 2; but see Dkt. #75, Exh. 9). Defendants also contend that all documents from 2 Donuts

8

related to the franchises have been produced (Dkt. #80, at 20-21 & Exh. 13), thus, plaintiffs' requests are unreasonably cumulative or duplicative; plaintiffs had an ample opportunity to obtain the information sought; and the burden or expense of the discovery outweighs its likely benefit.  (Dkt. # 80, at 14-19).

In plaintiffs' reply, they acknowledge that defendants have produced bank records relating to 2 Donuts (Dkt. #91, at 1, n.1); however, according to plaintiffs, defendants "still refuse to permit Dunkin' to subpoena financial information related to 2 Donuts . . . [and] no register tapes have been produced from any of [d]efendants' franchises, despite numerous requests." (Dkt. # 91, at 9).  Thus, according to plaintiffs, "[f]or defendants to claim that all relevant 2 Donuts documents were produced is not accurate." (Id.).

Although it is clear that defendants have not been entirely forthcoming with the relevant information,[14] defendants have submitted over four hundred pages of financial documents relating to the franchise at issue.  (Dkt. #80, at 20; Dkt. #91, at 1, n.1).[15] However, defendants appear to continue to mischaracterize 2 Donuts' role: "2 Donuts . . ., among other things, operates the donut shop at Forbes Ave., much in the way that office buildings hire companies to manage and maintain the property."  (Dkt. #80, at 20). Management companies, however, do not usually handle payroll of the employees of the

---

[14]In their Answer to plaintiffs' complaint, defendants admitted that Grando entered into a Franchise Agreement with plaintiffs (Dkt. #41, at ¶ 4); however, plaintiffs later discovered that the tax returns filed for the Forbes Avenue shop (the location of the franchise for which Grando was the signed franchisee), were filed by 2 Donuts. (Dkt. #75, Exh. 6). Additionally, the gross receipts for the Forbes Avenue shop were deposited into 2 Donuts' account and the quarterly tax return, evidencing payroll taxes, was filed by 2 Donuts. (Id., Exhs. 7-8).

[15]Plaintiffs have received approximately 4,000 pages of documents from defendants and the twenty-five entities to which subpoenas were sent. (Dkt. #80, at 13-15 & n. 4).

9

company. (See Dkt. #80, Exh. 6, at 46).[16]  Rather, the evidence discovered thus far reveals

an interconnected relationship between 2 Donuts and the franchise located at Forbes

Avenue.  The Franchise Agreement for this particular location was between Dunkin' Donuts

and Grando; however, 2 Donuts filed the federal and quarterly tax return for this franchise

location.  (Dkt. #75, Exhs. 6-8).  Plaintiffs seek "[a]ll of the financial information relating to

the Forbes Avenue franchise [which] is in the name of 2 Donuts, Inc."  (Dkt. #75, at 5).  This

information is relevant and it "reasonably could lead to other matter[s] that could bear on,

any issue that is or may be in the case."  Oppenheimer Fund, 437 U.S. at 351 (citation

omitted).  Plaintiffs are entitled to all outstanding financial information relating to the Forbes

Avenue shop or any other franchise with which 2 Donuts is involved.  To the extent such

information has not been produced, defendants must provide such financial documents on

or before September 29, 2003.

### B. PRODUCTION OF DOCUMENTS RELATED TO 3 KINGS

Plaintiffs contend that defendants should be compelled to produce documents

related to 3 Kings because it is the landlord for one or more of defendants' shops (Dkt. #75,

Exh. 11), has been the recipient of inter-company transfers from 4 Donuts (id., Exh. 12), and

has paid wages to at least one employee working at the shops.  (Id., Exh. 13.  See also Dkt.

#75, at 6-7).  Defendants respond that 3 Kings[17] is the "owner of the . . . convenience store

on Forbes Ave[nue]" at which "[o]ne of [Glenn] Stetzer's donuts shops rents space."  (Dkt.

#80, at 19; Exh. 8, at ¶ 4).  According to defendants, the three transfers at issue represent

---

[16]Richard Czuprynski testified that he received paychecks from 3 Kings and 2 Donuts. (Dkt. #80, Exh. 6, at 46).  3 Kings paid him for the work he did for the convenience store on Forbes Avenue and 2 Donuts paid him "for the doughnuts."  (Id.).

[17]Defendant McManama has had an interest in 3 Kings from 1999 through present.  (Dkt. #78, Exh. B, at 2).

10

personal capital contributions from Glenn Stetzer to 3 Kings which "saved Mr. Stetzer the trouble of transferring payments into his personal bank account and then transferring the money again to 3 Kings." (Id. at 19-20; Exh. 8, at ¶ 7).  However, as plaintiffs note, "[s]ince the payments came from the 4 Donuts account, it is unclear how that would be considered [Glenn] Stetzer's personal contribution." (Dkt. #91, at 9).  Moreover, there exists evidence of more than three transfers of money between 4 Donuts and 3 Kings; the general ledgers show over a dozen transfers of money from 4 Donuts to 3 Kings which seem to refer to "Jeep" and "Escort".  (Dkt. # 91, at 9-10; Exhs. 12-13; see Dkt. #86, at 3-4).

Additionally, defendants contend that the wages paid to Richard Czuprynski ["Czuprynski"] show the separateness of the two companies as Czuprynski worked for the convenience store and was paid by 3 Kings as a different company for work related to the donut shop at Forbes Avenue. (Dkt. #80, at 20; Exh. 6, at 46).  This Court agrees; however, the cumulative documents discovered thus far evidence the fact that the two corporations are financially intertwined as a result of the actions by defendant Glenn Stetzer.  Thus, plaintiffs are entitled to receive the remaining financial materials requested from 3 Kings on or before September 29, 2003.

### C. DEFENDANTS MCMANAMA AND GERMANO

Plaintiffs contend that McManama should be compelled to produce discovery responses because he has had an interest in one or more of the franchises since 1996. (Dkt. # 75, at 7).  In the March Ruling, this Magistrate Judge held that "[p]laintiffs' . . . 'undercover surveillance . . . show[ing that] McManama [was] operating an unauthorized Dunkin' catering business whose sales were not reported to Dunkin' Donuts' . . . is insufficient to transform McManama from an unrelated party as a result of the transfer of his interest in the franchises, to a franchisee, partner or shareholder governed by the terms and

11

AO 72A
(Rev. 8/82)

conditions of the Franchise Agreements." (Dkt. #58, at 3). Plaintiffs now contend that McManama "admitted having an interest in 2 Donuts, Inc. since 1996 in his sworn interrogatory answers" (see Dkt. #75, at 7; Exh. 14, at 7); bank statements for the State Street franchise are in the names of 2 Donuts, Glenn Stetzer and James McManama (see id., Exh. 7); tax returns filed by 2 Donuts state that McManama is an officer of 2 Donuts (see id., Exh. 15); and McManama was the general manager of all of the franchises; thus, McManama should be compelled to fully respond to plaintiffs' interrogatories and document requests for 1996 to the present. (Dkt. #75, at 7-8). Additionally, in a website, McManama has held himself out to the public as an owner of Dunkin' Donuts franchises. (Dkt. #86, at 4 & Exh. 1).[18]

Defendants Germano and McManama respond that the Franchise Agreements do not require the production of documents as to non-franchisees (Dkt. #78, at 3-4) and because McManama is not a franchisee, partner or shareholder (id., Exh. A) and because Germano ceased his ownership interest in the franchises in 1994 (see Dkt. #75, Exh. 16, at 3-4), they should not be compelled to produce documents. (Dkt. #78, at 5-9). These two defendants also observe that defendant McManama has amended his response to plaintiffs' interrogatory, removing his reference to 2 Donuts[19] and plaintiffs were informed several

---

[18]On July 22, 2003, this Magistrate Judge filed her Ruling on Defendant McManama's Motion to Stay Discovery (Dkt. #79), granting such motion. However, on August 13, 2003, this Magistrate Judge lifted the stay as of August 18, 2003, if the State of Connecticut did not appeal the granting of McManama's application to participate in the accelerated rehabilitation program. (8/13/03 endorsement on Dkt. #83).

[19]In his supplemental responses to plaintiffs' First Set of Interrogatories, defendant McManama affirmed that he "has had an interest in . . . 2 Donuts, Inc. from 1996 through present". (Dkt. #75, Exh.14, at 7).

Schedule K-1 for the 2000 tax return for 2 Donuts indicates that Glenn Stetzer is the sole shareholder, holding 100% of the company's stock. (Dkt. #75, at 6). Defendants contend that plaintiffs cannot translate McManama's title as the secretary of 2 Donuts into that of a shareholder in the company. (Dkt. #78, at 6).

12

AO 72A
(Rev. 8/82)

months ago that McManama did not have an interest in 2 Donuts. (Dkt. #78, at 5 & Exhs. B-C; see also Dkt. #75, Exh. 10). Moreover, defendants contend that plaintiffs' "supposed new evidence," including the tax returns and bank statements relating to 2 Donuts, have been in plaintiffs' possession since plaintiffs opposed defendants' objection to the February Ruling. (Dkt. #78, at 5-6).

Plaintiffs respond that such discovery is warranted as evidence gathered by plaintiffs to date demonstrates that money has been diverted from the franchises to other companies owned and operated by McManama and Germano; Germano has held himself out as a Dunkin' franchisee despite having completed an unapproved transfer of his interest in the franchises; and McManama owns an interest in the franchises. (Dkt. #86, at 2-5).

McManama is the secretary and general manager of 2 Donuts and his name appears on 2 Donuts' bank statements. (Dkt. #78, at 6). Defendants contend that "[i]n order to discharge his duties, a general manager must perform official acts of the corporation"; however, according to defendants, McManama is not a shareholder of 2 Donuts. (Id.). The evidence gathered by plaintiffs thus far shows that McManama is not an unrelated party as a result of the transfer of his interest in the franchises. Moreover, the foregoing constitute more than just "[p]laintiffs' . . . 'undercover surveillance . . . show[ing that] McManama [was] operating an unauthorized Dunkin' catering business whose sales were not reported to Dunkin' Donuts'" which, alone, is insufficient to transform McManama to a franchisee, partner or shareholder governed by the terms and conditions of the Franchise Agreements. (See Dkt. #58, at 3). Although McManama was not an signatory to a franchise agreement (see Dkt. #75, Exh. 3, at 15) and has transferred any interest he acquired (see Dkt. #78, Exh. A), his involvement in 2 Donuts and in potentially diverting gross sales owed to plaintiffs, justifies compelling McManama to produce discovery responses relating to 2

13

Donuts for the duration of his involvement in the company as this discovery is not privileged and is relevant to plaintiffs' claim that defendants transferred an interest in one or more franchise to McManama, without requesting or obtaining the written approval of Dunkin' Donuts. Moreover, plaintiffs have offered evidence that defendants McManama and Glenn Stetzer co-founded HMS Racing, LLC ["HMS Racing"] and HMS Racing has received over $400,000 from the franchises. (Dkt. #91, Exh. 1). This appears to be in direct contravention to defendants' earlier assertions that their other businesses are not relevant to the claims made relating to their franchises. (Dkt. #46). Moreover, plaintiffs contend that "[i]n 2001, much of the money -- totaling more than $60,000 -- that was diverted to HMS Racing was declared as an expense of the donut franchise and was categorized as 'miscellaneous advertising expenses'". (Dkt. # 86, at 3. See also Dkt. #91, at 2). However, plaintiffs are relying on the general ledger for 2002 which shows a significant amount of payments made to HMS but relatively few payments characterized as advertising expenses. (Dkt. #91, at 2 & Exh. 1). Regardless of the ultimate number of payments uncovered, the Franchise Agreements require the franchisees to "submit all advertising and promotional materials prepared for use in local areas to [plaintiffs] prior to use." (Dkt. #75, Exh. 5, at ¶ 5.4). Without access to the financial records of HMS Racing, plaintiffs are unable to determine why such large sums of money were diverted from the franchises and how the money was used. Such potential transfer of money from the franchises to HMS is relevant to plaintiffs' claims that defendants have under reported gross sales and have failed to pay plaintiffs all fees on gross sales as required under the Franchise Agreements. (See Dkt. #1). Thus, McManama is compelled to respond to interrogatories and document requests for the period 1998 to present, without prejudice to plaintiffs seeking additional years upon cause established by documents produced for the past five years. Defendant McManama is to

14

respond **on or before September 29, 2003**.

Plaintiffs contend that although Germano "may have transferred his interest in the franchises [on September 1, 1994], it was done without the authorization or knowledge of Dunkin' Donuts" and Germano "continued to execute documents for the franchises well past 1994." (Dkt. #75, at 9). Specifically, in 1997, Germano executed an amendment to the Dunkin' Franchise Agreement. (Id., Exh. 17). Because Germano failed to pay Dunkin' transfer fees, as required by the Franchise Agreement, plaintiffs seek financial information from Germano and answers to their interrogatories for the period beginning from 1994 to determine how much he was paid for the franchises and whether he still received money from any of the franchises. (Dkt. #75, at 9).

As expected by plaintiffs, defendants respond that Germano signed the 1997 franchise amendment on behalf of the corporation because he retained a security interest in the shares that he transferred in 4 Donuts in order to collateralize the promissory note that was issued to pay the purchase price for the transfer of those shares, which note was to be paid on an installment basis over a period of years. (Dkt. #78, at 8). Moreover, according to defendants, the "gravamen of plaintiffs' Complaint is that defendants under [ ] reported gross sales[;] . . . [p]laintiff[s] make[ ] no allegation . . . that defendants failed to pay transfer fees." (Id. at 9).

Contrary to defendants' assertion, plaintiffs contend that Count VI of their Complaint alleges that one or more of the franchises was transferred in breach of the franchise agreements, and specifically states that "Dunkin' has incurred substantial losses, fees, and expenses" as a result. (Dkt. #86, at 5; see Dkt. #1, at ¶¶ 36, 58-60). In their Complaint, plaintiffs allege that defendants "have knowingly and purposefully breached their Franchise Agreements by, without limitation, under [ ] reporting their gross sales, failing to pay

15

franchise fees and advertising fees on gross sales, and failing to maintain accurate financial records . . . [and] [d]efendants 4 Donuts, Inc., Grando, Inc., Glenn Stetzer and Kathleen Stetzer are in default of the terms of the . . . Franchise Agreement[s] . . . for transferring an interest . . . to [d]efendant Jim McManama . . . " (Dkt. #1, at ¶¶ 34 & 36).  Defendant Germano, as alleged in the Complaint, is an officer and shareholder of 4 Donuts and executed a Personal Guarantee pursuant to which he promised to personally perform and be bound by the provisions of the State Street Franchise Agreement, the Frontage Road Franchise Agreement, the York Street Franchise Agreement and the Sargent Drive Franchise Agreement.  (Dkt. #1, at ¶ 7).  Additionally, regardless of the reason for which Germano signed the 1997 franchise amendment on behalf of the corporation, plaintiffs contend that at no time in 1994 or after did defendant Germano pay the requisite transfer fees provided for in the Franchise Agreement bearing Germano's signature.  Thus, the circumstances and information related to Germano's alleged transfer of his interest in default of the terms of the Franchise Agreements which will assist in the establishment of the loss, fees and expenses incurred by plaintiffs as a result, is relevant to the issues involved in this case.  See FED. R. CIV. P. 26(b)(1).  For the foregoing reasons, Germano is compelled to respond to interrogatories and document requests from 1994, the date which Germano allegedly breached the Franchise Agreement, to present.  Defendant Germano shall comply on or before September 29, 2003.

### D. DOCUMENT REQUESTS SERVED ON GLENN STETZER AND INTERROGATORIES SERVED ON GLENN STETZER, 4 DONUTS AND GRANDO

Plaintiffs contend that defendant Glenn Stetzer's personal financial records "will plainly shed light on how much money has been unreported and where it has gone."  (Dkt. #75, at 10).  In the March Ruling (Dkt. #58),  this Magistrate Judge reiterated that plaintiffs are not entitled to obtain information regarding defendants' spouses and children, and the

16

AO 72A
(Rev. 8/82)

information to which plaintiffs are entitled is limited to the past three years. (Dkt. #58, at 6).

This holding, like the February Ruling, was "without prejudice to plaintiffs later seeking

additional information." (Dkt. #58, at 6 )(emphasis in original); (Dkt. #54, at 11)(emphasis

in original).   Plaintiffs now assert that in addition to the evidence of the large amounts of

money diverted to HMS Racing, plaintiffs have evidence that defendants have paid

employees off-the-books by issuing checks to employees and accounting for them as "food

expenses" (Dkt. # 91, at 3 & Exh. 3); that defendants diverted over $698,000 in cash from

4 Donuts alone, the majority of which was declared as food expenses (Dkt. #91, at 3 & Exh.

5); and that some of defendants' wholesale sales have not been reported. (Dkt. #91, at 4

& Exh. 7).

Defendants assert that to the extent plaintiffs seek financial information in Document

Requests Nos. 1-4, 6-10, 12, 14-18 & 21-22 and Interrogatory Requests Nos. 1-2, 4-6, 9-10

& 12, plaintiffs' requests are "overly broad," "unwarranted, unduly burdensome, and simply

harassment" because plaintiffs have "utterly failed to come forward with any reliable

evidence of under [ ] reporting." (Dkt. #80, at 21.  See also id. at 21-31).  Additionally,

according to defendants, plaintiffs have already received this information from third-party

financial institutions (though not from Glenn Stetzer's children) from the past three years and

"[t]here is no reason to believe that obtaining the same information from previous years will

be any more relevant." (Dkt. #80, at 22).  Additionally, defendants contend that production

of the financial records of Glenn Stetzer's children is "far beyond the bounds of relevance."

(Id.).

Plaintiffs respond that they are seeking responses to written discovery requests as

to materials and subject matters that the Court has already ruled are discoverable. (Dkt. #91,

at 5-6). Additionally, plaintiffs claim that they have been prejudiced by defendants' failure

17

to provide discovery responses; plaintiffs reiterate that they are in fact only seeking information for two additional years -- not from January 1991[20]; and plaintiffs contend that defendants have failed to produce all of the records of the franchises despite their contractual obligation to do so. (Id. at 6-8). Moreover, plaintiffs contend that production of this information is relevant as the Franchise Agreements contain an "obey all laws" clause. (Id. at 7-8). Plaintiffs also invite defendants to execute a confidentiality agreement in order to protect their privacy rights. (Id.)(Dkt. #91, at 6 & Exh. 11).

Defendants respond in their surreply brief that plaintiffs' new evidence does not show under reporting but rather exposes plaintiffs' motion as simply a pretext to search for tax fraud (Dkt. #95, at 3-7) and plaintiffs have in their possession information they claim not to have. (Id. at 7-8).

The Court agrees with plaintiffs' dismissal of defendants' argument that discovery is limited to the requirements in the Franchise Agreements. "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. . . . Relevant information need not be admissible at the trial if the discovery [of the information sought] appears reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b)(1). Moreover, as this Court stated in its February Ruling, because "plaintiffs have alleged under reporting of the sales of their franchises and underpaid royalty fees owed as a percentage of those sales, and thus seek the documents for purposes of gathering information evidencing the alleged scheme to hide the money that defendants allegedly failed to report[,] . . . it is clear to the Court that the discovery sought by plaintiffs is relevant to the case at hand." (Dkt. #54, at 6). However,

---

[20]Counsel have agreed that plaintiffs would only seek documents from January 1, 1998 to the present where a date is specified in the request. (See Dkt. #75, at 12, n.6).

18

discovery may still be limited if "the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(2)(iii).

Defendants contend that plaintiffs' "vague and unsubstantiated allegations" of under reporting, however, have led to plaintiffs' abuse of the judicial process by basing "massive discovery requests upon those nebulous allegations, in the hope of finding particular evidence of wrongdoing." (Dkt. # 80, at 7, citing Koch v. Koch Indus., Inc., 203 F.3d 1202, 1238 (10th Cir. 2000)). Unlike the plaintiffs in Koch, who were alleging fraud, a claim which must be stated with particularity, plaintiffs here have alleged that defendants have "knowingly and purposefully breached their Franchise Agreements by [, among other things,] under [ ] reporting their gross sales . . . ." (Dkt. #1, at ¶ 34). Moreover, contrary to defendants' suggestion, plaintiffs are not required to prove their case prior to trial. (See Dkt. #80, at 21; Dkt. #95, at 3-4).

Included in the majority of plaintiffs' requests is to receive the documents at issue relating to "you, your spouse, or any dependent of yours." (See Dkt. #75, at 11-26). Discovery of personal records from family members of the parties to litigation "must face more exacting scrutiny" than subpoenas seeking records from the parties themselves. See In re McVane, 44 F.3d 1127, 1131 (2d Cir. 1995)(holding that the administrative subpoenas at issue, seeking personal records from family members, fail to withstand heightened scrutiny.). McVane involved the FDIC's investigation of former officers and directors of the failed Landmark Bank of Hartford, Connecticut. Id. The FDIC, which was appointed receiver of the bank, sought, among other things, financial statements, credit applications, tax returns, and pension or profit-sharing plans of the spouses of the former officers and directors and records of inheritances and other gifts received by family members of the officers and directors. Id. at 1131-33. As in this case, the directors objected to the requests

19