71. The allegations of Paragraph 71 are denied.

72. The Defendants' responses to Paragraphs 1 through 71 are incorporated by reference.

73. The Defendants admit that their shops are often identified by signs on which the words "Dunkin' Donuts" often appears. With regard to the remaining allegations of Paragraph 73, the Defendants do not have sufficient knowledge of information upon which to form a belief and therefore leave the plaintiffs to their proof.

74. The allegations of Paragraph 74 are denied.

75. The allegations of Paragraph 75 are denied.

76. The allegations of Paragraph 76 are denied.

77. The Defendants' responses to Paragraphs 1 through 76 are incorporated by reference.

78. The allegations of Paragraph 78 are denied.

79. The allegations of Paragraph 79 are denied.

80. The allegations of Paragraph 80 are denied.

81. The Defendants' responses to Paragraphs 1 through 81 are incorporated by reference.

82. The allegations of Paragraph 82 are denied.

83. The allegations of Paragraph 83 are denied.

84. The allegations of Paragraph 84 are denied.

85. The allegations of Paragraph 85 are denied.

303490                                      11

86.    The allegations of Paragraph 86 are denied.

## AFFIRMATIVE DEFENSES

1.    The plaintiffs have failed to state a claim upon which relief may be granted.

2.    The plaintiffs' claims are barred by the statute of limitations.

3.    The plaintiffs have waived their claims with respect to Counts II, V, and VI.

4.    The plaintiff's claims are barred by the doctrine of unclean hands.

## TRIAL BY JURY

The Defendants demand a trial by jury on all issues triable to a jury.

## COUNTERCLAIMS

## ALLEGATIONS COMMON TO ALL COUNTS

1.    Counterclaimants 4 Donuts, Inc., Grando, Inc., and Glenn Stetzer (hereinafter collectively referred to as "franchisees" or counterclaimants") are franchisees of the plaintiffs/counterclaim defendants (hereinafter collectively "Dunkin' Donuts").

2.    Counterclaimant James McManama, is the general manager for the Franchisees.

3.    Glenn Stetzer is the sole shareholder of 4 Donuts, Inc. 4 Donuts, Inc. executed Franchise Agreements with Dunkin' Donuts for the shops located at: 200 Sargent Drive, New Haven, Connecticut ("Sargent Drive Franchise Agreement"); 87 Frontage Road, East Haven, Connecticut ("Frontage Road Franchise Agreement"); 291 Ferry Street, New Haven, Connecticut

("Ferry Street Franchise Agreement"); 66 York Street, New Haven, Connecticut ("York Street Franchise Agreement"); and 1950 State Street, Hamden, Connecticut ("State Street Franchise Agreement").

4. Glenn Stetzer is the sole shareholder of Grando, Inc. Grando, Inc. executed a Franchise Agreement with Dunkin' Donuts for the shop located at 475 Forbes Avenue, New Haven, Connecticut ("Forbes Avenue Franchise Agreement").

5. Glenn Stetzer, either individually or through 4 Donuts, Inc. or Grando, Inc., has been a Dunkin' Donuts franchisee since 1985.

6. Counterclaimants have received numerous awards and designations over their years as franchisees in recognition of their excellence and dedication to the Dunkin Donuts' system. Counterclaimants received "A" MAGIC scores on a majority of their franchises in the most recent round of inspections and three of their stores were recently recognized as being in the top ten stores in increased sales in the Hartford-New Haven market.

7. Dunkin' Donuts are the franchisors.

8. Glen Stetzer executed a Franchise Agreement for a shop located at 1950 State Street, Hamden, Connecticut, and also executed the York Street Franchise Agreement, Sargent Drive Franchise Agreement and Ferry Street Franchise Agreement (collectively referred to as "Franchise Agreements"). Dunkin' Donuts are the franchisors under the Franchise Agreements.

9. As franchisees of Dunkin' Donuts, counterclaimants are engaged in the business of the retail sale of donuts, coffee and freshly baked goods.

10. The Franchise Agreements contain acknowledgments and agreements by Dunkin' Donuts concerning the importance of assistance from Dunkin' Donuts to counterclaimants. For example, the Sargent Drive Franchise Agreement states, "FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations."

11. The ten-year renewal term for the Sargent Drive shop expired on June 21, 2002.

12. The Sargent Drive Franchise Agreement requires that the Sargent Drive shop be remodeled no later than the tenth anniversary of the original opening date, which was on June 21, 2002.

13. On January 26, 2001, in preparation for remodeling of the Sargent Drive shop, Glenn Stetzer and James McManama, met with two agents of Dunkin' Donuts, Joe Chaves and David Crisfulla.

14. During the January 26, 2001 meeting, Glenn Stetzer requested an extension or renewal of the Sargent Drive Franchise Agreement for an additional ten-year term prior to incurring the expense of remodeling. Glenn Stetzer explained to Joe Chaves and David Crisfulla that it would

make sense to incur the expense of remodeling if he stood to enjoy the benefits of the remodeling for a substantial period of time.

15. In response to Glenn Stetzer's request, David Crisfulla stated that Dunkin' Donuts would not allow the renewal of any of Glenn Stetzer's six franchises in retaliation for a previous lawsuit brought by Glenn Stetzer against Dunkin' Donuts.

16. In a letter dated March 19, 2001 to Dunkin' Donuts, another request was made for an additional ten year term of the Sargent Drive Franchise Agreement.

17. In a letter dated March 23, 2001, Dunkin' Donuts responded, "The franchise agreement for the Sargent Drive location does not expire until June 21, 2002. We are not prepared to make a determination on renewal at this time. Your client will be advised approximately 6 months prior to the expiration of our decision based on a review of all factors at that time."

18. In another letter dated April 17, 2001 to Dunkin' Donuts, a request was made for Dunkin' Donuts to confirm or deny David Crisfulla's statement regarding nonrenewal and, if the statement were confirmed, to provide all grounds for nonrenewal.

19. In August 29, 2001, Dunkin' Donuts advised Glenn Stetzer that he should wait to begin remodeling the Sargent Drive shop until he receives Dunkin' Donuts determination on renewal. Dunkin' Donuts confirmed that so long as Glenn Stetzer begins his remodel in a timely manner after receiving confirmation of renewal, Dunkin Donuts will allow Glenn Stetzer additional time after June

21, 2002 to complete the remodel of the Sargent Drive location and will not consider Glenn Stetzer in default of the Sargent Drive Franchise Agreement for not completing the remodel on or before June 21, 2002.

20. In a letter dated August 31, 2001 to Dunkin' Donuts, a request was made for confirmation regarding the renewal of the Sargent Drive Franchise Agreement by January 21, 2002.

22. In April, 2002, a Dunkin' Donuts representative examined the books and records ("Examination") of the six franchise shops operated by counterclaimants.

23. The results of the Examination were never disclosed to counterclaimants.

24. On June 11, 2002, another request was made to Dunkin' Donuts regarding the renewal of the Sargent Drive Franchise Agreement.

25. By June 21, 2002, despite numerous inquiries to Joe Chaves by Glenn Stetzer, Dunkin' Donuts had still not confirmed its renewal of the Sargent Drive Franchise Agreement even though the six months had long passed and the Franchise Agreement was on the verge of expiration.

26. Dunkin' Donuts failed to adequately respond to counterclaimants' repeated requests for assistance regarding the renewal for the Sargent Drive Franchise Agreement.

27. Since Dunkin' Donuts failed to either send a notice of nonrenewal, termination or cancellation to 4 Donuts, Inc. or Glenn Stetzer sixty (60) days prior to June 21, 2002, the Sargent Drive Franchise Agreement automatically renewed.

28.  Since the Sargent Drive Franchise Agreement automatically renewed, counterclaimants retained architects and had plans prepared for the Sargent Drive remodel. The plans were submitted to Dunkin' Donuts for approval as required by the Sargent Drive Franchise Agreement and Dunkin' Donuts approved the plans.

29.  Dunkin' Donuts did not send the notice to counterclaimants prior to October, 2002 despite Dunkin' Donuts' knowledge that counterclaimants relied on the renewal of the Sargent Drive Franchise Agreement and that counterclaimants would begin the remodeling process once the Sargent Drive Franchise Agreement was renewed.

30.  Dunkin' Donuts did not provide counterclaimants any notice of a possible termination prior to October, 2002 despite Dunkin' Donuts' knowledge that counterclaimants relied on the renewal of the Sargent Drive Franchise Agreement and that counterclaimants would begin the remodeling process once the Sargent Drive Franchise Agreement was renewed.

31.  The State Street Franchise Agreement states, "FRANCHISOR shall maintain a continuing advisory relationship with FRACHISEE, including consultation in the areas of marketing, merchandising and general business operations."

32.  The State Street Franchise Agreement does not expire until November 2012.

33.  The State Street Franchise Agreement requires that the State Street shop be remodeled no later than the tenth anniversary of the original opening date, which was on November 1, 2002.

34. The remodeling plans were submitted to Dunkin' Donuts for approval as required by the State Street Franchise Agreement and Dunkin' Donuts approved the plans on July 22, 2002.

35. Based on the approval of Dunkin' Donuts and in accordance with the State Street Franchise Agreement, counterclaimants remodeled the State Street shop expending a significant amount of money, time and effort.

36. Counterclaimants used approved Dunkin' Donuts general contractors to remodel the State Street shop.

37. Agents from Dunkin' Donuts had visited the newly remodeled State Street shop.

38. Just two weeks before the opening of the remodeled State Street shop, Dunkin' Donuts sent counterclaimants a Notice of Default and Termination on October 24, 2002, purporting to terminate the Franchise Agreements.

39. Upon information and belief, Dunkin' Donuts has adopted a plan to revamp its franchise system to consist primarily, if not exclusively, of franchisees who each operate many shops and to weed from its system franchisees like counterclaimants who operate only a handful of shops.

40. The Notice of Default and Termination relies on alleged violations of the Franchise Agreements by counterclaimants that either occurred more than six (6) years prior to the issuance of the Notice or began years ago with the knowledge of Dunkin' Donuts.

41. Further, Dunkin' Donuts relies upon the statement of a former manager of the State Street shop. Dunkin' Donuts knows that this statement was retracted. In order to undermine the retraction, Dunkin' Donuts has proffered an absurd allegation that as part of a conspiracy, counterclaimants obtained a false notary public's seal as to the authenticity of the former manager's signature on the retraction he signed.

42. Despite this knowledge, Dunkin' Donuts continues to make false allegations against counterclaimants as a pretext for terminating the Franchise Agreements in retaliation against counterclaimants for suing Dunkin' Donuts.

43. Dunkin' Donuts allowed counterclaimants to rely on the renewal of the Sargent Drive Franchise Agreement and begin the plans to remodel and allowed counterclaimants to rely on approval of the remodeling of the State Street shop for the purpose of inflicting greater harm on counterclaimants once Dunkin' Donuts terminated the Franchise Agreements.

44. Dunkin' Donuts' failure to assist and/or respond to counterclaimants request for renewal of the Sargent Drive Franchise Agreement, its approval of the remodeling of the State Street shop and subsequent termination of the State Street Franchise Agreement, its retaliation for a previous lawsuit brought by Glenn Stetzer against Dunkin' Donuts, and nondisclosure of the results of the Examination demonstrate Dunkin' Donuts' systematic plan to force out certain franchisees that do not fit Dunkin' Donuts' new business model.

45. Dunkin' Donuts is utilizing false allegations and inconsequential actions of counterclaimants as a pretext to terminate the Franchise Agreements.

46. Dunkin' Donuts is utilizing false allegations and inconsequential actions of counterclaimants to carry out a vendetta against counterclaimants for suing Dunkin' Donuts in the past.

### FIRST CLAIM FOR RELIEF (VIOLATION OF CONNECTICUT FRANCHISE ACT)

47. The allegations of Paragraphs 1 - 46 are repeated and realleged herein.

48. Counterclaimants are "franchisees" within the meaning of and are protected by the Connecticut Franchise Act, Connecticut General Statutes § 42-133e et seq.

49. Although under the Franchise Agreements Dunkin' Donuts may terminate a franchise if the franchisee does not meet certain standards, Dunkin' Donuts has abused such power and its economic leverage in an attempt to drive the counterclaimants out of business. Such abuse of a contractual right to effectuate a termination is void under the Connecticut Franchise Act, Connecticut General Statutes § 42-133f(f).

50. Dunkin' Donuts is violating the termination and notice provisions of the Connecticut Franchise Act, Connecticut General Statutes § 42-133f(a), by failing to have good cause for terminating counterclaimants' franchises because counterclaimants substantially complied with their obligations as a franchisee.

51.     Dunkin' Donuts is violating the termination and notice provisions of the Connecticut Franchise Act, Connecticut General Statutes § § 42-133f(a) and 42-133f(e), by using false allegations and inconsequential actions of counterclaimants as a pretext for terminating a franchise that does not fit the Dunkin' Dounts business model despite the fact that counterclaimants substantially complied with their obligations as a franchisee.

52.     Dunkin' Donuts is violating the terms and notice provisions of the Connecticut Franchise Act Connecticut Franchise Act, Connecticut General Statutes § § 42-133f(a) and 42-133f(e), by using false allegations and inconsequential actions of counterclaimants as a pretext for Dunkin' Donuts to fulfill their vendetta against counterclaimants and retaliate for the prior lawsuit.

53.     As a result of Dunkin' Donuts' violations of the Connecticut Franchise Act, counterclaimants have suffered and will continue to suffer damages.

54.     Counterclaimants will be irreparably harmed by the termination of their Franchise Agreements.

## SECOND CLAIM FOR RELIEF (VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT)

55.     The allegations of Paragraphs 1 - 54 are repeated and realleged herein.

56.     Dunkin' Donuts is a person as defined in the Connecticut Unfair Trade Practices Act ("CUTPA"), Connecticut General Statutes §§ 42-110a et seq., and has been conducting trade or commerce in Connecticut within the meaning of CUTPA.

57. Dunkin' Donuts has abused its power under the executed Franchise Agreements in an attempt to drive counterclaimants out of business so that Dunkin' Donuts can assume control over counterclaimants' shops by operating the shops itself or selling the franchises to other franchisees.

58. By abusing its power under the respective Franchise Agreements for the purpose of driving counterclaimants out of business and by violating the Connecticut Franchise Act, Dunkin' Donuts has engaged in conduct that is immoral, unethical, oppressive, and unscrupulous and that offends the public policy of Connecticut.

59. By utilizing the false and inconsequential actions of counterclaimants as a pretext for Dunkin' Donuts to fulfill their vendetta against counterclaimants and retaliate for the prior lawsuit, Dunkin' Donuts has engaged in conduct that is immoral, unethical, oppressive, and unscrupulous and that offends the public policy of Connecticut.

60. By allowing counterclaimants to rely on the renewal of the Sargent Drive Franchise Agreement and begin the remodeling process, Dunkin' Donuts has engaged in conduct that is immoral, unethical, oppressive, and unscrupulous and that offends the public policy of Connecticut.

61. By allowing counterclaimants to rely on the approval of the remodeling of the State Street shop and complete the remodeling, Dunkin' Donuts has engaged in conduct that is immoral, unethical, oppressive, and unscrupulous and that offends the public policy of Connecticut.

62. By failing to properly assist counterclaimants in their business, Dunkin' Donuts has engaged in conduct that is immoral, unethical, oppressive, and unscrupulous and that offends the public policy of Connecticut.

63. By the acts alleged above, Dunkin' Donuts has engaged in unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade of commerce, in violation of CUTPA, Connecticut General Statutes § 42-110b.

64. As a direct and proximate result of these violations, counterclaimants have suffered ascertainable losses, and such losses and damages will continue unless Dunkin' Donuts' acts are enjoined by the Court.

65. Counterclaimants will be irreparably harmed by the termination of their Franchise Agreements.

66. Pursuant to Connecticut General Statutes § 42-110g(c), a copy of this Answer, Verified Counterclaim And Jury Demand is being mailed to the Connecticut Attorney General and Commissioner of Consumer Protection.

### THIRD CLAIM FOR RELIEF (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

67. The allegations of Paragraphs 1 - 66 are repeated and realleged herein.

68. Dunkin' Donuts is now improperly and without good cause attempting to force counterclaimants out of the Dunkin' Donuts system.

69. By failing to abide by the terms of the Franchise Agreements as described above, Dunkin' Donuts has breached its implied covenant of good faith and fair dealing inherent in its performance of the Franchise Agreements.

70. As a result of Dunkin' Donuts' breach of the covenant of good faith and fair dealing, counterclaimants have suffered damages.

71. Counterclaimants will be irreparably harmed by the termination of their Franchise Agreements.

**FOURTH CLAIM FOR RELIEF (BREACH OF CONTRACT)**

72. The allegations of Paragraphs 1 - 71 are repeated and realleged herein.

73. The allegations set forth herein constitute a breach of the Franchise Agreement.

74. As a result of Dunkin' Donuts' breach of contract, counterclaimants have suffered and will continue to suffer damages.

**TRIAL BY JURY**

75. Defendants and counterclaimants demand a trial by jury on all issues triable to a jury.

**PRAYER FOR RELIEF**

**WHEREFORE**, the counterclaimants pray that the Court enter judgment for defendants on plaintiffs' claims and, on the counterclaims, award counterclaimants:

1. Compensatory damages;

2. Preliminary and permanent equitable relief enjoining Dunkin' Donuts from terminating the counterclaimants' franchise agreements;

3. Punitive damages under the common law and under Connecticut General Statutes §42-110g(a);

4. Attorneys' fees under Connecticut General Statutes §42-133g(a) and §42-110g;

5. Interest;

6. Costs; and

7. Such other relief as the Court deems just and proper.

DEFENDANTS/COUNTERCLAIMANTS,
4 DONUTS, INC., ET AL.

By: _____
RICHARD S. ORDER, ESQ.
Federal Bar Number CT02761
BRAD N. MONDSCHEIN, ESQ.
Federal Bar Number CT13800
AMY LEETE VAN DYKE, ESQ.
Federal Bar Number CT23181
Updike, Kelly & Spellacy, P.C.
One State Street
P.O. Box 231277
Hartford, CT  06123-1277
Tel. (860) 548-2600

## VERIFICATION

I am an individual defendant and the operator of several of the named franchises named in the plaintiff's Complaint dated October 29, 2002. I have personal knowledge of the allegations of the foregoing Verified Counterclaims. I have read the foregoing Verified Counterclaims, and, to the best of my knowledge and belief, all the allegations contained therein are true.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 15, 2002.

GLENN STETZER

303490

26

## **CERTIFICATION**

**THIS IS TO CERTIFY** that a copy of the foregoing has been served by hand delivery this 18th day of November 2002, to the following counsel of record:

**PAUL D. SANSON, ESQ.**
Shipman & Goodwin LLP
One American Row
Hartford, CT 06103-2819

By: _____
AMY LEETE VAN DYKE, ESQ.
Updike, Kelly & Spellacy, P.C.

303490

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DUNKIN' DONUTS INCORPORATED,<br>a Delaware corporation, and<br>DUNKIN' DONUTS USA, INC.,<br>A Michigan corporation,<br><br>Plaintiffs,<br><br>v.<br><br>4 DONUTS, INC.,<br>a Connecticut corporation<br>GRANDO, INC.<br>a Connecticut corporation<br>GLENN STETZER<br>KATHLEEN STETZER<br>GEORGE GERMANO, and<br>JAMES MCMANAMA | C.A. No. 302CV1920 (JBA)<br><br><br><br><br><br>NOVEMBER 18, 2002 |

### COUNTERCLAIMANTS' MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Counterclaimants 4 Donuts, Inc., Grando, Inc., Glenn Stetzer, and James McManama (hereinafter collectively referred to as "counterclaimants") respectfully submit this Memorandum of Law in Support of their Application for Temporary Restraining Order and Preliminary Injunction enjoining plaintiff/counterclaim defendant Dunkin' Donuts Inc. ("Dunkin' Donuts") from terminating counterclaimants' Ferry Street Franchise Agreement, State Street Franchise Agreement, Frontage

303639

Road Franchise Agreement, Forbes Avenue Franchise Agreement, York Street Franchise Agreement, and Sargent Drive Franchise Agreement (hereinafter collectively referred to as "Franchise Agreements").

## ARGUMENT

### POINT I

### THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION BECAUSE COUNTERCLAIMANTS HAVE SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS AND AN IMMINENT AND IRREPARABLE HARM

The test for issuance of a temporary restraining order and a preliminary injunction is whether the applicant has shown "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979). In their Answer, Verified Counterclaim and Jury Demand, counterclaimants sufficiently demonstrate that a temporary restraining order and a preliminary injunction are warranted.

I.  **THE COUNTERCLAIMANTS WILL SUFFER IMMINENT AND IRREPARABLE HARM**

Dunkin' Donuts' attempt to terminate the Franchise Agreements on or about December 24, 2002 threatens imminent and irreparable harm.

303639                                                          2